## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **LINDA BEARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | |
| | ) | **2:07-CV-790-MNT** |
| **COLDWATER CREEK, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant, Coldwater Creek, Inc. ("Coldwater Creek"), moves the Court to enter summary judgment in its favor on the grounds that there is no genuine issue with respect to any material fact and Coldwater Creek is entitled to a judgment as a matter of law.

Plaintiff, Linda Beard ("Plaintiff") has failed to establish a *prima facie* case of discrimination based on disability. More specifically, Plaintiff cannot demonstrate that she was an otherwise qualified individual as defined under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et. seq.*, i.e., that she could perform the essential functions of her position. Further, Plaintiff failed to identify any reasonable accommodation which would allow her to do so. Finally, Plaintiff has offered no evidence that Coldwater Creek discriminated against her based on her alleged disability.

This motion is based upon the pleadings, the Plaintiff's Depositions (and the exhibits attached thereto), and the Declaration of Tara Kesslar attached hereto.   A separate Brief in Support of Defendants' Motion for Summary Judgment is also being filed simultaneously with this motion.

Respectfully submitted,

/s/ Fern H. Singer _____
FERN H. SINGER
Attorney for Defendant

**OF COUNSEL**:
**BAKER, DONELSON, BEARMAN,**
  **CALDWELL & BERKOWITZ, P.C.**
420 North 20th Street, Suite 1600
Birmingham, Alabama 35203
(205) 244-3801 - Phone
(205) 488-3801 - Fax

**CERTIFICATE OF SERVICE**

I certify that the foregoing has been served upon the following counsel of record by electronic filing, this 13th day of May, 2008.

Andy Nelms, Esquire
Anderson Nelms and Associates, L.L.C.
847 South McDonough Street, Ste 104
Montgomery, Alabama 36104

/s/ Fern H. Singer _____
Of Counsel

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **LINDA BEARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | |
| | ) | **2:07-CV-790-MNT** |
| **COLDWATER CREEK, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# PLAINTIFF LINDA BEARD'S FEBRUARY 1, 2008 DEPOSITION

# PART 1 OF 3

# American Court Reporting
## toll-free (877) 320-1050

### Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL CASE NUMBER
2:07-CV-00790-MHT

LINDA BEARD,
   Plaintiff,
vs.
COLDWATER CREEK, INC.,
   Defendant.

DEPOSITION TESTIMONY OF:
LINDA BEARD

February 1, 2008
1:00 p.m.

COURT REPORTER:
Gwendolyn P. Timbie, CCR

### Page 3

grounds at the time of trial or at the
time said deposition is offered in
evidence, or prior thereto.
    Please be advised that this is the
same and not retained by the Court
Reporter, nor filed with the Court.

### Page 2

STIPULATIONS

    IT IS STIPULATED AND AGREED by and
between the parties through their
respective counsel that the deposition of
LINDA BEARD, may be taken before Gwendolyn
P. Timbie, Certified Court Reporter and
Notary Public, State at Large, at the law
office of Jay Lewis, Montgomery, Alabama,
on February 1, 2008, commencing at
approximately 1:00 p.m.

    IT IS FURTHER STIPULATED AND
AGREED that the signature to and the
reading of the deposition by the witness
is waived, the deposition to have the same
force and effect as if full compliance had
been had with all laws and rules of Court
relating to the taking of depositions.

    IT IS FURTHER STIPULATED AND
AGREED that it shall not be necessary for
any objections to be made by counsel to
any questions, except as to form or
leading questions, and that counsel for
the parties may make objections and assign

### Page 4

I N D E X

EXAMINATION BY:        PAGE NO:
Ms. Singer            7
Certificate          202

LIST OF EXHIBITS

| EXHIBITS: | PAGE NO: |
| --- | --- |
| Defendant's 1 | 10 |
| Defendant's 2 | 57 |
| Defendant's 3 | 62 |
| Defendant's 4 | 72 |
| Defendant's 5 | 72 |
| Defendant's 6 | 82 |
| Defendant's 7 | 82 |
| Defendant's 8 | 94 |
| Defendant's 9 | 116 |
| Defendant's 10 | 124 |
| Defendant's 11 | 128 |
| Defendant's 12 | 138 |
| Defendant's 13 | 140 |
| Defendant's 14 | 142 |
| Defendant's 15 | 155 |
| Defendant's 16 | 156 |

## American Court Reporting
### February 1, 2008

**American Court Reporting**
**toll-free (877) 320-1050**

Page 5

| 1 | LIST OF EXHIBITS (Continued) |
|---|---|
| 2 | EXHIBITS: | PAGE NO: |
| 3 | Defendant's 17 | 156 |
| 4 | Defendant's 18 | 156 |
| 5 | Defendant's 19 | 165 |
| 6 | Defendant's 20 | 170 |
| 7 | Defendant's 21 | 173 |
| 8 | Defendant's 22 | 196 |

Page 6

1   A P P E A R A N C E S

3   FOR THE PLAINTIFF:
4       KEITH A. NELMS, Esquire
5       Attorney at Law
6       Post Office Box 5059
7       Montgomery, Alabama  36103-5059

9   FOR THE DEFENDANT:
10      FERN H. SINGER, Esquire
11      Baker, Donelson, Bearman, Caldwell
12          & Berkowitz, P.C.
13      420 20th Street North
14      Suite 1600
15      Birmingham, Alabama  35203

Page 7

1   I, Gwendolyn P. Timbie, Certified
2   Court Reporter and Notary Public for the
3   State of Alabama at Large, acting as
4   Commissioner, certify that on this date,
5   pursuant to the Federal Rules of Civil
6   Procedure, and the foregoing stipulation
7   of counsel, there came before me at the
8   law office of Jay Lewis, Montgomery,
9   Alabama, commencing at approximately
10  1:00 p.m. on February 1, 2008, Linda
11  Beard, plaintiff in the above cause, for
12  oral examination, whereupon the following
13  proceedings were had:

15      LINDA BEARD,
16  Having been first duly sworn, was examined
17  and testified as follows:
18      COURT REPORTER:  Usual
19  stipulations?
20      MR. NELMS:  Yes.

22  EXAMINATION BY MS. SINGER:
23      Q.   Ms. Beard, my name is Fern

Page 8

1   Singer.  I represent Coldwater Creek in
2   this matter.  Have you ever given a
3   deposition before?
4       A.   No.
5       Q.   Well, I assume that you
6   prepared with your counsel for this
7   deposition?
8       A.   (Witness nodded head in the
9   affirmative.)
10      Q.   Is that a yes?
11      A.   Yes.
12      Q.   What you have to do today for
13  the court reporter is you need to wait for
14  me to finish asking my question and then
15  you need to answer aloud, because she
16  can't take down nods of the head.  Is that
17  fair?
18      A.   Right.
19      Q.   And if there's something about
20  my question that you don't understand, if
21  you'll let me know, I'll try to do better
22  the second time.  Is that fair?
23      A.   Yes.

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 9

1   Q.   And we're starting today at
2   1:00 to accommodate you, correct,
3   Ms. Beard?
4       A.   Yes.
5       Q.   Good. And what you've brought
6   with you today, that we now -- that you've
7   given me a copy of, is a list of places
8   where you may have worked over the years;
9   is that correct?
10      A.   Right.
11      Q.   And it's a pretty detailed
12  list, is it not?
13      A.   Yes. I guess.
14      Q.   And then, on the top -- what
15  do you have on top of this page?
16      A.   Just some notes regarding my
17  family.
18      Q.   What about it? What about
19  your family?
20      A.   Andy had said that you might
21  ask me about, you know, what family I had
22  living locally and stuff, you know. I
23  didn't know how nervous I was going to

Page 10

1   be. So it's just to help me in case I
2   couldn't think.
3       Q.   Can you think?
4       A.   I'm trying to.
5       Q.   So you wrote this this morning?
6       A.   No. I wrote it yesterday or
7   the day before.
8       Q.   All right. I don't want you
9   to tell me anything that you and Mr. Nelms
10  talked about going forward. All right?
11  Because that's privileged conversation
12  between you and your lawyer.
13      (WHEREUPON, a document was
14  marked as Defendant's Exhibit Number 1 and
15  is attached to the original transcript.)
16      MS. SINGER: I'm going to put
17  into evidence what is marked as
18  Defendant's Exhibit Number 1, and this is
19  a list prepared by Ms. Beard in advance of
20  this deposition.
21      Q.   Is that correct, Ms. Beard?
22      A.   Yes.
23      Q.   How long did it take you to

Page 11

1   write this?
2       A.   I don't know. About an hour
3   or so.
4       Q.   And this is your handwriting?
5       A.   Right.
6       Q.   So you can write, correct?
7       A.   Yes.
8       Q.   Can you use a computer?
9       A.   Yes.
10      Q.   How proficient are you at a
11  computer?
12      A.   I'm pretty good.
13      Q.   Are there certain software
14  packages that you are familiar with?
15      A.   Windows 98.
16      Q.   Anything else?
17      A.   No.
18      Q.   Excel?
19      A.   No.
20      Q.   Are you pretty proficient with
21  a computer?
22      A.   I guess so.
23      Q.   Are you taking any medicine?

Page 12

1       A.   Yes.
2       Q.   Tell me what medicine you're
3   taking, please.
4       A.   I take Tramadol.
5       Q.   What is that for?
6       A.   Pain.
7       Q.   What kind of pain?
8       A.   Back pain, neck pain, muscle
9   pain, aching.
10      Q.   How much do you take?
11      A.   Usually two every eight hours.
12      Q.   What's the dosage?
13      A.   I think it's 50 milligrams.
14      Q.   Who prescribed it?
15      A.   Well, right now it's
16  prescribed by the Pain Center.
17      Q.   And who is that?
18      A.   Dr. Herrick.
19      Q.   Doctor whom?
20      A.   Herrick.
21      MR. NELMS: H-E-R-R-I-C-K?
22      THE WITNESS: I believe so.
23      Q.   And where is the Pain Center?

3 (Pages 9 to 12)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 13

```
 1      A.   On St. Luke's Court, I think
 2   it is.
 3      Q.   Here in Montgomery?
 4      A.   St. Luke's Drive or St. Luke's
 5   Court.  Yes.
 6      Q.   How long have you been going
 7   to The Pain Clinic?
 8      A.   Since like last -- since like
 9   November of 2006 -- I mean -- yeah, 2006.
10      Q.   What other medicine are you
11   taking, Ms. Beard?
12      A.   I take Skelactin -- Skelaxin.
13      Q.   And what is that prescribed
14   for?
15      A.   It's a muscle relaxer that you
16   can take during the daytime that won't
17   cause you to be, you know, too drowsy.
18      Q.   And who prescribed this?
19      A.   Dr. Jakes.
20      Q.   And how long have you been
21   taking it?
22      A.   Years.  I couldn't tell you
23   exactly when I started.
```

Page 14

```
 1      Q.   Before you started working at
 2   Coldwater Creek?
 3      A.   Yes.
 4      Q.   All right.  Any other
 5   medicine?
 6      A.   I take Flexeril occasionally
 7   at night.
 8      Q.   And who prescribed that,
 9   ma'am?
10      A.   Dr. Jakes.
11      Q.   How long have you had a
12   prescription for Flexeril?
13      A.   Probably since around '98.
14      Q.   Any other medicine?
15      A.   Zanaflex.  I take that at
16   night to sleep.
17      Q.   And how much of Zanaflex do
18   you take?
19      A.   Three tablets.  And I can't
20   remember what the milligrams are.  I don't
21   remember.
22      Q.   All right.  And do you take
23   three tablets every night?
```

Page 15

```
 1      A.   Uh-huh.
 2      Q.   Is that a yes?
 3      A.   Yes.
 4      Q.   And how long have you been
 5   taking Zanaflex?
 6      A.   A long time.  You know,
 7   somewhere -- since '98.  You know, we
 8   tried two or three different medications
 9   for sleep, and that, you know, was the one
10   that worked.  I don't know the exact date
11   that I got on that one.
12      Q.   And Dr. Jakes gives you a
13   prescription for that as well?
14      A.   Right.
15      Q.   Any other medicine, Ms. Beard?
16      A.   I'm taking Synthroid.
17      Q.   And who prescribes that?
18      A.   Dr. Jakes.
19      Q.   And how long have you been on
20   Synthroid?
21      A.   Since this past October.
22      Q.   October of '07?
23      A.   Right.
```

Page 16

```
 1      Q.   And is that for a thyroid
 2   condition?
 3      A.   Uh-huh.
 4      Q.   Is that a yes?
 5      A.   Yes.  I'm sorry.  I'm
 6   forgetting that.
 7      Q.   No problem.
 8      A.   And I'm also taking Maxzide.
 9      Q.   I'm not familiar with that.
10   How do you spell that?
11      A.   M-A-X-I-D-E (sic).
12      Q.   And what do you take Maxzide
13   for?
14      A.   It's a diuretic for a problem
15   I was having associated with the thyroid
16   problem.
17      Q.   And how long have you been
18   taking that?
19      A.   Since October of '07.
20      Q.   And does Dr. Jakes prescribe
21   that?
22      A.   Yes.
23      Q.   All right.  Any other
```

4 (Pages 13 to 16)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 17

1 medicine?
2    A.   How many is that?
3    Q.   It's one, two, three, four,
4 five, six medicines -- Tramadol, Skelaxin,
5 Flexeril, Zanaflex, Synthroid, and
6 Maxzide.
7    A.   I think that's everything. I
8 use a pain patch. I don't know if you --
9    Q.   How often do you use the pain
10 patch?
11    A.   Several times a week. It's a
12 prescription.
13    Q.   From Dr. Herrick?
14    A.   Yes.
15    Q.   Do any of these medicines
16 affect your memory, Ms. Beard?
17    A.   Sometimes.
18    Q.   Which medicine affects your
19 memory?
20    A.   The muscle relaxers and the
21 pain medication.
22    Q.   All right. Did you take --
23    A.   Mainly the -- like the

Page 18

1 nighttime muscle relaxers. And more so
2 the Flexeril.
3    Q.   Is that why you take it at
4 night?
5    A.   Well, yeah. The Flexeril is
6 to help me sleep. It's just that it's
7 stronger than the Zanaflex. And I use it
8 more when I'm, you know, feeling really
9 bad. And if, you know -- and it causes me
10 to be a lot groggier, you know. The
11 effects of it last a lot longer the next
12 day.
13    Q.   All right.
14    A.   So I use it when I'm in bad
15 shape, so to speak.
16    Q.   Well, you told me you take
17 Flexeril occasionally at night.
18    A.   Right.
19    Q.   And you take Zanaflex at
20 night.
21    A.   Right.
22    Q.   So the only other medicine is
23 the Skelaxin?

Page 19

1    A.   Skelaxin.
2    Q.   That's a muscle relaxer. How
3 often do you take that?
4    A.   Twice a day. Most of the
5 time. Not always.
6    Q.   All right. And when -- and
7 Dr. Jakes prescribed that?
8    A.   Right.
9    Q.   You've already told me that.
10 And when did you start taking it?
11    A.   I had taken it some, you
12 know -- sometime since '98, but I really
13 started taking it a lot -- on a more
14 regular basis in 2003.
15    Q.   And you're saying it affects
16 your memory?
17    A.   Not the Skelaxin. The
18 Tramadol. The other one.
19    Q.   All right. But the --
20    A.   The pain medication.
21    Q.   Yes, ma'am. And Tramadol you
22 started taking in November of '06,
23 correct?

Page 20

1    A.   No. I've been taking it since
2 probably '98 or shortly -- sometime after
3 '98.
4    Q.   I guess I understood you to
5 say that Dr. Herrick at the Pain Center --
6    A.   He -- well, Dr. Jakes used to
7 prescribe it. And I was taking last -- in
8 2006 I was put on Prozac, an
9 antidepressant. And you have to be really
10 careful with taking Prozac and Tramadol
11 together, with the dosage and everything.
12 So he referred me to the Pain Center for
13 the dosage and everything because he
14 didn't feel comfortable prescribing that
15 along with the antidepressant, because he
16 had had a patient that had had a problem
17 taking those two together.
18    Q.   But you're saying you've been
19 taking it, Tramadol, on and off for years;
20 is that correct?
21    A.   Right.
22    Q.   And Dr. Jakes used to
23 prescribe it for you?

5 (Pages 17 to 20)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 21

1  A. Right.
2  Q. All right. Any other
3  medicine, while you're sitting here?
4  A. No.
5  Q. Did you list any other
6  medicines on what we've marked as
7  Defendant's Exhibit Number 1?
8  A. No.
9  Q. Did you drive over here today?
10  A. Yes.
11  Q. And tell me what you did today
12  before coming here to give your
13  deposition.
14  A. I watched the news this
15  morning, drank coffee, took a shower, got
16  dressed, and ate something, straightened
17  up a few things around my house and -- a
18  little bit, and fed my cats, opened all
19  the drapes and let the light in.
20  Q. Call anybody on the phone?
21  A. I called here.
22  Q. Did you make the coffee?
23  A. Yes.

Page 22

1  Q. And did you make for yourself
2  what you ate this morning?
3  A. Yes.
4  Q. Do you go shopping -- food
5  shopping?
6  A. Today?
7  Q. Not today.
8  A. Oh, do I?
9  Q. Yes.
10  A. Yes.
11  Q. And you said you cleaned up a
12  little bit as well?
13  A. Well, straightened a couple of
14  things.
15  Q. Do you clean your home?
16  A. Sort of.
17  Q. Do you live alone?
18  A. Yes.
19  Q. Are you married?
20  A. No.
21  Q. Have you ever been married?
22  A. Yes.
23  Q. To whom were you married,

Page 23

1  please?
2  A. David Beard.
3  Q. And when were you and
4  Mr. Beard married?
5  A. In 1968.
6  Q. And are you a widow? Are you
7  divorced?
8  A. Divorced.
9  Q. When were y'all divorced?
10  A. In 1971.
11  Q. Any children as a part of that
12  marriage?
13  A. Yes. I have one son.
14  Q. What's his name?
15  A. Chris -- Christopher.
16  Q. And where is Christopher?
17  A. He lives in Tampa, Florida.
18  Q. What does he do?
19  A. He's in real estate,
20  unfortunately, at the time -- at this
21  time.
22  Q. Is he married?
23  A. Yes.

Page 24

1  Q. And does he have any children?
2  A. No.
3  Q. Were you married after you and
4  Mr. Beard divorced?
5  A. No.
6  Q. Have you ever lived with
7  anybody?
8  A. Yes.
9  Q. Tell me with whom you've
10  lived.
11  A. I had -- I've had roommates,
12  girlfriends.
13  Q. When was the last time you had
14  a girlfriend or a roommate?
15  A. 1997.
16  Q. What is your current address?
17  A. 8305 Grand Oak Court.
18  Q. And how long have you been at
19  that address?
20  A. Going on 12 years.
21  Q. Is it a house?
22  A. Patio home.
23  Q. You told me that you haven't

6 (Pages 21 to 24)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 25

1  had any roommates or a girlfriend living
2  with you since 1997. Have you lived with
3  a man at any time since you and Mr. Beard
4  divorced?
5      A.  Yes.
6      Q.  All right. Tell me with whom
7  you've lived.
8      A.  David Stafford.
9      Q.  Stafford?
10     A.  Right.
11     Q.  When did you and Mr. Stafford
12  live together?
13     A.  In 1989.
14     Q.  Anybody else?
15     A.  No.
16     Q.  I'm looking at Defendant's
17  Exhibit Number 1. You have two sisters
18  here in Montgomery?
19     A.  Well, one is in Montgomery and
20  one is in -- right outside of Montgomery.
21  I think it's Pine Level.
22     Q.  All right. And what are their
23  names?

Page 26

1      A.  Freddie Copeland and Sally
2  Peacock.
3      Q.  And do either Freddie or Sally
4  work outside the home?
5      A.  Yes.
6      Q.  All right. Tell me what
7  Freddie does.
8      A.  She works part time at a
9  clothing, department-type store.
10     Q.  Where?
11     A.  Stein Mart.
12     Q.  Stein Mart? Is that here in
13  Montgomery?
14     A.  Uh-huh.
15     Q.  That's Freddie. What does
16  Sally do?
17     A.  Well, right now she's keeping
18  children in her home.
19     Q.  All right.
20     A.  Just two children. For
21  somebody she knows.
22     Q.  And are they married?
23     A.  Sally is married, and my --

Page 27

1  Freddie is widowed.
2      Q.  What's Sally's husband's name,
3  please?
4      A.  Michael.
5      Q.  What kind of work does Michael
6  do?
7      A.  He works at Sikes and Kohn.
8      Q.  What kind of place is that?
9      A.  They have sporting goods.
10  Mainly -- they're known for their jeans.
11  And they have shoes and, you know, a lot
12  of different types of clothes.
13     Q.  Here in Montgomery?
14     A.  Western-type stuff. It's in
15  Pine Level.
16     Q.  That's on, what, 231 or --
17     A.  Right.
18     Q.  I know where that is.
19     All right. Now, I know that you met
20  with counsel and, as I told you, I don't
21  want to know what you and Mr. Nelms may
22  have spoken about. But tell me what else
23  you did in preparation for this

Page 28

1  deposition.
2      A.  I just read over my notes that
3  I had written out that I had given --
4  provided him, you know, regarding my
5  documentation of what happened.
6      Q.  Are these notes that Mr. Nelms
7  asked you to write?
8      A.  No.
9      Q.  These are -- what kind of
10  notes are they?
11     A.  I just provided it to him as
12  information regarding the case.
13         MS. SINGER:  Are you claiming
14  those notes as privileged?
15         MR. NELMS:  Are they notes you
16  made at my instructions?
17         THE WITNESS:  No.
18         MR. NELMS:  Is it something
19  that you made in anticipation of
20  litigation?
21         THE WITNESS:  No.
22         MR. NELMS:  Not privileged.
23         THE WITNESS:  I mean, I made

7 (Pages 25 to 28)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 29

1  it just -- I made it -- it's those notes
2  that I had, right there, that I made.
3           MR. NELMS: To help you
4  remember?
5           THE WITNESS: Right. And
6  to -- actually, I gave them to -- well, it
7  was Chaz that I saw that day. Gave them
8  to him to give to Anthony, to give him
9  some information about the case, because
10  he wasn't here the day I came in.
11          MR. NELMS: Oh. So these
12  notes I have?
13          MS. SINGER: Yes.
14          THE WITNESS: They're in the
15  file.
16          MR. NELMS: Is this them?
17          THE WITNESS: Uh-huh.
18          MR. NELMS: Yes, that's them?
19  And that? That's just this right here,
20  right?
21          THE WITNESS: Uh-huh.
22          MS. SINGER: We can go off the
23  record while they decide.

Page 30

1          (Off-the-record discussion.)
2      Q.   Have you ever filed for
3  bankruptcy?
4      A.   Yes.
5      Q.   And tell me when.
6      A.   1990.
7      Q.   Chapter 13 or Chapter 7?
8      A.   Chapter 7.
9      Q.   Ever been arrested?
10     A.   No.
11     Q.   Did you grow up in Montgomery,
12  Ms. Beard?
13     A.   Yes.
14     Q.   And where did you go to
15  school?
16     A.   You mean from --
17     Q.   High school.
18     A.   High school?
19     Q.   Yes, ma'am.
20     A.   Lanier.
21     Q.   And when did you graduate from
22  Lanier?
23     A.   1968.

Page 31

1      Q.   And then -- do you have any
2  college?
3      A.   I took some courses at AUM.
4      Q.   And when was the last time you
5  took a course at AUM?
6      A.   I think it was like '74.
7      Q.   Any other formal education?
8      A.   No.
9      Q.   Ever been fired from a job?
10     A.   Yes.
11     Q.   Other than the one that brings
12  us here today?
13     A.   Yes.
14     Q.   All right. Tell me from what
15  job were you fired.
16     A.   Sabel Industries.
17     Q.   What kind of work does Sabel
18  do?
19     A.   Sabel Steel. It's a steel
20  company.
21     Q.   Here in Montgomery?
22     A.   Yes.
23     Q.   And when were you let go from

Page 32

1  that job?
2      A.   In June of 2003.
3      Q.   And what was the reason you
4  were let go?
5      A.   It had to do with -- I had
6  health problems and I had requested
7  accommodation, and it was regarding that.
8      Q.   What kind of accommodation did
9  you request?
10     A.   I needed to go to physical
11  therapy.
12     Q.   For what?
13     A.   A back problem.
14     Q.   And did they --
15     A.   That's when I was first
16  diagnosed with degenerative disc disease.
17     Q.   In June of '03?
18     A.   Well, I was actually diagnosed
19  in March/April of that year.
20     Q.   Of '03?
21     A.   Uh-huh.
22     Q.   And you're saying you
23  requested accommodation to go to physical

8 (Pages 29 to 32)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 33

1  therapy?
2      A.  (Witness nodded head in the
3  affirmative.)
4      Q.  And are you saying that
5  accommodation was denied?
6      A.  Yes.
7      Q.  And so what happened?
8      A.  So I was terminated.
9      Q.  Who was your supervisor at
10 Sabel?
11     A.  Steve Dunlap.
12     Q.  What was his job?
13     A.  He was the credit manager.
14     Q.  What were you doing for them?
15     A.  I was the assistant credit
16 manager.
17     Q.  And did you file suit against
18 them?
19     A.  Yes.
20     Q.  And who represented you in
21 that case?
22         THE WITNESS:  Can I answer
23 that?

Page 34

1         MR. NELMS:  Yes.
2      A.  Julian McPhillips.  I can't
3  think of his name.
4      Q.  And what happened with that
5  lawsuit?
6      A.  I'm not -- the terms -- I'm
7  not --
8         MR. NELMS:  Tell her what the
9  disposition is.
10     Q.  You settled the case?
11     A.  Yes, it was settled.
12     Q.  Did you have to give a
13 deposition in that case?
14     A.  No.
15     Q.  So it was settled before there
16 was any discovery in the case?  Giving a
17 deposition or interrogatories, you know.
18 Do you know?
19     A.  No.  I mean, I know I didn't
20 do a -- there were no depositions.  But,
21 you know -- you know, it was before we
22 filed the lawsuit actually.
23     Q.  I see.  Okay.  You settled at

Page 35

1  the EEOC?
2      A.  We were going to file the
3  lawsuit unless they wanted to settle
4  before we --
5      Q.  Do you know who the lawyer for
6  Sabel was?
7      A.  No.  I mean, I can't
8  remember.  It was somewhere -- somebody
9  out of town.
10     Q.  And were there any other jobs
11 that you were let go from?  Again, I'm not
12 talking about Coldwater Creek because
13 we'll have time to discuss that.
14     A.  No.
15     Q.  Are you working now?
16     A.  No.
17     Q.  When was the last time you
18 worked?
19     A.  August the 29th was the last
20 day I reported to work.  I didn't actually
21 work that day.
22     Q.  At Coldwater Creek?
23     A.  Right.

Page 36

1      Q.  Is that '05 or '06?
2      A.  '06.
3      Q.  And where have you looked for
4  work?
5      A.  I haven't.
6      Q.  Have you applied for Social
7  Security disability?
8      A.  I am on Social Security
9  disability and have been since June of
10 2003.
11         MS. SINGER:  Let's go off the
12 record for a second.  No.  Let's go back
13 on.  My mistake.
14     Q.  You've been on Social Security
15 disability since June of 2003?
16     A.  Right.
17     Q.  And how much do you collect a
18 month?
19     A.  Now?  I mean, it goes up every
20 year.
21     Q.  Well, sure.  Now.
22     A.  Eight seventy-five.
23     Q.  A month?

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 37

1  A.  Right.
2  Q.  And do you have a copy of
3  the -- of your Social Security disability
4  application?
5  A.  The application?
6  Q.  Yeah.
7  A.  I don't think so.
8  Q.  Did you have a lawyer?
9  A.  Yes.
10  Q.  Who was your lawyer?
11  MR. NELMS:  Was it here in
12  town?
13  THE WITNESS:  Uh-huh.  I can't
14  think of her name.
15  MR. NELMS:  There's only a
16  couple.  Brenda Vann?
17  THE WITNESS:  She's on TV all
18  the time.
19  MR. NELMS:  S. Kay Dansby?
20  THE WITNESS:  Yeah.
21  MS. SINGER:  Kay Dansby?
22  MR. NELMS:  D-A-N-S-B-Y.
23  Q.  (BY MS. SINGER)  And what is

Page 38

1  the nature of the disability for which
2  Social Security pays you?
3  A.  I don't know exactly what you
4  mean.  What are my illnesses?
5  Q.  Yeah.
6  A.  I have --
7  Q.  For which Social Security
8  sends you a check every month.
9  A.  I have degenerative disc
10  disease and fibromyalgia.
11  Q.  Does fibromyalgia affect your
12  joints?
13  A.  Yes.  And, you know, like
14  muscle tissue -- fibrous tissue.
15  Q.  Do you wear high heels?
16  A.  Yes.
17  Q.  Ever been told you ought not
18  to wear high heels with fibromyalgia?
19  A.  No.
20  Q.  Ever been told that you might
21  not to wear high heels for degenerative
22  disc disease?
23  A.  No.

Page 39

1  Q.  And is the Social Security
2  disability -- is it -- you obviously have
3  worked since June of 2003, correct?
4  A.  (Witness nodded head in the
5  affirmative.)
6  Q.  Is that yes?
7  A.  Yes.
8  Q.  And so is it that you can't
9  work full time?
10  A.  Right.  I can't sustain
11  working eight hours a day, 40 hours a
12  week.  And also I have a lot of problems
13  in the mornings, which makes it more
14  difficult to work full time with -- in the
15  kind of work that I have experience in.
16  Q.  Well, that's a good point.
17  Tell me -- you were an assistant credit
18  manager?
19  A.  (Witness nodded head in the
20  affirmative.)
21  Q.  And as an assistant credit
22  manager, tell me what some of the tasks
23  were.

Page 40

1  A.  Well, the accounts were, you
2  know, on computer, and I talked with
3  owners and managers regarding payment.
4  Also, when they sold steel, you know, and
5  bought it on credit, it would come up on
6  our computer, and we had to okay for them
7  to -- okay it for them to have -- be able
8  to have that much credit.  In other words,
9  based on their account.
10  Q.  Sure.
11  A.  And, you know, there were
12  some -- we called accounts, you know --
13  worked 60- and 90-day delinquent accounts
14  and set up new accounts, you know, got the
15  credit background and all that.  And
16  that's pretty much it.
17  Q.  Could you do that job today on
18  a part-time basis?
19  A.  Probably -- I might could do
20  it part time.  I don't know.
21  Q.  Well, is there any part of
22  that job that you could not do today?  I
23  understand Social Security says you can't

10 (Pages 37 to 40)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 41

1   work eight hours a day, 40 hours a week.
2   That will be the given. But for those
3   other tasks that you've just described to
4   me as the assistant credit manager, is
5   there any part of that -- of those tasks
6   that you could not do today?
7       A.   I could probably do it most of
8   the time. I'm not sure I could do it all
9   the time.
10      Q.   What do you mean by that?
11      A.   Because when I get really
12  stressed and then feeling really bad, you
13  know, I get nervous and I can't think as,
14  you know -- as clearly as -- I don't know
15  if it's part of the medication or what,
16  but I just -- I'm slower than I used to
17  be.
18      Q.   Can you determine or predict
19  when you're going to be stressed?
20      A.   No. Not always.
21      Q.   What other work experience do
22  you have?
23      A.   I mean, like -- do you want --

Page 42

1   what do you want me to give you? Jobs or
2   what kind of experience I have or --
3       Q.   Yeah. What kind of
4   experience, yes, ma'am.
5       A.   Well, I have other, you
6   know -- finance and marketing and interior
7   design. Other -- you know, retail --
8   interior design, furniture sales.
9       Q.   Could you do that work part
10  time, interior design and furniture sales?
11      A.   Uh-huh.
12      Q.   Is that a yes?
13      A.   Yeah. Most of the time. I
14  mean, I haven't actually -- you know, I
15  have done some of it like freelance -- a
16  little bit of freelance work of that type,
17  which, you know, it's easier to do it when
18  I can make my own schedule, so to speak.
19      Q.   Absolutely. I understand.
20  Have you been paid for that freelance
21  work?
22      A.   Yes.
23      Q.   And would it be reported on

Page 43

1   your income tax?
2       A.   (Witness shook head in the
3   negative.)
4       Q.   Is that a no?
5       A.   No. Well, it's like from
6   friends or --
7       Q.   But you've been --
8       A.   -- family that were just
9   paying me to help me out.
10      Q.   Well, who paid you to help you
11  out?
12      A.   Some family and friends.
13      Q.   Well, I want names.
14      A.   My sister.
15      Q.   Which one?
16      A.   Freddie.
17      Q.   And when did she pay you?
18      A.   In 2000.
19      Q.   Who else?
20      A.   A friend of mine named Bob
21  McCain.
22      Q.   Is he here in Montgomery?
23      A.   Uh-huh.

Page 44

1       Q.   And what kind of freelance
2   work did you do for Mr. McCain?
3       A.   Just helped him pick some
4   fabric out to -- for reupholstering and,
5   you know, just suggestions for arranging
6   furniture and you, know, hanging pictures,
7   that type of thing.
8       Q.   When did you do that for him?
9       A.   I did that some in two
10  thousand -- 2004, I think it was. Before
11  I went to work at Coldwater Creek.
12      Q.   And have you done any
13  freelance work in the area of interior
14  design and furniture sales since you left
15  Coldwater Creek?
16      A.   No.
17      Q.   None at all?
18      A.   (Witness shook head in the
19  negative.)
20      Q.   You said you also have some
21  retail experience. Other than at
22  Coldwater Creek, you've done some other
23  retail work?

11 (Pages 41 to 44)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 45

1　　A.　(Witness nodded head in the
2　affirmative.)
3　　Q.　Is that a yes?
4　　A.　Yes.
5　　Q.　For whom? What kind of
6　retail?
7　　A.　I worked at Parisian in their
8　shoe department, which was -- you know, it
9　wasn't -- the shoe department was owned by
10　a shoe company. I worked there for a few
11　years.
12　　Q.　When did you work there? Do
13　you remember?
14　　A.　That was in -- like '82 to
15　'84.
16　　Q.　All right. Well, could you
17　work part time selling shoes now?
18　　A.　Probably.
19　　Q.　Now, you also told me you have
20　some background in finance and marketing.
21　　A.　Right.
22　　Q.　Could you do finance and
23　marketing work on a part-time basis?

Page 46

1　　A.　Probably.
2　　Q.　What's the reason you haven't
3　looked for work since leaving Coldwater
4　Creek?
5　　A.　Because of health -- my
6　health. And also the fact that -- what I
7　went through at Coldwater Creek regarding,
8　you know, everything that happened, you
9　know, when I was trying to get an
10　accommodation for the health problems, and
11　the hostility and retaliation and
12　discrimination that I felt like I went
13　through. I have this fear of what's going
14　to happen when I go back to work.
15　　Q.　But you haven't looked for
16　work?
17　　A.　No.
18　　Q.　And are there any other sums
19　of money that you receive on a monthly
20　basis other than the $875 from Social
21　Security?
22　　A.　No. But I did get some help
23　after I lost my job because I -- I didn't

Page 47

1　have enough money, you know, for the
2　medical expenses and gas to get back and
3　forth for treatments. And the Cancer
4　Center referred me to a wellness
5　foundation that provided gas vouchers for
6　me to get back and forth for treatments
7　and appointments. And then also I
8　received some grants from a cancer
9　organization.
10　　Q.　How much money did the
11　wellness foundation give you?
12　　A.　They gave me gas vouchers. So
13　I don't know.
14　　Q.　Do you have any record of
15　that?
16　　A.　What that came to? No.
17　　Q.　Is that taxable to you?
18　　A.　No.
19　　Q.　Now, you said -- I understood
20　you to say that you also got some grants?
21　　A.　Right.
22　　Q.　From whom?
23　　A.　Cancer Care Organization.

Page 48

1　　Q.　Where is that?
2　　A.　It's -- I think it's in --
3　located in New York.
4　　Q.　And do you know how much money
5　you received from Cancer Care?
6　　A.　I think I got $150 to -- you
7　know, different times and $300 another
8　time.
9　　Q.　When was the last time you
10　received any money from Cancer Care?
11　　A.　Last summer -- no. Wait. I
12　think I got -- I got $150 in October.
13　This past October.
14　　Q.　Is that taxable income to
15　you? Do you know?
16　　A.　No.
17　　Q.　You're currently being treated
18　by Dr. Jakes; is that correct?
19　　A.　Uh-huh.
20　　Q.　Is that a yes?
21　　A.　Yes.
22　　Q.　And are you currently being
23　treated by Dr. Herrick or not?

12　(Pages 45 to 48)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 49

```
 1        A.   Yes.
 2        Q.   You still see Dr. Herrick?
 3        A.   Yes.
 4        Q.   When was the last time you saw
 5   Dr. Herrick?
 6        A.   May of 2007.  And I have an
 7   appointment with him February the 28th.
 8        Q.   You see him, what, every six
 9   months or so?  Is that about right?
10        A.   Uh-huh.
11        Q.   Was that on an as-needed
12   basis?  I mean, I'm just -- I'm trying to
13   find out, Ms. Beard.
14        A.   Sort of.  I guess I would have
15   to -- I usually see him -- at first I saw
16   him every six months, and then he put it
17   to once a year.  I'm seeing him for
18   something else besides what I've been
19   seeing him for on the 28th.
20        Q.   You've been seeing him for the
21   neck pain?
22        A.   Right.
23        Q.   And now what are you going to
```

Page 50

```
 1   see him for?
 2        A.   Headaches.
 3        Q.   And what other doctors are you
 4   currently seeing, other than Dr. Herrick
 5   and Dr. Jakes?
 6        A.   Dr. Epperson.
 7        Q.   Who is Dr. Epperson?
 8        A.   A neurologist.
 9        Q.   And what are you seeing
10   Dr. Epperson for?
11        A.   Back -- the back problems and
12   I have carpal tunnel.  And, actually,
13   Dr. Jakes is giving me -- I have to get
14   shots in my wrists about every three
15   months now.  And, actually, I was supposed
16   to -- I probably would have had the
17   surgery by now if I hadn't had the cancer
18   and all that.  It was kind of planned for
19   that summer.  And I haven't had it yet
20   because I haven't been able to afford the
21   co-payments and everything to have it
22   done.
23        And, actually, I had it -- when I
```

Page 51

```
 1   got my last shot in October -- the shots
 2   are not working anymore, and I need to
 3   hurry up and have the surgery because the
 4   shots are not working very well anymore.
 5   It's gotten really bad.  And I was
 6   planning to have it this January, but I
 7   haven't had it yet.  You know, all this
 8   came up.  So, anyway, I have an
 9   appointment with the surgeon Tuesday to
10   see about it.
11        And that's one of the reasons that I
12   haven't gone back to work, is because --
13   actually, what, you know -- after I lost
14   the job at Coldwater Creek -- a month
15   after I lost the job, it was suggested to
16   me to apply for unemployment.  I applied
17   for unemployment.  So I was able to draw
18   my unemployment for six months, which, you
19   know -- while I finished the radiation
20   treatments.  And I suffered a lot of
21   fatigue during that period of time.  And
22   so I didn't -- that's one reason I didn't
23   try to go back to work.
```

Page 52

```
 1        And then, once the unemployment ran
 2   out, I was -- that's when I was going to
 3   try to go back to work, but I was having
 4   the, you know, stress and anxiety about
 5   what I mentioned, you know, about my
 6   concern about the problems.  But that's at
 7   the -- around that same time is when my
 8   wrists started -- you know, were getting a
 9   lot worse.  And that's associated with my
10   fear of going back to work.  I don't want
11   to start another job where I have to be
12   off to have surgery.  And so I have -- I
13   need to have surgery on both wrists, and I
14   still need to have some reconstruction
15   surgery.  And I wanted to get that done.
16        Q.   All right.  So you're seeing
17   Dr. Epperson for back problems and your
18   carpal tunnel.  When was the first time
19   you saw Dr. Epperson?
20        A.   In 2003.
21        Q.   When was the last time you saw
22   him?
23        A.   Like a week and a half ago.
```

13 (Pages 49 to 52)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 53

1  Q.  And are you seeing any other
2  physicians?
3  A.  Well, the surgeon I'm going to
4  have -- that I have an appointment with.
5  Dr. Hester.
6  Q.  And he's going to do your hand
7  or he's going to do reconstruction
8  surgery -- reconstruction surgery?
9  A.  He's for the carpal tunnel.
10  Q.  Any other physicians that you
11  see?
12  A.  Primary care physician.
13  Q.  Who's your primary care
14  physician?
15  A.  Cathy Middleton.
16  Q.  And when was the last time you
17  saw Dr. Middleton?
18  A.  Last May or June or somewhere
19  around that time.
20  Q.  And what did you see her for?
21  A.  The antidepressant that I was
22  taking.
23  Q.  Did she prescribe it?

Page 54

1  A.  Not originally.
2  Q.  Well, who originally
3  prescribed it?
4  A.  An oncologist.
5  Q.  And who is that oncologist?
6  A.  Dr. Padazangah.
7  Q.  Can you spell it?
8  A.  I can try.
9  Q.  Sure.
10  A.  P-A-D-A-Z-A-N-G-A-H -- G-H-A
11  or something like that.
12  Q.  And where is he?
13  A.  It's a woman.
14  Q.  Where is she?
15  A.  She's in Montgomery.
16  Q.  And she's you're oncologist?
17  A.  She was.  I'm not seeing her
18  anymore.
19  Q.  When was the last time you saw
20  her?
21  A.  Last spring.
22  Q.  When was the first time you
23  saw her?

Page 55

1  A.  June of 2006.
2  Q.  That's the first time you saw
3  her?
4  A.  I think so.
5  Q.  Who diagnosed the breast
6  cancer?
7  A.  Well, I had -- I found a lump,
8  and then I had a mammogram.  So the -- it
9  was diagnosed from the mammogram.
10  Q.  Was the mammogram done here?
11  A.  Yes.
12  Q.  Do you know who the
13  radiologist was?
14  A.  No.
15  Q.  All right.  And did you have a
16  mastectomy or a lumpectomy?
17  A.  A lumpectomy.
18  Q.  And when did you have the
19  lumpectomy?
20  A.  In June of 2006.
21  Q.  And is it outpatient surgery?
22  A.  Yes.
23  Q.  So you go in in the morning

Page 56

1  and you're out in the afternoon, or you go
2  in in the afternoon and you're out in the
3  later afternoon?  Which one was it for
4  you?
5  A.  Afternoon.
6  Q.  And who took you?
7  A.  My sister.  My younger sister.
8  Q.  Is that Sally?
9  A.  Yes.
10  Q.  And then when did you first
11  receive radiation treatment?
12  A.  August -- August the 7th I
13  think is when it started.
14  Q.  And how many radiation
15  treatments did you receive?
16  A.  It was supposed to be for
17  eight weeks.  So I've been -- I had that
18  many.  It wasn't -- I had to miss some.
19  So it wasn't a straight eight weeks, but
20  it was a total of eight weeks.
21  Q.  How come you had to miss some,
22  Ms. Beard?
23  A.  I got sick after the first

**American Court Reporting**
**February 1, 2008**

Page 57

1 week I started the radiation. I got sick,
2 and I missed two one week and then the
3 next week I was sick in bed and missed the
4 whole week.
5 Q. All right.
6 A. And then another time I missed
7 a week because -- when your skin gets --
8 if it gets burned to a certain degree,
9 they stop the treatments until it gets
10 better.
11 (WHEREUPON, a document was
12 marked as Defendant's Exhibit Number 2 and
13 is attached to the original transcript.)
14 Q. I'm going to show you what
15 your lawyer gave me this morning --
16 because this is the first time I'm seeing
17 it. And I'm going to mark it as
18 Defendant's Exhibit Number 2.
19 If you would -- this is dated at the
20 top. This is a four-page document,
21 correct?
22 A. Yes.
23 Q. And is that your handwriting

Page 58

1 on the first page?
2 A. Where it says doctor excuses
3 and accommodation request?
4 Q. Yes.
5 A. Yes.
6 Q. Can you read the rest of it?
7 A. Accommodation request for
8 employee terminated before able to turn
9 in.
10 Q. That's your handwriting,
11 correct?
12 A. Right.
13 Q. So was -- nobody at the -- at
14 Coldwater Creek saw this note; is that
15 correct?
16 A. Right.
17 Q. And who was the radiologist?
18 I mean, who -- or who does radiation? Is
19 it an oncologist?
20 A. Yes. Dr. Helvie.
21 Q. Dr. Helvie?
22 A. He was the radiation doctor.
23 Q. Do you wear glasses?

Page 59

1 A. I wear reading
2 glasses sometimes.
3 Q. Do you have them with you?
4 A. No.
5 Q. Because I'm going to ask you
6 to look at a bunch of documents today.
7 When you --
8 A. Well, I mean, I can see it.
9 Q. All right. Where were you
10 working immediately prior to going to
11 apply at Coldwater Creek?
12 A. I had worked for like a month
13 at a telemarketing place.
14 Q. Why only a month?
15 A. Well, I mean, I just -- that
16 was the first job I had gotten since I had
17 been, you know, determined disabled. And
18 I don't remember if I applied -- if I had
19 applied at Coldwater Creek before I
20 started that job or not because, you know,
21 I applied through the mail to Coldwater
22 Creek.
23 But, you know, I just took that job

Page 60

1 kind of to see how I would do working.
2 And I hated it, for one thing. So, you
3 know, when the opportunity to work at
4 Coldwater Creek came up, I left it.
5 Q. Were you able to work at home?
6 A. No.
7 Q. Do you remember what the name
8 of the telemarketing company was?
9 A. ASK, A-S-K.
10 Q. So do I understand that you
11 left Sabel Industries the same month that
12 you learned that you received the Social
13 Security disability?
14 A. Well, I mean, no. I did --
15 you have to -- I didn't apply for it until
16 like March of 2004.
17 Q. And then they made it
18 retroactive?
19 A. Right. But they -- you know,
20 when I was awarded -- they said I was
21 determined to be disabled as of June of
22 2003.
23 MS. SINGER: Can we go off the

15 (Pages 57 to 60)

Case 2:07-cv-00790-MHT-CSC    Document 13-2    Filed 05/13/2008    Page 16 of 48

**American Court Reporting**
**toll-free (877) 320-1050**

Page 61

1 record for a second?
2      (Off-the-record discussion.)
3      Q.   And so after -- tell me --
4 after you left Sabel, where did you go to
5 work?
6      A.   I didn't go to work anywhere
7 until I went to work at ASK.
8      Q.   Until you went to do the
9 telemarketing?
10     A.   Right.
11     Q.   And so does that mean you were
12 out of work for about 11 months? Because
13 if you left Sabel in June of '03 and then
14 you came to work for Coldwater Creek --
15     A.   And I went to work at ASK
16 in -- like May, because I came to work at
17 Coldwater Creek in June.
18     Q.   So you were out of work for
19 about 11 months?
20     A.   (Witness nodded head in the
21 affirmative.)
22     Q.   Is that right?
23     A.   Right.

Page 62

1      Q.   Did you look for work at all
2 during that period of time?
3      A.   No.
4      Q.   Did you --
5      A.   I drew unemployment.
6      Q.   When you drew unemployment
7 from -- after you left Coldwater Creek,
8 how much -- what did you receive from
9 Social -- unemployment?
10     A.   I can't remember the exact
11 amount. I don't remember. I can find
12 out. I can look it up at home. But I
13 want -- it might be $190. I don't know.
14 A week. But I'm not sure if that was it
15 or not. And, again, it could have been
16 109, you know. It was probably 109,
17 because it wasn't very much.
18     (WHEREUPON, a document was
19 marked as Defendant's Exhibit Number 3 and
20 is attached to the original transcript.)
21     Q.   All right. Let me show you
22 what I am marking as Defendant's Exhibit
23 Number 3. And if you would -- and if you

Page 63

1 would, could you identify this for me,
2 please?
3      A.   It's the application I filled
4 out at Coldwater -- for Coldwater Creek.
5      Q.   All right. And it says that
6 you cannot work the morning hours,
7 correct?
8      A.   Yes. I was asking not to work
9 morning hours.
10     Q.   All right. So you didn't want
11 to work before 1:00 due to other work; is
12 that correct?
13     A.   Right.
14     Q.   What other work were you
15 doing?
16     A.   That was -- I had thought that
17 I might do some freelance-type work or
18 something, but I never did.
19     Q.   So you did not have another
20 job?
21     A.   No.
22     Q.   At any time when you worked at
23 Coldwater Creek, did you have another job?

Page 64

1      A.   Yes.
2      Q.   Tell me about the other job.
3      A.   It was called OSI, Outsourcing
4 Services.
5      Q.   Is that here in Montgomery?
6      A.   Yes.
7      Q.   And what does OSI do?
8      A.   They handle, you know, billing
9 and -- and customer service for Direct TV
10 and BellSouth.
11     Q.   All right. And when did you
12 start to work for OSI?
13     A.   In April of '05.
14     Q.   And when did you stop working
15 for OSI?
16     A.   Well, actually, I didn't work
17 anymore -- the last day I worked was
18 sometime in December, but I actually
19 resigned on January the 9th of 2006.
20     Q.   And what's the reason that you
21 resigned?
22     A.   Because it was too hard to,
23 you know -- I was worn out from working

16   (Pages 61 to 64)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 65

1  two jobs. And the whole time I had wanted
2  to get more hours at Coldwater Creek.
3      And like, when I originally started
4  at OSI, I was working 20 hours a week.
5  And then in August, first of September, I
6  was able to get more hours at Coldwater
7  Creek. So I had my hours cut back at OSI
8  to just three -- supposed to be three days
9  a week.
10     Sunday, Monday, and Tuesday I was
11 going to work at OSI, and then I was going
12 to be off on Wednesday and work Thursday,
13 Friday, and Saturday at Coldwater Creek,
14 which is what I tried to do. But,
15 unfortunately, Coldwater Creek kept
16 scheduling me for all four days. So I was
17 working seven days a week, which was what
18 led to part -- to some of my problems.
19     But I was supposedly going to be
20 able to get more hours at Coldwater
21 Creek. And so, you know -- and I -- and I
22 didn't like working there. I only was
23 working there for the money because I

Page 66

1  wasn't getting enough hours and making
2  enough money at Coldwater Creek.
3      Because when you go on disability,
4  you don't have any medical insurance for
5  two years. So I didn't have any medical
6  insurance. And I was going to, you know,
7  qualify for medical insurance starting in
8  2006. So that was going to help me out as
9  far as financially. But it was a real
10 hardship, trying to work both jobs.
11     Q.  Well, you're on Medicare now,
12 correct?
13     A.  Right.
14     Q.  And you worked at OSI from
15 April through December of '05?
16     A.  Uh-huh.
17     Q.  Is that correct? When would
18 you go to work for them? What hours?
19     A.  6 to 10.
20     Q.  6 p.m. to 10 --
21     A.  6 to 10 at night, during the
22 week. And then some Saturdays you worked
23 in the afternoon and some Sundays you

Page 67

1  worked in the afternoon. You know, like
2  it was never more than 20 hours, or it
3  might have been a little less. Because if
4  you worked on the weekend, you didn't
5  work, you know, during the week.
6      Q.  And would you go to their
7  office?
8      A.  Yes.
9      Q.  What kind of work -- and what
10 did you do?
11     A.  Well, it was on computer, you
12 know. You wore a head set. Calls were
13 coming in. And, you know, the account
14 would pop up on your -- a computer, and
15 you would, you know, help them with
16 billing questions or service, you know.
17 You could sell, you know, more -- a bigger
18 package for Direct TV, that type thing.
19     Q.  And how were you paid?
20     A.  And you took payments.
21     Q.  How were you paid? Hourly or
22 commission?
23     A.  Hourly. But what you could

Page 68

1  make -- like a commission-type bonus.
2  But, unfortunately, I never did.
3      Q.  Could you do that kind of work
4  today?
5      A.  (Witness nodded head in the
6  affirmative.)
7      Q.  Is that a yes?
8      A.  Yes. I guess so.
9      Q.  Was that a place where you
10 could make your own hours?
11     A.  No.
12     Q.  So you didn't have any --
13     A.  I mean, I might can do -- I
14 had a problem with -- I have more of a
15 problem sitting all day or sitting for
16 periods of time, which there they were
17 real strict. You know, it was the type of
18 place that you sat there at your desk the
19 whole time and worked, and you had like a
20 15-minute break. And that was difficult
21 for me because sometimes I needed to get
22 up when it wasn't my 15-minute break.
23     And that was one reason why I liked

17 (Pages 65 to 68)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 69

1  the retail, where I got to stand up and
2  walk around, because that's actually
3  easier for me with my back and my -- it's
4  just enough exercise to be good for me
5  rather than -- and I seem to have more
6  difficulty with sitting. And I couldn't
7  do it today, right now, until I get my
8  carpal tunnel fixed.
9     Q.  Because you can't use a
10 computer right now?
11    A.  Right. I mean, I can't do
12 anything until I have the surgery for the
13 carpal tunnel because it has gotten so
14 severe.
15    Q.  What could you do?
16    A.  And I also have arthritis in
17 one hand.
18    Q.  So could you do a retail job?
19    A.  Right now?
20    Q.  Yes.
21    A.  I don't know, you know.
22 Because I -- when I worked at Coldwater
23 Creek, I worked at the cash rap a lot.

Page 70

1  And I didn't have any problems with my
2  hands hurting while I was actually there
3  doing the work. I guess because I was
4  taking the pain pills and whatever. But
5  at night, you know, they would really hurt
6  a lot. You know, we had to straighten
7  with the hangers and fold and do a lot of
8  that stuff, and I had noticed the effects
9  of it at night.
10     So I don't know how bad it would be
11 right now. It probably would be -- I
12 would think it would be a problem because
13 I have problems with it every -- all day.
14 You know, it's a constant problem for me
15 right now. I usually wear the braces, you
16 know, at home, and I sleep in them every
17 night.
18    Q.  So is there no work you can do
19 right now? Because when I asked you
20 earlier today, you said that you could --
21    A.  Well, I mean, I was thinking
22 about mentally. You know, I don't know
23 what -- I mean, I was not thinking about

Page 71

1  that. I don't think I could do it right
2  now while I -- until I have this surgery
3  for the carpal tunnel because it is
4  extremely severe. The doctor told me I
5  need to have the surgery, certainly on my
6  left hand, as soon as possible.
7     Q.  Well, isn't it true,
8  Ms. Beard, that Dr. Jakes recommended
9  years ago that you have the surgery for
10 carpal tunnel?
11    A.  He's been telling me that I
12 needed to have the surgery. And like I
13 said, it was planned for the summer that I
14 was diagnosed with the cancer.
15    Q.  But even before that, ma'am,
16 didn't he tell you you needed to have the
17 carpal tunnel surgery?
18    A.  I don't know if he told me to
19 have it very much before that because it
20 wasn't that bad. When I -- you know, when
21 I -- first, when I got the shots --
22 actually, I first started having --
23 getting the shots in my elbows, and it

Page 72

1  wasn't necessarily diagnosed as carpal
2  tunnel. We didn't know what was causing
3  the problem. And then -- and I wouldn't
4  get -- I would go like six months or
5  longer before I got shots. You know, I
6  didn't -- it gradually worked up to where
7  I had to get the shots every three months.
8     Q.  I understand.
9     (WHEREUPON, a document was
10 marked as Defendant's Exhibit Number 4 and
11 is attached to the original transcript.)
12    Q.  I'm going to show you what I
13 am marking as Exhibit Number 4. And if
14 you would, identify this for me.
15    A.  It's just a new hire form that
16 we filled out when -- from being hired at
17 Coldwater Creek and listing someone to
18 contact in case of emergency.
19    Q.  Sure. And you remember
20 signing this, correct?
21    A.  Right.
22     (WHEREUPON, a document was
23 marked as Defendant's Exhibit Number 5 and

18  (Pages 69 to 72)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 73

1 is attached to the original transcript.)
2    Q. And I'm going to mark this as
3 Exhibit Number 5. Will you identify this
4 for me, please?
5    A. Coldwater Creek handbook.
6    Q. And you remember receiving a
7 copy of this handbook, correct?
8    A. Right.
9    Q. Anything about this handbook
10 you didn't understand?
11    A. No. Well, they -- the hours.
12 You know, they told you that you were
13 going to get -- part-time people are
14 supposed to be getting a certain number of
15 hours, and that -- we didn't get the
16 number of hours that we were told we were
17 going to be getting when we were hired.
18    Q. Who is "we"?
19    A. All the people that were hired
20 when I was.
21    Q. Who else was hired when you
22 were?
23    A. Well, I can't remember

Page 74

1 everybody's name, but I --
2    Q. The best you can.
3    A. I can give you first names.
4    Q. All right.
5    A. Pat, Stephanie, Deborah,
6 Michelle. She was a manage -- in
7 management.
8    Q. So she was not part time?
9    A. No.
10    Q. But Pat, Stephanie, and
11 Deborah --
12    A. There was a lot more people,
13 though. I'm just kind of drawing a
14 blank. I mean, I still have their names
15 at home, but --
16    Q. Really? What do you have at
17 home that relates --
18    A. It's their phone list. It's a
19 phone list that when we -- you know, just
20 the list with everybody's name on it, with
21 their phone numbers.
22    Q. And you have that at home?
23    A. Uh-huh.

Page 75

1    Q. What other paperwork regarding
2 Coldwater Creek do you have at home?
3    A. I have all my schedules. A
4 copy of all my schedules. And I have my
5 employee handbook. I have a copy of my
6 review that I received the first year that
7 I was there. The only review that I ever
8 received. Some other books that are --
9 you know, that related to the
10 merchandise. You know, information about
11 merchandise and helping the customer in
12 the dressing room, that type of thing.
13    Q. And are you saying that you
14 and Deborah and Stephanie and Pat were all
15 hired about the same time or on the same
16 day?
17    A. Well, I don't know the exact
18 day they were hired. But we were all
19 hired to open the store, because it was a
20 brand-new store that opened in EastChase.
21 And so, you know, nobody had worked there
22 before. So we -- you know, we all went to
23 a training class -- we went through

Page 76

1 training together and helped get the store
2 stocked and ready to open.
3    Q. And who trained you?
4    A. It was a lady that came from
5 another store, and I can't remember her
6 name.
7    Q. And what did they tell you?
8 You and Deborah and Stephanie and Pat,
9 last names to be discerned --
10    A. Well, there was a lot more --
11 it was like 20 or so people.
12    Q. And everybody was part time?
13    A. Everybody but management.
14 And, in fact, you know, that was one of
15 the things we -- we thought it was going
16 to be a really big store, because
17 Coldwater Creek has different size stores.
18 And we were shocked when we saw the size
19 of the store because there were so many of
20 us.
21    Q. And what did they tell you --
22 well, first of all, who told you anything
23 about hours?

19 (Pages 73 to 76)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 77

1    A.   Mary Ralph, who was the
2  manager.
3    Q.   At the time?
4    A.   Uh-huh.
5    Q.   And what do you --
6    A.   Well, when I was working at
7  ASK, I was working 20 -- definitely -- you
8  had to work 20 hours.  You could work 24
9  hours because you could work some hours on
10  Saturday if you wanted to.
11    Q.   Now, was that at the --
12    A.   Telemarketing place.  Which I
13  left to take the job at Coldwater Creek.
14         And so she asked me how many hours I
15  wanted, you know.  What do you want?  She
16  said, you can have whatever you want.  And
17  I said, well, I'd like to have 20 to 24
18  hours a week and not -- you know, that --
19  not any more than that, you know.  And she
20  said, that's no problem.  Well, I rarely,
21  if ever, got that.  And it was very
22  difficult for me because, you know, that
23  was my sole income, because I had not

Page 78

1  received the money from my disability yet.
2    Q.   All right.  But you told her
3  you wanted to work between 20 and 24 hours
4  a week?
5    A.   Right.
6    Q.   No more than that, correct?
7    A.   And a lot of the other
8  employees, you know, they all picked and
9  -- the kind of hours they wanted, you
10  know.  There were some people that had
11  full-time jobs and they only wanted to
12  work at night during the week, and some
13  people that only wanted to work during the
14  day or during the week and they didn't
15  want to work on the weekend because they
16  had families.  Different -- people had
17  different reasons for their schedules that
18  they wanted and the hours they wanted.
19         But the majority of the people were
20  very disappointed because we did not get
21  the kind of hours that we were told we
22  would get.
23    Q.   So you were disappointed; is

Page 79

1  that correct?
2    A.   Yes.
3    Q.   And you were disappointed from
4  the beginning of your employment with
5  Coldwater Creek?
6    A.   Yes.  For that reason.
7    Q.   Not being given the number of
8  hours you wanted to work, which was
9  between 20 and 24?
10    A.   Right.
11    Q.   And who else was disappointed?
12    A.   The majority of the people,
13  which, you know, I can't remember
14  everybody's name.  There was a girl named
15  Jill.  And I don't know why I can't think
16  of everybody's name because it's like I
17  knew them so well, but I just can't think
18  of them right now.
19    Q.   Have you shopped at Coldwater
20  Creek since you left there?
21    A.   No.
22    Q.   Did you shop there before?
23    A.   Yeah.  Before I worked there?

Page 80

1    Q.   Well, I guess you said you
2  opened the store.  Did you shop while you
3  were there?
4    A.   Yes.  Definitely.
5    Q.   So is it your testimony here
6  today that no one -- or based on what you
7  understand, no one who was working part
8  time, which was everybody but management,
9  received the number of hours that they had
10  requested when they signed on?
11    A.   I can't say that nobody
12  received them.  Like, you know, the people
13  that had full-time jobs, basically they
14  could only work from 6 to 9 at night.  You
15  know, pretty much most of them worked till
16  at least 5.  And, you know, some -- and
17  some of them wanted to work on the
18  weekend, and they did.  So, you know, some
19  of those people that had full-time jobs
20  where, you know, they had a good income
21  anyway, you know, they may have been
22  satisfied with the hours.
23         But there was still a lot of comment

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 81

1 about -- you know, I don't know who -- you
2 know, I can't say for sure. But there was
3 a lot of comments about this -- this is a
4 lot of people to try to get enough hours
5 for this small store, which, you know --
6 and, you know, it was a lot of discussion
7 among us that we weren't getting the kind
8 of hours that we -- you know, we all
9 talked to each other. Well, I was told
10 I'd get this and I was told I'd get that,
11 and we're not getting it.
12    Q.  Do you know if any of these
13 other women were receiving Social Security
14 disability?
15    A.  Not that I know of.
16    Q.  Do you know of any of them who
17 had a disability?
18    A.  No.
19    Q.  I'm going to show you --
20    A.  Well, there was -- there was a
21 girl that -- but she wasn't on
22 disability.  I think she had some -- like
23 lupus or something.

Page 82

1    Q.  Do you remember her name?
2    A.  No, I can't remember it.  But
3 she was like a good -- a friend of mine,
4 but I can't remember her name.  It might
5 come to me before it's over with, but I
6 can't think of it off the top of my head.
7    Q.  Did she leave Coldwater Creek
8 before you did?
9    A.  Uh-huh.
10    Q.  Is that a yes?
11    A.  Yes.
12       (WHEREUPON, a document was
13 marked as Defendant's Exhibit Number 6 and
14 is attached to the original transcript.)
15    Q.  Let me show you what I'm
16 marking as Defendant's Exhibit Number 6.
17 If you would, just identify this for me.
18    A.  I guess an information form
19 that I filled out when I was hired.
20       (WHEREUPON, a document was
21 marked as Defendant's Exhibit Number 7 and
22 is attached to the original transcript.)
23    Q.  I'm going to show you what I'm

Page 83

1 marking as Defendant's Exhibit Number 7,
2 and see if you can identify this for me.
3 And I will tell you that it's 59 pages,
4 because I counted it.
5    A.  It says it's the timecard, but
6 this is not something that I saw.
7    Q.  All right.
8    A.  You know, this is not
9 something that I ever saw.
10    Q.  Did you have to clock in and
11 clock out?
12    A.  Yes.
13    Q.  And did your timecard look
14 like what I've marked as Defendant's
15 Exhibit Number 7?
16    A.  Well, it's -- it was in the
17 computer, you know.  And you didn't see
18 all this.  You could just see when you
19 clocked in, you know, that it took.  But
20 it didn't -- you didn't have this list,
21 that I recall.
22    Q.  Well --
23    A.  I think at the end of the week

Page 84

1 you could get this list.  Like you were
2 supposed to go in at the end of the week
3 and like sign it, but we didn't do it.
4    Q.  All right.
5    A.  Very rarely.  You know, we
6 sort of attempted to do that some at the
7 beginning, you know, when -- after the
8 store first opened or at some point in
9 time.  I remember doing it on occasion.
10 But they just didn't have us do it.
11    Q.  Well, this seems to reflect
12 what your schedule was at the store, does
13 it not?  I know you don't have your
14 reading glasses.  So take your time.
15    A.  I'm sure that's what it is.
16    Q.  Why don't you just take a
17 moment and just look at it.
18    A.  (Witness complied.)
19    Q.  Does that look like a
20 schedule?
21    A.  Uh-huh.
22    Q.  Is that a yes?
23    A.  Yes.

21  (Pages 81 to 84)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 85

1　　　Q.　Would the schedule be in the
2　computer?
3　　　A.　Uh-huh.
4　　　Q.　Is that a yes?
5　　　A.　Yes.
6　　　Q.　So you would look on the
7　computer to see what your schedule was?
8　　　A.　No.
9　　　Q.　You would just come in and --
10　　　A.　Clock in.
11　　　Q.　-- clock in on the computer?
12　　　A.　Right.
13　　　Q.　And how did you know your
14　schedule?
15　　　A.　It was -- they gave it to us,
16　on a piece of paper.
17　　　Q.　Was it a piece of paper that
18　looked like this?
19　　　A.　No. It was like handwritten.
20　Or, you know, you might even write it
21　yourself and, you know, get it off a list.
22　Like they'd put everybody's schedule on
23　this one piece of paper, and you'd just

Page 86

1　look at it and write your own down, for
2　yourself.
3　　　Q.　But this looks like the
4　schedule, correct? It doesn't look like
5　the schedule you received, but it looks
6　like your schedule at work?
7　　　A.　Right.
8　　　Q.　All right. Thank you.
9　　　Now, you asked to work starting at
10　1:00, correct?
11　　　A.　Yes.
12　　　Q.　Is that correct?
13　　　A.　1:00 or later, you know. It
14　didn't have to be 1:00. But not before 1.
15　　　Q.　And during the -- let's see.
16　You worked for Coldwater Creek for about
17　26 months, correct?
18　　　A.　Yeah. I guess so.
19　　　Q.　Well, you tell me.
20　　　A.　Yes.
21　　　Q.　How long did you work for
22　Coldwater Creek?
23　　　A.　Almost two years.

Page 87

1　　　Q.　Well, you came in June of '04,
2　correct?
3　　　A.　Right.
4　　　Q.　And then you left in August of
5　'06, correct?
6　　　A.　A little over two years.
7　　　Q.　All right. So you can do that
8　calculation, right?
9　　　A.　(Witness nodded head in the
10　affirmative.)
11　　　Q.　I'm not being disrespectful.
12　You can do that kind of calculation?
13　　　A.　Right.
14　　　Q.　Do you remember if you
15　worked -- if you were scheduled to work
16　before 1:00 on any -- during any time or
17　any period?
18　　　A.　Actually, the very first
19　schedule they made out, they had me
20　scheduled to come in at sometime in the
21　morning, you know, which I immediately
22　told them, you know, that that -- I
23　couldn't work those hours, and that was

Page 88

1　not what I was hired to work. But I did
2　have -- I did come in once or twice during
3　the first couple of weeks at like 12 or
4　12:30 or something, but that was the only
5　time, really.
6　　　Q.　So after that you did work at
7　1:00 or after 1:00, correct?
8　　　A.　Right.
9　　　Q.　For the whole time that you
10　were --
11　　　A.　Employed.
12　　　Q.　-- employed? All right.
13　　　MS. SINGER: I need to take a
14　break for a moment, if you don't mind.
15　　　　2:15 p.m.
16　　　　(Recess taken.)
17　　　　2:22 p.m.
18　　　Q.　Do you remember telling
19　Dr. Jakes that -- back in July of 1998
20　that you were fired from a job and were
21　considering applying for disability?
22　　　A.　In '98?
23　　　Q.　Yes, ma'am.

22　(Pages 85 to 88)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 89

1    A.   I know I was considering -- I
2  considered applying for disability because
3  that's when I was diagnosed with
4  fibromyalgia.
5    Q.   Well, do you remember being
6  fired from a job sometime in or around
7  1998?
8    A.   No.
9    Q.   When was the first time you
10  applied for disability?
11    A.   I applied in 1998.
12    Q.   Do you remember telling
13  Dr. Jakes in 1999 that you had been
14  missing work because you were too tired to
15  go to work?
16    A.   Yeah. I'm sure I've told him
17  that.
18    Q.   And do you remember telling
19  Dr. Jakes in 2001 that you had lost two
20  jobs in -- due to not being able to go to
21  work because of sore throats?
22    A.   Well, I've left jobs because I
23  knew they were going to terminate me and I

Page 90

1  was sick -- because I was sick all the
2  time.
3    Q.   Which jobs did you leave
4  because you knew you were going to be
5  terminated?
6    A.   The job that I had at Ethan
7  Allen.
8    Q.   When was that?
9    A.   In 2000. I worked there -- I
10  don't have that on here, but I worked
11  there in 2000.
12    Q.   You're looking at the list
13  that's in the record as Defendant's
14  Exhibit Number 1, correct?
15    A.   I worked at Ethan Allen two
16  different times.
17    Q.   Well, when did you
18  leave anticipating that you were going to
19  be fired?
20    A.   Ethan Allen. I was sick the
21  entire time I worked there. I had --
22  constantly had an infection. And I
23  worked -- it was a draw against

Page 91

1  commission.
2         This was a new store that had
3  opened. I started to work there when that
4  store opened. And our business was really
5  bad, and it was a draw against
6  commission. And the draw was like minimum
7  wage. And none of us were making any
8  money. And, you know, I wasn't happy
9  there because I wasn't making any money,
10  and it was a lot of like back stabbing,
11  stealing customers. Everybody was so
12  desperate to make some money and stuff
13  then. I felt like I would be let go, and
14  so I left there.
15    Q.   So you left there because you
16  knew you were going to be fired, or you
17  left there because their --
18    A.   I mean, I was unhappy, but I
19  anticipated that I would be let go.
20    Q.   Because you were sick?
21    A.   Yes. I was -- I had an
22  infection like every two or three weeks.
23  The entire time I was working there.

Page 92

1    Q.   Are you smoking?
2    A.   I do smoke.
3    Q.   Have you been told to stop
4  smoking?
5    A.   Well, it's been suggested to
6  me.
7    Q.   Strongly suggested?
8    A.   No. But it is something I've
9  tried -- I mean, I can't -- I haven't been
10  able to quit, but it's something I'm
11  hoping to try to do.
12    Q.   Well, have you ever taken any
13  medicine to help you try to quit?
14    A.   No. I've -- I was told --
15  actually, it was my insurance company. I
16  was talking to them about that new drug
17  they have out called Chantix. And if I --
18  if my doctor contacts the insurance
19  company, you know, recommending that I try
20  it -- because I had tried other things and
21  haven't been successful. Because I've had
22  cancer, that -- in other words, you know,
23  a letter from one of my doctors might be

23 (Pages 89 to 92)

**American Court Reporting**
**February 1, 2008**

Page 93

1  able to get the insurance to pay for the
2  medicine for me. And so I'm planning on
3  pursuing that.
4      Q. Well, what insurance? What
5  insurance do you have?
6      A. Med -- through Medicare.
7      Q. Have you ever told Dr. Jakes
8  that you didn't want to stop smoking
9  because you didn't want to gain weight?
10      A. I've told him that I was
11  afraid that I would gain weight if I quit
12  smoking.
13      Q. And you see Dr. Jakes for the
14  fibromyalgia; is that correct?
15      A. Right.
16      Q. For anything else? What else
17  do you see him for?
18      A. Well, I mean, he's the one
19  that did the blood work for, you know --
20  about my thyroid, but that was at my
21  suggestion because I knew something was
22  wrong. And, you know, he sort of -- he
23  has, you know, suggested physical therapy

Page 94

1  when I've had back trouble.
2      Q. Have you ever worked as a
3  secretary?
4      A. No.
5          (WHEREUPON, a document was
6  marked as Defendant's Exhibit Number 8 and
7  is attached to the original transcript.)
8      Q. I'm going to show you what I'm
9  marking as Defendant's Exhibit Number 8.
10  And if you would, identify this for me,
11  please.
12      A. It's the warning I received in
13  December.
14      Q. And do you know how many times
15  you had been late that prompted you
16  receiving what I've marked as Defendant's
17  Exhibit Number 8?
18      A. No.
19      Q. Were you late to work?
20      A. Yes.
21      Q. Now, you've already testified,
22  Ms. Beard, that you had asked not to begin
23  work before 1:00, and you said, except

Page 95

1  really for the very early part of your
2  employment with Coldwater Creek, they did
3  allow you to work after 1:00, correct?
4      A. Right.
5      Q. But you are saying that, in
6  fact, you did come to work late, correct?
7      A. On occasion. Yes.
8      Q. When you say "on occasion," do
9  you have any independent recollection how
10  often you were late from June until
11  December of '05?
12      A. No. But I know that I
13  started -- I was having a lot of trouble
14  because that was during that time. Well,
15  like the end of July and August. That's
16  when the manager, Mary Ralph, left, and
17  also a lot of employees left shortly after
18  she did. And we -- normally we had like
19  20 or so employees, and we were down to
20  like 13 associates.
21      And before Mary Ralph left, she had
22  hired a new assistant manager and another
23  part of the management team. I think she

Page 96

1  was maybe the manager -- in charge of
2  training, but sort of did all kinds of the
3  management work.
4      But, anyway, I worked a lot of hours
5  during the month of August -- or part of
6  June and August because the assistant
7  manager, Diane -- they were asking me to
8  work a lot because they didn't have enough
9  help. She was calling me up at 11:00 at
10  night at home begging me to work because
11  she didn't have anybody to work.
12      So I was working more hours than I
13  really should have, because I was still
14  working 20 hours at OSI and -- but I was
15  doing this because I really wanted to
16  leave OSI and only work at Coldwater
17  Creek. So -- and also I was doing it
18  because I was helping them out.
19      And then, as I mentioned earlier,
20  when I changed my schedule to cut back to
21  just three days at OSI and work three days
22  at Coldwater Creek, there were several
23  weeks which -- over a two-month period

24  (Pages 93 to 96)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 97

1  where I worked -- they scheduled me for
2  four days. So I was working seven days a
3  week, which is too much for me to work.
4  That's too many hours for me to work. And
5  I kept telling them I needed to have the
6  day off, and it was supposed to be that
7  Wednesday, but they said they needed me to
8  be available on Wednesday.
9      So I would -- we had availability
10 sheets we would fill out. So I would -- I
11 put myself as being available on
12 Wednesday, so they could schedule me on
13 Wednesday, and I could be off on Thursday
14 or I could be off on Friday. I just
15 needed a day off. But they --
16     Q.  Hold on.
17     A.  -- kept scheduling --
18     Q.  Hold on one second. I have
19 asked you if you have any judgment about
20 how many times you were late between
21 June --
22     A.  No.
23     Q.  Let me finish. Between June

Page 98

1  and July of '05.
2      A.  No. But I know that I was
3  late because of those problems. And what
4  I was going to get to was that I had a --
5  I guess you'd call it a -- I call it a
6  fibromyalgia flare-up, where I was having
7  a health issue that was causing me --
8  there were several -- a number of times
9  that I ran late. You know, like 30, 45
10 minutes, an hour. I always called them
11 ahead of time and told them. And they
12 said it was -- you know, I told them, you
13 know, I'm going to try to get there and it
14 be 30 minutes or -- you know, try to give
15 them an estimate of when I thought I would
16 be there, and they said it was okay.
17     And I went to Kim on -- I think it
18 was December the 6th. It was
19 approximately five or six days before I
20 got this warning. On a Friday. I had
21 come in late that day. And she wasn't
22 there when I got there, but she came in.
23 And, actually, she had been -- supposed to

Page 99

1  be there earlier that day, and she had
2  come in late because she was not feeling
3  well, she said. Not to imply that she was
4  -- had a habit of coming in late or
5  anything. But she told me that -- she had
6  fibromyalgia also. So she told me that
7  she had had a real bad morning because of
8  her fibromyalgia.
9      And I went to her to ask -- to tell
10 her that I knew that I had been running
11 late a lot, and particularly, you know,
12 significantly late. Like, you know, not
13 five or ten minutes, but more. And that,
14 you know, because of this health issue --
15 which she knew about. I said, did I need
16 to provide a letter from my doctor
17 regarding this problem. And she said,
18 no. Don't worry about it. You know, I
19 understand. You know, because we were
20 talking about she had fibromyalgia and she
21 was sick that morning.
22     And so, you know, I was really upset
23 that exactly six days later -- and she

Page 100

1  said -- her exact words to me were, no.
2  Don't worry about it. And then six days
3  later, I get this.
4      Q.  Well, you had been late,
5  correct?
6      A.  Yes.
7      Q.  And that was a violation of
8  company policy, correct?
9      A.  Yes.
10     Q.  Now, let me ask you
11 something. Did the company have an open
12 door policy?
13     A.  You mean regarding problems?
14     Q.  Yes, ma'am.
15     A.  That was my understanding.
16     Q.  All right. Did you ever call
17 the hot line or take advantage of the open
18 door?
19     A.  I did eventually.
20     Q.  Well, with respect to what
21 I've marked as Defendant's Exhibit Number
22 8.
23     A.  No.

25  (Pages 97 to 100)

**American Court Reporting**
**February 1, 2008**

Page 101

1    Q.   And you're not arguing that
2  you were late, correct?
3    A.   No.
4    Q.   Do you have --
5    A.   I did call regarding that, but
6  not -- it was later, when other things
7  happened. I referred back to that.
8    Q.   You called the open door --
9    A.   I called the regional manager,
10 Valerie Lee.
11   Q.   Do you remember when you
12 called Ms. Lee?
13   A.   The first time I called her
14 was in March. Early March. I think it
15 was right after I received the second
16 warning.
17   Q.   What did you and Ms. Lee talk
18 about?
19   A.   Well, the main thing that I
20 called -- I called her because I was upset
21 that I had gotten this other warning,
22 because I was having a health problem at
23 the time. And also I called her regarding

Page 102

1  the fact that they had requested a -- what
2  they called a disability letter from me.
3    And the way this came up -- do you
4  want to know how it came about that I
5  needed to provide that?
6    Q.   Sure.
7    A.   In February -- well, over
8  the -- you know, practically ever since
9  Kim had been working there as the new
10 manager, whenever somebody was absent or
11 unable to come in -- you know, called and
12 couldn't come in to work their shift and I
13 was there, you know, they would ask me a
14 lot of times -- the majority of the time
15 they would ask me if I wanted to work in
16 their place. Or if the store was busy,
17 they'd ask me to -- you know, can you stay
18 and work an extra hour -- work a little
19 later today? Because we need you.
20   Q.   When did that start?
21   A.   It happened off and on ever
22 since -- from the time that Kim came
23 there.

Page 103

1    Q.   When did Kim --
2    A.   Especially, you know -- it
3  happened -- it was happening during that
4  time when I was working, you know, all
5  those days in a row back in the fall.
6  Because she came in like September of '05.
7    Q.   She came in September of '05,
8  and then --
9    A.   That's when we were short of
10 employees. Plus, you know, people would
11 call because they couldn't come in for
12 whatever reason. And I worked to fill in
13 for people not -- who weren't there quite
14 often. So in February --
15   Q.   This is February of '06?
16   A.   Right.
17   Q.   All right.
18   A.   I was -- asked her one day if
19 I -- instead of me getting extra hours
20 because -- you know, by filling in when
21 people weren't there -- you know, a lot of
22 people -- they would schedule people to
23 work who didn't really care about having

Page 104

1  those hours, you know. And I wanted
2  them. And I was trying to ask her why she
3  couldn't schedule me for more hours and
4  let some of these people that didn't
5  really care about having that many hours
6  -- instead of me only being able to pick
7  up hours by -- on the spur of the moment.
8    And she said to me, on the sales
9  floor in front of other sales associates
10 and customers, that if I didn't drink so
11 much, I might be able to get up and come
12 to work at 8:00 in the morning and get
13 some extra hours. And I was very
14 offended.
15   Q.   Do you drink?
16   A.   On occasion, but I had never
17 had a drink around her. I don't drink
18 very much because of all the medication I
19 take. I can't really drink too much.
20   Q.   Well, let me ask you this:
21 When was the first time you felt you had
22 been discriminated against on the basis of
23 your alleged disability?

26 (Pages 101 to 104)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 105

1   A.   Well --
2   Q.   The first time.
3   A.   The first thing that
4   happened -- well, first of all, I didn't
5   understand that -- because they asked me
6   about -- what happened was, after she said
7   that to me --
8   Q.   About the drinking?
9   A.   Right. I called --
10   Q.   That was in February of '06?
11   A.   Right. I called her -- the
12   next day I was off, and I called her
13   and -- to discuss it. To let her know
14   that I didn't appreciate it. Because she
15   left. Right after she said that, she left
16   the store. And I called her to let her
17   know that I didn't appreciate it, and I
18   didn't think it was appropriate for her to
19   say that to me. And we talked about it
20   and everything. And I thought it was
21   settled. You know, she apologized. And I
22   thought that would be the end of that.
23       Well, I can't remember how soon

Page 106

1   after that, she told me that she had
2   told -- and I said something about --
3   because I had a disability, you know, was
4   one of the reasons I didn't work in the
5   morning. I mentioned that in our -- when
6   we were talking on the phone. But she
7   already knew I had a disability. She knew
8   I had the back trouble. She knew I had
9   the fibromyalgia. We had discussed all
10   about fibromyalgia.
11       And she questioned me about, you
12   know, how I qualified -- or how I got
13   disability, because she might want to get
14   on disability. At some point in time, she
15   might not be able to work, is what she
16   said. So she asked me all these questions
17   regarding it.
18       And, anyway, she told me that she
19   had talked to Ron Shermack, which is --
20   was our regional manager at the time, and
21   that he had told her that she needed to
22   get a disability letter from me, which,
23   you know, I don't understand that because,

Page 107

1   to me -- it's my understanding that you're
2   not supposed to -- you don't need a
3   disability letter from an employee unless
4   they have requested an accommodation or
5   they're not doing some job function they
6   can't do, you know.
7       Q.   Well, didn't you request an
8   accommodation?
9       A.   Not yet.
10       Q.   Didn't you request an
11   accommodation by not being asked to work
12   before 1:00?
13       A.   No. Because I don't see that
14   that's requesting an accommodation any
15   different than an employee who says they
16   can't work except between 6 and 9 or an
17   employee who says they can only work on
18   the weekend. There were employees that
19   said they could only work from 10 to 2 or
20   an employee that said they could only work
21   in the afternoon or they could only work
22   on the weekend. I mean, that's the nature
23   of a part-time business, is that you can

Page 108

1   say that you only want to work certain
2   hours. If she's accommodating me, then
3   she was accommodating every single person
4   that worked there.
5       Q.   Okay.
6       A.   So, you know, then she needed
7   a letter from everybody if she was going
8   to get a letter from me. But I didn't
9   have a problem providing a letter. And I
10   told her -- I said, well, the next time I
11   go to the doctor, I'll get one, because I
12   was going to -- I was supposed to see him
13   in a few weeks.
14       And then I was, you know -- and I
15   had told her in February -- I was sick --
16   actually, I was visibly sick that day that
17   this occurred, when she said that to me.
18   My face was swollen, and I had started
19   having really bad headaches and pain in my
20   neck and everything.
21       And I had scheduled an appointment
22   for -- to go to the chiropractor on March
23   the 1st. And the reason it was March the

27 (Pages 105 to 108)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 109

1    1st was because -- as I said, I just went
2    on -- qualified for the insurance, and
3    I -- you know, I had to -- sort of a
4    learning thing to get -- understand all
5    about that Medicaid and everything.
6        Q.   Medicare.
7        A.   Right.  And I had to get -- I
8    changed insurance, you know, companies --
9    plans that I was on.  So I was starting on
10   a new plan on March the 1st.  So that's
11   one reason I was scheduling it for March
12   the 1st.  Because on the insurance that I
13   was on, I had this higher co-payment to
14   pay; where on the new insurance, I had a
15   much lower co-pay.
16       So, anyway -- and I was having to go
17   to a new chiropractor who was covered
18   under this insurance.  My chiropractor
19   that I had seen for 25 or 30 years was not
20   covered under this insurance.
21       Anyway, I had told her that I had --
22   that, you know, I had this health problem
23   and, you know, that I was going to go to

Page 110

1    the doctor, you know, and that I was
2    having all this pain and stuff.
3        And, anyway, on March the 1st --
4    I've lost my train of thought.  But on
5    March the 1st, I went to the chiropractor,
6    and he would not touch me.  He did an
7    x-ray, and he said he would not touch me
8    without me having an MRI.
9        And so I came back to work the next
10   day.  You know, I had told her I was doing
11   that.  I said, you know, I'm going to have
12   to schedule an appointment with a
13   neurologist and get an MRI and
14   everything.  And I'm really having a lot
15   of pain, but I need to try to keep
16   working, you know, and I hope you'll work
17   with me.  I want you to try to -- I'd
18   appreciate it if you would try to work
19   with me, because I want to work as much as
20   I can.  And she said, no problem.  Just
21   let me know what's going on.
22       And then I was suddenly scheduled --
23   you know, here I was, like I said, trying

Page 111

1    to get hours all the time because I -- it
2    was a struggle.  And they told, you know
3    -- and what they eventually told you,
4    after -- you know, at some point in time,
5    after we were hired, that you could never
6    count on having 20 hours a week over --
7    that's a seven-day work week.  That that
8    would be far and few between.  You're not
9    going to get that many hours on a regular
10   basis.  But then, all a sudden, here I was
11   in all this pain and I'm trying to work.
12       And I was scheduled, you know -- I
13   don't remember which one it was.  But
14   there was one time I was scheduled for
15   four days straight, like 21 hours, and
16   then the next week it was like five days
17   straight, 23 hours or something, which was
18   a rare thing.  Suddenly, while I'm in
19   agony, trying to go to the doctor and have
20   tests and find out what's wrong with me, I
21   get all these hours.  And then --
22       Q.   So do you feel that was
23   discriminatory in some way?

Page 112

1        A.   Well, I don't -- no.  I can't
2    say that that was discriminatory.
3        But what happened was she -- I got a
4    warning -- I was late during that time,
5    and I missed one day of one of those -- of
6    the five-day schedule because I wasn't
7    able to get there.  And I got a warning.
8        I thought I was answering the
9    question about what I called Valerie Lee
10   about.
11       Q.   Well, you were, but you like
12   to talk about a whole lot of other
13   things.  So while you think about that --
14       A.   Well, what happened was --
15       Q.   What happened at what point?
16       A.   She gave me -- they gave me a
17   warning.
18       Q.   All right.  But what --
19       A.   And on the day she gave me the
20   warning, she said, I need that letter --
21   disability letter.  I have to have it in a
22   week.  Well, I had been to the --
23   Dr. Jakes on Friday requesting -- to

28  (Pages 109 to 112)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 113

1  request the letter, and he told me it
2  would take about two weeks. And that's
3  what I told her at that time while she --
4  when she was demanding the letter. I
5  said, I can't have it in a week. He told
6  me it's going to take about two weeks.
7      And, actually, what it was, it -- it
8  normally didn't take quite that long, but
9  his -- his trans -- you know, has a --
10  transcribes it, and she had had a death in
11  the family and, you know, there was a
12  delay. But Kim was -- she was like, I
13  have to have it. She wouldn't take no for
14  an answer. She wouldn't take the answer
15  that my doctor had said. I couldn't get
16  it that quick.
17      So on -- that was on Saturday that
18  this all occurred. So on Monday --
19      Q.   What date was that? What
20  date?
21      A.   I think it was March 11th. On
22  Monday I was off, and I called her and
23  asked her for Valerie Lee's phone number

Page 114

1  because -- I said -- and I was calling her
2  to let her know -- because Kim made me
3  sound like that they, at corporate --
4  Valerie Lee was the one that was demanding
5  this letter. So I wanted to call and
6  explain to her what my doctor had said;
7  that I was getting it as soon as possible,
8  but I couldn't get it before he gave it to
9  me.
10      Q.   Sure.
11      A.   And she didn't like it because
12  I wanted Valerie Lee's phone number. And
13  when I called Valerie Lee, I explained the
14  situation to her. And she was real nice
15  and said she understood perfectly, you
16  know. She didn't know why Kim said that.
17      And I also brought up to her how I
18  felt about the warning that I had gotten
19  in December and now the one in March.
20  Because both times when I got these
21  warnings was when I was having, you know,
22  some health issues, and, you know, that I
23  had offered to provide a letter in

Page 115

1  December and that I had come to Kim in --
2  what I would call it -- I did ask for an
3  accommodation verbally when I asked her to
4  work with me while I was trying to go to
5  the doctor and have tests and find out
6  what was wrong with me. And suddenly I
7  get more hours. And then, because I can't
8  meet the hours, I get another warning.
9      And I felt like she -- it was
10  obvious to me that she -- she thought that
11  I was going -- the reason she ran to Ron
12  immediately after she said that to me, you
13  know, about drinking, was because she
14  thought she was going to -- I was going to
15  say something about it, and she was going
16  to get in trouble.
17      And, you know, I just told Valerie
18  Lee -- I didn't even tell Valerie Lee that
19  day what -- anything about what she had
20  said to me, about the drinking. I hadn't
21  -- I didn't mention that at that point in
22  time. I just mentioned that I didn't feel
23  good. The warnings were warranted at that

Page 116

1  time, while I was sick.
2      (WHEREUPON, a document was
3  marked as Defendant's Exhibit Number 9 and
4  is attached to the original transcript.)
5      Q.   Well, let me show you what
6  I've marked as Defendant's Exhibit Number
7  9.
8      A.   Yeah. This is the one from
9  March 11th.
10      Q.   Where you can concede that you
11  have had difficulty being at work and
12  getting there on time. That's your
13  handwriting on the bottom, is it not?
14      A.   Right.
15      Q.   So you concede that you were
16  having trouble getting to work on time,
17  correct?
18      A.   Uh-huh.
19      Q.   Is that yes?
20      A.   Yes.
21      Q.   Was the accommodation that you
22  requested that you be let off from work,
23  that you be -- that you have days off?

29  (Pages 113 to 116)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 117

1      A.   No. I had just, you know -- I
2  mean, I don't know if you would call it
3  accommodation. I had just asked -- told
4  her that I was trying to find out what was
5  wrong with me; that I was trying to work.
6  I was in a lot of pain. I didn't, you
7  know -- I was just trying to find out what
8  was wrong with me.
9      Q.   But what I'm trying to
10 understand --
11     A.   And what I don't understand
12 is, if she's trying to work with me, why
13 did she schedule -- suddenly schedule me
14 four hours in -- 20-something hours in
15 four days and 20-something hours in five
16 days. When I was well and wanted to work
17 all those hours, I could never have them.
18     Q.   Well --
19     A.   I think it was deliberate.
20     Q.   Well, what --
21     A.   It looked deliberate.
22     Q.   Well, let me ask you this
23 question: What evidence do you have that

Page 118

1  it was deliberate? Evidence. Not
2  opinion. Not conjecture. Not belief.
3  What evidence do you have that it was
4  deliberate?
5      A.   I guess I don't have any
6  evidence except that it's an odd
7  coincidence.
8      Q.   What evidence? You either
9  have evidence or you don't. It's a very
10 simple question. No need for a
11 narrative. Do you have any evidence?
12     A.   That she did it on purpose?
13     Q.   Yes, ma'am.
14     A.   Well, no.
15     Q.   Did you want to be scheduled
16 for work?
17     A.   Did I want to be scheduled for
18 work?
19     Q.   Yes, ma'am.
20     A.   Yes.
21     Q.   You did. You needed the
22 money, did you not?
23     A.   Uh-huh.

Page 119

1      Q.   Did you simply want her to
2  understand that you might be late?
3      A.   You know, I just -- I wanted
4  her -- I guess I -- yeah, I might be
5  late. That I might be late. And
6  certainly, you know, I wouldn't expect
7  that she would give me more hours when
8  you're not feeling well than you normally
9  ever get.
10     Q.   Well, let me ask you this,
11 Ms. Beard: Do you know what the labor
12 budget was for that store?
13     A.   No.
14     Q.   Do you know anything about the
15 management of the store?
16     A.   Like what part of the
17 management?
18     Q.   What the goal -- what the
19 sales goals were.
20     A.   Well, I mean, sometimes they
21 would tell us.
22     Q.   Right.
23     A.   But I can't give that to you

Page 120

1  at this point.
2      Q.   Right. Do you know anything
3  about what requirements Ms. Curry or the
4  other management staff may have had in
5  terms of the number of hours they could
6  staff the store with part-time
7  associates? If you know.
8      A.   You know, I know that they had
9  to -- it was based on projected sales for
10 the day and, you know, what we might have
11 done at that time the previous year and
12 stuff.
13     Q.   Sure. But that --
14     A.   And that's how they scheduled
15 it. But, I mean, they could have -- it
16 didn't -- they could have scheduled
17 somebody else on one of those four or five
18 days instead of me. Just like she had in
19 the past when I wanted to work and didn't
20 get to.
21     MR. NELMS: Just listen to --
22     THE WITNESS: I don't know
23 what to say.

30 (Pages 117 to 120)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 121

1  MR. NELMS: Well, then just
2  listen to what her question is and do the
3  best you can to answer that question.
4  THE WITNESS: Okay.
5  A.  I'm sorry.
6  Q.  Don't be sorry.
7  At other times you're saying that
8  Ms. Curry did accommodate you when you
9  needed a day off?
10  A.  Well, we filled out
11  availability sheets. So if you said that
12  you weren't available that day, then
13  usually they wouldn't schedule you to work
14  on that day.
15  Q.  So you're saying but for this
16  period of time -- we're talking about the
17  March '06 period of time. Prior to that,
18  I understand your testimony to be that
19  Ms. Curry was, in fact, working with you,
20  and that if you had a doctor's appointment
21  that you --
22  A.  I had asked her to. Yes.
23  Q.  Did you have that time off to

Page 122

1  go to see your doctor or whatever?
2  A.  I did -- I did go to the
3  doctor.
4  Q.  Sure.
5  A.  I don't quite -- I don't know
6  if I know what you're trying to ask me.
7  Q.  What word don't you
8  understand?
9  A.  I mean, I don't know what --
10  well -- okay. That's -- I don't know what
11  else to say.
12  Q.  Were there times between
13  December of '05 and March of '06 that you
14  asked for days off that you did, in fact,
15  receive those days off?
16  A.  Yes.
17  Q.  Were there days between
18  December of '05 and March of '06 that you
19  came to work late?
20  A.  I guess. Yes.
21  Q.  You guess? Were you --
22  A.  Yes. Yes.
23  Q.  You were late, were you not?

Page 123

1  A.  Yes.
2  Q.  Haven't you had trouble
3  getting to work on time for much of your
4  adult life?
5  A.  No.
6  Q.  Do you remember telling some
7  of your colleagues at the store that
8  coming -- you were late for everything?
9  A.  Well, yeah. I'm a person that
10  might tend to run late. Yeah. You know,
11  anywhere.
12  Q.  Does that have anything to do
13  with your alleged disability?
14  A.  The fact that I run late?
15  Q.  Yes, ma'am.
16  A.  Not if I run like five minutes
17  or something like that. No.
18  Q.  But you're a person --
19  A.  If I run significantly late,
20  then that's usually because, you know,
21  something else is going on physically.
22  Q.  Are you only significantly
23  late to work?

Page 124

1  A.  No.
2  Q.  You're significantly late
3  elsewhere, correct?
4  A.  If I'm sick or having a
5  problem -- a physical problem.
6  (WHEREUPON, a document was
7  marked as Defendant's Exhibit Number 10
8  and is attached to the original
9  transcript.)
10  Q.  Let me show you what I've
11  marked -- what's marked as Defendant's
12  Exhibit Number 10, and let me know if that
13  was the piece of paper that she asked you
14  to complete. She being Ms. Curry. I'm
15  sorry.
16  A.  Yes.
17  Q.  Let me just ask you one
18  question. You gave your lawyer this
19  morning a very detailed document, page --
20  11 pages, single spaced, starting with the
21  date of 12/2/05 and going through
22  8/29/06. When did you write this
23  document?

31 (Pages 121 to 124)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 125

1      A.   This past fall.
2      Q.   The fall of '07?
3      A.   Uh-huh.
4      Q.   And did you write these 11
5  pages from memory?
6      A.   No.
7      Q.   All right. What documents did
8  you use to write these 11 pages?
9      A.   My schedules. Where I wrote
10  down my schedule.
11      Q.   These are your actual
12  schedules?
13      A.   My -- the hours that I was
14  scheduled to work. And I had a calendar,
15  you know, that I used.
16      Q.   Well, we're going to have to
17  reconvene this deposition because I'm
18  entitled to see those calendars and all of
19  those schedules and all those other
20  documents that you have at home. So we're
21  going to do this again.
22      A.   Well, that's just my -- that's
23  just my -- where I scribbled down my

Page 126

1  schedule.
2      Q.   That's fine. I understand.
3  But I'm entitled to see that.
4      A.   Well, I don't know if I still
5  have all that, because that's where I
6  wrote all that out.
7      Q.   Well, you told me you have
8  these schedules at home earlier in your
9  deposition.
10      A.   I may have them. I'll have to
11  go back and check. But if I have -- the
12  printed schedules -- what I -- let me --
13  what I did with my printed schedule is --
14  the printed schedule -- I folded them up
15  like this, and I -- the back side was
16  white. And I wrote up there -- I wrote
17  Monday through -- or Sunday through
18  Saturday, which is how we were scheduled.
19  And I'd write up there that, you know --
20  say on Sunday I'm scheduled 1 to 5, and
21  I'd write Monday off. And I'd just put it
22  on the front of that schedule so that I,
23  you know, could have a quick reference to

Page 127

1  when I was supposed to work that week.
2      Q.   Absolutely. I want them.
3      A.   And then I would write on
4  there sometimes that -- you know, what
5  time I went to work that day or what time
6  I got off or I was absent that day or I
7  was sick or something.
8      Q.   Right. I want all of those.
9      MS. SINGER:  Do you have
10  something to say, Counsel? I'm sorry. I
11  may have interrupted you.
12      We can go off the record.
13      (Off-the-record discussion.)
14      Q.   But you will go home and see
15  whether or not you have the original
16  documents, correct?
17      A.   Right.
18      Q.   Including calendars?
19      A.   I know I don't have the
20  calendar. The calendar that was -- you
21  know, it was like a calendar that has
22  pictures of -- I think it was one like you
23  get that has pets in it, you know. A

Page 128

1  picture calendar like that. It's just one
2  of those cheap, advertisement-type
3  calendars.
4      Q.   And you have a list of --
5      A.   You know -- and it has all my
6  -- it had all my other personal
7  information on it that, you know -- that
8  has absolutely nothing to do with
9  Coldwater Creek and stuff.
10      Q.   I am entitled to any documents
11  that reference your employment with
12  Coldwater Creek that were not prepared for
13  your attorney. And if there's other
14  personal information on those calendars,
15  feel free to have your lawyer redact it.
16      MR. NELMS:  Get them all
17  together for us.
18      (WHEREUPON, a document was
19  marked as Defendant's Exhibit Number 11
20  and is attached to the original
21  transcript.)
22      Q.   I'm going to show you what is
23  marked as Defendant's Exhibit Number 11.

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 129

1 And I assume this is the first letter
2 that -- this is the letter that you
3 provided to Coldwater Creek, correct?
4    A.   Right.
5    Q.   All right. And it says here
6 that it's beneficial for you to work,
7 correct?
8    A.   Yes.
9    Q.   And what is the accommodation
10 that Mr. -- that Dr. Jakes is requesting
11 on your behalf?
12    A.   What -- he's requesting
13 that -- because I was -- this is -- I had
14 been prescribed to have -- to go to
15 physical therapy, you know. I had been
16 diagnosed with herniated or bulging discs
17 in my neck and lower back. I had been
18 prescribed to go to physical therapy.
19    So the first part of the letter was
20 just -- like they asked for a disability
21 letter. It was just -- the first
22 paragraph was supposed to be like just the
23 basic disability letter that they were

Page 130

1 asking for.
2    Q.   Where it says that you're not
3 to start work before 1:00, correct?
4    A.   Right.
5    Q.   And that was an accommodation
6 because of your illness, correct?
7    A.   I guess you can call it an
8 accommodation. I don't consider it to be
9 an accommodation because I should be able
10 to be hired to go to work at 1:00 the same
11 way that somebody else is hired to go to
12 work at 1:00.
13    Q.   All right. It also says that
14 you should be able to maintain a work
15 schedule in the range of 28 hours per
16 week. Do you see where it says that?
17    A.   Right.
18    Q.   Do you disagree with that?
19    A.   Well, no. We made it more
20 hours than I actually expected to get
21 because it was so hard to get hours. That
22 was at my suggestion because, you know, I
23 knew I'd never probably get 24. But --

Page 131

1 and no.
2    On occasion I can -- I can work --
3 like I said, there were some weeks in
4 August and -- all those months between
5 August and December when I was working at
6 OSI and I was working all those hours at
7 Coldwater Creek that I worked, you know,
8 30 plus hours a week. And the fact that I
9 have this disability is that -- I can't
10 sustain, over a long period of time,
11 regularly working eight hours a week for
12 40 hours, because what happens is I get
13 run down and it affects my immune system
14 and I get infections or I have
15 fibromyalgia flare-ups and stuff. It
16 doesn't mean that -- one week I might be
17 able to work 40 hours just fine. It's
18 just that I can't sustain it over and over
19 on a regular basis like you would for a
20 full-time job.
21    Q.   What kind of accommodation
22 were you requesting?
23    A.   Right here I was requesting

Page 132

1 that -- it says in here that, you know --
2 he's referring to -- in the last few weeks
3 that I, you know, was -- had this health
4 problem, which I was trying to get
5 diagnosed and treatment for. And it says
6 at times -- that I have significant pain
7 at times and that I didn't expect it --
8 you know, hopefully it wouldn't interfere
9 with my work, but it could. You know,
10 there was no way to know for sure. That's
11 what he's referring to. Just what it
12 says. And he was -- also it was -- I
13 requested that, you know, I needed to go
14 to physical therapy like three days a
15 week.
16    Q.   Where does it say anything
17 about physical therapy in this letter?
18    A.   Maybe I hadn't been diag -- I
19 don't know that -- if I had gotten -- I
20 went to -- okay. When I went to see
21 Dr. Jakes to get the letter, it was the
22 Friday before I got that warning on the
23 11th. And I hadn't even had the MRI yet.

33 (Pages 129 to 132)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 133

1 So I think I went back to see him. And
2 somehow he combined the letters, because
3 this was supposed to be the disability
4 letter.
5     I had asked her for the -- for them
6 just to accommodate me to let me go to
7 physical therapy by the fact that I needed
8 to go three days a week, preferably, not
9 two days in a row. Like on a Monday,
10 Wednesday, or Friday or something. And
11 not to schedule me three days in a row.
12     Q.   Where does it say that in this
13 letter? That's all my question is.
14     A.   Well, obviously I hadn't
15 been -- I don't think I had been -- I had
16 been -- I hadn't gotten the -- I hadn't
17 been sent to physical therapy yet. So I
18 may have just verbally requested the
19 physical therapy, and she probably said no
20 problem. And all I had to do was put on
21 my availability sheet that I wasn't
22 available. And this was just to let them
23 know, though, that I was going through a

Page 134

1 difficult time, you know. Had pain.
2     And it, you know -- in other words,
3 like what happened one day -- in fact, I
4 think it was the day that I got the
5 warning. I went -- came in to work, and I
6 was hurting a lot in my neck and my
7 shoulders.
8     Q.   Were you late that day?
9     A.   I don't remember.
10     Q.   Would you have any record at
11 home that would reflect whether you were
12 late or not?
13     A.   I don't know.
14     Q.   All right. Go ahead.
15     A.   But I think I might have
16 mentioned that it was bothering me.
17     Q.   Mentioned it to whom?
18     A.   Some people that were -- other
19 associates or whoever was around. Just,
20 you know, in conversation.
21     And I was working the cash rap, and
22 it was -- it got really slow. And so I
23 was doing something at the cash rap.

Page 135

1 Probably what I was doing was filling out
2 these forms that we put on clothes that --
3 when people return them that have to be
4 shipped out because we don't carry them in
5 the store anymore. I think that's what I
6 was doing. But I was doing some kind of
7 work like that at the cash rap, which is
8 part of the responsibility that you do
9 when you work that section.
10     And other people were just kind of
11 standing around talking and maybe
12 straightening a little bit, you know. We
13 weren't busy. There were a lot of other
14 associates kind of standing around.
15     And Jennease came out from the back
16 and said, specifically to me, that she
17 wanted me to fold all the shirts that were
18 on this table, you know, to get them
19 straight, which is something I did on a
20 regular basis, you know. And we do it a
21 lot when you're at the cash rap, when
22 you're not busy.
23     And I got them, and I -- but I said

Page 136

1 something about, you know -- that my back
2 was really bothering me, you know, but I
3 would try to do it or something, you
4 know. Or either after I started doing
5 it. It was really hurting. The movement
6 like this -- because it's repetition you
7 do a lot.
8     And also I noticed, though, that --
9 it was strange to me. It was like -- it
10 was strange to me that all these people
11 were standing around. And she came
12 straight from the back, and Kim was in the
13 back. And she just came straight out
14 there and picked me to do that.
15     And -- but my point is that that was
16 the only time that I had ever said
17 anything about my pain preventing me to do
18 -- from doing something. And then I
19 worked until -- it seems like it was
20 like -- it was after 6. Like a lot of
21 times you got off at 6 when you came in
22 early in the day. But I did work till
23 after 6. I don't know if it was 7 or 8 or

34  (Pages 133 to 136)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 137

1  what. And we'd start straightening for
2  the evening, you know, at 6 or 7 if we're
3  not busy.
4      And I did a lot of folding. In
5  fact, I think I did that whole table
6  before I left that night, and it didn't
7  bother me a bit, you know. It was just
8  hurting when I -- then because, you know,
9  maybe I hadn't gotten enough pain
10 medication in me or, you know -- for
11 whatever reason, at that particular point
12 in time, it was bothering me. Had nothing
13 to do with me not wanting to fold the
14 clothes. I liked doing that. That's the
15 only time that I ever, you know, had a
16 problem doing some work that I was --
17 might need to do because of it.
18     And I think that occurred before
19 this letter was done, which is one reason
20 that I had him to word this like this,
21 just in case I was in enough pain that
22 there was some little task like that that
23 I couldn't do on that particular day, at

Page 138

1  that particular moment in time, which
2  didn't mean that I could never do it again
3  or, you know, that I couldn't do it later
4  that day while I was going through
5  physical therapy and getting treatment
6  and -- until I got, you know, to where the
7  pain wasn't so bad.
8      Q. So you told Dr. Jakes what you
9  wanted in this letter?
10     A. I told him kind of what I
11 needed. What I thought they were asking
12 for.
13     Q. Well, let me ask you
14 something: Do you think coming to work is
15 an important function? Do you think
16 coming to work is a requirement for
17 employees?
18     A. Coming to work? Yes.
19     Q. Would you agree with me that
20 getting to work on time is also an
21 important function for an employee?
22     A. Yes.
23         (WHEREUPON, a document was

Page 139

1  marked as Defendant's Exhibit Number 12
2  and is attached to the original
3  transcript.)
4      Q. I'm going to show you what's
5  been marked as -- well, let's do this:
6  Let me show you what I'm marking as
7  Exhibit Number 12. If you would, identify
8  this document for me. Can you identify
9  that document for me, please?
10     A. It's an availability sheet.
11     Q. And you're showing here when
12 you needed off for your doctor's
13 appointment, correct?
14     A. I guess.
15     Q. Well --
16     A. That looks like -- that
17 doesn't look like my writing where it says
18 doctor appointment. It looks like it was
19 written in by somebody else.
20     Q. Well, do you recall -- do you
21 have an independent recollection whether
22 you had a doctor's appointment on the 16th
23 of March of '06?

Page 140

1      A. Pardon me?
2      Q. Do you have an independent
3  recollection whether you had a doctor's
4  appointment on March 16th of '06?
5      A. Oh, I may have because I have
6  a note down here saying -- that may be
7  what happened. I let them know about it.
8  Because I have that I'll let them know as
9  soon as it was scheduled, and they would
10 write it in.
11     Q. So they gave you the day off
12 when you told them that you were having a
13 doctor's appointment, correct?
14     A. Right.
15         (WHEREUPON, a document was
16 marked as Defendant's Exhibit Number 13
17 and is attached to the original
18 transcript.)
19     Q. Let me show you what I'm going
20 to mark as Exhibit Number 13, please. Can
21 you please identify this document for me?
22 Can you identify this document?
23     A. Yes. It's an availability

35 (Pages 137 to 140)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 141

1  sheet.
2  Q.   And it shows here where you
3  may have doctor's appointments, correct?
4  Or it says RO.  What does RO mean?
5  A.   Request off.
6  Q.   And if we looked at your
7  schedule, would it reflect, in fact,
8  Ms. Beard, that you were given off on
9  April 11th of '06, April 18th of '06, and
10  then again on April 28th of '06?
11  A.   Probably.
12  Q.   And that's the
13  accommodation --
14  A.   I'm sure I had other days off
15  because you don't get that many hours.
16  That just is -- you're just letting them
17  know you're available.
18  Q.   And I appreciate that,
19  Ms. Beard.  I really do.  I'm just trying
20  to make clear -- or I'm trying to
21  understand that when you asked for time
22  off due to a doctor's appointment, you got
23  the time off.

Page 142

1  A.   Right.
2  Q.   You did, didn't you?
3  A.   Yes.  Everybody got the day --
4  whenever anybody requested off, there was
5  no problem because we had enough people
6  that -- that's what that was for.
7  MR. NELMS:  Just answer her
8  question.
9  Q.   You had a doctor's
10  appointment?
11  A.   Yes.
12  Q.   It was important for your
13  physical therapy, correct?
14  A.   Yes.
15  Q.   And you got the time off to go
16  to the doctor, correct?
17  A.   Yes.
18  Q.   Thank you.
19  (WHEREUPON, a document was
20  marked as Defendant's Exhibit Number 14
21  and is attached to the original
22  transcript.)
23  Q.   Let me show you what I'm

Page 143

1  marking as Defendant's Exhibit Number 14.
2  And if you would, will you please identify
3  what I've marked as Defendant's Exhibit
4  Number 14?
5  A.   Availability sheet.
6  Q.   Once again, you asked, for
7  health reasons, not to schedule more than
8  two days in a row, correct?
9  A.   Right.
10  Q.   And if we looked at schedules,
11  you were not scheduled for more than two
12  days in a row, were you, Ms. Beard?
13  A.   After I requested that?
14  Q.   Yes.
15  A.   No.
16  Q.   That's --
17  A.   I don't think so.
18  Q.   Right.
19  A.   But they didn't -- they didn't
20  like it because I requested that.
21  Q.   Ms. Beard --
22  A.   They said something to me
23  about it.

Page 144

1  Q.   Ms. Beard, were you scheduled
2  for more than two days in a row after you
3  requested this in or around May of '06?
4  A.   Not that I recall.
5  Q.   Great.  Now, tell me who said
6  what to you about what thing.
7  A.   They asked me --
8  Q.   Who is "they"?
9  A.   Kim and Valerie Lee --
10  Q.   Yes, ma'am.
11  A.   -- asked me why I couldn't
12  work more than two days in a row.
13  Q.   All right.  And what, if
14  anything, did you say?
15  A.   I told them that -- because
16  back in March, when I was having, you
17  know, the health problem and a lot of
18  pain, I was scheduled, you know, for four
19  and five days in a row, up to 20-something
20  hours, and it was very difficult to work
21  those hours when I was feeling bad.  And
22  that, you know, I still was not a hundred
23  percent.  I had just found out I had

36 (Pages 141 to 144)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 145

1  breast cancer, and I was having a lot of
2  doctor's appointments. Plus, there was a
3  lot of stress and hostility going on in
4  the workplace. And I felt that it would
5  be to my advantage not to work more than
6  two days in a row.
7      Q.  And they accommodated that?
8      A.  The best that I can recall.
9  Yes.
10     Q.  Did you think at that point
11 you were being discriminated against?
12     A.  Yes.
13     Q.  Did you file a charge?
14     A.  You mean with the EEOC?
15     Q.  Yes, ma'am.
16     A.  No.
17     Q.  And you thought you were --
18     A.  Do you want me to say why I
19 thought -- what occurred that I thought
20 was discriminating?
21     Q.  Well, sure.
22     A.  In early -- I think it was
23 around May the 18th. Approximately a

Page 146

1  little more than two weeks prior to May
2  the 18th -- around May the 18th, if I've
3  got my dates correct in my mind, we were
4  doing -- like restocking the store and
5  working visual merchandising where you
6  could work at night, after the store
7  closed, from like 9 or 10 to 12 or 1:00 in
8  the morning or 5:00 in the morning, you
9  know. Working on visual merchandising.
10 Something that I really enjoyed. It, you
11 know, relates to my interior design
12 background too. And I had worked on the
13 visual team before, in the past.
14     And the visual merchandise manager
15 on the floor in the store one afternoon
16 said that she needed more people to work
17 during that time because she didn't have
18 enough help. And I said, oh, I'd really
19 like to do that. And so she immediately
20 left the floor and went back to the back
21 to tell Kim that I wanted to work. And --
22     Q.  Who is the person you said
23 this to?

Page 147

1      A.  Jessica, the visual
2  merchandise manager.
3      Q.  All right.
4      A.  And so I thought I was going
5  to get -- nothing else was said about it.
6  So I thought I was going to get to -- be
7  scheduled to work. Because she acted like
8  she was glad I volunteered, and she went
9  to tell Kim.
10     And so then, when the schedule came
11 out that week to work those hours, I
12 didn't get any of them. And I called
13 Valerie Lee, who I had had many
14 conversations with by this point in time.
15 And she wasn't in, so I left a message for
16 her to please return my call. And I was
17 off that Wednesday. That was my -- I had
18 an appointment that day with the -- my
19 first appointment with my breast surgeon
20 when I -- he gave me all the worst-case
21 scenarios and everything about breast
22 cancer that you could ever not want to
23 know.

Page 148

1      And the next day, when I went in to
2  work -- and I never had heard back from
3  Valerie Lee. And the next day I went in
4  to work. Kim calls me back in the office,
5  and she said, I know that you called
6  Valerie Lee and I want to know what you
7  called her for. And then, before I could
8  even answer her -- and she said it in that
9  kind of tone. Before I could answer her,
10 she said, was it about the schedule? And
11 I said, yes, it was about the schedule.
12 It was also about, you know, the fact that
13 I've got cancer and I'm going to be having
14 surgery and, you know, several things of
15 that nature.
16     And she said, the reason you didn't
17 get to work on the visual team is because
18 of your disability letter. And she also
19 said, you know, and I was afraid you
20 couldn't climb a ladder. And I said, you
21 know, I volunteered to do this over two
22 weeks ago. And if I had known that my
23 letter that you have would have caused a

37 (Pages 145 to 148)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 149

1  problem -- if you had told me this, I
2  could have gotten a letter from my doctor
3  saying that it was fine for me to do
4  this.
5      Because I had finished physical
6  therapy by then. I was feeling a lot
7  better, you know, as far as my back was
8  concerned and all that. And I really
9  needed those hours because I knew that at
10  some point in time I was probably going to
11  have to take a leave of absence. In fact,
12  at that point, I didn't know how involved
13  my surgery was going to be. So I didn't
14  know how much I was going to be missing
15  from work or what. So I wanted to work as
16  much as I could prior to all that. And I
17  liked doing that work.
18      And to me, that's discrimination
19  because she perceived that I couldn't do
20  that work because of that letter. And she
21  didn't give me an opportunity to give her
22  another letter because she didn't want me
23  to be able to work.

Page 150

1      Q.  And what did that --
2      A.  And when I talked to Valerie
3  Lee, who called me the next day at home,
4  she said that I did need to turn in a
5  release letter. And I said, well, you
6  know, I would have done that had I known.
7  But what I don't understand is why am I
8  being -- not being told this until after
9  the fact. When it's too late for me to
10  get the hours, you're telling me this.
11  And to me, that's discrimination.
12      Q.  Okay.
13      A.  Another time is -- my hours
14  were cut. And after I got those, you
15  know, extra hours in March, when I was
16  feeling so bad -- well, after I went to
17  physical therapy -- actually, after I had
18  one treatment, I was a lot better. But
19  after I had been going to physical therapy
20  for several weeks -- you know, I'd have to
21  refer back to find out the exact day -- my
22  hours started getting cut. As I felt
23  better and was better able to work, which

Page 151

1  I let them know that, my hours got cut.
2      And then there was a point in time
3  in there when Kim was scheduled to go out
4  of town for, you know, a store meeting
5  they had in Idaho. And for some -- the
6  schedule normally came out like on Tuesday
7  for the next week, you know. Well, that
8  particular week it didn't -- we didn't get
9  it till that weekend. And by the time I
10  got the schedule, she was gone out of
11  town. And I was scheduled for five hours,
12  which I had never worked five hours. It
13  was very deliberate that she gave me five
14  hours.
15      Q.  And when was that?
16      A.  She was out of town.
17      Q.  When was that?
18      A.  If you give me that --
19      Q.  I'm just asking for an
20  independent recollection.
21      A.  It was --
22      Q.  What month?
23      A.  It was probably -- might have

Page 152

1  been -- it was either -- it was probably
2  April, maybe. You know, somewhere between
3  March, April, and May, I would say.
4      And what I did was I called Valerie
5  Lee, which I couldn't get her. I had to
6  leave her a message on her voice mail.
7  And I told her that I had -- we had
8  already been discussing the fact that I
9  was only getting five hours -- I mean,
10  that I hadn't been getting enough hours.
11  And I called her and told her that I, you
12  know -- what had happened and I was upset
13  about only getting five hours. And she
14  called -- she called one of the managers
15  at the store. They didn't specifically
16  tell me what happened. But obviously she
17  called them, and they gave me another -- I
18  got another day to work.
19      And prior to that, when I questioned
20  them about my hours when I was going to
21  physical therapy and stuff, they were
22  giving the hours that I typically worked
23  in the afternoons to other people and

38  (Pages 149 to 152)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 153

1  saying they didn't have any hours to give
2  me. But there I saw the hours. They had
3  just given them to other people.
4      I mean, there was a conversation in
5  there one day when I -- because Santina,
6  who was one of the assistant managers --
7  she was the one that did
8  the schedules then, but, you know, Kim had
9  the final say on them and stuff. And I
10  said something about the schedule, and she
11  said, we don't have any hours to give you
12  that you can work. But there they are on
13  the schedule. The same kind of hours that
14  I had been working since I was hired.
15  And -- and then -- and she'd say, if you
16  want to talk about the hours, you need to
17  talk to Kim.
18      Then I go to Kim, and Kim would tell
19  me she didn't make the schedules. Santina
20  did it. I needed to talk to her. They
21  were just jerking me back and forth.
22      There were -- there were numerous
23  times that are listed in that timeline

Page 154

1  thing I gave you over there when I called
2  Valerie Lee about the schedule and about
3  things that Kim had said to me.
4      And -- like one time she said -- you
5  know, one time, when I was questioning the
6  schedule -- because these other people had
7  had more hours repeatedly for some weeks,
8  and I wanted to know, you know, why mine
9  were cut. And she was -- and I said,
10  well, why, you know -- she had more than I
11  did last week. So why didn't you -- I was
12  trying to say like why couldn't you make
13  it a more even -- you know, even it out
14  between everybody. And, you know, I said,
15  if you had given me that one day that you
16  gave her, it would have been more even,
17  you know. But it was my usual time to
18  work and stuff. And she said, well, I
19  can't take hours from them and just give
20  them to you. But basically what she did
21  was she took hours from me and gave them
22  to them.
23      And I'm having trouble saying all

Page 155

1  this because it, you know --
2      Q.  Let me ask you this one
3  question.
4      A.  It's frustrating.
5      Q.  Is coming to work an important
6  function for being a good employee?
7      A.  Yes.
8      Q.  And being at work on time,
9  correct?
10      A.  Yes.
11      Q.  Thank you.
12      (WHEREUPON, a document was
13  marked as Defendant's Exhibit Number 15
14  and is attached to the original
15  transcript.)
16      Q.  I'm going to show you what I'm
17  marking as Defendant's Exhibit Number 15.
18  And you asked for no more than two days
19  straight, correct?
20      A.  Correct.
21      Q.  And is it your testimony that,
22  in fact, you were not asked to work more
23  than two days straight?

Page 156

1      A.  As I recall.
2      (WHEREUPON, a document was
3  marked as Defendant's Exhibit Number 16
4  and is attached to the original
5  transcript.)
6      Q.  Let me show you what I'm
7  marking as Defendant's Exhibit Number 16.
8  And, once again, this is your availability
9  sheet from July of '06, correct?
10      A.  Right.
11      (WHEREUPON, documents were
12  marked as Defendant's Exhibit Numbers 17
13  and 18 and are attached to the original
14  transcript.)
15      Q.  Let me show you what I'm
16  marking as Exhibits 17 and 18. Look at
17  these side by side. Can you identify what
18  I've marked, Ms. Beard, as Defendant's 17
19  and 18?
20      A.  I'm sorry. What did you ask
21  me?
22      Q.  I want you to identify
23  Exhibits 17 and 18.

39  (Pages 153 to 156)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 157

1      A.   Availability sheets.
2      Q.   These are for August of '06,
3   correct?
4      A.   Right.
5      Q.   And one was revised, was it
6   not?
7      A.   Yes.
8      Q.   And you had requested to move
9   from 1:00 to 2:00, correct?
10     A.   Right.
11     Q.   And what was the reason that
12   that was --
13     A.   Because I was starting my
14   radiation treatments, and you're supposed
15   to go -- try to go at the same time every
16   day. And the time that they were able to
17   try to fit me in was like around 12:00.
18   And I was afraid that I would be late if I
19   had to work at 1. You know, they're not
20   always on schedule.
21     Q.   Sure.
22     A.   And because I was having to go
23   for treatments every day, that's why I was

Page 158

1   spacing it out like that, because I
2   thought that it would be easier for me.
3      Q.   Sure. And, in fact, your
4   schedule was moved so that you could come
5   to work at 2:00, correct?
6      A.   Well, actually, I requested --
7   I spoke to Kim about two weeks or so
8   before I was supposed to start the
9   treatments on the 7th. And she -- you
10   know, asked her about accommodating me for
11   the radiation treatments. And she said,
12   no problem.
13     Well, when the schedule came out,
14   the prior -- week before the 7th -- but
15   for the week of the 7th -- which we
16   received it -- I think it came out on like
17   Thursday of that week. I was not -- I was
18   scheduled -- and I had gone back -- gone
19   to her by that time and told her that I
20   needed to not work before 2:00. The
21   schedule came out. They had me scheduled
22   to work at 1.
23     So I went to Santina, who was the

Page 159

1   one doing the schedule, and told -- you
2   know, said that -- you know, that Kim had
3   agreed to accommodate me, and the schedule
4   was not accommodating me. And she said,
5   just because you want to be accommodated
6   doesn't mean you will be accommodated.
7   And she studied the schedule for a minute,
8   you know, and just said that they didn't
9   have any hours to give me. And like they
10   were just going to cut my hours and not
11   give me any, and that upset me. So -- and
12   I told her, you know, that I had talked to
13   Kim, and she had agreed to do it.
14     So she supposedly goes back to the
15   back to talk to Kim about it and, you
16   know, comes backs and tells me that she
17   can't change it. There's nothing they can
18   do. It's just too bad. And this went,
19   you know -- and she went back and talked
20   to Kim more than one time. And it was
21   never changed except for where my -- to
22   where my hours were cut.
23     Q.   You came in at 2:00, though,

Page 160

1   in the month of August, did you not, for
2   those days that you did work?
3      A.   I guess. But I -- in other
4   words, they put me through a lot.
5     And what happened was I had to call
6   the regional manager, Jan DeCrosta,
7   whatever her name is, on Friday because --
8      Q.   Friday when?
9      A.   The Friday before the 7th.
10   Which on that -- on the Friday before the
11   7th, I was -- Friday, the 4th, I was to go
12   to the radiation where they x-ray you and
13   scan you to get you set up to get the
14   radiation. And I was all upset about the
15   schedule. I was all stressed out because,
16   you know, my hours were cut.
17     And so I called her about it, and
18   she told me that she didn't know that --
19   whether they were required to accommodate
20   me for radiation treatments, and she'd
21   have to check into it and she would call
22   me back on August the 9th and let me know
23   about it.

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 161

1   And I was all tensed up when I went
2   to get set up for my radiation treatment
3   and hurt my back. And it just, you
4   know -- they just caused me a lot of
5   grief, stress, and anxiety that wasn't
6   necessary. And she never called me back
7   on the 9th. I never heard from her again
8   until, I think, she terminated me.
9   Q.   You, in fact, were scheduled
10  to work at 2:00 in August, were you not?
11  A.   Yes. After I called Jan
12  and -- Kim called me and got mad because I
13  called Jan and said that she -- and told
14  me that she didn't know anything about the
15  schedule not being right, even though I
16  saw Santina go back there and talk to her
17  that day. She denied that any of that
18  happened. She didn't know anything about
19  it, you know. You know, it was just
20  all -- it was -- you know, I don't know
21  why they would -- why she was doing this,
22  you know.
23   And I was absent on Saturday because

Page 162

1   I hurt my back. And she called me back
2   twice that morning mad because I wasn't
3   coming to work. Tried to demand that I
4   come in, you know. Not believing that I
5   was having a problem with my back.
6   And I was so upset when I went to
7   get marked for the radiation and
8   everything, you know, that they had
9   suggested that maybe I should come back,
10  because I was just all tensed up and upset
11  about the radiation because, you know, I
12  had been in this hostile, stressful -- all
13  this stuff had been going on at work since
14  February while I was trying to get treated
15  for my back.
16  Then immediately following the
17  physical therapy, I was diagnosed with the
18  cancer. And the whole time that I'm
19  dealing with all that stuff, she's making
20  my life at work as miserable as she
21  possibly can.
22  And, you know, I went to work on
23  Sunday because I was only scheduled to

Page 163

1   work two or three hours, and we were
2   having a meeting that night. And when we
3   got through -- when we finished working,
4   were cleaning up, like we normally do --
5   and you have to vacuum. Which I had a
6   letter from Dr. Jakes. Had asked them to
7   accommodate me by not requiring me to
8   vacuum until he released me to vacuum
9   again.
10  And she said out on the sales
11  floor -- asked me to vacuum. And I said,
12  well, you know I'm not supposed to because
13  of my letter. But she was not supposed to
14  discuss that with me out on the sales
15  floor in front of other people. And then
16  she made a big deal about it and acted
17  like I should be able to vacuum and like
18  she didn't know anything about the letter
19  and just, you know, created a hostile
20  situation.
21  Q.   You keep saying hostile
22  situation. I don't know what that means.
23  What do you mean by that?

Page 164

1   A.   She just had a hostile
2   attitude toward me. Some days she came in
3   and just gave you a dirty look and didn't
4   speak.
5   Q.   Did she have that attitude
6   toward anybody else?
7   A.   Ever since she -- ever since
8   she said that --
9   Q.   Did she have that attitude
10  toward anybody else?
11  A.   Yes.
12  Q.   Other workers, correct?
13  A.   One other employees that --
14  who was a friend of mine. And it started
15  because we were friends.
16  Q.   Now, you don't know -- you
17  said that you saw Santina go back and talk
18  to Kim. But you didn't hear what they had
19  to say, did you?
20  A.   No. But I went back there one
21  time because I had to get some --
22  something from the stock room, and I saw
23  them standing there talking.

41 (Pages 161 to 164)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 165

1  Q.  Do you know what they were
2  talking about?
3  A.  They had the schedule in their
4  hand, and that's when she went back there.
5  She came right back out and told me she
6  talked to Kim about the schedule.
7  Q.  Did you hear their
8  conversation?
9  A.  No.
10  Q.  Thank you.  See, this is not
11  complicated.
12  A.  It feels complicated to me.
13  Can we take a break?
14  Q.  Sure.
15       3:37 p.m.
16       (Recess taken.)
17       3:53 p.m.
18       (WHEREUPON, a document was
19  marked as Defendant's Exhibit Number 19
20  and is attached to the original
21  transcript.)
22  Q.  I'm going to show you,
23  Ms. Beard, what I'm marking as Exhibit

Page 166

1  Number 19.  If you would, identify this
2  document for me, please.
3  A.  This is from my surgeon,
4  saying that I was able to return to work
5  after my surgery.
6  Q.  Well, it says here, when she
7  feels capable to return to work, doesn't
8  it?
9  A.  Right.
10  Q.  So does that mean that it was
11  open-ended?  That you could return to work
12  when you felt like coming to -- when you
13  felt ready to return to work?
14  A.  (Witness nodded head in the
15  affirmative.)
16  Q.  Correct?
17  A.  Right.
18  Q.  So there's nothing definitive
19  here, correct?
20  A.  Right.  Well, I returned after
21  only two days --
22  Q.  This doesn't --
23  A.  -- or three days after.

Page 167

1  Q.  Defendant's Exhibit 19
2  reflects the fact that this physician said
3  you could return to work when you felt
4  like it, correct?
5  A.  Yes.
6  Q.  Thank you.  Do you know in the
7  month of August or the last week of August
8  or the -- let me strike that -- in the
9  month of August how many days you were
10  late?
11  A.  No.
12  Q.  Do you know how many days you
13  were out?
14  A.  I think four.
15  Q.  Do you remember calling out on
16  Sunday, August 20th?  Do you remember
17  calling out on Sunday, August 20th?
18  A.  Well, I didn't call on August
19  the 20th.  I believe I called on Saturday
20  night and let them -- I actually was sick
21  at work that day, and I called that night
22  and told them that I wouldn't be able to
23  work the next day.  And that Susan -- I

Page 168

1  had arranged -- which we were allowed to
2  do -- for Susan to work in my place.
3  Q.  Do you remember calling in on
4  Tuesday, August 22nd?
5  A.  Actually, I called on
6  Monday -- I was off on Monday, the 21st,
7  and I called and told Kim that I was still
8  sick and that I had a doctor's appointment
9  on Tuesday and a doctor's appointment on
10  Wednesday.  Those were the soonest I could
11  get the appointments.  And that I was
12  really sick and that I didn't expect that
13  I would be able to work on Thursday
14  either, so that she could go ahead and
15  make arrangements for somebody to work in
16  my place on those two days.  And she said
17  that she wanted me to call her back
18  regarding Thursday.
19  Q.  And did you?
20  A.  I called back on Wednesday
21  evening, after I got home from the doctor,
22  and spoke with the manager, Heather, and
23  told her, you know, that I was still very

42 (Pages 165 to 168)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 169

1 sick and that I wouldn't be able to work.
2 And, you know, she said that was fine.
3 And then she called me back. I called,
4 you know, early evening, like 5, 6, or
5 something like that. And she called me
6 back at like 9:00, while I -- and woke me
7 up and told me that Kim said that I needed
8 to work the next day and that I needed to
9 call -- and if I wasn't coming to work, I
10 needed to call back in the morning.
11    So on Thursday morning, I called
12 back and said I am sick -- still sick, and
13 I can't come in. And Heather was the one
14 that was there. And she said that Kim had
15 said that I needed to get doctor's
16 excuses, you know, for the absences. And
17 I said, you know, that's not going to be a
18 problem, but I'm going to have to get them
19 to mail them to me because, you know, I'm
20 not able to go back to get the doctor's
21 excuses. But I will get them -- I'll call
22 them right away and get them to mail them
23 to me. And she said that would be fine.

Page 170

1    (WHEREUPON, a document was
2 marked as Defendant's Exhibit Number 20
3 and is attached to the original
4 transcript.)
5    Q. I'm going to show you what I'm
6 marking as Defendant's Exhibit Number 20.
7 If you would, identify this for me,
8 please.
9    A. That's when I was terminated.
10    Q. And who was present?
11    A. Kim and Jan DeCrosta.
12    Q. Did Ms. DeCrosta say anything
13 to you, Ms. Beard?
14    A. She said I was being
15 terminated because I didn't obey the
16 attendance policy.
17    Q. And do you know if you were in
18 compliance with the attendance policy?
19    A. I just -- I asked her -- well,
20 I asked her if this was because I was --
21 had been out sick. And she said -- that's
22 when she said because I didn't obey the
23 attendance policy.

Page 171

1    Q. Do you know how many times --
2 and I may have asked you this, and I
3 apologize. Do you know how many times you
4 were late in the month of August?
5    A. No.
6    Q. Do you know how many times you
7 were late in the month of July?
8    A. No.
9    Q. Do you know how many times you
10 were late in the month of June?
11    A. No.
12    Q. I'm talking all about '06.
13    A. No.
14    Q. Do you know how many days you
15 were late in the month of May of '06?
16    A. No.
17    Q. Do you know how many days you
18 were late in the month of April of '06?
19    A. No.
20    Q. Or March of '06?
21    A. No.
22    Q. February of '06?
23    A. No.

Page 172

1    Q. Would you say that you were
2 late 50 percent of the time?
3    A. I don't think so.
4    Q. Give me your best judgment
5 about how many days in any given month --
6 from March through August of '06 were you
7 late on the day that you were scheduled to
8 come to work.
9    A. I don't remember. I do know
10 that Valerie Lee told me that you were not
11 considered late unless you were more than
12 ten minutes late.
13    Q. Do you know how many times in
14 those months you were more than ten
15 minutes late?
16    A. No, I don't.
17    Q. Do you have a record of your
18 tardiness during that period of time?
19    A. No.
20    Q. Were you late more than once a
21 month, starting in March of '06?
22    A. Yes.
23    Q. Were you late more than twice

43 (Pages 169 to 172)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 173

1  a month?
2      A.   Yes.
3      Q.   Were you late more than three
4  times a month?
5      A.   Probably.
6      Q.   What about four times a month?
7      A.   I don't remember.
8      Q.   But you know that you were
9  late at least three times a month?
10     A.   Probably.
11         (WHEREUPON, a document was
12  marked as Defendant's Exhibit Number 21
13  and is attached to the original
14  transcript.)
15     Q.   Let me show you what I'm
16  marking as Defendant's Exhibit Number 21.
17  If you would, identify this document for
18  me, please. Ms. Beard?
19     A.   Do I recognize it?
20     Q.   Yes.
21     A.   It's the form we sent in to
22  the EEOC.
23     Q.   And it says here, in the first

Page 174

1  paragraph, at all times I performed my
2  duties to the reasonable expectation of my
3  employer.
4      That's not a hundred percent
5  accurate, is it, Ms. Beard?
6      A.   Well, I was -- it was
7  referring to duties.
8      Q.   But the expectation of your
9  employer was that you would come to work
10  on time, was it not?
11     A.   Well, yes.
12     Q.   Thank you. And it's also not
13  true that you say here, until early 2006,
14  there had been no complaints regarding my
15  work performance as an employee.
16     In fact, in December of '05 you had
17  been warned about your excessive
18  absenteeism and tardiness, correct?
19     A.   Well, we were referring to,
20  you know, work -- not -- work performance
21  as far as my work duties, functions of job
22  duties, or whatever you want to call it.
23  That's what we were referring to.

Page 175

1      Q.   But it's fair to say that the
2  main goal for -- or an important goal for
3  an employee is to show up at work, one,
4  correct?
5      A.   Right.
6      Q.   And, number two, to show up on
7  time?
8      A.   Right.
9      Q.   Thank you. All right. Now --
10     A.   But I was not the only person
11  who ran late consistently.
12     Q.   Who else ran late?
13     A.   One was somebody that was in
14  management. And, in fact, when I was
15  working at OSI -- and I was scheduled to
16  get off at 5 so that I could get to my job
17  there at 6. There were several times that
18  they asked me to stay later because she
19  wasn't there.
20     Q.   Who was that person?
21     A.   Jolee Barlow. And then there
22  was another girl, Judy, who ran late a
23  lot. And, you know -- and I know one

Page 176

1  time, in particular, when she came in
2  about 30 minutes late and she hadn't even
3  called. And they approached her. It was
4  Jessica who approached her when she came
5  in. You know, like, Judy, you're running
6  a little late today. It was like it was
7  not serious. You know, they wouldn't
8  have -- they didn't act like that toward
9  me.
10     And she -- and I knew she had been
11  late a lot. And she was somebody who had
12  said that she ran late all the time too.
13  Like I had -- that's the fact -- when that
14  conversation probably occurred at work,
15  when we were talking about that I was a
16  person who tended to run late everywhere I
17  went or something like that. And that's
18  what she said. And I do believe she
19  received some warnings. They didn't have
20  the same attitude toward her that they did
21  toward me.
22     Q.   Do you know if they warned
23  her?

44  (Pages 173 to 176)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 177

1     A.  I think she said that she had
2 been warned.
3     Q.  Thank you. Now, you say in
4 this, in paragraph two, that you felt you
5 were being discriminated against as early
6 as March of 2006; is that correct?
7     A.  Yes.
8     Q.  But you never filed a charge
9 in March of 2006?
10     A.  No.
11     Q.  Nor did you file a charge in
12 April of 2006, correct?
13     A.  No. The entire time I was
14 talking to Valerie Lee. I talked to
15 Valerie Lee on numerous occasions. And,
16 you know, when my hours started to be cut
17 in March, they were cut drastically into
18 April, as I said, when I was starting to
19 feel better and able to work and I was
20 asking for hours. And they were giving me
21 all these runaround excuses about the
22 hours. And, you know, I started being
23 scheduled to work 3 to 6, a shift I had

Page 178

1 never worked before and a shift that
2 was -- we never even had. It was created
3 for one associate that had come to work
4 there some months prior.
5     And Valerie Lee told me several
6 times that Kim was not handling this
7 properly or professionally. She suggested
8 that Kim and I sit down and talk in the
9 office, you know, regarding the schedule,
10 regarding the fact that I, you know, had
11 these health issues and trying to get
12 treatment and, you know, all the different
13 stuff that was going on. And every time
14 that we were supposed to get together, Kim
15 would not be there or -- and one time she
16 suggested that we would have a conference
17 call between me, Kim, and Valerie Lee, and
18 that never occurred.
19     And, you know, when my hours were
20 cut to ten hours a week and I called
21 Valerie Lee and talked, well, Kim told me
22 that Valerie Lee told her to schedule me
23 for ten hours a week. And I -- so I

Page 179

1 called Valerie Lee and asked her, you
2 know, why she had said for me to be
3 scheduled for only ten hours a week, and
4 she said she never said that, you know.
5 That's not what was said. That went back
6 and forth several times.
7     There was, you know, all this -- I
8 was trying to -- because I couldn't get
9 anything -- get -- communicate well with
10 Kim it seemed. I had to talk to Valerie
11 Lee just to try to get -- I just wanted to
12 get this straightened out to where, you
13 know, I didn't -- she wasn't, you know, I
14 felt like she was -- I felt like she -- it
15 seemed like, after she said that remark to
16 me -- which she ran and told Ron about.
17 You know, told on herself because I didn't
18 say anything about it. That she was
19 retaliating against me. And then she kept
20 referring to the letter.
21     And they brought up, you know --
22 they made an issue about the fact that I
23 couldn't vacuum. And there had been

Page 180

1 several -- a couple of other people that
2 worked there -- one girl that either had
3 carpal tunnel or tendinitis or something
4 in her hand and had to wear the wrist
5 brace for a month or so, and she couldn't
6 vacuum. But she provided no letter or
7 anything. And there was -- they had no
8 problem with her not being able to vacuum
9 during that time.
10     And I didn't have to vacuum very
11 often. It didn't come up for me to vacuum
12 because I didn't normally work till
13 close. That was a rare thing in the first
14 place. And, I mean -- and I did vacuum
15 when I first went to work there.
16     And also, after they had received a
17 release letter from Dr. Jakes, both
18 Valerie Lee and Kim brought up about --
19 one of their excuses for the way they were
20 scheduling me was because they didn't know
21 what duties I could do, what -- you know,
22 if I could do everything that needed to be
23 done at work. And I said, well, I can do

45 (Pages 177 to 180)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 181

1  everything I've been doing for the past --
2  almost two years, you know. And what are
3  you referring to? And then they said
4  something about the ladder. Well, I, you
5  know -- I did most of the Christmas
6  decorations. I climbed the eight-foot
7  ladder and decorated all the wreaths. And
8  there was never an issue about me climbing
9  the ladder, you know. These are things
10  they perceived that I couldn't do.
11        And they never said to me that we're
12  cutting your hours because you're late or,
13  you know, we're scheduling you only the 3
14  to 6 shift or telling you we don't have
15  any shifts because you run late. They
16  said it was because of the disability
17  letter. That was thrown up in my face
18  repeatedly because of what response --
19  what duties I might be able to do in the
20  store, you know, as far as straightening,
21  you know -- you know, the typical retail
22  things that you do. And, you know, made
23  the issue about the vacuuming and stuff.

Page 182

1  That's where I felt like I was being
2  discriminated against. And, you know, I
3  was very stressed out.
4        When you have fibromyalgia, you get
5  stressed out easily. And stress affects
6  you. And I just wanted things to get
7  straightened out so that I could, you
8  know, deal with these health issues. I
9  just wanted peace at work, and I wanted to
10  work as much as I could.
11        Q.    But you couldn't get to work
12  on time.
13        A.    But they didn't tell me that.
14  You know, they just scheduled me 25 hours
15  in four days when I was really sick and
16  then said now you've got a warning. I
17  just don't think they were fair.
18        Q.    You were warned before March
19  of '06, were you not?
20        A.    Before March?
21        Q.    Yes, ma'am.
22        A.    Yes. And I offered to provide
23  a letter from my doctor because I had a

Page 183

1  problem. A flare-up from a particular
2  type symptom that you have with
3  fibromyalgia, that I only had one other
4  time before.
5        Q.    You had --
6        A.    And I haven't had it since.
7        Q.    One second. One second. You
8  have already agreed with me that getting
9  to work on time is a critical issue for an
10  employee, correct?
11        A.    Yes.
12        Q.    Thank you.
13        Ms. Beard, do you want to go back
14  and work for Coldwater Creek?
15        A.    Well, I liked working there,
16  but I don't -- is Kim still the manager?
17        Q.    I don't have to answer any
18  questions.
19        A.    Well, I liked working there,
20  but I don't know that I could go back to
21  work there under the circumstances.
22        Q.    Are you physically able to go
23  back and work there?

Page 184

1        A.    Not at this very moment.
2        Q.    When was the last time you
3  were able to work retail?
4        A.    Well, I mean, I could have --
5  I felt like I could have continued to
6  work, you know, through my treatment.
7  There may have been a point in time -- I
8  mean, I know -- you know, I got -- the
9  reason -- they told me the reason I got
10  sick that week was because I had been
11  under so much stress with everything that
12  had been going on. And then, when I
13  started the radiation treatments, the
14  combination of everything that had gone on
15  --
16        Q.    Ms. Beard, it's a simple
17  question. If you don't know the answer,
18  that's fine.
19        When is the last time you were able
20  to work retail?
21        A.    I think I could have continued
22  to work. I might have had to take a leave
23  of absence at some point in time for a few

46 (Pages 181 to 184)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 185

1  weeks. And if I had continued to work, I
2  would have had my surgery for the carpal
3  tunnel. So that wouldn't be an issue at
4  this point.
5      Q.   And if Dr. Jakes' records
6  reflect that he recommended that you have
7  carpal tunnel surgery many years ago,
8  would you disagree with that?
9      A.   I haven't even been getting
10 the shots many years. I have had one
11 carpal tunnel test before the one I had
12 two weeks ago, and the neurologist said
13 that it wasn't that bad. And he said that
14 he didn't think I needed to have surgery
15 at that time. And he's the one that does
16 the test for it.
17     Q.   When was the last time you
18 were able to do any work?
19     A.   Well, after I got over being
20 sick, I could have kept working. That was
21 in the latter part of August into
22 September.
23     Q.   But you already told me that

Page 186

1  you didn't look for work.
2      A.   No. Because I didn't want to
3  go start a new job at, you know -- and try
4  to tell them I've been getting treatment
5  for radiation. And at the end of the
6  radiation treatment, it's very common to
7  have a problem with a lot of fatigue, and
8  typically you'll need several weeks of
9  rest. And that I would have to ask for a
10 leave of absence on a brand-new job.
11     Q.   So you aren't able to work; is
12 that correct?
13     A.   No. I don't think -- I did
14 not say that I wasn't able. I chose not
15 to under the circumstances.
16     Q.   You chose not to? You
17 chose --
18     A.   Because I didn't want to put
19 myself in the position to have to request
20 accommodations again after what I had just
21 been through.
22     Q.   But you could have done some
23 freelance work where you could have

Page 187

1  controlled your schedule, correct?
2      A.   Well, freelance work is not --
3  you know, you kind of have to know some
4  people that need some -- that type work
5  done.
6      Q.   Well, excuse me.
7      A.   I kind of lost touch with
8  that -- because I haven't done that in
9  quite a while.
10     Q.   Well, you had done it in 2003
11 for Mr. McCain, correct?
12     A.   Yeah. One friend.
13     Q.   Well, you've done marketing.
14 You couldn't market your services?
15     Are you aware that under the law
16 that you're obligated to look for work?
17     A.   What do you mean?
18     Q.   That the law requires that you
19 mitigate your damages. Are you aware of
20 that?
21     A.   No. I don't know what you're
22 talking about.
23     Q.   All right. It says here, in

Page 188

1  paragraph seven, that in June of 2003 that
2  you were diagnosed with fibromyalgia,
3  correct? Seven on the complaint.
4  Paragraph seven. It's probably on page
5  two. Paragraph seven.
6      A.   That's what it says. I was
7  actually diagnosed with fibromyalgia
8  1998.
9      Q.   And when you applied for your
10 job at Coldwater Creek, they were unaware
11 of that, correct?
12     A.   Right.
13     Q.   Now, on the next page -- well,
14 I should say on paragraph ten, the
15 allegation here is that Curry is -- and
16 we're talking about Kim Curry -- is a
17 manager -- is a member of upper management
18 to the extent that she was -- that she was
19 empowered to hire, fire, and discipline
20 and to set work schedule.
21     Are you aware that Ms. Curry was not
22 empowered to fire anybody?
23     A.   No.

47 (Pages 185 to 188)

**American Court Reporting**
**February 1, 2008**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LINDA BEARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: |
| v. | ) | |
| | ) | 2:07-CV-790-MNT |
| COLDWATER CREEK, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# PLAINTIFF LINDA BEARD'S
# FEBRUARY 1, 2008 DEPOSITION

# PART 2 OF 3

**American Court Reporting**
**toll-free (877) 320-1050**

Page 189

1  Q. Now, paragraph 13 -- you've
2 already told me a little bit about this --
3 or you've told me a lot about this. That
4 sometime after March 25, 2006 that Curry
5 changed your schedule from the date of the
6 evening shift and reduced your hours from
7 20 to five per week.
8  Do you see that?
9  A. (Witness nodded head in the
10 affirmative.)
11  Q. Is that accurate?
12  A. Well, I guess they're
13 referring to the fact that I was changed
14 to that 3 to 6 shift a lot.
15  Q. Now, other people were working
16 the 3 to 6 shift as well, correct? If you
17 know.
18  A. I know there was this one main
19 person that the shift was created for, and
20 there may have been some other people, you
21 know, who preferred that shift.
22  Q. Well, let me ask you
23 something. When you were scheduled to

Page 190

1 work at 3:00, were you able to get there
2 on time?
3  A. Some of the time, I guess. I
4 don't know that I was every single time.
5  Q. Well, let me ask you this: If
6 you had been already warned on two prior
7 occasions about not getting to work on
8 time, what's the reason that you didn't
9 make a greater effort to get to work on
10 time?
11  A. Because I -- I was trying,
12 but, you know, I was going through a very
13 stressful, awful time. It's, you know --
14 it was extremely traumatic, overwhelming,
15 devastating to be fighting a
16 life-threatening illness.
17  Q. Are you talking about the
18 breast cancer?
19  A. Uh-huh.
20  Q. Now, it says here that you
21 were diagnosed in March -- on March 12,
22 2006; is that correct?
23  A. No.

Page 191

1  Q. When were you diagnosed?
2  A. At the first of May.
3  Q. Well, what I'm asking is if
4 you knew that in December of '05 you were
5 on notice that your absentee and lateness
6 record was unacceptable and then you were
7 put on notice a second time in March --
8 was there any improvement between March,
9 before you got the diagnosis, and May?
10  A. There was a period of time of
11 improvement.
12  Q. For how long?
13  A. I don't remember, but there
14 was definitely a time of improvement.
15 Probably between the time that I got
16 better with my -- with the -- from the
17 physical therapy, before I found out about
18 the cancer. But, you know, I was also
19 suffering from a lot of stress because of
20 all the problems that were going on.
21  Q. Stress in terms of what? A
22 lot of problems going on physically?
23  A. No. With the attitude that

Page 192

1 Kim had about the schedule and cutting my
2 hours and --
3  Q. What's the reason --
4  A. -- bringing up the disability
5 letter, purposely keeping me from working
6 on the visual team, you know, treating the
7 other associate that was a friend of mine
8 who -- we got a lot closer while I was
9 going through the health issues. They
10 were ugly to her because she was friends
11 with me.
12  Q. Have you ever been a manager?
13  A. No.
14  Q. Have you ever supervised
15 anybody?
16  A. Been an assistant manager.
17  Q. Right. In that role, have you
18 ever managed any employees?
19  A. Uh-huh.
20  Q. Is that a yes?
21  A. Yes.
22  Q. What kind of employees?
23  A. Sales associates at a shoe

48 (Pages 189 to 192)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 193

1 store.
2 Q. At a shoe store? Did you have
3 authority to counsel with them?
4 A. No.
5 Q. What is it -- you say in your
6 complaint that the company failed to
7 accommodate you. What is it -- in what
8 way did they fail to accommodate you?
9 A. They didn't want to
10 accommodate me for the physical therapy.
11 They made an issue about it. They told me
12 that there were no shifts for me to work.
13 They used that as an excuse to --
14 Q. And what month was that?
15 A. March and April. That's when
16 my hours became drastically cut. They
17 told me there were no shifts for me to
18 work. Those were the exact words I was
19 told on one occasion. And like on one --
20 Q. How else did they fail to
21 accommodate you?
22 A. One occasion -- first of all,
23 you know, I was never hired to work an

Page 194

1 on-call shift, and you'll notice that I
2 was scheduled for a lot of on-call
3 shifts. And on one occasion, when I was
4 called to come in to work for an on-call
5 shift, it was when I was getting physical
6 therapy. And I came in to work, and I
7 told Kim that I would have to leave
8 earlier. Like I was supposed to work till
9 6 for that on-call shift, and I told her I
10 needed to leave earlier because I needed
11 to go to physical therapy that day. And
12 she didn't like that. Acted like that was
13 a big deal. And --
14 Q. But you did go, did you not?
15 A. Yes. But she was angry about
16 it. And I've forgot what I was going to
17 say.
18 Just like I said, when I -- they
19 made it an ordeal when I was supposed to
20 be accommodated for the radiation
21 treatment. They didn't -- even though she
22 said she would accommodate me, she didn't
23 want me to -- she didn't, you know, want

Page 195

1 to. She tried not to. And even the
2 regional manager told me that she didn't
3 think they were, you know, supposed to
4 accommodate me for that.
5 Q. Did they accommodate you?
6 A. Eventually. After causing me
7 a lot of grief. And then, you know,
8 the -- and I told her that I had that
9 accommodation letter for my doctor. And
10 she said, why are you getting a letter
11 when I said I'd accommodate you? That was
12 before she didn't do it -- didn't
13 accommodate me like she said.
14 Q. Who is "she"?
15 A. Kim. And then I never got to
16 turn that request in. And the request
17 says in there, you know, that, you know,
18 there could be problems. You don't know
19 what kind of problems there were.
20 You know, to me, I think there
21 should be some understanding about the
22 fact that -- because I already had these
23 chronic illnesses. And then, when I

Page 196

1 started the radiation -- I got sick the
2 first week after I started the radiation,
3 and then I missed those three days. You
4 know, I think they should have understood,
5 you know -- when you're going through
6 cancer treatment and if you get sick, that
7 should be something that -- it's an
8 excused absence.
9 Q. That's your opinion, correct?
10 A. Right. It's my understanding,
11 though, according to the ADA, that you're
12 supposed to accommodate people who are
13 getting treatment for cancer.
14 Q. Anything else that the law
15 you want to tell me? Specifically the
16 ADA.
17 A. I just said that was my
18 understanding.
19 (WHEREUPON, a document was
20 marked as Defendant's Exhibit Number 22
21 and is attached to the original
22 transcript.)
23 Q. I'm going to show you what I'm

49 (Pages 193 to 196)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 197

1  marking as Defendant's Exhibit Number 22.
2  Can you identify that for me, please?
3       A.   Yes.  That's a note that I
4  wrote to Kim.
5       Q.   When?
6       A.   Sometime during that time,
7  when my hours were being cut.
8       Q.   Well, it's not --
9       A.   I don't know the exact date.
10       Q.   Do you have a month?
11       A.   No.  I don't remember the
12  exact time, but I do know that this is
13  what Ron said to me.  And it also mentions
14  seniority in the handbook.
15       And then, you know -- after I
16  expressed this opinion, then they said
17  that -- they came out -- this was shortly
18  before -- this was like in August, I
19  think.  Maybe it was June.  I don't know.
20  They came out with this new program
21  that -- they were going to keep this chart
22  to chart your productivity every day.  And
23  the people that were the most productive,

Page 198

1  that was how you would get hours.  It came
2  out shortly after I did -- turned this
3  letter in.  And it was a totally new thing
4  that Coldwater Creek had never had.  And
5  it lasted about two weeks.  And it wasn't
6  a problem for me because I was high up on
7  the productivity.  I was one of the top
8  ones on the chart.  But I don't know what
9  else to say about it.
10       Q.   How was productivity measured?
11       A.   It had to do with the cash rap
12  and, you know, trying to add on sales
13  and -- I can't even remember because it
14  was such a brief -- it was, you know, done
15  in such a short period of time before I
16  left, while I was in the turmoil of my
17  treatment and all this was going on.  And,
18  you know, the chart was up there maybe two
19  or three weeks.
20       And then I found out from some other
21  employees that they dropped that about as
22  quick as they started it.  It didn't --
23  you know, after I had been terminated,

Page 199

1  they didn't continue doing that.  It was
2  just some -- in fact, they had -- she said
3  they had the chart up there, and they
4  didn't put anybody's productivity on it
5  for weeks or something, and then it just
6  was never mentioned again.
7       Q.   Who was the person that was
8  your friend at Coldwater Creek?
9       A.   Tonya.
10       Q.   What's Tonya's last name?
11       A.   I can't remember.
12       Q.   Did she frequently work with
13  you?
14       A.   Off and on.
15       Q.   Are you aware that everybody
16  who worked for that -- most sales
17  associates at Coldwater Creek had on-call
18  hours?
19       A.   Right.  But when we were
20  hired -- when the store opened, they
21  hired -- they had like two specific people
22  that were only on-call people.  Only when
23  we -- when -- after Kim came did she start

Page 200

1  putting everybody on on-call shifts.  She
2  never even asked anybody.
3       Q.   Sure.  But she put everybody
4  on on-call shifts, correct?
5       A.   Right.
6       MS. SINGER:  I think this is
7  probably a good time to adjourn, Andy.
8  And just, on the record, I'm saying that
9  I'm adjourning it because I want to see
10  any and all documents that Ms. Beard may
11  have at home or anywhere else that relate
12  to this matter.  And then we'll reconvene
13  the deposition.
14       One other thing, Ms. Beard.
15  If I provide your lawyer with consents to
16  get your medical records, will you sign
17  those consents?
18       THE WITNESS:  I guess.
19       Are we okay?
20       MR. NELMS:  For the record,
21  I've agreed that because certain records
22  and documents were not produced that I
23  have no objection to adjourning and

50  (Pages 197 to 200)

**American Court Reporting**
**February 1, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 201

1   reconvening --
2           MS. SINGER:  At a time that's
3   convenient for Ms. Beard.
4           MR. NELMS:  Right.
5           4:30 p.m.
6   (Deposition to be reconvened for another
7           date.)
8
9       FURTHER DEPONENT SAITH NOT
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 202

1       C E R T I F I C A T E
2
3   STATE OF ALABAMA  )
4   MONTGOMERY COUNTY )
5       I hereby certify that the above and
6   foregoing deposition was taken down by me
7   in stenotype, and the questions and
8   answers thereto were transcribed by means
9   of computer-aided transcription, and that
10  the foregoing represents a true and
11  correct transcript of the deposition given
12  by said witness upon said hearing.
13      I further certify that I am neither of
14  counsel nor of kin to the parties to the
15  action, nor am I in anywise interested in
16  the result of said cause.
17
18          GWENDOLYN P. TIMBIE, CCR
19          Certificate No:  AL-CCR-172
20
21  My Commission Expires
22  March 4, 2009
23

51 (Pages 201 to 202)

**American Court Reporting**
**February 1, 2008**

family - sisters, brother - local 2-sisters - 2 neices, great
neices, nephew - (neice - Mobile - family base) - 3rd generation Ala
son Tampa - brothers - wife's family - local

Grad high school 1968 - took test to get hired by
State of Ala - worked as dental asst trainee for
orthodontist - Married 9/11/1968 - worked several
part time temporary positions for State - until hired
permanent - full time position in income tax division
Madison Jan 1970 - full time position started in
1970 - resigned after 1½ years - move to Denver 10/71
Return to Montg. Dec 1971 - got divorced
1972 - Credit Bureau - credit reporter
1972-73 - Domestic Loan Co - cashier/general office
1973 - Aldridge Borden & Co. - statistical typist (abt 2 mo
1973 - Pfeifers Dept Store - mens dept
1974-75 - Jack James Volkswagon - billing/loan asst.
1975 - Brooks Fashions - asst mgr
1976 - Snelling & Snelling Emp Agency - emp counselor
1976-78 - The Hub - sales associate
1978-79 - The Glass Slipper - asst mgr
1979-82 - Financial Counseling Assoc. - billing/collection rep
1982-84 - Parision Shoe Dept - Hurt Park Shoe Corp - sales
1984-1990 - Ethan Allen - design consultant
1990-91 - The Shoe Emporium - asst mgr
1991-92 - Kyser Fine Furniture - design consultant
1992-97 - Greentree Financial Corp - cust serv/collection rep
1997-98 - Alltel Mobile Communications - financial serv/rep
11/98-2/00 - AT+T Broadband/Internet Serv. - cust Serv/sales rep
1/2001 to 8/2002 - free lance work - design & organization
8/02-6/03 Sabel Steel Industries Inc - asst credit mgr

(left margin, rotated:)
Experience
in marketing
finance
cust serv
Organized
proficient in
communication
+ skills
extensive
business office
skill

DEFENDANT'S
EXHIBIT

Brain



**Medical Oncology**
Harry M. Barnes III, M.D.
Keith A. Thompson, M.D.
Stephen L. Davidson, M.D.
Stephen A. White, M.D.
Phatama Padavanija, M.D.
Scott A. McDaniel, M.D.
**Hospitalist**
William Von Taaffe, M.D.

Montgomery Cancer Center

**Radiation Oncolog**
William W. Helvie, M.D.
R. Lee Franklin III, M.D.
Michael L. Ingram, M.D.
David T. Vega, M.D.

August 28, 2006

To Whom It May Concern
8305 Grand Oak Court
Montgomery, AL 36117

*Hi... doctor excuses and accommodation request for employee terminated before able to turn in*

    RE:   Linda Beard
          MCC# 27147
          DOB: Dec. 31, 1949
          SS # 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

Dear Gentlemen:

I am writing on behalf of my current patient, Ms. Linda Beard, who is receiving needed daily radiation treatments. She reports that starting the weekend of 08-12-06 she began to experience fatigue and has actually missed treatments on 08-15-06 and 08-17-06 and informs me she became quite ill the weekend of 08-19-06, missing needed treatments the following week.

Ms. Beard's early onset of fatigue is undoubtedly related to her other multiple health problems and the stress that she states she noted in March, as well as stress and anxiety experienced related to the current diagnosis for which she is being treated.

I understand that during this difficult time Ms. Beard has done her best to continue to work for the much-needed income. These recent health difficulties require Ms. Beard to request a leave of absence from work starting immediately.

Any assistance, accommodation, consideration regarding this necessary request is most appreciated.

If I can provide any additional information which might be of help to you, please do no hesitate to contact me.

Most sincerely yours,

William W. Helvie, MD
WWH/mm

Main Campus
4145 Carmichael Road
Montgomery, Alabama 36106-2801
Phone 334/ 273-7000
Medical Oncology Fax 334/ 260-2010
Radiation Oncology Fax 334/ 260-5010

East
7085 Sydney Curve
Montgomery, Alabama 36117
Phone 334/ 244-4000
Fax 334/ 244-4053

Prattville
645 McQueen Smith Road North
Prattville, Alabama 36066
Phone 334/ 358-3374
Fax 334/ 358-3375

Selma
1023 Medical Center Parkway, Suite 110
Selma, Alabama 36701
Phone 334/ 872-9300

# ALABAMA BREAST CENTER
### Diseases of the Breast

Lee Eaddy, M.D., FACS

4749 Berry Blvd.
Montgomery, AL 36106
(334) 271-0280  Fax (334) 271-1918

Howard C. Snider, M.D., FACS

American Society of Breast Surgeons
Breast Ultrasound Certified

August 8, 2006

RE:   Linda Beard

To Whom It May Concern:

I am writing on behalf of Linda Beard.  She recently had surgery for a life-threatening condition and is now taking additional treatment.  The treatment is given five days a week for seven weeks. A daily treatment time is set up in advance and the schedule must be maintained over the course of the treatments.

Ms. Beard indicates that she would like to work as many hours as possible during the time that she is being treated.  Most patients are able to continue working during the treatment period.  She would like to work as many hours as possible on the two days when she does not have treatment and would like to work between 2:00 p.m. and 10:00 p.m. on the days that she does have treatment.  We would appreciate any consideration you could give her in order to accommodate this request.

It is important to Ms. Beard to try to maintain as much income as she has in order to meet financial obligations.  Although side effects vary with patients, we would anticipate that Ms. Beard would be able to work her usual number of hours if you are able to accommodate her schedule.  We would appreciate any help you can give her during this difficult time.

Please feel free to contact us if you have further questions.

Sincerely,

Howard C. Snider, Jr., M.D.

HCSjr/wdm

## Montgomery Primary Medicine Associates

2055 East South Boulevard, Suite 308
Montgomery, Alabama 36116-2008
334-286-2390

| Samuel J. Saliba, M.D. | Cathy Middleton, D.O. | Chere Fulmer, M.D. |
|---|---|---|
| 10346 | DO 878 | 27069 |

**Date:** 8/23/2006

**Patient Name:** LINDA BEARD

**May Return to School/Work:**

**Comments:**
Patient was seen in the office today and can return to work on Saturday.

*Chere Fulmer MD*

**Chere Fulmer MD**



# Neurology Consultants of Montgomery, P.C.

1722 Pine Street / Suite 700
Montgomery, Alabama 36106-1149
(334) 834-1300 • Fax (334) 834-8347

P. Caudill Miller, M.D.
*Diplomate American
Board of Psychiatry
& Neurology*

Ben C. Wouters, M.D., Ph.D.
*Diplomate American
Board of Psychiatry
& Neurology*

Sara S. Shashy, M.D.
*Diplomate American Board
of Internal Medicine*

Larry W. Epperson, M.D.
*Diplomate American
Board of Psychiatry
& Neurology*

DATE: 8/22/04

RE: Linda Beard                    DOB: 12-31-49

## TO WHOM IT MAY CONCERN:

This is to inform you that ___Linda Beard___ is a patient of mine, and ☑ **IS** / ☐ **IS NOT** being released to return to work.

☐    MAY RETURN TO FULL DUTY

☐    MAY RETURN TO LIGHT DUTY

## RESTRICTIONS THAT APPLY:

☐    NO BENDING

☐    NO SITTING, STANDING FOR MORE THAN TWO HOURS AT A TIME

☐    NO LIFTING GREATER THAN _____ LBS.

☐    NO STOOPING

☐    NO MOPPING

☐    NO DRIVING

☐    OTHER  *pls excuse pt from work 8/20 – 8/25*

This patient ☑ **WAS** / ☐ **WAS NOT** seen in the office today for medical evaluation and/or test.

Sincerely,

*Caudill Miller, MD*                *BCW*                *Larry W. Epperson, MD*

☐ Caudill Miller, M.D.        ☐ Ben C. Wouters, M.D.        ☑ Larry W. Epperson, M.D

# Coldwater Creek

**EMPLOYMENT APPLICATION**

Coldwater Creek is an equal opportunity employer and all applicants will be considered without regard to race, color, creed, gender, marital status, sexual orientation, pregnancy, childbirth or pregnancy-related conditions, age, religion, national origin, disability, handicap or any other basis protected by local, state or federal law.

## PERSONAL

Name: (please print) **Beard**    **Linda**    **L**    SS# **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**
LAST    FIRST    MIDDLE

Current address: **8305 Grand Oak Ct    Mtgy    Mtgy    AL    36117**
NUMBER    STREET    CITY    COUNTY    STATE    ZIP CODE

Telephone number: **334 409-9436** (  )
HOME    WORK    CELL    E-MAIL

## POSITION

Position applied for: **part-time Sales** Location: **Eastchase**    ☐ Full-time    ☒ Part-time    ☐ Temporary

If you are not available to work Coldwater Creek's hours of operation, please list any exceptions: **Cannot work morning hours - preferrably - prior to 1:00 - due to other wo + persona reas**

Referral source: ☐ CWC employee / Name:    ☐ Employment agency    ☐ Job Fair    ☒ Newspaper    ☐ Radio    Other:

Have you ever filed an application with Coldwater Creek before?    ☐ Yes  ☒ No    If yes, please give date:    /    /

Have you ever been employed by Coldwater Creek before?    ☐ Yes  ☒ No    If yes, please give date:    /    /

Do you have any relatives currently working for Coldwater Creek?  ☐ Yes  ☒ No

If so, name of relative and employment location:

On what date would you be available to start work? **6/15/04**  What are your salary requirements? $ **800**    ☒ Hr  ☐ Mo  ☐ Yr

Are you over 18 years of age?  ☒ Yes  ☐ No

Have you ever been convicted of a felony crime or have you been convicted of a misdemeanor in the last seven years?  ☐ Yes  ☒ No

If yes, please list details, including date(s) of conviction(s) and jurisdiction(s) of crime(s).

*(Convictions will not necessarily disqualify applicant. Each case is considered individually.)*

## WORK EXPERIENCE

May we contact your current employer?  ☐ Yes  ☐ No    If yes, please initial here

| | |
|---|---|
| Employer: **Sabel Industries Inc** | Dates employed: From **Aug 02** To **June 03** |
| Address: **740 S. Court St** | Hourly rate/salary: **$29,000°° yr** |
| Telephone number: (  ) | Supervisor: **Steve Dunlap** |
| Job title: **Assist Credit Manager** | Reason for leaving: **Health - no longer able** |
| Duties: **See resume** | **to work 8hrs at 40 per week** |
| Employer: **Ethan Allen** | Dates employed: From **4-00** To **12-00** |
| Address: **Eastern Blvd** | Hourly rate/salary: **commission** |
| Telephone number: (  ) | Supervisor: |
| Job title: **Design Consultant** | Reason for leaving: **Not enough money - bus slow** |
| Duties: **See resume** | **Pursue ~~freelance~~ + other** |
| Employer: **AT+T Broadband + Internet** | Dates employed: From **11-98** To **2-00** |
| Address: **Monticello Drive** | Hourly rate/salary: |
| Telephone number: (  ) | Supervisor: |
| Job title: **Cust Serv Sales** | Reason for leaving: **for job above** |
| Duties: | |

Have you ever been fired or forced to resign from any employment?

☐ Yes  ☒ No    If yes, please explain:

HR-APP-ESTAB 06-03

## BUSINESS REFERENCES

Give (three) 3 business references who are not related to you.

| Name | Position | |
|---|---|---|
| Company | Business Phone ( ) | Home Phone ( ) |
| Name | Position | |
| Company | Business Phone ( ) | Home Phone ( ) |
| Name | Position | |
| Company | Business Phone ( ) | Home Phone ( ) |

## EDUCATION

| Education (Circle last year completed) | | | | | School name, city, state | Major subjects | Diploma/Degree |
|---|---|---|---|---|---|---|---|
| High school | 9 | 10 | 11 | (12) | Sidney Lanier | | ☑ Yes ☐ No |
| Junior College | 1 | 2 | 3 | 4 | | | ☐ Yes ☐ No |
| College | 1 | (2) | 3 | 4 | AUM | | ☐ Yes ☑ No |
| Graduate | 1 | 2 | 3 | 4 | | | ☐ Yes ☐ No |
| Other (Business, Vocational, Military) | | | | | | | ☐ Yes ☐ No |

## SKILLS AND QUALIFICATIONS

Please indicate the job skills you possess:

☑ Computer Software: _____

☐ Computer Hardware: _____

☐ Spreadsheets: _____

☑ Telephone Skills: _____

☐ Typing: _____ words per minute

☑ 10 Key        ☐ Forklift        ☐ Hand-truck        ☐ Pallet Jack        ☑ Other: Xerox, fax

## SIGNATURE

I understand that Coldwater Creek may obtain and use a "consumer report" from a "consumer reporting agency" in considering my application for employment. I agree to sign all necessary authorizations upon request by Coldwater Creek to obtain such information.

I authorize the release to Coldwater Creek of all high school, college or other educational records pertaining to my attendance or course work.

I authorize my former employers to release to Coldwater Creek all information contained in human resource files concerning me, and to provide to Coldwater Creek information concerning my performance, terms and conditions of employment, and the reason(s) for my separation of employment. I release my former employers from any liability that may arise as a result of their providing this information to Coldwater Creek.

I understand that I may be required to take and pass a drug test prior to employment with Coldwater Creek, and I agree to such testing.

I understand that no contract of employment with Coldwater Creek will exist at any time or be created as a result of Coldwater Creek hiring me, or by any representation made by any person at any time, with the exception of a written contract signed by the CEO of Coldwater Creek. I understand and agree that if I am hired by Coldwater Creek, my employment can be terminated with or without cause, and with or without notice, at any time at the option of the company or myself. I also understand and agree that all terms or conditions of employment, including benefits and Human Resource policies, are subject to change by Coldwater Creek at any time without notice.

In compliance with the Immigration and Reform Control Act of 1986, I understand that any job offer by Coldwater Creek is contingent upon presenting the required documentation to prove that I am a U.S. citizen or authorized to work in the United States.

I certify that all statements made by me on this application are true and complete. I understand that any misrepresentation or falsification of statements made in this application are grounds for immediate disqualification or termination of employment.

Signature _____    Date 6, 5, 04

# *Coldwater Creek*

# New Hire Checklist

Some or all of the following topics will be discussed with you during your Employee Orientation
and may or may not be applicable depending on your employment classification.

Employee Name **Linda L. Beard**                 Hire Date **5-25-04**

Emergency Contact Name and Phone # **Kim Thompson - Hm 395-5366 - WK 240-874 or 834-60C**
**Cell # 868-0845**

## PRE-EMPLOYMENT

☐ Application
☐ Interview
☐ Reference Check
☐ Offer Letter

## COMPENSATION / BENEFITS

☐ Compensation
☐ Incentive Award
☐ Stock Options
☐ Performance Appraisal
☐ Insurance Enrollment
☐ 401(k)
☐ Holidays

## EMPLOYMENT

☑ New Hire Orientation Program
☑ Employee Handbook Review
☐ Safety Orientation
☐ Harassment Policy
☐ I-9 Form / Documents
☑ W-4 Form
☐ Direct Deposit Form
☐ Name Badge
☐ Timekeeping
☐ Seasonal / Temporary Employment Form
☐ Confidentiality Agreement (salaried only)
☐ Code of Conduct (salaried only)
☐ Signed EIF Form
☐ Signed Attendance Policy
☐ Employee Discount
☐ Tour of location

## EMPLOYEE ACKNOWLEDGMENT  (Please initial each point and sign below)

· I have received and carefully read the Coldwater Creek Employee Handbook. I fully understand the policies
described in this book and have had the opportunity to ask questions about these policies.

· I acknowledge that my employment with Coldwater Creek is at-will which means that either I or Coldwater
Creek may terminate the employment relationship at any time for any or no reason.

· I acknowledge that I have read Coldwater Creek's Anti-Discrimination and Harassment Policy as well as its
Sexual Harassment and Workplace Violence Policies. I have had the chance to ask questions about these
policies, and I understand to whom I should report any perceived discrimination and/or harassment.

· I have received the following company property from Coldwater Creek _____

_____
And I agree to return all such property immediately upon my termination. I acknowledge that I will be required
to reimburse Coldwater Creek for the cost of such property if it is not returned at the time of my termination.
I acknowledge and authorize that Coldwater Creek may withhold the cost of such property from my final
paycheck in compliance with state law. _____

Employee Signature _____     Date **5-26-04**

Human Resources Signature _____     Date _____

rev. 8.6.03

# we're glad you're with us!

Coldwater Creek was founded in 1984 by Dennis and Ann Pence who dreamed of building a business with these principles: offer the customer the most compelling merchandise assortments possible, provide exceptional customer service and create a truly unique shopping experience. These principles remain the hallmark of Coldwater Creek's business today, as we have become one of the fastest growing and most dynamic triple channel retailers of women's apparel, jewelry, accessories and gifts in the United States.

You've joined a truly unique company that, above all, cares about its employees, its customers and the quality of its products and service.

We take great pride in fostering an entrepreneurial culture of performance, results, teamwork, and respect for each individual.

Coldwater Creek makes an ongoing investment in our culture, because we understand that employees who feel engaged in the business are more productive and more likely to remain with the company.

We consistently involve employees at all levels of the company in improving the workplace environment. We believe that each employee can affect the success of Coldwater Creek and encourage feedback of ideas that can positively impact the business through improved processes and services. Our company-wide recognition programs provide for continued acknowledgement and awards for outstanding service, contribution and tenure with Coldwater Creek. Our passion to provide our customer with outstanding service, product quality, and a unique shopping experience is supported by our high comparative industry ratings in employee/customer engagement and shopping satisfaction.

Our participation in research conducted by the Gallup Organization, surveying over 50 companies, across 23 different industries, and over 300,000 employees, reaffirms the strength of our culture.

When compared with other companies in the areas of employee engagement relating to retention, productivity, safety, customer loyalty, and profitability, Coldwater Creek scored in the top quartile of respondents and many of our work groups scored as high as the 95th percentile!

By measuring employee engagement, we can develop training and action plans that continue to strengthen our business. We are committed to the professional development of our employees and provide technical and managerial training across the company. We actively promote from within for job opportunities whenever possible. Our Retail growth will create hundreds of management positions each year across the country.

COLDWATER CREEK EMPLOYEE HANDBOOK

Our 2003 employee turnover ranks well below industry average at under 50% and our management turnover is even less at an average of 20%.



\* National Retail Federation Survey 2004

We are also very proud of the fact that women represent over 84% of our total workforce, 67% of our middle management, and 43% of our senior management positions.



\* Bureau of Labor Statistics Survey 2004

We also provide our employees with innovative and highly competitive compensation and incentive award programs that support our culture of performance and results. Additionally, we provide our employees with comprehensive benefit programs with Coldwater Creek paying on average over 92% of the costs of insurance for eligible employees!

People come to work for Coldwater Creek because they truly enjoy the special camaraderie and spirit that make us such a great place to work. Throughout the year numerous employee events are held at each Coldwater Creek location that give us time to relax and get to know each other better. Employees remark that working for Coldwater Creek is like having a second family. The care and concern shown by employees towards one another is very special, in times of success or misfortune our employees are always there.

At Coldwater Creek, we challenge ourselves and each other to grow personally and professionally. Because we want you to enjoy your work, pursue your dreams and think beyond traditional boundaries, your creative and professional fulfillment are important to us.

We hope you share in this same spirit and enjoy working for Coldwater Creek!

3

COLDWATER CREEK EMPLOYEE HANDBOOK

# our focus

## CUSTOMER PROFILE
The Coldwater Creek customer is a woman between the ages of 30 and 60 with a discretionary income of approximately $75,000 a year. She enjoys shopping from our catalogs and online and uses our retail store as a place to get away from it all – while she shops.

## PRODUCTS
Our in house product development continues to drive the unique look of our apparel giving the Coldwater Creek brand a unique differentiation in the marketplace, as well as a growing perception of value.

Our core merchandise assortment remains anchored in stylish, casual dressing. We continue to infuse tailored designs with color and unique novelty to our product, creating fresh new looks and innovative yet classic, wear-now styling.

## CUSTOMER SERVICE
Our Customer Service is legendary. Our strong ethic of customer service supports our brand with a foundation of reliability, caring, friendliness, and a willingness to do whatever it takes to make each and every one of our customers truly feel good about shopping and spending their money with Coldwater Creek.

# we have three distinct business channels

## CATALOGS
Northcountry remains Coldwater Creek's core catalog featuring women's apparel, jewelry, footwear, accessories and gifts. Supplemented with other catalogs which offer contemporary assortments of more upscale and versatile mix and match, wear-now apparel and accessories, our catalog business has grown to include over 13 million names with over 2.6 million active buyers.

## RETAIL STORES
With an explosive growth strategy, Coldwater Creek's retail stores are located throughout the country in regional malls and lifestyle centers. Our stores are distinctly styled and average approximately 5,000 square feet and represent the "best of the best" of Coldwater Creek's apparel, jewelry, footwear, accessories and gifts. We also have a growing number of outlet stores around the country, which offer our customers fantastic values on our clearance merchandise. Our retail stores also feature conveniently located kiosks which allow our customers to shop online while visiting our stores.

## E-COMMERCE SITE
Coldwater Creek's award-winning website, www.coldwatercreek.com, was launched in 1999 and features our entire merchandise assortment. Almost 5% of all women's apparel sold online in the United States is sold by us at www.coldwatercreek.com. . . A remarkable market share!

4

# coldwater creek locations

### CORPORATE HEADQUARTERS

Our corporate offices are located in the resort town of Sandpoint, Idaho. Our corporate staff includes Advertising, Business Intelligence, Finance, Human Resources, Information Technology, Inventory Planning, Marketing, Merchandising, Quality Assurance, Real Estate, Retail, and more.

### CUSTOMER SERVICE CENTERS

Our locations in Coeur d'Alene, Idaho and Parkersburg, West Virginia handle 40,000 calls on peak days with all calls answered in 8 seconds or less.

### DISTRIBUTION CENTER

Our state of the art distribution center is located in Parkersburg, West Virginia. We ship over 52,000 packages on peak days with 98% of all in-stock orders shipped within 24 hours! We also replenish our store inventory nationally within 1 to 3 days.

There's so much more to learn about Coldwater Creek, so ask any questions you may have. We're looking forward to working with you!

## OUR LOCATIONS



retail stores
⬤ outlet stores
△ new stores

1 corporate headquarters
2 call center
3 distribution center

5

COLDWATER CREEK EMPLOYEE HANDBOOK

Our mission is simple:
to be the women's
specialty retailer of
choice by offering
the most compelling
shopping experience
for apparel in the
United States for
women 30 years
and older.

COLDWATER CREEK EMPLOYEE HANDBOOK

2   welcome!
4   our focus
    business channels
5   coldwater creek locations
6   mission statement
7   general statement
8   business ethics/code of conduct
    at-will employment
9   equal employment opportunity
    harassment
10  workplace violence prevention
    confidentiality/proprietary info.
    confidentiality agreement
11  insider trading
    outside employment
    business gifts and entertainment
    information systems
12  phone, e-mail and internet usage
    solicitation/distribution
13  union-free workplace
    smoke-free workplace
    drug-free workplace
    drug and alcohol testing
14  benefits
    HIPPA - health insurance portability
        and protection act
    helping hands
    mileage reimbursement

15  leave of absence
    FMLA - family and medical leave act
16  medical
    benefits protection
    return to work
17  job applications
    reference checks
    pre-employment credit &
        criminal checks
    employment classifications
18  work schedules
    absences/tardiness
    breaks and meal periods
    timekeeping
    job postings
    rehires
    referral program
    employment of relatives
19  dress code/personal appearance
    personal items
    personal vehicles
    employee parking
    entrances/exits
    guests
    employee shopping

20  employee discount
21  access to human resource files
    change of status
    paydays/direct deposit
    overtime
    premium pay
    vacation pay
22  sick pay
    holidays
    safety
23  workers compensation
    loss prevention
    your development at cwc
    performance reviews
24  standards of conduct
25  performance warnings
    open door
    exit interviews
26  alphabetical index

# general statement

This Handbook has been prepared as a general reference guide so that you may better understand your privileges and responsibilities as an employee of Coldwater Creek, Inc. and its subsidiaries, including the rules and practices governing your employment with Coldwater Creek. This Handbook supercedes any and all prior policies and practices of Coldwater Creek, oral or written, and any policies, procedures, handbooks or Coldwater Creek rules previously in effect. The general information pertaining to the various benefit plans in our Benefit Plan Summary is based upon official texts, which supersede in case of questions or inconsistency.

THIS HANDBOOK IS NOT INTENDED TO BE OR TO CREATE A CONTRACT OF EMPLOYMENT. THE EMPLOYMENT RELATIONSHIP OF EACH EMPLOYEE IS "AT WILL." THIS MEANS EMPLOYMENT IS NOT FOR A DEFINITE PERIOD AND IS TERMINABLE AT ANY TIME AT THE WILL OF THE EMPLOYER, WITH OR WITHOUT NOTICE, CAUSE OR COMPENSATION.

Please read this Handbook and keep it in a convenient place for future reference. If you have any questions on any part of the Handbook, or any subject not covered in it, ask your supervisor or your Human Resources representative. Coldwater Creek reserves the right to amend or interpret its polices and procedures at any time for any reason without prior notice.

# business ethics code of conduct

The successful business operation and reputation of Coldwater Creek is built upon the principles of fair dealing and ethical conduct of our employees. Our reputation for integrity and excellence requires careful observance of the spirit and letter of all applicable laws and regulations, as well as a scrupulous regard for the highest standards of conduct and personal integrity.

Coldwater Creek will comply with all applicable laws and regulations and expects its directors, officers and employees to conduct business in accordance with the letter, spirit and intent of all relevant laws and to refrain from any illegal, dishonest or unethical conduct.

Compliance with this policy of business ethics and conduct is the responsibility of every Coldwater Creek employee. Disregarding or failing to comply with this standard of business ethics and conduct may result in disciplinary action, up to and including termination of employment. Employees are expected to demonstrate honesty, integrity and fairness in dealing with customers, vendors, co-workers and other Coldwater Creek affiliates, following these guidelines:

- Be polite, respectful and helpful to customers and co-workers at all times and uphold the dignified image of our company.

- Be loyal and respectful to our company.

- Strive for excellence.

- Protect and conserve company and customer resources.

- Comply with the requirements of company rules and regulations and follow their spirit and intent.

- Avoid situations where personal interests could conflict, or appear to conflict, with the interests of Coldwater Creek.

- Employees may not purchase CWC merchandise for resale purposes.

- Avoid outside employment or activities that may have a negative impact on job performance, or negatively impact Coldwater Creek's reputation in the community.

- If you are in doubt about a policy or procedure, it is your responsibility to ask your Supervisor, Manager(s) or Human Resources before taking a chance on committing a violation.

- Follow your Supervisor or Manager's instructions. If you ever think they are improper, contact a member of Sr. Management or Human Resources as soon as possible, but don't risk being insubordinate.

- Follow the official procedures for every task you perform and don't take shortcuts. If you don't know the correct procedure, look it up or ask someone in an official capacity, not someone who might be guessing.

## CODE OF CONDUCT AGREEMENT

ALL SALARIED EMPLOYEES WILL BE REQUIRED TO READ AND SIGN A DETAILED CODE OF CONDUCT AGREEMENT AT THE TIME OF HIRE AND ON A PERIODIC BASIS THEREAFTER.

# at-will employment

This Handbook cannot anticipate every situation or answer every question about employment at Coldwater Creek. It does not form or imply a contract between Coldwater Creek and any of its employees. Unless a written document is provided to you and signed by the CEO of Coldwater Creek expressly stating otherwise, your employment status at Coldwater Creek remains "at-will." No member of management, a recruiter, or representative or other agent of Coldwater Creek is authorized to enter into any employment agreement or contract. Nothing in this Handbook changes your at-will status. The term at-will, means that either the employee or Coldwater Creek may terminate employment at any time, with or without cause.

8

# equal employment opportunity

The philosophy of Coldwater Creek is to staff positions with the most qualified candidates available. It is the policy of Coldwater Creek to comply with all federal, state and local laws and regulations, and to grant equal employment opportunities to all qualified persons without regard to race, color, creed, gender, marital status, sexual orientation, pregnancy, childbirth or pregnancy-related conditions, age, religion, national origin, disability, handicap or any other basis protected by local, state or federal law. Equal consideration is exercised in all recruiting, hiring, training, promotion, wages and other terms and conditions of employment provided that the individual is qualified for the position or benefit. Coldwater Creek will make reasonable accommodations for qualified individuals with disabilities unless doing so would result in an undue hardship. Individuals requiring accommodations are encouraged to contact their Supervisor, Manager or Human Resources.

# harassment

We strongly believe that our employees have the right to work in an environment that is free from all forms of harassment. It is the policy of Coldwater Creek that there be no harassment of any employee or applicant on the basis of race, color, creed, gender, marital status, sexual orientation, pregnancy, childbirth or pregnancy-related conditions, age, religion, national origin, disability, or handicap in the workplace, or any other kind of unlawful harassment. The company is proud of its professional and congenial work environment, and will take all reasonable and necessary steps to ensure that the work environment remains pleasant for all employees.

Sexual harassment is a violation of federal law under Title VII of the Civil Rights Act of 1964, as amended, and also state law. Coldwater Creek will not tolerate

or permit sexual harassment of our employees in any form, and such conduct may result in disciplinary action, up to and including termination of employment.

Sexual or other harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual or harassing nature when:

1. Submission to the conduct is made either an explicit or implicit condition of employment;

2. Submission to or rejection of the conduct is used as the basis for an employment decision affecting the harassed employee; or

3. The harassment unreasonably interferes with an employee's work performance or creates an intimidating, hostile, or offensive work environment.

Any employee or applicant who feels he or she has been harassed or discriminated against is required to report such incidents to a Supervisor, Manager or anyone in Human Resources that he or she feels comfortable reporting it to. Do not allow an inappropriate situation to continue by not reporting it, regardless of who is creating that situation. Coldwater Creek will take your concerns seriously, and will take all reasonable steps to ensure that you do not suffer any retaliation. Reasonable efforts will be made to maintain confidentiality, although the employee reporting such conduct must be aware that Coldwater Creek will conduct an investigation with the person(s) alleged to be involved. Any employee of Coldwater Creek who has been found by Coldwater Creek, after appropriate investigation, to have harassed another employee, may be subject to disciplinary action, up to and including termination of employment, at Coldwater Creek's sole discretion.

This policy applies not only to co-workers and management, but also to non-employees who you come into contact with while working. We trust that all employees of Coldwater Creek will act in a responsible manner.

# workplace violence prevention

Conduct that threatens, intimidates, or coerces another employee, a customer, a vendor or a member of the public at any time, including off-duty periods, will not be tolerated. This prohibition includes all acts of harassment, including harassment that is based on an individual's race, color, creed, gender, marital status, sexual orientation, pregnancy, childbirth or pregnancy-related conditions, age, religion, national origin, disability, handicap or any other basis protected by local, state or federal law. ALL threats of (or actual) violence, both direct and indirect, should be reported immediately to your supervisor, another member of management or Human Resources.  This includes threats by employees, as well as threats by vendors, customers, or the public. Anyone determined to be responsible for threats of (or actual) violence or other conduct that is in violation of these guidelines may be subject to disciplinary action, up to and including termination of employment.

Coldwater Creek encourages employees to bring disputes or differences with other employees to the attention of their Supervisor or Manager before the situation escalates into potential violence. If the situation is not resolved, it should then be reported to Human Resources.

# confidentiality and proprietary information

While employed at Coldwater Creek, employees may have access to and learn of confidential and proprietary company information, the unauthorized use or disclosure of which would cause irreparable injury to Coldwater Creek. It is a violation of Coldwater Creek's policies for employees to disclose any such information to any third party at any time during or after employment, unless such disclosure has been specifically authorized in writing by a member of Coldwater Creek's Executive Management.

The following proprietary information falls within these categories:

1. Company/Employee compensation information.

2. Customer/Employee personal or business information.

3. Financial/Sales/Productivity information.

4. Marketing data and materials.

5. New materials research.

6. Pending projects and proposals.

7. Human Resource files.

8. Research and development strategies.

It is a further violation of Coldwater Creek policies for employees to release any correspondence, memoranda, files, magnetic tape, electronic or other media of any kind which contain any confidential or proprietary information or to permit any inspection or copying of such information, by any third party at any time without the specific written approval of Coldwater Creek.

The protection of confidential business and proprietary information is vital to both the interests and success of Coldwater Creek. Any employee who discloses such information may be subject to disciplinary action, up to and including termination of employment. Unauthorized disclosure may also result in Coldwater Creek taking legal action to protect its interests. All confidential or proprietary information is the property of Coldwater Creek.

## CONFIDENTIALITY AGREEMENT

All salaried employees will be required to read and sign a detailed Confidentiality Agreement at the time of hire and on a periodic basis thereafter.

COLDWATER CREEK EMPLOYEE HANDBOOK

# insider trading

The trading window to buy and sell Coldwater Creek stock will remain open year-round for most employees. Employees at the Divisional Vice President level and above and salaried finance and accounting employees are restricted by trading window closures. Notification will be sent to these employees when they may buy and sell Coldwater Creek stock.

# outside employment

While employed at Coldwater Creek, employees may hold outside jobs as long as the employee continues to meet performance expectations at Coldwater Creek. Employees are required to disclose other employment outside Coldwater Creek to their respective Supervisor or Manager(s) or Human Resources. Employees may be restricted from working a second job if, as determined by management in its sole discretion, the job presents a potential or actual conflict of interest with Coldwater Creek.

SALARIED EMPLOYEES MAY BE SUBJECT TO ADDITIONAL RESTRICTIONS SET FORTH IN OTHER SIGNED AGREEMENTS WITH COLDWATER CREEK.

# business gifts and entertainment

Gifts and lavish entertainment may be viewed as attempts to unduly influence relationships between Coldwater Creek and its vendors, or other companies that may have relationships with Coldwater Creek. Employees should use the following guidelines to determine the appropriateness of receiving and giving business gifts and entertainment.

Each employee shall discourage, as tactfully as possible, the custom of individuals and companies giving gifts. Although such gifts are expressions of cordial relationships between individuals closely

associated by their work, acceptance can place the employee or Coldwater Creek in an inappropriate situation. Each employee should determine if the gift oversteps the bounds of propriety, but in no event should a gift be accepted or given that would either appear to compromise or actually compromise the employee in the performance of duties or cause any embarrassment to Coldwater Creek.

Whenever an employee receives a gift as a result of a work relationship, the employee shall inform his or her Supervisor or Manager and discuss the propriety of keeping the gift. If the value of the gift exceeds $30.00, it should be returned to the sender with notification of Coldwater Creek's gift policy. Other gifts of nominal value (i.e. fruit baskets, flowers, liquor, candy, etc.) that are not practical to return should be donated or distributed in such a way that a larger number of employees may share in the benefit of the gift. The sender is to be notified of this policy and the distribution of the gift to the staff. Tickets for entertainment or sporting events may be accepted by the employee if the employee pays the full price of the ticket.

Gifts may not be given as a matter of business practice without the approval of Management.

# information systems

Computer software licenses and the confidential and proprietary information in our systems are assets of Coldwater Creek. These assets carry legal responsibilities for Coldwater Creek and its employees under the law, as well as under contracts with the software vendors. Therefore, most duplication of software is prohibited except to create backup or archival data. Unauthorized usage of software is prohibited, as is distribution of a copy of original software to any individual not employed by Coldwater Creek.

In addition, the confidential and proprietary information contained in this software may not be discussed or disclosed, except as authorized and necessary to perform job responsibilities.

11

COLDWATER CREEK EMPLOYEE HANDBOOK

## PHONE, E-MAIL AND INTERNET USAGE

Coldwater Creek e-mail, Internet and voice mail are corporate assets and critical components of communication systems. The e-mail and voice mail systems are provided by Coldwater Creek for employees to help facilitate in the performance of company work and their contents are the property of Coldwater Creek. Although Coldwater Creek does not make a practice of monitoring these systems, management reserves the right to retrieve the contents for legitimate reasons, such as to find lost messages, to comply with investigations of wrongful acts or to recover from system failure. In the course of their duties, systems operators and managers may monitor use of the Coldwater Creek network or review the contents of stored records and files.

Telephone, electronic mail and access to the Internet are provided for business use only. Coldwater Creek understands that sometimes it is necessary for employees to make personal calls or e-mails during business hours. They must be kept to a minimum, and, whenever possible, handled during breaks and meal periods so they do not negatively impact work or disrupt business operations. Use of e-mail, Internet and voice mail is limited to employees and authorized vendors, temporaries, or contractors. Employees and authorized users are responsible to maintain the security of their account and their password. Attempts should be made to keep messages concise and directed to individuals with an interest or need to know basis. Communications via e-mail, Internet or voice mail should not burden the receiver inappropriately or unnecessarily.

Misuse of e-mail, Internet and voice mail may result in disciplinary action, up to and including termination of employment. Examples of inappropriate and prohibited use include but are not limited to:

- Obscene, profane or offensive material transmitted over any company communication system. This includes, for example, accessing erotic materials via news groups and web sites, as well as messages, jokes, or other communications which violate our harassment policy or create an intimidating or hostile work environment.

- Downloading of any proprietary company information that is not authorized by the Information Technology department.

- Downloading of any programs, utilities, services or graphic/audio files not authorized by Information Technology.

- Use of company communications systems to set up personal businesses or send chain letters.

- Forwarding confidential company messages to locations outside Coldwater Creek.

- Accessing copyrighted information in a way that violates the copyright.

- Breaking into the system or unauthorized use of a password/mailbox.

- Broadcasting personal views on social, political, religious or other non-business related matters.

- Solicitation to buy or sell goods or services.

The Information Technology department is responsible to ensure the efficient use of systems according to this policy. Where issues arise, Human Resources and Information Technology will deal directly with the employee and notify their respective Supervisor or Manager where appropriate.

# solicitation/distribution

In order to prevent disruption in the operations of Coldwater Creek, certain limitations apply to any solicitation or distribution of materials by employees and non-employees. Persons not employed by Coldwater Creek may not solicit or distribute literature on Coldwater Creek property for any purpose at any time. In addition, employees may not solicit or provide non-business goods or services during work time. No employee shall solicit or promote support of any cause or organization during his or her working time or during the working time of the employee or employees at whom such activity is directed. This includes solicitation for purposes of

12

COLDWATER CREEK EMPLOYEE HANDBOOK

sale, surveys, and distribution of samples of literature, the taking of petition signatures or any other form of solicitation.

No employee shall distribute or circulate any written or printed material during his or her working time or during the working time of the employee or employees at whom such activity is directed. Employees may not distribute any form of literature or other written material at any time for any purpose in work areas.

During non-working time such as meal and break periods, reasonable forms of solicitation and contact between employees are permitted in recognized non-working areas. For purposes of the above policy, "working time" does not include meal or break periods.

No employee shall enter or remain in the building and other work areas for any purpose except to report for, be present during, or conclude his or her work. Cards, literature, announcements, notices and other materials of any kind may not be posted on bulletin boards or distributed in or about the working areas of any employee at any time other than materials that are expressly endorsed by Senior Management of Coldwater Creek.

This policy is not intended to prevent Coldwater Creek from carrying on its normal employee relations programs or activities, which may, from time to time, result in distributions and solicitations on Coldwater Creek premises.

# union-free workplace

Coldwater Creek believes that an appreciation and concern for each employee in our company provides the best possible environment for the achievement of both individual and company goals. We believe that any outside third party such as a union would interfere with these goals.

A union seeks to limit Coldwater Creek's right to operate our business most effectively and limits the employee's rights to deal directly with Management. Coldwater Creek strives to earn the right to work directly with our employees by maintaining an environment in which a union is not necessary.

# smoke-free workplace

In keeping with Coldwater Creek's intent to provide a safe and healthy environment, smoking is prohibited in all Coldwater Creek offices, warehouses and satellite facilities, unless otherwise designated.

# drug-free workplace

Coldwater Creek is a drug-free and alcohol-free workplace. Employees who abuse prescription drugs or who use, sell, purchase, or distribute unlawful drugs or controlled substances on Coldwater Creek property, in parking lots adjacent to Coldwater Creek's stores or facilities, or during working hours, or who report to work under the influence of illegal drugs, abused prescription drugs or alcohol or while visiting Company facilities during non-working hours may be subject to disciplinary action, up to and including termination of employment.

The only exception to this policy is when Coldwater Creek sponsors events, with the approval of Senior Management that may allow for the consumption of alcoholic beverages on a limited basis, or when alcoholic products are merchandised as part of our normal business operations. Employees are expected to act responsibly in such circumstances.

## DRUG AND ALCOHOL TESTING

Coldwater Creek may require employees to submit to testing for illegal use of drugs or controlled substances, or alcohol as a condition of employment, or whenever Coldwater Creek has reason to believe that the employee has violated the policies set forth in Coldwater Creek's Employee Handbook, or for the following purposes:

COLDWATER CREEK EMPLOYEE HANDBOOK

- Investigation of possible individual employee impairment.

- Investigation of accidents in the workplace or incidents of workplace theft.

- Maintenance of safety for employees or the general public.

- Maintenance of productivity, quality of products or services, or security of property or information.

- To comply with regulations mandated by federal or state government.

All information, interviews, reports, statements, memoranda, or test results received by Coldwater Creek through drug and alcohol testing are confidential and will be handled on a "need to know" basis, and will only be used in the event of action by Coldwater Creek, or in defense of any action brought against Coldwater Creek.

# benefits

Coldwater Creek offers a variety of benefit programs for our employees including, but not limited to, medical, dental, life insurance, Short Term Disability, Long Term Disability, 401(k), holiday pay, sick pay, vacation, leave of absence and employee discount. Eligibility for these benefits is based on employment classification and length of service. Benefits information will be outlined in our Benefit Plan Summary and discussed with you in greater detail during your employment orientation.

## HIPPA – HEALTH INSURANCE PORTABILITY AND PROTECTION ACT

Coldwater Creek has established guidelines in compliance with HIPPA to safeguard employees' protected health information. Any employee wishing to disclose information about a health condition to Coldwater Creek Management or Human Resources must complete an authorization form. The HIPPA privacy notice is distributed to all full-time eligible and salaried employees.

## HELPING HANDS

Helping Hands is a not-for-profit organization developed to help Coldwater Creek employees in times of financial crisis. Helping Hands is supported by donations from Coldwater Creek employees. If a financial crisis occurs, Coldwater Creek employees may request assistance by completing an Employee Assistance Request Form that is available from your respective manager or Human Resources department. The Helping Hands Committee will review each case confidentially to determine how the funds are distributed.

The following are some examples of catastrophic situations for which an employee may qualify for assistance:

- Medical emergencies.

- Domestic emergencies, i.e. inability to pay for food or a utility bill, the need for emergency housing, etc.

- Assistance as a result of domestic violence or child abuse.

- Eviction from one's home.

- Financial support during a temporary or permanent disability.

Employees may contribute to Helping Hands by designating a specific amount to be deducted from their paycheck on an ongoing basis or make a one-time donation via a personal check. Contact your respective Supervisor, Manager or Human Resources department to sign up for a payroll deduction or to make a contribution.

## MILEAGE REIMBURSEMENT

Employees who use their personal vehicles for approved business purposes will receive a mileage reimbursement equal to the current federal mileage reimbursement rate. This allowance is to compensate for the cost of gasoline, oil, depreciation, insurance, etc. Mileage reimbursement will cover work miles traveled to locations other than the regular work site, but do not cover miles driven from home to your regular work site.

COLDWATER CREEK EMPLOYEE HANDBOOK

Mileage should be itemized on an expense report and authorized by the individual's Manager. Reimbursement is made through the payroll system and will appear on the employee's paycheck.

## TRAVEL EXPENSE REIMBURSEMENT

Employees who travel on company business may be reimbursed by the company for business related expenses incurred in conjuction with company policy.

## LEAVE OF ABSENCE

Coldwater Creek provides for employee leaves of absence with Senior Management and Human Resources approval in accordance with company policy and are outlined in our Benefit Plan Summary.

# family and medical leave act (FMLA)

This general statement of Coldwater Creek's policy on the federal Family and Medical Leave Act (FMLA) is intended to inform employees of the existence of certain rights they are entitled to exercise under the FMLA.

The specific rights of employees are governed by the FMLA and interpretive regulations adopted by the U.S. Department of Labor.

## REASONS FOR TAKING LEAVE

The FMLA allows eligible employees to take up to 12 workweeks of paid or unpaid leave (in a 12-month period), based on state regulations, for certain family and medical reasons. Unpaid leave will be granted to eligible employees for any of the following reasons:

- · For the birth of a child and to care for the newborn child, or because of the placement of a child for adoption or foster care.

- · To care for the employee's spouse, son or daughter or parent who has a serious health condition.

- · For a serious health condition that renders an employee unable to perform the functions of his or her job.

The definition of serious health condition is set forth in the FMLA regulations, a copy of which is available in the Human Resources Department for you to review. Eligible employees are required to use any accrued sick and disability leave payment under Coldwater Creek's sick and or disability leave policies while on FMLA leave. Employees may choose, at their discretion, to use any paid leave time available to them under the vacation policy. The total allowance for FMLA leave remains at 12 weeks, regardless of any accrued benefits that are paid during such leave.

## ELIGIBILITY

Employees are eligible for FMLA leave if they have worked for Coldwater Creek for at least one year and have accrued at least 1,250 hours worked over the 12-month/52-week period immediately prior to the requested leave. The 12-month period in which an employee may use FMLA leave is measured from the date the employee's FMLA leave begins. The next 12-month period would begin the first time FMLA leave is taken after completion of any previous 12-month period.

Employees should provide a thirty (30) day advance written notice for any leave that is foreseeable based on an expected birth, placement for adoption or foster care, or planned medical treatment for a serious health condition of the employee or family member. The notice must include the reason for and the anticipated dates of the leave. In the event the leave is due to an emergency situation, the employee should give as much advance notice as possible. Failure to provide such notice of a foreseeable leave may result in Coldwater Creek denying the leave for a period of up to 30 days.

15

COLDWATER CREEK EMPLOYEE HANDBOOK

In the case of an employee's or family member's serious health condition, an employee may take leave on a reduced or intermittent schedule. The employee should make every effort to schedule reduced or intermittent leave so that it does not unduly disrupt Coldwater Creek's operations. Coldwater Creek reserves the right to temporarily transfer an employee taking reduced or intermittent leave to another position with equivalent pay and benefits in the event disruption is anticipated or occurs. In those situations where a husband and wife both work for Coldwater Creek, and both wish to request time off under the FMLA, the leave will be administered as follows:

- Birth or care for child after birth, placement for adoption, foster care or to care for a child after placement, serious health condition of parent. Leave is limited to a combined total of 12 weeks between spouses employed by Coldwater Creek.

- Serious health condition of child or spouse – both spouses employed by Coldwater Creek can take the full 12 weeks of leave during the 12-month period.

## MEDICAL
Medical certification from a licensed health care provider will be required to support a request for leave involving a serious health condition of the employee or family member. The employee must ensure that the attending physician (or other licensed health care provider) completes and returns the Certification of Health Care Provider form certifying that the reason for leave is due to a serious health condition, within fifteen days of receipt. The Certification of Health Care Provider form is available in the Human Resources department and should be completed and returned by the employee to Human Resources before the leave begins. Coldwater Creek may require a second or third opinion, at Coldwater Creek's expense, to further verify the need for leave. Coldwater Creek reserves the right to require periodic medical updates throughout the duration of the leave. A fitness-for-duty certification from the employee's health care provider is required before an employee is eligible to return to work from leave that is taken due to the employee's serious health condition.

## BENEFITS PROTECTION
The use of FMLA leave will not result in the loss of any employment benefit that accrued prior to the start of an employee's leave. This includes accrual of vacation, disability and sick leave and timing of performance / salary reviews. Benefit premiums that are currently being paid by Coldwater Creek will continue to be paid by Coldwater Creek while the employee is on leave. The employee must continue to pay the same portion of any individual, spouse and or dependent benefit premiums that the employee was responsible for prior to the FMLA leave in order to maintain coverage under the insurance plan(s). If an employee's share of any health insurance premium is delinquent for more than 30 days, the employee's health care coverage will be terminated, provided we notify you in writing within 15 days prior to the cancellation. An employee should consult with Human Resources prior to his or her leave to discuss and make arrangements for continuation of premium payments or to temporarily waive benefits coverage while out on leave.

If an employee decides to temporarily waive coverage for him or herself and/or dependents in any of the plans, the coverage will be reinstated upon his or her return with the same benefit elections he or she had prior to leave and with no penalties or waiting periods. If an employee fails to return from leave within thirty (30) days following expiration of such leave, Coldwater Creek reserves the right to recover the cost of any benefit premiums that Coldwater Creek paid during the employee's leave.

## RETURN TO WORK
In most instances, an employee returning from FMLA leave will be restored to the position previously held prior to the FMLA leave, provided that the position remains available. If that position is unavailable, the employee will be reinstated to an equivalent position with equivalent pay and benefits. An employee taking an FMLA leave is not entitled to any greater right to reinstatement or other benefits than if continuously employed during the leave.

# job applications

Coldwater Creek relies upon the accuracy of information contained in the employment application, as well as the accuracy of other information presented throughout the hiring process and employment. Any misrepresentations, falsifications, or material omissions may result in Coldwater Creek's exclusion of the individual from further consideration for employment or, if the person has been hired, may result in disciplinary action, up to and including termination of employment.

# reference checks

All requests for employment related references, in any form, on current or former employees, must be directed to Human Resources. Generally, responses to such inquiries will confirm only dates of employment and position(s) held.

Under no circumstances should Coldwater Creek employees release employment reference information regarding another current or former employee.

# pre-employment criminal background & credit checks

In consideration of possible employment with Coldwater Creek or as a condition of continued employment with Coldwater Creek, the company may obtain a consumer report or an investigative consumer report from a consumer reporting agency concerning prospective or current employees.

# employment classifications

Employment classifications determine work schedules and benefit eligibility. These classifications do not guarantee employment for any specified period of time. Accordingly, the right to terminate the employment relationship at-will at any time is retained by both the employee and Coldwater Creek.

**SALARIED EMPLOYEES** are those who are exempt from overtime compensation in accordance with federal and state laws.

**SALARIED NON-EXEMPT EMPLOYEES** are those who are eligible for overtime in accordance with Federal and State law.

**HOURLY EMPLOYEES** may receive overtime compensation in accordance with federal and state laws.

- **FULL-TIME HOURLY** employees are those who are regularly scheduled to work 32 or more hours per week.

- **PART-TIME HOURLY** employees are those who are regularly scheduled to work an average of 20 or more hours per week. Actual hours may vary by location and business needs.

- **SEASONAL OR TEMPORARY HOURLY** employees are those who are scheduled to work on an intermittent and/or unpredictable basis. Actual hours may vary by location and business needs.

- **ON-CALL HOURLY** employees generally work less than 20 hours per week on an intermittent or unpredictable schedule based on business needs.

# work schedules

Employees may be required to work a variety of scheduled hours during days, evenings, and or weekends based on business demands. Additionally, employees may be provided cross training for work assignments in other departments based on business needs.

Coldwater Creek reserves the right to modify an employee's work schedule as necessary.

## ABSENCES AND TARDINESS
Employment is a matter of mutual agreement. Coldwater Creek has a right to expect that employees will be present and ready for work when and where they are assigned. Employees have the right to expect consideration for legitimate excuses for absence and tardiness.

All Coldwater Creek employees are expected to personally contact their supervisors or managers with prior notice if they will be absent or tardy for a legitimate reason. Excessive absenteeism or tardiness, unexcused absences or no-shows for whatever reason, may result in disciplinary action, up to and including termination of employment in conjunction with the attendance policy at each respective location.

## BREAKS AND MEAL PERIODS
Breaks and meal periods are provided in each Coldwater Creek location and may vary in compliance with state law.

## TIMEKEEPING
Accurately recording time worked is the responsibility of every salaried non-exempt and hourly employee. All salaried non-exempt and hourly employees are required to record on the timekeeping system when you arrive at work, leave for and return from meal periods, and leave at the end of the workday. The company reserves the right to require other employee classifications to record hours worked as necessary. If you make an error, have your Supervisor or Manager correct it immediately. Do not clock in or out for another employee or have another employee clock in or out for you. Falsifying personal time records or recording time on another employee's time record may result in disciplinary action, up to and including termination of employment.

# job postings

Coldwater Creek will, whenever reasonably possible, communicate open positions through our job posting process. Employees who are interested in applying for open positions at Coldwater Creek must notify their respective Supervisor, Manager and Human Resources. When filling a vacancy, Coldwater Creek may promote or transfer a current employee who meets the job requirements and qualifications of the open position.

# rehires

Individuals who have previously worked for Coldwater Creek may be considered for rehire provided they meet the requirements and qualifications of the position and had a previous satisfactory work record. Employees rehired within 30 days of the previous termination date with Coldwater Creek will be reinstated with former benefits in compliance with company benefit eligibility policy. Depending on location and position, employees rehired may be required to submit to drug testing.

# referral program

Coldwater Creek may at various times of the year offer referral bonuses to employees who refer candidates for employment. Referral programs may vary depending on location.

# employment of relatives

In order to insure fairness and avoid potential conflicts, Coldwater Creek will, whenever possible, avoid hiring relatives into the same departments or retail locations with one another.

Under no circumstances will relatives be allowed to work in a direct supervisory relationship.

18

# dress code and personal appearance

Coldwater Creek's dress code varies by location. For example, if you work in our Distribution Center, closed-toe shoes are a must. If you work in our retail stores we ask that you dress casually yet professional, in relationship with the apparel you are selling. A casual yet professional appearance works for our corporate offices too. Extreme body piercing, tattoos or excessive use of body fragrances may be considered inappropriate as determined at each company location. If an employee comes to work wearing inappropriate clothing, the Supervisor or Manager will provide guidance for appropriate attire or, if necessary, send the employee home to change clothes before returning to work. All employees must present a neat, clean and professional appearance.

Not sure what is acceptable? Check with your Supervisor or Manager as dress requirements will vary.

# personal items

Coldwater Creek is not responsible for the loss of any personal items belonging to an employee, whether in the workplace or in their personal vehicles.

Employees may be required to have personal items (i.e. briefcases, purses, shopping bags, etc.) inspected while entering or leaving a Coldwater Creek facility, or at any time during business hours.

Coldwater Creek maintains the right to complete access to its property including lockers, desks, and other storage units, and that accordingly, such property can be inspected by an authorized representative of Coldwater Creek at any time, with or without prior notice.

# personal vehicles

Coldwater Creek is not responsible for damage to employees' personal vehicles on Coldwater Creek property.

# employee parking

Employees must park in designated employee parking areas, which will vary by location. Check with your Supervisor or Manager if you have any questions.

# entrances/exits

All employees are required to use designated employee entrances and exits as identified at each location.

# guests

In order to insure a safe and efficient workplace in Coldwater Creek's offices, retail stores, distribution center, call centers and corporate headquarters, all guests, contractors, vendors and the general public will be required to check in at designated areas in each respective location.

# employee shopping

Employees are not permitted to shop at retail locations or online during his or her working hours. Employee shopping must be done either before or after a scheduled work shift, or during an approved meal period. Retail store employees must make their purchases at the end of their respective work shift in the store and must have their purchase rung at the register by a member of the store management team or designated lead associates. Retail employees must make their returns prior to the start of their respective work shift. Merchandise will not be held for employees or eligible dependents in the retail stores beyond the close of business each day.

# employee discount

Employees are normally allotted the discounts listed below. During some special events, or in certain locations (i.e. Warehouse stores, Warehouse Sales, etc.) employee purchasing may be restricted and discounts may be altered.

- 40% on all regular price and ticketed sale price merchandise in premium and outlet stores. 10% on all seconds merchandise. The only exception where the employee discount is not allowed is during special in store promotions, or on selected merchandise.

- 40% on merchandise purchased on the Coldwater Creek website. To receive the employee discount on the website, employees must enter the letter "E" along with their employee number. Employees may not use their employee discount along with another website offer code or the kiosk free shipping offer code. Employees without a credit or debit card may make purchases from the website via check orders sent to any Customer Service Manager.

- Employees may not order directly from Coldwater Creek catalogs via the phones. Employees are required to place catalog orders using mail, fax or the website. All items are available on the website.

- Employees may be required to observe a waiting period after the release of promotional catalogs (i.e. Clearance, Gifts to Go, etc.) before they can make purchases using their employee discount.

## ELIGIBILITY

- Employees, spouses, or significant others and dependents that live with the employee and are claimed as dependents on the employee's income tax returns are eligible to receive the Coldwater Creek employee discount.

- Prior to first-time use, each employee must validate his/her discount by notifying Human Resources of eligible dependents.

- It is the responsibility of each employee to insure that each eligible dependent fully understands the discount benefit and the rules with which they must comply.

## PURCHASE WITH DISCOUNT

- Only employees and eligible dependents with proper identification may make purchases with discounts.

- Employees may make their own purchases on the website. Employees will pay postage and handling charges on orders placed on the website.

## GIFTS

- May be purchased by the employee and eligible dependents for a discount provided that they pay for the purchase themselves and receive no reimbursement.

## RETURNS

- Must be made within 30 days from date of purchase with the appropriate receipt to receive cash or credit as per the original method of payment.

- An Employee return or exchange <u>MUST</u> be accompanied by a receipt or collate. If a receipt or collate is unavailable, the return/exchange will <u>only</u> be accepted if the original purchase/order can be located in the system.

- No employee returns are accepted over 30 days from date of purchase unless the merchandise is defective.

- No refunds or price adjustments are allowed for merchandise purchased at an earlier time that is later shown in a sale catalog or offered at a lower price in any channel of Coldwater Creek.

Misuse of the employee discount policy will result in disciplinary action, up to and including termination of employment.

# access to human resource files

Human Resource files are the property of Coldwater Creek and access to the information they contain is restricted. Generally, only Coldwater Creek Management may review information in the Human Resource files. With reasonable advance notice, employees may review their Human Resources files in the presence of the respective Human Resources Manager or Retail Manager.

# change of status

It is the responsibility of each employee to promptly notify their respective Human Resource representative of any changes in personal data. Personal mailing addresses, name change, telephone numbers, number and names(s) of dependents, marital status change, beneficiary designation, individuals to be contacted in the event of an emergency, educational accomplishments, and other such status reports must be accurate and current at all times.

# paydays

All employees are paid bi-weekly (every 2 weeks) on Thursday. Each paycheck will include earnings for all work performed through the end of the previous 2 week payroll period. Workweeks begin each Sunday at 12:01 a.m. and end the following Saturday at 12:00 midnight. Paychecks will be available during business hours on each payday at a designated location in compliance with federal and state regulations. No paycheck will be released to any employee prior to payday (Thursday).

Direct Deposit is available for all employees and will be discussed in greater detail during your employment orientation. Pay advances are not issued to employees under any circumstances.

# overtime

When operating requirements or other needs cannot be met during regular working hours, employees may be scheduled to work overtime hours. When reasonably possible, advance notification of these assignments will be provided. All overtime work must receive prior approval from the immediate Supervisor or Manager. Overtime assignments will be distributed as necessary to all employees qualified to perform the required work.

Hourly and salaried non-exempt employees will be paid overtime in compliance with respective state and federal law. Paid leave will not be considered hours worked for purposes of determining overtime.

An employee is responsible for reporting all time worked. Employees who work overtime without receiving prior authorization from their manager may be subject to disciplinary action, up to and including termination of employment. Salaried exempt employees are not entitled to overtime pay in accordance with federal law.

# premium pay

All hourly employees (full-time, part-time, seasonal and temporary) may receive premium pay for certain hours worked as determined at each company location.

# vacation pay

Eligible employees accrue vacation on a monthly basis beginning on their anniversary date based on the following schedule:

ANNIVERSARY DATE TO 3RD YEAR ANNIVERSARY DATE
- Accrue 80 Hours Per Year

THIRD YEAR ANNIVERSARY DATE
TO FIFTH YEAR ANNIVERSARY DATE
- Accrue 120 Hours Per Year

21

**FIFTH YEAR ANNIVERSARY DATE**
**TO TENTH YEAR ANNIVERSARY DATE**
- Accrue 160 Hours Per Year

**TENTH YEAR ANNIVERSARY DATE AND FORWARD**
- Accrue 200 Hours Per Year

Vacation calendar years may vary based on location. Earned and unused vacation will be paid at the time of termination. Please refer to the policy for your respective location for specific plan information.

# sick pay

Eligible employees receive a maximum of one week (40 hours) of paid sick leave each calendar year, which may be taken for employee illness or for the illness of an immediate family member who requires care (this amount is pro-rated the first year for employees who are eligible after January 1). Unused sick leave may not be carried over year-to-year. Unused sick leave is not paid at the time of termination. Please refer to the policy for your respective location for specific plan information.

# holidays

Coldwater Creek observes the following Holidays:

- New Year's Day
- Memorial Day
- Independence Day
- Labor Day
- Thanksgiving Day
- Christmas Day

- HOURLY EMPLOYEES WHO ARE FULL-TIME, AND BENEFIT ELIGIBLE, WILL RECEIVE 8 HOURS OF HOLIDAY PAY FOR THESE HOLIDAYS.

- All hourly employees (full-time, part-time, seasonal and temporary) who work on a holiday will receive time and one-half for actual hours worked.

- All hourly employees (full-time, part-time, seasonal and temporary) who work on Easter will receive time and one-half for actual hours worked but will not receive any other additional holiday pay.

Hourly employees are eligible for holiday pay immediately from date of hire. Paid time off for holidays will not be counted as hours worked for the purpose of determining overtime.

Salaried employees required to work on a holiday may schedule another day off within the same pay period with management approval.

# safety

Establishment and maintenance of a safe work environment is the shared responsibility of all employees. Coldwater Creek will attempt to do everything within its control to comply with federal, state, and local safety regulations. Each employee is expected to be aware of good safety habits and to exercise caution in all work activities.

Employees should report potential safety hazards to their Supervisor, Manager or Human Resources as soon as possible. It is not only the responsibility of the Manager, but also the responsibility of all employees to correct unsafe conditions as promptly as possible.

In the event of a fire, activate the nearest fire alarm, and call 911 or the local emergency number immediately. Fire extinguishers are stationed throughout each location. Check with your Supervisor or Manager for training and use of this equipment. Know the location of exits and the proper procedures in the event of a fire.

**ACCIDENT REPORTING**
Employees are required to report and document employee or customer accidents to their respective Manager or Human Resources as soon as possible in accordance with company safety policies.

**FIRST AID SUPPLIES**
First aid kits are available at all sites for employee use, and will be checked regularly by management

COLDWATER CREEK EMPLOYEE HANDBOOK

for appropriate contents. Employees should check with their Manager for the location of the nearest first aid kit. In a continuing effort to maintain a safe work environment, Coldwater Creek has installed AED's (Automatic External Defibrillator) throughout the Sandpoint, Coeur d'Alene and Parkersburg campuses. These units are to be used only in case of a life threatening emergency by trained personnel. Coldwater Creek offers First Aid, CPR and AED training throughout the year and is voluntary.

### SAFETY COMMITTEE

In an effort to provide the safest possible working environment for employees, guests, and visitors, Coldwater Creek has appointed a safety committee composed of representatives throughout Coldwater Creek.

# workers compensation

Coldwater Creek provides Workers Compensation Insurance for all employees as defined by states' Workers Compensation laws. We also pay the premium for Workers' Compensation insurance, in case you are injured or suffer an occupational illness while on the job as defined by states' Workers Compensation laws. If you are injured or suffer an occupational illness of any kind, you must notify your Supervisor or Manager immediately and complete an incident report.

Some jobs require post-accident drug testing and may affect your Workers Compensation weekly benefit amount. Medical fees and weekly timeless benefits are paid as in conjunction with state law.

# loss prevention

Coldwater Creek is committed to protecting our employees, as well as Coldwater Creek's merchandise and property. All employees share in this responsibility.

Be alert at all times and if you notice something unusual or spot a shoplifter, contact your Supervisor,

Manager or immediately contact the Employee Hotline at 1-888-480-4747. Never attempt to stop or apprehend a shoplifter!

All share in the responsibility of minimizing inventory shortage and protecting company assets. Accordingly, Coldwater Creek will aggressively prosecute anyone including employees apprehended for theft.

# your development at coldwater creek

Your development at Coldwater Creek starts immediately with a new hire orientation program. This program has been developed to acquaint you with our culture, company policies and procedures, including the daily operation of our business, and how your job plays a significant role.

The manner in which you approach your job, accept your responsibilities and perform will determine your success. Coldwater Creek will do everything within reason to assist you in your development. You will be provided training, performance reviews, and guidance in career development. Your Manager can be of great assistance in familiarizing you with your job responsibilities, and will help you adjust to your new work environment. You and your Manager will periodically discuss your overall job performance as a means of measuring your progress.

Coldwater Creek strongly believes in the promotion of our employees within Coldwater Creek, wherever reasonably possible, subject to the availability of other qualified candidates for promotion. You are encouraged to discuss your job performance and career objectives with your respective Manager and/or Human Resources.

### PERFORMANCE REVIEWS

Building a high performance organization is critical to the success of Coldwater Creek. An important aspect to achieving this goal is to provide a clear and effective Performance Review Process that focuses on business objectives as well as skills and competencies needed to be successful in our culture.

23

COLDWATER CREEK EMPLOYEE HANDBOOK

- **PERFORMANCE REVIEWS FOR SALARIED EMPLOYEES** are administered in two measurement periods. The first measurement period is February through July. The second measurement period is August through January of each fiscal year.

- **PERFORMANCE REVIEWS FOR HOURLY EMPLOYEES** may vary depending on location but are generally administered on a semi-annual and/or annual (anniversary date) basis.

Coldwater Creek's Performance Review Process is based on open and ongoing communication regarding job performance throughout the course of the year, and culminates annually with candid and direct written feedback on the employee's job performance. We believe it is the responsibility of each manager and employee to make a mutual commitment to fostering professional growth and development.

Performance-based increases for both salaried and hourly employees are administered in conjunction with the annual performance review.

# standards of conduct

The following are examples of other policy and procedure violations that, as determined by Coldwater Creek, may subject an employee to disciplinary action, up to and including termination of employment. Coldwater Creek's management reserves the right to review and make determinations on each situation on a case-by-case basis. This list is not all-inclusive:

1. Rude or discourteous treatment of customers.

2. Dishonesty in any form or degree.

3. Damage, loss or destruction of Coldwater Creek property, employee, or customer property due to willful or careless acts.

4. Unauthorized possession of, removal or use of property belonging to Coldwater Creek, its customers or other employees.

5. Being under the influence of, or possessing or using alcohol or illegal drugs during work time or on Coldwater Creek premises.

6. Insufficient performance of duties, incompetence or neglect of work or duties or sleeping on the job.

7. Willful refusal to perform work as directed (insubordination), failure to perform work, and failure to follow a Supervisor's or Manager's directions or instructions.

8. Negligence in observing fire prevention or safety regulations, or failure to report on-the-job injuries or unsafe conditions.

9. Unexcused or excessive absence or tardiness.

10. Unwillingness or inability to maintain professional working relationships with others.

11. Failure to fully cooperate in any Coldwater Creek investigation.

12. Violation of any other commonly accepted reasonable rule or responsible personal conduct, appearance or cleanliness.

13. Inappropriate, obscene, abusive, or degrading language or actions.

14. Giving another employee false or misleading information.

15. Dealing with agents, solicitors, collectors, or sales people not engaged in Coldwater Creek business during working hours, or failure to report their presence on the property to a manager.

16. Utilization of Coldwater Creek facilities or property, including telephones, for personal benefit or convenience.

17. Permitting friends or relatives to use facilities, which are provided for employee's use only, unless otherwise approved and as a part of a company sponsored program.

18. Abandonment of job or unavailability for work without Coldwater Creek's prior approval of a leave of absence.

19. Falsification of documents or records with or without the intent of deriving personal gain, or being an accessory to such falsification including, without limitation, providing false information in the course of application for employment or in timekeeping processes.

20. The possession or use of firearms, weapons, ammunition or casings and explosive materials on the premises of Coldwater is strictly prohibited.

# performance warnings

If an employee does not meet performance expectations, Coldwater Creek's management will bring the performance issues to the attention of the employee. In such circumstances management will make reasonable efforts to assist the employee in improving their job performance. If an employee continues to have unsatisfactory job performance, it will be the responsibility of management to recommend the appropriate disciplinary action.

Some or all of the following guidelines may be used in resolving performance related problems:

· Verbal warnings

· Written warnings

· Suspension without pay

· Termination of employment

Coldwater Creek reserves the right to amend or accelerate the disciplinary process up to and including immediate termination of employment, when Coldwater Creek, through its managerial representatives, determines in its sole discretion that it is necessary or appropriate.

# open door

Coldwater Creek realizes that employees may have concerns or questions regarding work-related matters. Our Open Door policy provides a forum for employees and the company in the clarification or resolution of any issues. Employees have the following options available for registering questions, concerns or suggestions:

1. Contact the immediate Supervisor.

2. Contact the next level Manager. (Retail employees may also contact their respective District, Regional or Director of Retail Operations.)

3. Contact Human Resources.

4. Contact a Vice President of the company.

5. Contact the Employee Hotline at 1-888-480-4747, or write to: Coldwater Creek Employee Hotline P.O. Box 1921, Sandpoint, ID 83864 or via email at: employeehotline@thecreek.com.

Contact with the Employee Hotline may be made anonymously, and all communications will be maintained on a confidential basis.

All questions, concerns, investigations and subsequent responses will be maintained as confidential as possible recognizing, however, that in the course of investigating, resolving and communicating, some dissemination of information to other members of management may be necessary.

# exit interviews

An exit interview with Human Resources will be scheduled wherever possible for terminating employees (excluding seasonal and temporaries). The exit interview provides the opportunity to discuss such issues as employee relations, working conditions, compensation, benefits, training and the repayment or return of company property.

COLDWATER CREEK EMPLOYEE HANDBOOK

| TOPIC | PAGE |
|---|---|
| absences/tardiness | 18 |
| access to human resource files | 21 |
| at-will employment | 8 |
| benefits | 14 |
| breaks and meal periods | 18 |
| business channels | 4 |
| business ethics/code of conduct | 8 |
| business gifts and entertainment | 11 |
| change of status | 21 |
| confidentiality/proprietary information | 10 |
| confidentiality agreement | 10 |
| coldwater creek locations | 5 |
| direct deposit | 21 |
| dress code/personal appearance | 19 |
| drug and alcohol testing | 13 |
| drug-free workplace | 13 |
| equal employment opportunity | 9 |
| email usage | 12 |
| employee discount | 20 |
| employee parking | 19 |
| employee shopping | 19 |
| employment classifications | 17 |
| employment of relatives | 18 |
| entrances/exits | 19 |
| exit interviews | 25 |
| FMLA - family and medical leave act | 15 |
| general statement | 7 |
| guests | 19 |
| harassment | 9 |
| helping hands | 14 |
| HIPPA | 14 |
| holidays | 22 |
| information systems | 11 |
| insider trading | 11 |
| internet usage | 12 |

| TOPIC | PAGE |
|---|---|
| job applications | 17 |
| job postings | 18 |
| leave of absence | 15 |
| loss prevention | 23 |
| mission statement | 6 |
| mileage reimbursement | 14 |
| open door | 25 |
| our focus | 4 |
| outside employment | 11 |
| overtime | 21 |
| paydays/direct deposit | 21 |
| performance reviews | 23 |
| performance warnings | 25 |
| personal items | 19 |
| personal vehicles | 19 |
| phone, e-mail and internet usage | 12 |
| pre-employment credit & criminal checks | 17 |
| premium pay | 21 |
| reference checks | 17 |
| referral program | 18 |
| rehires | 18 |
| safety | 22 |
| sick pay | 22 |
| smoke-free workplace | 13 |
| solicitation/distribution | 12 |
| standards of conduct | 24 |
| tardiness | 18 |
| timekeeping | 18 |
| union-free workplace | 13 |
| vacation pay | 21 |
| welcome! | 2 |
| work schedules | 18 |
| workers compensation | 23 |
| workplace violence prevention | 10 |
| your development at coldwater creek | 23 |

COLDWATER CREEK EMPLOYEE HANDBOOK

## Coldwater Creek

**Employee Information Form**
Please enter all appropriate information based on the nature of the transaction and email this form immediately to Human Resources. Follow-up with a fax, including the authorized signatures.

CRP _____

Social Security No. **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**   Location No. _____   Timeclock ID _____

Employee Name **Linda L. Beard**

---

**Personal Information**   Effective Date **6-5-04**

Name Change _____   Preferred Name **Linda,**   Date of Birth **12-31-49**

Address **8305 Grand Oak Court  Mtgy.  AL.  36117**
Street/PO Box                City        State    Zip Code

Home Phone **(334) 409-9436**   Other Phone **834-531-0125 cell #**

Marital Status (circle one)  Single  Married  (Divorced)  Widow   Gender (circle one)  Male  (Female)

Emergency Contact **Kim Thompson**   Phone Number **(334) 395-5366-Hm**

Relationship **neice - cell # 868-0845    wk-240-8746 or 834-6000**

---

**Job Status/Compensation Change**   Effective Date **6/5/04**

Reason for Change (circle one) (New Hire) Rehire  Merit Increase  Promotion  Reclassification  Reorganization
Salary Adjustment  Salary Reduction  Transfer  Status Change

Job Number _____   Job Title **Part-time associate**

Location **184**   Business _____   Site/Region _____   Chan/Dist _____

Department _____   Manager/Supervisor _____

Work Group Number _____

Employee Type (circle one)  Salary (check autopaid)  Full-Time Hourly  (Part-Time Hourly)  Temporary  On Call
Seasonal - Indicate Last Day to be Worked _____

Pay Group (circle one)  HR   PT   SAL   TMP

Salary  Current Hourly Rate/Salary $ **8.00**   Increase/Decrease Amount  $ _____

New Hourly Rate/Salary $ _____   Hourly _____  Annual _____

Training Wage $ _____   From: _____  To: _____

HR Use Only   Earnings/Deduction Group   Accruals   Direct Deposit   ECOMETRY   POS

---

**Performance Appraisal**   Effective Date _____

Review Score _____   Next Performance Review Date _____

Next Increase Review Date _____

Review Type: (circle one)  Annual  Semi-Annual  6-Month  90-Day NP  90-Day NH

---

**Termination**   Effective Date _____

Reason (circle one): _____   Eligible for Rehire: (circle one)  Yes   No

Quit for Another Job - Non Retail        Quit for Another Job - Retail
Quit Medical Reasons                     Quit Moved out of Area
Quit No Notice                           Quit Personal Reasons
Quit for School                          Termination Exhausted Leave
Termination Layoff                       Termination Policy Violation
Termination Unsatisfactory Performance   Retired
Deceased

HR Use Only   Autopaid   Ecometry   POS   Direct Deposit

Employee Signature _____   Date **6-5-04**

r/Supervisor Signature _____   Date **6/4/04**

r/Supervisor Signature _____   Date _____

208 2653199    COLDWATER CREEK    10:21:17 a.m.    10-08-2007    2 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2





Home | Help | Logout





Home

## Timecard for Linda Beard ⊞

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable  Return to Approval Timecard

| Signed | No | | | |
|---|---|---|---|---|
| Approved | No | | | |
| Pay Freq | BiWeekly (Locked) ADJUST TIMECARD | | | |
| Pay Period | 05/30/2004-06/12/2004 View Other Periods | | | |

| | REG | NonWk | 0.00 |
|---|---|---|---|
| | OT | OT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 22.25 | | |

REG 22.25

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sun 06/06 | RG | 08:30A | 12:15P | 01:45P | 05:00P | 07:00 | | | | 80184 | 800 |
| | Tue 06/08 | RG | 06:00P | | | 09:45P | 03:45 | | | | 80184 | 800 |
| | Wed 06/09 | RG | 06:00P | | | 09:30P | 03:30 | | | | 80184 | 800 |
| | Fri 06/11 | RG | 01:00P | | | 05:00P | 04:00 | | | | 80184 | 800 |
| | Sat 06/12 | RG | 01:00P | | | 05:00P | 04:00 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| 05/30 | 05/31 | 06/01 | 06/02 | 06/03 | 06/04 | 06/05 | | |
|---|---|---|---|---|---|---|---|---|
| 06/06 | 06/07 | 06/08 | 06/09 | 06/10 | 06/11 | 06/12 | | 22.25 |
| 7.00 | | 3.75 | 3.50 | | 4.00 | 4.00 | 22.25 | top ▶ |

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|---|---|---|---|---|---|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |

208 2653199          COLDWATER CREEK                    10:21:37 a.m.    10-08-2007     3/60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2



Kronos Time & Attendance

Home | Help | Logout

# Timecard for Linda Beard

| Signed | No |
| Approved | 06/27/2004@1:46PM by Mary Russell |
| Pay Freq | BiWeekly (Locked) |
| Pay Period | 06/13/2004-06/26/2004 View Other Periods |

| | |
|---|---|
| REG | 37.75 |
| OT | 0.00 |
| NIGHT | 0.00 |
| TOTAL | 37.75 |

| | |
|---|---|
| NonWk | 0.00 |
| OT | 0.00 |
| WKEND | 0.00 |

Operations: Printable  Return to Approval Timecard

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mon 06/14 | RG | 06:00P | | | 08:30P | 02:30 | | | | 80184 | 800 |
| | Wed 06/16 | RG | 01:00P | | | 06:00P | 05:00 | | | | 80184 | 800 |
| | Fri 06/18 | RG | 12:00P | | | 05:00P | 05:00 | | | | 80184 | 800 |
| | Sat 06/19 | RG | 05:00P | | | 09:45P | 04:45 | | | | 80184 | 800 |
| | Sun 06/20 | RG | 01:00P | 04:00P | 04:30P | 06:45P | 04:45 | | | | 80184 | 800 |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Wed 06/23 | RG | 05:00P | | | 09:45P | 04:45 | | | | 80184 | 800 |
| | Thu 06/24 | RG | 01:00P | | | 06:00P | 05:00 | | | | 80184 | 800 |
| | Sat 06/26 | RG | 12:00P | 03:00P | 03:30P | 06:00P | 05:30 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| 06/13 | 06/14 | 06/15 | 06/16 | 06/17 | 06/18 | 06/19 | |
|---|---|---|---|---|---|---|---|
| | 2.50 | | 5.00 | | 5.00 | 4.75 | 17.25 |
| 06/20 | 06/21 | 06/22 | 06/23 | 06/24 | 06/25 | 06/28 | |
| 5.25 | | | 4.75 | 5.00 | | 5.50 | 20.50 |

top ▶ 37.75

Time Code Listing

208 2653199        COLDWATER CREEK                    10:21:59 a.m.    10-08-2007      4/60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

Coldwater Time & Attendance

Home | Help | Logout

Home ◀

## Timecard for Linda Beard ⊕

| | | |
|---|---|---|
| Signed | 07/10/2004 6:22PM | |
| Approved | 07/12/2004@9:40AM by Mary Russell | |
| Pay Freq | BiWeekly (Locked) | |
| Pay Period | 06/27/2004-07/10/2004 View Other Periods | |

| | | |
|---|---|---|
| REG | 31.50 | NonWk | 0.00 |
| OT | 5.25 | OT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 36.75 | | |

Operations: Printable  Return to Approval Timecard

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sun 06/27 | RG | 01:00P | 03:30P | 04:00P | 06:15P | 04:45 | | | | 80184 | 800 |
| | Mon 06/28 | RG | 12:00P | | | 06:15P | 06:15 | | | | | 80184 | 800 |
| | Wed 06/30 | RG | 06:15P | | | 10:15P | 04:00 | | | | | 80184 | 800 |
| | Sat 07/03 | RG | 12:00P | | | 05:30P | 05:30 | | | | | 80184 | 800 |
| Del | Sun 07/04 | NP | 12:00A | | | 08:00A | 08:00 | | | | | 80184 | 800 |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sun 07/04 | RG | 01:00P | | | 06:15P | 05:15 | | | | | 80184 | 800 |
| | Fri 07/09 | RG | 12:00P | | | 06:00P | 06:00 | | | | | 80184 | 800 |
| | Sat 07/10 | RG | 01:15P | | | 06:15P | 05:00 | | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| 06/27 | 06/28 | 06/29 | 06/30 | 07/01 | 07/02 | 07/03 | |
|---|---|---|---|---|---|---|---|
| 4.75 | 6.25 | | 4.00 | | | 5.50 | 20.50 |
| 07/04 | 07/05 | 07/06 | 07/07 | 07/08 | 07/09 | 07/10 | |
| 13.25 | | | | 6.00 | 5.00 | | 24.25 |
| | | | | | | | 44.75 |

top ▶

Time Code Listing

208 2653199    COLDWATER CREEK    10:22:21 a.m.    10-08-2007    5 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2



Home | Help | Logout

Confidential Time & Attendance

Home ▾

## Timecard for Linda Beard ⊙

**Signed** | 07/24/2004 9:40PM
**Approved** 07/26/2004@12:23PM by Mary Russell
**Pay Freq** BiWeekly (Locked)
**Pay Period** 07/11/2004–07/24/2004 View Other Periods

| REG | 10.25 | NonWk | 0.00 |
| OT | 0.00 | OT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 10.25 | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|-----|------|-----------|-----|----------|---------|-----|-------|-----|--------------|------|------|-----|
| | Sun 07/11 | RG | 01:15P | | | 06:30P | 05:15 | | | | 80184 | 800 |
| | Sat 07/24 | RG | 04:45P | | | 09:45P | 05:00 | | | | 80184 | 800 |

Operations: Printable Return to Approval Timecard

top ▶

### Daily Hours Summary

| 07/11 | 07/12 | 07/13 | 07/14 | 07/15 | 07/16 | 07/17 |
|-------|-------|-------|-------|-------|-------|-------|
| 5.25 | | | | | | 5.25 |
| 07/18 | 07/19 | 07/20 | 07/21 | 07/22 | 07/23 | 07/24 |
| | | | | | | 5.00 |
| | | | | | | 5.00 |

| 10.25 |

top ▶

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|----|---------|----|-------------|----|------------|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |
| VA | Vacation Pay | | | | |

©1994-2006 Ceridian Corporation, All Rights Reserved

http://cdav1apprcdrn01/cta660/cta.asp

10/8/2007

208 2653199    COLDWATER CREEK    10:22:40 a.m.    10-08-2007    6/60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2




Ceridian Time & Attendance

Home | Help | Logout

# Timecard for Linda Beard

Signed | No
Approved  08/09/2004 @11:47AM by Mary Russell
Pay Freq)  BiWeekly (Locked)
Pay Period) 07/25/2004-08/07/2004 View Other Periods

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable Return to Approval Timecard

| REG | 10.00 | NonWk | 0.00 |
|---|---|---|---|
| OT | 0.00 | DT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 10.00 | | |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sat 07/31 | RG | 06:00P | | | 09:30P | 03:30 | | | | 80184 | 600 |
| | Mon 08/02 | RG | 06:00P | | | 09:15P | 03:15 | | | | 80184 | 800 |
| | Wed 08/04 | RG | 06:00P | | | 09:15P | 03:15 | | | | 80184 | 800 |
| | | | | | | | | | | | 80184 | 800 |

Operations: Printable Return to Approval Timecard

### Daily Hours Summary

| 07/25 | 07/26 | 07/27 | 07/28 | 07/29 | 07/30 | 07/31 |
|---|---|---|---|---|---|---|
| 08/01 | 08/02 | 08/03 | 08/04 | 08/05 | 08/06 | 08/07 |
| | | | 3.25 | | 3.50 | 3.50 |
| | 3.25 | | 3.25 | | | 6.50 |

top ▶ 10.00

### Time Code Listing

| AB Absence | AD Admin Leave | DS Disability |
|---|---|---|
| FN Funeral Pay | HP Holiday Pay | JD Jury Duty |
| ML Military Leave | MT Meeting | NP No Pay |
| PT PTO | RG Regular Hours | S2 Shift 2 Premium |
| SK Sick Pay | TN Training | TV Travel Time |
| VA Vacation Pay | | |

top ▶

208 2653199        COLDWATER CREEK                    10:22:59 a.m.    10-08-2007        7 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

*Certified Time & Attendance*

Home | Help | Logout

Home [ ▼ ]

## Timecard for Linda Beard ▣

| | | | NonWk | 0.00 |
| Signed | No | REG | 18.00 | | |
| Approved | 08/23/2004@9:56AM by Mary Russell | OT | 0.00 | DT | 0.00 |
| Pay Freq | BiWeekly (Locked) | NIGHT | 0.00 | WKEND | 0.00 |
| Pay Period | 08/08/2004-08/21/2004 View Other Periods | TOTAL | 18.00 | | |

Operations: Printable  Return to Approval Timecard

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fri 08/13 | RG | 06:15P | | | 09:15P | 03:00 | | | | 80184 | 800 |
| | Sat 08/14 | RG | 01:00P | | | 05:00P | 04:00 | | | | 80184 | 800 |
| | Sun 08/15 | RG | 01:00P | | | 03:30P | 02:30 | | | | 80184 | 800 |
| | Fri 08/20 | RG | 02:15P | | | 06:45P | 04:30 | | | | 80184 | 800 |
| | Sat 08/21 | RG | 03:00P | | | 07:00P | 04:00 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| 08/08 | 08/09 | 08/10 | 08/11 | 08/12 | 08/13 | 08/14 |
|---|---|---|---|---|---|---|
| | | | | | 3.00 | 4.00 |
| 08/15 | 08/16 | 08/17 | 08/18 | 08/19 | 08/20 | 08/21 |
| 2.50 | | | | | 4.50 | 4.00 |

| 7.00 |
| 11.00 |

18.00

top ▶

### Time Code Listing

| AB | Absence | AD | Admin Leave | DB | Disability |
|---|---|---|---|---|---|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |

10/8/2007

208 2653199    COLDWATER CREEK    10:23:20 a.m.    10-08-2007    8 /60

Timecard - CWC Time History - NOT PRODUCTION for Jenifer Flynn

Page 1 of 2

Ceridian Time & Attendance

Home | Help | Logout

Home ▾

# Timecard for Linda Beard

**Operations:** Printable  Return to Approval Timecard

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

|  | REG | 8.75 | NonWk | 0.00 |
| Signed | No | OT | 0.00 | DT | 0.00 |
| Approved | 09/06/2004@11:28AM by Mary Russell | NIGHT | 0.00 | WKEND | 0.00 |
| Pay Freq | BiWeekly (Locked) | TOTAL | 8.75 |
| Pay Period | 08/22/2004-09/04/2004 View Other Periods |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Sat 08/28 | RG | 01:30P |  |  | 06:30P | 05:00 |  |  |  | 80184 | 800 |
|  | Sat 09/04 | RG | 02:15P |  |  | 06:00P | 03:45 |  |  |  | 80184 | 800 |

**Operations:** Printable  Return to Approval Timecard

### Daily Hours Summary

| 08/22 | 08/23 | 08/24 | 08/25 | 08/26 | 08/27 | 08/28 |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  | 5.00 | 5.00 |
| 08/29 | 08/30 | 08/31 | 09/01 | 09/02 | 09/03 | 09/04 |
|  |  |  |  |  |  | 3.75 | 3.75 |
|  |  |  |  |  |  | 8.75 |

top ▶

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |
| VA | Vacation Pay |

top ▶

©1994-2006 Ceridian Corporation, All Rights Reserved



http://cdav1apprdn01/cta660/cta.asp

10/8/2007

208 2653199     COLDWATER CREEK

10:23:42 a.m.     10-08-2007     9 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2





Home | Help | Logout

Home ▼

## Timecard for Linda Beard

**Signed** No
**Approved** 09/20/2004@10:20AM by Mary Russell
**Pay Freq** BiWeekly (Locked)
**Pay Period** 09/05/2004-09/18/2004 View Other Periods

| REG | 3.75 | NonWk | 0.00 |
| OT | 0.00 | DT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 3.75 | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

**Operations:** Printable Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mon 09/06 | NP | 12:00A | | | 08:00A | 08:00 | | | | 80184 | 800 |
| | Sat 09/11 | RG | 01:00P | | | 04:45P | 03:45 | | | | 80184 | 800 |

**Operations:** Printable Return to Approval Timecard

### Daily Hours Summary

| 09/05 | 09/06 | 09/07 | 09/08 | 09/09 | 09/10 | 09/11 |
|---|---|---|---|---|---|---|
| | 8.00 | | | | | 3.75 |

| 09/12 | 09/13 | 09/14 | 09/15 | 09/16 | 09/17 | 09/18 |
|---|---|---|---|---|---|---|
| | | | | | | |

| | | | 3.75 | 11.75 |

11.75

top ▶

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|---|---|---|---|---|---|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |
| VA | Vacation Pay | | | | |

top ▶

©1994-2006 Ceridian Corporation, All Rights Reserved

http://cdav1apprdn01/cta660/cta.asp

10/8/2007

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

*Ceridian Time & Attendance*

Home | Help | Logout

Home

# Timecard for Linda Beard

Signed | No
Approved | 10/04/2004@10:00AM by Mary Russell
Pay Freq | BiWeekly (Locked)
Pay Period | 09/19/2004-10/02/2004 View Other Periods

|  | REG | 7.75 | NonWk | 0.00 |
|---|---|---|---|---|
|  | OT | 0.00 | DT | 0.00 |
|  | NIGHT | 0.00 | WKEND | 0.00 |
|  | TOTAL | 7.75 |  |  |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Fri 09/24 | RG | 06:15P |  |  | 09:15P | 03:00 |  |  |  | 80184 | 800 |
|  | Sat 10/02 | RG | 02:15P |  |  | 07:00P | 04:45 |  |  |  | 80184 | 800 |

Operations: Printable Return to Approval Timecard

top ▶

### Daily Hours Summary

| 09/19 | 09/20 | 09/21 | 09/22 | 09/23 | 09/24 | 09/25 |
|---|---|---|---|---|---|---|
|  |  |  |  |  | 3.00 | 3.00 |
| 09/28 | 09/27 | 09/28 | 09/29 | 09/30 | 10/01 | 10/02 |
|  |  |  |  |  |  | 4.75 |

4.75

7.75

top ▶

### Time Code Listing

| AB | Absence | AD | Admin Leave | DB | Disability |
|---|---|---|---|---|---|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |
| VA | Vacation Pay |  |  |  |  |

©1994-2006 Ceridian Corporation, All Rights Reserved

http://cdav1appcrtdn01/cta660/cta.asp

10/8/2007

208 2653199      COLDWATER CREEK                    10:24:22 a.m.    10-08-2007    11 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

Certelian Time & Attendance



Home | Help | Logout

## Timecard for Linda Beard ☺

| Signed | 10/16/2004 7:08PM |
| Approved | 10/18/2004@10:09AM by Mary Russell |
| Pay Freq | BiWeekly (Locked) |
| Pay Period | 10/3/2004-10/16/2004 View Other Periods |

| | | |
|---|---|---|
| REG | 15.75 | NonWk | 0.00 |
| OT | 0.00 | DT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 15.75 | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Thu 10/07 | RG | 06:00P | | | 09:15P | 03:15 | | | | 80184 | 800 |
| | Fri 10/08 | RG | 06:00P | | | 09:30P | 03:30 | | | | 80184 | 800 |
| | Sat 10/09 | RG | 02:15P | | | 07:00P | 04:45 | | | | 80184 | 800 |
| | Sat 10/16 | RG | 02:45P | | | 07:00P | 04:15 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| 10/03 | 10/04 | 10/05 | 10/06 | 10/07 | 10/08 | 10/09 | |
|---|---|---|---|---|---|---|---|
| | | | | 3.25 | 3.50 | 4.75 | 11.50 |

| 10/10 | 10/11 | 10/12 | 10/13 | 10/14 | 10/15 | 10/16 | |
|---|---|---|---|---|---|---|---|
| | | | | | | 4.25 | 4.25 |

15.75

top ▶

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|---|---|---|---|---|---|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |
| VA | Vacation Pay | | | | |

208 2653199        COLDWATER CREEK                    10:24:45 a.m.    10-08-2007        12 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

*Certidian Time & Attendance*



Home

Home | Help | Logout

## Timecard for Linda Beard ■

**Signed** No
**Approved** 11/01/2004@9:19AM by Mary Russell
**Pay Freq** BiWeekly (Locked)
**Pay Period** 10/17/2004-10/30/2004 View Other Periods

| | REG | 17.25 | NonWk | 0.00 |
| | OT | 0.00 | DT | 0.00 |
| | NIGHT | 0.00 | WKEND | 0.00 |
| | TOTAL | 17.25 | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

**Operations:** Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|-----|------|-----------|-----|----------|---------|-----|-------|----|--------------|------|------|-----|
| | Sat 10/23 | RG | 02:15P | | | 05:15P | 03:00 | | | | 80184 | 800 |
| | Wed 10/27 | RG | 06:00P | | | 09:00P | 03:00 | | | | 80184 | 800 |
| | Fri 10/29 | RG | 01:00P | | | 06:15P | 05:15 | | | | 80184 | 800 |
| | Sat 10/30 | RG | 03:00P | 05:30P | 06:00P | 09:30P | 06:00 | | | | 80184 | 800 |
| | | | | | | | 17.25 | | | | 80184 | 800 |

**Operations:** Printable  Return to Approval Timecard

### Daily Hours Summary

| 10/17 | 10/18 | 10/19 | 10/20 | 10/21 | 10/22 | 10/23 |
|-------|-------|-------|-------|-------|-------|-------|
| | | | | | | 3.00 |
| 10/24 | 10/25 | 10/26 | 10/27 | 10/28 | 10/29 | 10/30 |
| | | | 3.00 | | 5.25 | 6.00 |

14.25    3.00

17.25

top ▶

### Time Code Listing

| Code | Description | | | Code | Description |
|------|-------------|---|---|------|-------------|
| AB | Absence | | AD | Admin Leave | DS | Disability |
| FN | Funeral Pay | | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | | MT | Meeting | NP | No Pay |
| PT | PTO | | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | | TN | Training | TV | Travel Time |
| VA | Vacation Pay | | | | |

http://cdav1apperdn01/ctn600/cta.asp

10/8/2007

208 2653199        COLDWATER CREEK                    10:25:05 a.m.    10-08-2007    13 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

**Certidians Time & Attendance**



Home ▾

## Timecard for Linda Beard

| | |
|---|---|
| Signed | No |
| Approved | 11/15/2004@9:24AM by Jennifer Friday |
| Pay Freq | BiWeekly (Locked) |
| Pay Period | 10/31/2004-11/13/2004 View Other Periods |

| REG | 34.50 | NonWK | 0.00 |
|---|---|---|---|
| OT | 0.00 | DT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 34.50 | | |

Operations: Printable Return to Approval Timecard

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mon 11/01 | RG | 01:00P | | | 06:00P | 05:00 | | | | 80184 | 800 |
| | Thu 11/04 | RG | 12:00P | | | 04:00P | 04:00 | | | | 80184 | 800 |
| | Fri 11/05 | RG | 12:00P | | | 04:00P | 04:00 | | | | 80184 | 800 |
| | Sat 11/06 | RG | 01:15P | | | 05:00P | 03:45 | | | | 80184 | 800 |
| | Sun 11/07 | RG | 07:00P | | | 09:00P | 02:00 | | | | 80184 | 800 |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Del | Thu 11/11 | RG | 03:15P | | | 09:30P | 06:15 | | | | 80184 | 800 |
| | Fri 11/12 | RG | 05:00P | | | 09:15P | 04:15 | | | | 80184 | 800 |
| | Sun 11/13 | RG | 12:00P | | | 05:15P | 05:15 | | | | 80184 | 800 |

Operations: Printable Return to Approval Timecard

### Daily Hours Summary

| 10/31 | 11/01 | 11/02 | 11/03 | 11/04 | 11/05 | 11/06 | |
|---|---|---|---|---|---|---|---|
| | 5.00 | | | 4.00 | 4.00 | 3.75 | 16.75 |
| 11/07 | 11/08 | 11/09 | 11/10 | 11/11 | 11/12 | 11/13 | |
| 2.00 | | | | 6.25 | 4.25 | 5.25 | 17.75 |
| | | | | | | | 34.50 |

top ▶

Time Code Listing

208 2653199    COLDWATER CREEK    10:25:26 a.m.    10-08-2007    14 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

Home | Help | Logout

Certegy Time & Attendances

# Timecard for Linda Beard

| Signed | No | | | | | REG | 27.00 | NonWk | 0.00 |
| Approved | No | | | | | OT | 0.00 | OT | 0.00 |
| Pay Freq | BiWeekly (Locked) ADJUST TIMECARD | | | | | NIGHT | 0.00 | WKEND | 0.00 |
| Pay Period | 11/14/2004-11/27/2004 View Other Periods | | | | | TOTAL | 27.00 | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: **Printable**  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|-----|------|-----------|----|----|----|-----|-------|----|----|----|----|----|
| | Sun 11/14 | RG | 06:00P | | | 08:45P | 02:45 | | | | 80184 | 800 |
| | Mon 11/15 | RG | 01:00P | | | 06:00P | 05:00 | | | | 80184 | 800 |
| | Sat 11/20 | RG | 06:15P | | | 09:15P | 03:00 | | | | 80184 | 800 |
| | Sun 11/21 | RG | 06:30P | | | 08:00P | 03:00 | | | | 80184 | 800 |
| | Mon 11/22 | RG | 01:15P | | | 06:00P | 04:45 | | | | 80184 | 800 |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|-----|------|-----------|----|----|----|-----|-------|----|----|----|----|----|
| | Thu 11/25 | NP | 12:00A | | | 08:00A | 08:00 | LD | | COMP | 80184 | 800 |
| | Fri 11/26 | RG | 12:45P | 04:45P | 06:15P | 08:00P | 06:45 | | | | 80184 | 800 |
| | Sat 11/27 | RG | 08:00P | | | 08:15P | 03:15 | | | | 80184 | 800 |

Operations: **Printable**  Return to Approval Timecard

Daily Hours Summary

| 11/14 | 11/15 | 11/16 | 11/17 | 11/18 | 11/20 |
|-------|-------|-------|-------|-------|-------|
| 2.75 | 5.00 | | | | 3.00 |

| 11/21 | 11/22 | 11/23 | 11/24 | 11/25 | 11/26 | 11/27 |
|-------|-------|-------|-------|-------|-------|-------|
| 1.50 | 4.75 | | 8.00 | 6.75 | 3.25 | 24.25 |

35.00

top

Time Code Listing

208 2653199        COLDWATER CREEK                10:25:48 a.m.    10-08-2007        15 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

**Ceridian Time & Attendance**

Home | Help | Logout

Home ▾

# Timecard for Linda Beard

| | | |
|---|---|---|
| Signed | No |
| Approved | 12/13/2004@9:54AM by Mary Russell |
| Pay Freq | BiWeekly (Locked) |
| Pay Period | 11/28/2004-12/11/2004 View Other Periods |

| | |
|---|---|
| REG | 32.00 | NonWk | 0.00 |
| OT | 0.00 | DT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 32.00 | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sun 11/28 | RG | 01:15P | | | 06:00P | 04:45 | | | | 80184 | 800 |
| | Wed 12/01 | RG | 02:00P | | | 06:00P | 04:00 | | | | 80184 | 800 |
| | Thu 12/02 | RG | 02:30P | | | 06:15P | 03:45 | | | | 80184 | 800 |
| | Fri 12/03 | RG | 06:15P | | | 10:00P | 03:45 | | | | 80184 | 800 |
| | Sat 12/04 | RG | 02:15P | | | 06:15P | 04:00 | | | | 80184 | 800 |
| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
| | Sun 12/05 | RG | 02:00P | | | 04:30P | 02:30 | | | | 80184 | 800 |
| | Fri 12/10 | RG | 08:15P | | | 10:00P | 04:45 | | | | 80184 | 800 |
| | Sat 12/11 | RG | 02:00P | | | 06:30P | 04:30 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| 11/28 | 11/29 | 11/30 | 12/01 | 12/02 | 12/03 | 12/04 |
|---|---|---|---|---|---|---|
| 4.75 | | | 4.00 | 3.75 | 4.00 | 20.25 |
| 12/05 | 12/06 | 12/07 | 12/08 | 12/09 | 12/10 | 12/11 |
| 2.50 | | | | 4.75 | 4.50 | 11.75 |

top ▶        32.00

Time Code Listing



208 2653199        COLDWATER CREEK                10:26:09 a.m.    10-08-2007    16 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2



Home | Help | Logout

## Timecard for Linda Beard

Home

| | | |
|---|---|---|
| Signed | No | |
| Approved | No | |
| Pay Freq | BiWeekly (Locked) ADJUST TIMECARD | |
| Pay Period | 12/12/2004-12/25/2004 View Other Periods | |

| | | | |
|---|---|---|---|
| REG | 15.25 | NonWk | 0.00 |
| OT | 0.00 | DT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 15.25 | | |

Operations | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mon 12/13 | RG | 06:15P | | | 08:00P | 01:45 | | | | 80184 | 800 |
| | Sat 12/18 | RG | 02:15P | 05:45P | 06:30P | 08:30P | 05:30 | | | | 80184 | 800 |
| | Sun 12/19 | RG | 03:15P | | | 08:15P | 05:00 | | | | 80184 | 800 |
| | Mon 12/20 | RG | 03:00P | | | 06:00P | 03:00 | | | | 80184 | 800 |
| | Sat 12/25 | NP | 12:00A | | | 08:00A | 08:00 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| 12/12 | 12/13 | 12/14 | 12/15 | 12/16 | 12/17 | 12/18 |
|---|---|---|---|---|---|---|
| | 1.75 | | | | | 5.50 | 7.25 |
| 12/19 | 12/20 | 12/21 | 12/22 | 12/23 | 12/24 | 12/25 |
| 5.00 | 3.00 | | | | | 8.00 | 16.00 |

23.25

top ▶

### Time Code Listing

| AB | Absence | AD | Admin Leave | D3 | Disability |
|---|---|---|---|---|---|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |

http://cdav1appcrdn01/cta660/cta.asp

10/8/2007

208 2653199    COLDWATER CREEK    10:26:30 a.m.    10-08-2007    17 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn    Page 1 of 2



*CWC Time & Attendance*

Home | Help | Logout

[ Home  ▾ ]

# Timecard for Linda Beard ⓘ

| Signed | No |
| Approved | No |
| Pay Freq | BiWeekly (Locked) ADJUST TIMECARD |
| Pay Period | 12/26/2004-01/08/2005 View Other Periods |

| | |
|---|---|
| REG | 17.75 |
| OT | 0.00 |
| NIGHT | 0.00 |
| TOTAL | 17.75 |

| | |
|---|---|
| NonWk | 0.00 |
| DT | 0.00 |
| WKEND | 0.00 |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sun 12/26 | RG | 01:00P | | | 06:00P | 05.00 | | | | 80184 | 800 |
| | Sat 01/01 | NP | 12:00A | | | 08:00A | 08.00 | | | | 80184 | 800 |
| | Sun 01/02 | RG | 01:15P | | | 06:00P | 04.45 | | | | 80184 | 800 |
| | Wed 01/05 | RG | 02:15P | | | 06:00P | 03.45 | | | | 80184 | 800 |
| | Thu 01/06 | RG | 02:00P | | | 06:15P | 04.15 | | | | 80184 | 800 |

Operations: Printable Return to Approval Timecard

| | Daily Hours Summary | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 12/26 | 12/27 | 12/28 | 12/29 | 12/30 | 12/31 | 01/01 | | |
| | 5.00 | | | | | | 8.00 | 13.00 | |
| | 01/02 | 01/03 | 01/04 | 01/05 | 01/06 | 01/07 | 01/08 | | |
| | 4.75 | | | 3.75 | 4.25 | | | 12.75 | |
| | | | | | | | | 25.75 | |

top ▶

| Time Code Listing | | | |
|---|---|---|---|
| AB | Absence | AD | Admin Leave | DS | Disability |
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |

http://cdsv1appcrdm01/ctm660/cta.asp

10/8/2007

208 2653199     COLDWATER CREEK                    10:26:50 a.m.   10-08-2007   18 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2





Home | Help | Logout

Home [ ]

## Timecard for Linda Beard ?

Signed : No
Approved : 01/24/2005@9:47AM by Mary Russell
Pay Freq : BiWeekly (Locked)
Pay Period : 01/09/2005-01/22/2005 View Other Periods

| REG | 10.50 | NonWk | 0.00 |
| OT | 0.00 | DT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 10.50 | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|-----|------|-----------|-----|----------|---------|-----|-------|-----|--------------|------|------|-----|
| | Sat 01/15 | RG | 01:15P | | | 04:00P | 02:45 | | | | 80184 | 800 |
| | Mon 01/17 | RG | 02:15P | | | 06:00P | 03:45 | | | | 80184 | 800 |
| | Tue 01/18 | RG | 02:15P | | | 06:15P | 04:00 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| 01/09 | 01/10 | 01/11 | 01/12 | 01/13 | 01/14 | 01/15 | | |
|-------|-------|-------|-------|-------|-------|-------|---|---|
| | | | | | | 2.75 | | 2.75 |
| 01/16 | 01/17 | 01/18 | 01/19 | 01/20 | 01/21 | 01/22 | | |
| | 3.75 | 4.00 | | | | | | 7.75 |
| | | | | | | | | 10.50 |

top ▶

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|----|---------|----|-------------|----|-----------|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |
| VA | Vacation Pay | | | | |

top ▶

http://cdav1xrpcrdn01/cta660/cta.asp

10/8/2007

208 2653199        COLDWATER CREEK                          10:27:09 a.m.    10-08-2007        19/60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

Home | Help | Logout

[ Home ]

# Timecard for Linda Beard

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

**Operations:** Printable Return to Approval Timecard

| Signed | No |
| Approved | 02/07/2005@9:14AM by Mary Russell |
| Pay Freq | BiWeekly (Locked) |
| Pay Period | 01/23/2005-02/05/2005 View Other Periods |

| REG | 12.00 | NonWk | 0.00 |
| OT | 0.00 | DT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 12.00 | | |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tue 01/25 | RG | 02:00P | | | 06:00P | 04:00 | | | | 80184 | 800 |
| | Tue 02/01 | RG | 02:00P | | | 06:15P | 04:15 | | | | 80184 | 800 |
| | Sat 02/05 | RG | 04:15P | | | 08:00P | 03:45 | | | | 80184 | 800 |

**Operations:** Printable Return to Approval Timecard

### Daily Hours Summary

| 01/23 | 01/24 | 01/25 | 01/26 | 01/27 | 01/28 | 01/29 |
|---|---|---|---|---|---|---|
| | | 4.00 | | | | 4.00 |

| 01/30 | 01/31 | 02/01 | 02/02 | 02/03 | 02/04 | 02/05 |
|---|---|---|---|---|---|---|
| | | 4.25 | | | 3.75 | 8.00 |

top ▶        12.00

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|---|---|---|---|---|---|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |
| VA | Vacation Pay | | | | |

top ▶

http://cdav1apperdin01/cta660/cta.asp

10/8/2007

208 2653199    COLDWATER CREEK

10:27:31 a.m.    10-08-2007    20 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2



Home | Help | Logout

## Timecard for Linda Beard

| | |
|---|---|
| Signed No | |
| Approved 02/21/2005@8:04AM by Mary Russell | |
| Pay Freq BiWeekly (Locked) | |
| Pay Period 02/06/2005-02/19/2005 View Other Periods | |

| | | NonWk | |
|---|---|---|---|
| REG | 13.00 | | 0.00 |
| OT | 0.00 | DT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 13.00 | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sun 02/06 | | | | | | | | | | | |
| | Mon 02/07 | RG | 01:00P | | | 04:00P | 03:00 | | | | 80184 | 800 |
| | Thu 02/10 | RG | 01:15P | | | 06:30P | 05:15 | | | | 80184 | 800 |
| | Sat 02/12 | RG | 01:00P | | | 05:45P | 04:45 | | | | 80184 | 800 |

Operations: Printable Return to Approval Timecard

### Daily Hours Summary

| 02/06 | 02/07 | 02/08 | 02/09 | 02/10 | 02/11 | 02/12 |
|---|---|---|---|---|---|---|
| | 3.00 | | | 5.25 | | 4.75 |

| 02/13 | 02/14 | 02/15 | 02/16 | 02/17 | 02/18 | 02/19 |
|---|---|---|---|---|---|---|
| | | | | | | 13.00 |

top ▶

### Time Code Listing

| | | | | | |
|---|---|---|---|---|---|
| AB | Absence | AD | Admin Leave | DS | Disability |
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |
| VA | Vacation Pay | | | | |

top ▶

208 2653199    COLDWATER CREEK    10:27:51 a.m.    10-08-2007    21 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

Certifious Time & Attendance



Home | Help | Logout

Home ▼

# Timecard for Linda Beard ⊟

**Signed | No**
Approved  03/07/2005@10:20AM by Mary Russell
Pay Freq  BiWeekly (Locked)
Pay Period  02/20/2005-03/05/2005 View Other Period

| | REG | 9.50 | NonWk | 0.00 |
| | OT | 0.00 | DT | 0.00 |
| | NIGHT | 0.00 | WKEND | 0.00 |
| | TOTAL | 9.50 | | |

**Timecard** | Transactions | Schedule | Accruals | Notes | Audit | Profile
**Operations:** Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|-----|------|-----------|-----|----------|---------|------|-------|-----|--------------|------|------|-----|
| | Sat 02/26 | RG | 01:00P | | | 06:00P | 05:00 | | | | 80184 | 800 |
| | Sun 02/27 | RG | 06:15P | | | 06:45P | 00:30 | | | | 80184 | 800 |
| | Sat 03/05 | RG | 01:00P | | | 05:00P | 04:00 | | | | 80184 | 800 |

**Operations:** Printable  Return to Approval Timecard

top ▶

### Daily Hours Summary

| 02/20 | 02/21 | 02/22 | 02/23 | 02/24 | 02/25 | 02/26 |
|-------|-------|-------|-------|-------|-------|-------|
| | | | | | | 5.00 |
| 02/27 | 02/28 | 03/01 | 03/02 | 03/03 | 03/04 | 03/05 |
| 0.50 | | | | | 4.00 | 4.50 |

| | | 9.50 |

top ▶

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|----|---------|----|-------------|----|-----------|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |
| VA | Vacation Pay | | | | |

208 2653199          COLDWATER CREEK                    10:28:10 a.m.    10-08-2007          22 /60

# Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn



Home | Help | Logout

## Timecard for Linda Beard #

Home ▾

**Signed** : No
**Approved** : 03/21/2005 9:51AM by Mary Russell
**Pay Freq** : BiWeekly (Locked)
**Pay Period** : 03/06/2005-03/19/2005 View Other Periods

| | |
|---|---|
| REG | 3.25 |
| OT | 0.00 |
| NIGHT | 0.00 |
| TOTAL | 3.25 |

| | |
|---|---|
| NonWk | 0.00 |
| DT | 0.00 |
| WKEND | 0.00 |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sat 03/12 | RG | 03:00P | | | 06:15P | 03:15 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| | 03/06 | 03/07 | 03/08 | 03/09 | 03/10 | 03/11 | 03/12 |
|---|---|---|---|---|---|---|---|
| | | | | | | | 3.25 |
| | 03/13 | 03/14 | 03/15 | 03/16 | 03/17 | 03/18 | 03/19 |
| | | | | | | | |

3.25
top ▶

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|---|---|---|---|---|---|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |
| VA | Vacation Pay | | | | |

©1994-2006 Ceridian Corporation, All Rights Reserved

http://cdav1appcrdn01/cta6n60/cta.asp

10/8/2007

208 2653199    COLDWATER CREEK    10:28:28 a.m.    10-08-2007    23 /60

Timecard - CWC Time History - NOT PRODUCTION for Jenifer Flynn

Page 1 of 2

Home | Help | Logout

## Timecard for Linda Beard

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable  Return to Approval Timecard

| Signed | No |
|---|---|
| Approved | 04/04/2005@10:54AM by Mary Russell |
| Pay Freq | BiWeekly (Locked) |
| Pay Period | 03/20/2005-04/02/2005 View Other Periods |

| REG | 10.00 | NonWk | 0.00 |
| OT | 0.00 | OT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 10.00 | | |

Operations: Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Thu 03/24 | RG | 01:00P | | | 05:30P | 04:30 | | | | 80184 | 800 |
| | Wed 03/30 | RG | 02:00P | | | 05:00P | 03:00 | | | | 80184 | 800 |
| | Fri 04/01 | RG | 02:30P | | | 05:00P | 02:30 | | | | 80184 | 800 |

top ▶

### Daily Hours Summary

| 03/20 | 03/21 | 03/22 | 03/23 | 03/24 | 03/25 | 03/26 |
|---|---|---|---|---|---|---|
| 03/27 | 03/28 | 03/29 | 03/30 | 03/31 | 04/01 | 04/02 |
| | | | 3.00 | 2.50 | | |
| | | | 4.50 | 4.50 | | 5.50 |

10.00 ▶

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|---|---|---|---|---|---|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |
| VA | Vacation Pay | | | | |

top ▶



**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **LINDA BEARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | |
| | ) | **2:07-CV-790-MNT** |
| **COLDWATER CREEK, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

# PLAINTIFF LINDA BEARD'S
# FEBRUARY 1, 2008 DEPOSITION

# PART 3 OF 3

208 2653199    COLDWATER CREEK    10:28:48 a.m.    10-08-2007    24 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 1

Home | Help | Logout

# Timecard for Linda Beard

Home

| | |
|---|---|
| Signed | No |
| Approved | 04/18/2005@10:10AM by Mary Russell |
| Pay Freq: | BiWeekly (Locked) |
| Pay Period : | 04/03/2005-04/16/2005 View Other Periods |

| | | | |
|---|---|---|---|
| REG | 4.25 | NonWk | 0.00 |
| OT | 0.00 | DT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 4.25 | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sat 04/09 | RG | 01:00P | | | 05:15P | 04:15 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| 04/03 | 04/04 | 04/05 | 04/06 | 04/07 | 04/08 | 04/09 |
|---|---|---|---|---|---|---|
| | | | | | 4.25 | 4.25 |
| 04/10 | 04/11 | 04/12 | 04/13 | 04/14 | 04/15 | 04/16 |
| 4.25 | | | | | | |

top

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|---|---|---|---|---|---|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |
| VA | Vacation Pay | | | | |

top

©1994-2005 Ceridian Corporation, All Rights Reserved

http://cdav1apprcrdn01/cta066/cta.asp

10/8/2007

208 2653199    COLDWATER CREEK    10:29:06 a.m.    10-08-2007    25 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

[Home ▾]

Home | Help | Logout

## Timecard for Linda Beard ■

| | | | |
|---|---|---|---|
| **Signed** | No | | |
| **Approved** | 05/02/2005@10:12AM by Mary Russell | | |
| **Pay Freq** | BWeekly (Locked) | | |
| **Pay Period** | 04/17/2005-04/30/2005 View Other Periods | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **REG** | 0.00 | **NonWk** | 0.00 |
| **OT** | 0.00 | **DT** | 0.00 |
| **NIGHT** | 0.00 | **WKEND** | 0.00 |
| **TOTAL** | 0.00 | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Unapprove Timecard  Printable  Return to Approval  Timecard

| Del | Date | Time | Source | Type | Time Code | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|

top ►

Operations: Unapprove Timecard  Printable  Return to Approval  Timecard

### Time Code Listing

| | | | | |
|---|---|---|---|---|
| **AB** | Absence | **AD** | Admin Leave | **DS** Disability |
| **FN** | Funeral Pay | **HP** | Holiday Pay | **JD** Jury Duty |
| **ML** | Military Leave | **MT** | Meeting | **NP** No Pay |
| **PT** | PTO | **RG** | Regular Hours | **S2** Shift 2 Premium |
| **SK** | Sick Pay | **TN** | Training | **TV** Travel Time |
| **VA** | Vacation Pay | | | |

### Transaction Time and Type Code Listing

| | |
|---|---|
| **A = Audit** | Indicates that the transaction was modified or initially created by a user |
| **M = Manual** | Indicates that the transaction type was manually determined (not a Fast Swipe), not analyzed by the system |
| **T = Transfer** | Indicates that the transaction type is a transfer, which will create an Out and In time on the timecard |

top ►

©1994-2006 Ceridian Corporation, All Rights Reserved

208 2653199    COLDWATER CREEK    10:29:30 a.m.    10-08-2007    26 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2




Home | Help | Logout

## Timecard for Linda Beard @

**Operations:** Printable  Return to Approval Timecard

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Signed: No
Approved: 05/16/2005@8:12AM by Mary Russell
Pay Freq: BiWeekly (Locked)
Pay Period: 05/01/2005-05/14/2005 View Other Periods

| | REG | 8.25 | NonWk. | 0.00 |
| | OT | 0.00 | DT | 0.00 |
| | NIGHT | 0.00 | WKEND | 0.00 |
| | TOTAL | 8.25 | | |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|-----|------|-----------|-----|----------|---------|-----|-------|----|--------------|------|------|-----|
| | **Sun 05/08** | RG | 02:00P | | | 06:30P | 04:30 | | | | 80184 | 800 |
| | **Thu 05/12** | RG | 01:15P | | | 05:00P | 03:45 | | | | 80184 | 800 |

**Operations:** Printable  Return to Approval Timecard

### Daily Hours Summary

| 05/01 | 05/02 | 05/03 | 05/04 | 05/05 | 05/06 | 05/07 |
|-------|-------|-------|-------|-------|-------|-------|
| | | | | | | |
| 05/08 | 05/09 | 05/10 | 05/11 | 05/12 | 05/13 | 05/14 |
| 4.50 | | | | 3.75 | | 8.25 |

top ▶    8.25

### Time Code Listing

| AB | Absence | AD | Admin Leave | DB | Disability |
|----|---------|----|-------------|----|------------|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |
| VA | Vacation Pay | | | | |

top ▶

©1994-2006 Ceridian Corporation, All Rights Reserved

208 2653199    COLDWATER CREEK    10:29:48 a.m.    10-08-2007    27 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

Home | Help | Logout

# Timecard for Linda Beard

| | |
|---|---|
| Signed | No |
| Approved | 05/30/2005@10:04AM by Mary Russell |
| Pay Freq | BiWeekly (Locked) |
| Pay Period | 05/15/2005-05/28/2005 View Other Periods |

| | | | |
|---|---|---|---|
| REG | 19.00 | NonWK | 0.00 |
| OT | 0.00 | DT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 19.00 | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Wed 05/18 | RG | 01:00P | | | 05:00P | 04:00 | | | | 80184 | 800 |
| | Sat 05/21 | RG | 01:30P | | | 06:15P | 04:45 | | | | 80184 | 800 |
| | Sun 05/22 | RG | 02:30P | | | 06:30P | 04:00 | | | | 80184 | 800 |
| | Mon 05/23 | RG | 02:15P | | | 05:00P | 02:45 | | | | 80184 | 800 |
| | Fri 05/27 | RG | 01:30P | | | 05:00P | 03:30 | | | | 80184 | 800 |

Operations: Printable Return to Approval Timecard

### Daily Hours Summary

| 05/15 | 05/16 | 05/17 | 05/18 | 05/19 | 05/20 | 05/21 | |
|---|---|---|---|---|---|---|---|
| | | | 4.00 | | | 4.75 | 8.75 |
| 05/22 | 05/23 | 05/24 | 05/25 | 05/26 | 05/27 | 05/28 | |
| 4.00 | 2.75 | | | | 3.50 | | 10.25 |
| | | | | | | | 19.00 |

top

### Time Code Listing

| AB | Absence | AD | Admin Leave | DB | Disability |
|---|---|---|---|---|---|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |

Home ▾



208 2653199    COLDWATER CREEK    10:30:09 a.m.    10-08-2007    28 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2





Home | Help | Logout

Home ▼

# Timecard for Linda Beard 

**Signed :** No
**Approved :** 06/13/2005@11:27AM by Mary Russell
**Pay Freq :** BiWeekly (Locked)
**Pay Period :** 05/29/2005-06/11/2005 View Other Periods

| | | |
|---|---|---|
| REG | 0.00 | NonWk 0.00 |
| OT | 4.00 | DT 0.00 |
| NIGHT | 0.00 | WKEND 0.00 |
| TOTAL | 4.00 | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Unapprove Timecard  Printable  Return to Approval Timecard

| Del | Date | Time | Source | Type | Time Code | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mon 05/30 | 12:00A | AUTOG | Manual TC M | NP | | | | | | |
| | Mon 05/30 | 02:16P | WBCLK | In | | 08:00 | | | | | |
| | Mon 05/30 | 06:12P | WBCLK | Out | | | | | | | |

top ▶

Operations: Unapprove Timecard  Printable  Return to Approval Timecard

**Time Code Listing**

| AB | Absence | AD | Admin Leave | DS | Disability |
|---|---|---|---|---|---|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |
| VA | Vacation Pay | | | | |

**Transaction Time and Type Code Listing**

| A = Audit | Indicates that the transaction was modified or initially created by a user |
|---|---|
| M = Manual | Indicates that the transaction type was manually determined (not a Fast Swipe), not analyzed by the system |
| T = Transfer | Indicates that the transaction type is a transfer, which will create an Out and In time on the timecard |

top ▶

©1994-2006 Ceridian Corporation, All Rights Reserved

208 2653199        COLDWATER CREEK                    10:30:32 a.m.    10-08-2007        29 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2



Home | Help | Logout

## Timecard for Linda Beard

Home

**Confidential Time & Attendance**

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable  Return to Approval Timecard

| | |
|---|---|
| Signed | No |
| Approved | No |
| Pay Freq | BiWeekly (Locked) ADJUST TIMECARD |
| Pay Period | 06/12/2005-06/25/2005 View Other Periods |

| | | |
|---|---|---|
| REG | 17.25 | NonWk | 0.00 |
| OT | 0.00 | DT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 17.25 | | |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Wed 06/15 | RG | 02:15P | | | 06:45P | 04:30 | | | | 80184 | 800 |
| | Sat 06/18 | RG | 01:00P | | | 07:00P | 06:00 | | | | 80184 | 800 |
| | Sun 06/19 | RG | 02:15P | | | 06:15P | 04:00 | | | | 80184 | 800 |
| | Sat 06/25 | RG | 06:30P | | | 09:15P | 02:45 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| 06/12 | 06/13 | 06/14 | 06/15 | 06/16 | 06/17 | 06/18 |
|---|---|---|---|---|---|---|
| | | | 4.50 | | | 6.00 | 10.50 |

| 06/19 | 06/20 | 06/21 | 06/22 | 06/23 | 06/24 | 06/25 |
|---|---|---|---|---|---|---|
| 4.00 | | | | | | 2.75 | 6.75 |

top  17.25

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|---|---|---|---|---|---|
| FN | Funeral Pay | AD | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |
| VA | Vacation Pay | | | | |

208 2653199        COLDWATER CREEK

10:30:52 a.m.    10-08-2007    30 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2



Home | Help | Logout

*Confidential Time & Attendances*

Home ▼

## Timecard for Linda Beard ⊚

**Signed** No
**Approved** 07/11/2005@8:01AM by Ronald Shimanek
**Pay Freq** BiWeekly (Locked)
**Pay Period** 06/26/2005-07/09/2005 View Other Periods

| | REG | 5.75 | NonWk | 0.00 |
| | OT | 5.00 | DT | 0.00 |
| | NIGHT | 0.00 | WKEND | 0.00 |
| | TOTAL | 10.75 | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sun 06/26 | RG | 06:00P | | | 07:45P | 01:45 | | | | 80184 | 800 |
| | Mon 07/04 | NP | 12:00A | | | 08:00A | 08:00 | | | | 80184 | 800 |
| | Mon 07/04 | RG | 01:15P | | | 06:15P | 05:00 | | | | 80184 | 800 |
| | Fri 07/08 | RG | 01:15P | | | 05:15P | 04:00 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| 06/26 | 06/27 | 06/28 | 06/29 | 06/30 | 07/01 | 07/02 |
|---|---|---|---|---|---|---|
| 1.75 | | | | | | 1.75 |
| 07/03 | 07/04 | 07/05 | 07/06 | 07/07 | 07/08 | 07/09 |
| | 13.00 | | | | 4.00 | |
| | | | | | | 17.00 |

18.75    top ▶

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|---|---|---|---|---|---|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |
| VA | Vacation Pay | | | | |

http://cdav1appcrdn01/cta660/cta.asp

10/8/2007

208 2653199    COLDWATER CREEK

10:31:12 a.m.    10-08-2007    31 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2



Home | Help | Logout

## Timecard for Linda Beard ⬛

| | | | REG | 22.75 | NonWk. | 0.00 |
|---|---|---|---|---|---|---|
| Signed | No | | OT | 0.00 | OT | 0.00 |
| Approved | 07/24/2005@4:43PM by Dianne Millican | | NIGHT | 0.00 | WKEND | 0.00 |
| Pay Freq | BiWeekly (Locked) | | TOTAL | 22.75 | | |
| Pay Period | 07/1/2005-07/23/2005 View Other Periods | | | | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

**Operations: Printable Return to Approval Timecard**

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sat 07/16 | RG | 06:15P | | | 09:30P | 03:15 | | | | 80184 | 800 |
| | Thu 07/21 | RG | 01:15P | | 05:00P | 05:00P | 03:45 | | | | 80184 | 800 |
| | Fri 07/22 | RG | 01:30P | 05:15P | 06:15P | 09:15P | 06:45 | | | | 80184 | 800 |
| | Sat 07/23 | RG | 01:15P | 04:30P | 05:30P | 11:15P | 09:00 | | | | 80184 | 800 |

**Operations: Printable Return to Approval Timecard**

| | | | | Daily Hours Summary | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 07/10 | 07/11 | 07/12 | 07/13 | 07/14 | 07/15 | 07/16 | | | | |
| 07/17 | 07/18 | 07/19 | 07/20 | 07/21 | 07/22 | 07/23 | | | 3.25 | 3.25 |
| | | | | 3.75 | 6.75 | 9.00 | 19.50 | | | |

top ▶    22.75

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|---|---|---|---|---|---|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |
| VA | Vacation Pay | | | | |

http://cdav1appcrdm01/cta660/cta.asp

10/8/2007




208 2653199   COLDWATER CREEK

10:31:32 a.m.   10-08-2007   32 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

*Celidian Time & Attendance*

Home | Help | Logout

Home ▾

## Timecard for Linda Beard ⊞

| | | |
|---|---|---|
| Signed | No | |
| Approved | 08/07/2005@8:10PM by Dianne Millican | |
| Pay Freq | BiWeekly (Locked) | |
| Pay Period | 07/24/2005-08/06/2005 View Other Periods | |

| | | |
|---|---|---|
| REG | 25.00 | NonWk 0.00 |
| OT | 0.00 | DT 0.00 |
| NIGHT | 0.00 | WKEND 0.00 |
| TOTAL | 25.00 | |

Operations: Printable Return to Approval Timecard

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fri 07/29 | RG | 01:45P | | | 06:00P | 04:15 | | | | 80184 | 800 |
| | Tue 08/02 | RG | 01:15P | | | 05:15P | 04:00 | | | | 80184 | 800 |
| | Tue 08/02 | RG | 10:15P | | | 12:00A | 01:45 | | | | 80184 | 800 |
| | Thu 08/04 | RG | 02:15P | | | 05:30P | 03:15 | | | | 80184 | 800 |
| | Fri 08/05 | RG | 01:15P | | | 05:15P | 04:00 | | | | 80184 | 800 |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sat 08/06 | RG | 01:00P | 03:45P | 05:15P | 10:15P | 07:45 | | | COMP | 80184 | 800 |

Operations: Printable Return to Approval Timecard

### Daily Hours Summary

| 07/24 | 07/25 | 07/26 | 07/27 | 07/28 | 07/29 | 07/30 | |
|---|---|---|---|---|---|---|---|
| | | | | | 4.25 | | 4.25 |
| 07/31 | 08/01 | 08/02 | 08/03 | 08/04 | 08/05 | 08/06 | |
| | | 5.75 | | 3.25 | 4.00 | 7.75 | 20.75 |
| | | | | | | 25.00 | |

top ▶

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|---|---|---|---|---|---|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |




http://cdav1appxrthn01/cta060/cta.asp

10/8/2007

208 2653199    COLDWATER CREEK    10:31:56 a.m.    10-08-2007    33 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

*Ceridian Time & Attendance*

Page 1 of 2

Home | Help | Logout

# Timecard for Linda Beard

Home ▾

| Signed | No |
| Approved | 08/22/2005@10:01 AM by Dianne Millican |
| Pay Freq | BiWeekly (Locked) |
| Pay Period | 08/07/2005-08/20/2005 View Other Periods |

| | | |
|---|---|---|
| REG | 31.50 | NonWk | 0.00 |
| OT | 0.00 | DT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 31.50 | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sun 08/07 | RG | 03:15P | | | 08:30P | 05:15 | | | | 8084 | 800 |
| | Tue 08/09 | RG | 03:00P | | | 05:30P | 02:30 | | | | 8084 | 800 |
| | Fri 08/12 | RG | 01:15P | | | 06:45P | 05:30 | | | | 8084 | 800 |
| | Tue 08/16 | RG | 11:45A | | | 06:30P | 06:45 | | | | 8084 | 800 |
| | Fri 08/19 | RG | 01:30P | | | 07:00P | 05:30 | | | | 8084 | 800 |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sat 08/20 | RG | 01:00P | | | 07:00P | 06:00 | | | | 8084 | 800 |

Operations: Printable Return to Approval Timecard

### Daily Hours Summary

| 08/07 | 08/08 | 08/09 | 08/10 | 08/11 | 08/12 | 08/13 | |
|---|---|---|---|---|---|---|---|
| 5.25 | | 2.50 | | | 5.50 | | 13.25 |
| 08/14 | 08/15 | 08/16 | 08/17 | 08/18 | 08/19 | 08/20 | |
| | | 6.75 | | | 5.50 | 6.00 | 18.25 |
| | | | | | | | 31.50 |

top ▶

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |

http://cdav1apprcrdn01/cta060/cta.asp

10/8/2007

208 2653199     COLDWATER CREEK                    10:32:20 a.m.     10-08-2007     34 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn



Page 1 of 2



Home | Help | Logout

## Timecard for Linda Beard

Home ▼

| | |
|---|---|
| Signed | No |
| Approved | 09/04/2005@3:16PM by Dianne Millican |
| Pay Freq | BIWeekly (Locked) |
| Pay Period | 08/21/2005-09/03/2005 View Other Periods |

| | |
|---|---|
| REG | 36.25 |
| OT | 0.00 |
| NIGHT | 0.00 |
| TOTAL | 36.25 |

| | |
|---|---|
| NonWK | 0.00 |
| DT | 0.00 |
| WKEND | 0.00 |

Operations: Printable  Return to Approval Timecard

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mon 08/22 | RG | 01:00P | | | 04:45P | 03:45 | | | | 80184 | 800 |
| | Thu 08/25 | RG | 01:15P | | | 05:15P | 04:00 | | | | 80184 | 800 |
| | Fri 08/26 | RG | 02:15P | | | 06:30P | 04:15 | | | | 80184 | 800 |
| | Sat 08/27 | RG | 02:15P | | | 09:00P | 06:45 | | | | 80184 | 800 |
| | Wed 08/31 | RG | 01:30P | | | 09:30P | 05:00 | | | | 80184 | 800 |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Wed 08/31 | RG | 09:15P | | | 12:15A | 03:00 | | | | 80184 | 800 |
| | Fri 09/02 | RG | 01:30P | | | 06:15P | 04:45 | | | | 80184 | 800 |
| | Sat 09/03 | RG | 01:45P | | | 06:30P | 04:45 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| 08/21 | 08/22 | 08/23 | 08/24 | 08/25 | 08/26 | 08/27 |
|---|---|---|---|---|---|---|
| | 3.75 | | 4.00 | 4.00 | 4.25 | 6.75 | 18.75 |
| 08/28 | 08/29 | 08/30 | 08/31 | 09/01 | 09/02 | 09/03 |
| 8.00 | | | 4.75 | 4.75 | 17.50 | 36.25 |

top ▶

Time Code Listing

208 2653199    COLDWATER CREEK    10:32:42 a.m.    10-08-2007    35 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn







Meridian Time & Attendance

[ Home ]

## Timecard for Linda Beard

Signed | No
Approved | 09/18/2005@8:16AM by Ronald Shimanek
Pay Freq | BiWeekly (Locked)
Pay Period | 09/04/2005-09/17/2005 View Other Periods

| REG | 32.00 | NonWk | 0.00 |
|-----|-------|-------|------|
| OT | 4.50 | DT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 36.50 | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|-----|------|-----------|-----|----------|---------|-----|-------|----|--------------|------|------|-----|
| | Mon 09/05 | NP | 12:00A | | | 08:00A | 08:00 | | | | 80184 | 800 |
| | Mon 09/05 | RG | 05:15P | | | 09:45P | 04:30 | | | | 80184 | 800 |
| | Wed 09/07 | RG | 01:30P | | | 06:15P | 04:45 | | | | 80184 | 800 |
| | Sat 09/10 | RG | 03:00P | | | 09:30P | 06:30 | | | | 80184 | 800 |
| | Wed 09/14 | RG | 04:15P | | | 09:15P | 05:00 | | | | 80184 | 800 |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|-----|------|-----------|-----|----------|---------|-----|-------|----|--------------|------|------|-----|
| | Thu 09/15 | RG | 01:15P | | | 06:30P | 05:15 | | | | 80184 | 800 |
| | Fri 09/16 | RG | 01:15P | | | 06:15P | 05:00 | | | | 80184 | 800 |
| | Sat 09/17 | RG | 04:15P | | | 09:45P | 05:30 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| 09/04 | 09/05 | 09/06 | 09/07 | 09/08 | 09/09 | 09/10 |
|-------|-------|-------|-------|-------|-------|-------|
| | 12.50 | | 4.75 | | 6.50 | 23.75 |
| 09/11 | 09/12 | 09/13 | 09/14 | 09/15 | 09/16 | 09/17 |
| | 5.00 | | 5.25 | 5.00 | 5.50 | 20.75 |

top ▶    44.50

Time Code Listing

208 2653199    COLDWATER CREEK    10:33:03 a.m.    10-08-2007    36 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

CERIDIAN TIME & ATTENDANCE

Home | Help | Logout

Home

## Timecard for Linda Beard

| Signed | No |
| Approved | 10/02/2005@1:30PM by Janieco Norwood |
| Pay Freq | BiWeekly (Locked) |
| Pay Period | 09/18/2005-10/01/2005 |

| REG | 33.00 | NonWk | 0.00 |
| OT | 0.00 | DT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 33.00 | | |

Operations: Printable  Return to Approval Timecard

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile  View Other Periods

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Wed 09/21 | RG | 01:45P | | | 06:30P | 04:45 | | | | 80184 | 800 |
| | Fri 09/23 | RG | 01:15P | | | 07:45P | 06:30 | | | | 80184 | 800 |
| | Sat 09/24 | RG | 02:00P | | | 08:15P | 06:15 | | | | 80184 | 800 |
| | Wed 09/28 | RG | 05:15P | | | 09:30P | 04:15 | | | | 80184 | 800 |
| | Fri 09/30 | RG | 01:15P | | | 06:15P | 05:00 | | | | 80184 | 800 |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sat 10/01 | RG | 03:15P | | | 09:30P | 06:15 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| 09/18 | 09/19 | 09/20 | 09/21 | 09/22 | 09/23 | 09/24 | |
|---|---|---|---|---|---|---|---|
| | | | 4.75 | | 6.50 | 6.25 | 17.50 |
| 09/25 | 09/26 | 09/27 | 09/28 | 09/29 | 09/30 | 10/01 | |
| | | | 4.25 | | 5.00 | 6.25 | 15.50 |
| | | | | | | | 33.00 |

top ▶

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|---|---|---|---|---|---|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |

http://cdav1apprcdtn01/cta660/cta.asp

10/8/2007

208 2653199    COLDWATER CREEK                     10:33:25 a.m.    10-08-2007        37 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

Home | Help | Logout



## Timecard for Linda Beard

| | | | | | | REG | 42.00 | NonWk | 0.00 |
|---|---|---|---|---|---|---|---|---|---|
| Signed No | | | | | | OT | 0.00 | DT | 0.00 |
| Approved 10/17/2005@1:46PM by Kimberly Curry | | | | | NIGHT | 0.00 | WKEND | 0.00 |
| Pay Freq BiWeekly (Locked) | | | | | TOTAL | 42.00 | | |
| Pay Period 10/02/2005-10/15/2005 View Other Periods | | | | | | | | |

Operations: Printable Return to Approval Timecard

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Wed 10/05 | RG | 01:15P | 03:00P | 03:30P | 09:15P | 07:30 | | | | 80164 | 800 |
| | Thu 10/06 | RG | 01:30P | | | 05:15P | 03:45 | | | | 80164 | 800 |
| | Fri 10/07 | RG | 02:15P | | | 08:15P | 06:00 | | | | 80164 | 800 |
| | Sat 10/08 | RG | 02:15P | | | 08:00P | 05:30 | | | | 80164 | 800 |
| Del | Wed 10/12 | RG | 04:15P | | | 08:15P | 04:00 | | | | 80164 | 800 |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Thu 10/13 | RG | 01:15P | | | 06:15P | 05:00 | | | | 80164 | 800 |
| | Fri 10/14 | RG | 01:15P | | | 06:15P | 05:00 | | | | 80164 | 800 |
| | Sat 10/15 | RG | 01:15P | | | 06:30P | 05:15 | | | | 80164 | 800 |

Operations: Printable Return to Approval Timecard

### Daily Hours Summary

| 10/02 | 10/03 | 10/04 | 10/05 | 10/06 | 10/07 | 10/08 | |
|---|---|---|---|---|---|---|---|
| | | | 7.50 | 3.75 | 6.00 | 5.50 | 22.75 |
| 10/09 | 10/10 | 10/11 | 10/12 | 10/13 | 10/14 | 10/15 | |
| | | | 4.00 | 5.00 | 5.00 | 5.25 | 19.25 |
| | | | | | | | 42.00 |

top ▶

Time Code Listing

10/8/2007

208 2653199   COLDWATER CREEK

10:33:47 a.m.   10-08-2007   38 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2



Certegin Time & Attendance

Home | Help | Logout



Home ▾

# Timecard for Linda Beard ⓘ

| | | |
|---|---|---|
| Signed | No | |
| Approved | 10/31/2005@12:09PM by Kimberly Curry | |
| Pay Freq | BiWeekly (Locked) | |
| Pay Period | 10/16/2005-10/29/2005 View Other Periods | |

| | | |
|---|---|---|
| REG | 34.00 | NonWk 0.00 |
| OT | 0.00 | DT 0.00 |
| NIGHT | 0.00 | WKEND 0.00 |
| TOTAL | 34.00 | |

Operations: Printable  Return to Approval Timecard

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Del | Sun 10/16 | RG | 06:30P | | | 09:00P | 02:30 | | | | 80184 | 800 |
| | Wed 10/19 | RG | 06:00P | | | 09:15P | 03:15 | | | | 80184 | 800 |
| | Thu 10/20 | RG | 01:00P | | | 06:15P | 05:15 | | | | 80184 | 800 |
| | Fri 10/21 | RG | 01:30P | | | 06:15P | 04:45 | | | | 80184 | 800 |
| | Sat 10/22 | RG | 01:15P | | | 06:15P | 05:00 | | | | 80184 | 800 |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Del | Thu 10/27 | RG | 06:15P | | | 09:30P | 03:15 | | | | 80184 | 800 |
| | Fri 10/28 | RG | 02:15P | | | 07:15P | 05:00 | | | | 80184 | 800 |
| | Sat 10/29 | RG | 03:00P | | | 08:00P | 05:00 | | | | 800 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| 10/16 | 10/17 | 10/18 | 10/20 | 10/21 | 10/22 | |
|---|---|---|---|---|---|---|
| 2.50 | | 3.25 | 8.25 | 4.75 | 5.00 | 20.75 |
| 10/23 | 10/24 | 10/25 | 10/27 | 10/28 | 10/29 | |
| | | | 3.25 | 5.00 | 5.00 | 13.25 |
| | | | | | | 34.00 |

top ▶

Time Code Listing



208 2653199     COLDWATER CREEK

10:34:08 a.m.    10-08-2007    39 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

Home | Help | Logout

Coldwater Home & Attendance

Home ▼

## Timecard for Linda Beard

| | | |
|---|---|---|
| Signed No | | |
| Approved | 11/14/2005@4:13PM by Kimberly Curry | |
| Pay Freq | BiWeekly (Locked) | |
| Pay Period | 10/30/2005-11/12/2005 View Other Periods | |

| | | | |
|---|---|---|---|
| REG | 20.00 | NonWk | 0.00 |
| OT | 0.00 | DT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 20.00 | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sat 11/05 | RG | 03:00P | | | 07:15P | 04:15 | | | | 80184 | 800 |
| | Thu 11/10 | RG | 02:00P | | | 06:15P | 04:15 | | | | 80184 | 800 |
| | Fri 11/11 | RG | 01:00P | | | 06:15P | 05:15 | | | | 80184 | 800 |
| | Sat 11/12 | RG | 02:15P | | | 08:30P | 06:15 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| 10/30 | 10/31 | 11/01 | 11/02 | 11/03 | 11/04 | 11/05 |
|---|---|---|---|---|---|---|
| | | | | | 4.25 | 4.25 |
| 11/06 | 11/07 | 11/08 | 11/09 | 11/10 | 11/11 | 11/12 |
| | | 4.25 | | 5.25 | 6.25 | 15.75 |

top ► 20.00

### Time Code Listing

| AB Absence | AD Admin Leave | DS Disability |
|---|---|---|
| FN Funeral Pay | HP Holiday Pay | JD Jury Duty |
| ML Military Leave | MT Meeting | NP No Pay |
| FT PTO | RG Regular Hours | S2 Shift 2 Premium |
| SK Sick Pay | TN Training | TV Travel Time |
| VA Vacation Pay | | |

http://cdav1ampcrdm01/cta660/cta.asp

10/8/2007

208 2653199    COLDWATER CREEK    10:34:28 a.m.    10-08-2007    40 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2



Home | Help | Logout

## Certegian Time & Attendance

Home ▾

## Timecard for Linda Beard ⊕

Signed | No
Approved | 11/28/2006@8:09AM by Kimberly Curry
Pay Freq | BiWeekly (Locked)
Pay Period | 11/13/2005-11/26/2005 View Other Periods

| | REG | 29.25 | NonWk | 0.00 |
|---|---|---|---|---|
| | OT | 0.00 | OT | 0.00 |
| | NIGHT | 0.00 | WKEND | 0.00 |
| | TOTAL | 29.25 | | |

Operations: Printable  Return to Approval Timecard

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sun 11/13 | RG | 07:45P | | | 09:45P | 02:00 | | | | 80184 | 800 |
| | Thu 11/17 | RG | 02:00P | | | 06:15P | 04:15 | | | | 80184 | 800 |
| | Fri 11/18 | RG | 01:00P | | | 07:00P | 06:00 | | | | 80184 | 800 |
| | Sat 11/19 | RG | 03:15P | | | 06:45P | 04:30 | | | | 80184 | 800 |
| | Thu 11/24 | NP | 12:00A | | | 08:00A | 08:00 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fri 11/25 | RG | 01:00P | | | 06:00P | 05:00 | | | | 80184 | 800 |
| | Sat 11/26 | RG | 01:00P | | | 08:30P | 07:30 | | | | 80184 | 800 |



### Daily Hours Summary

| | 11/13 | 11/14 | 11/15 | 11/16 | 11/17 | 11/18 | 11/19 |
|---|---|---|---|---|---|---|---|
| | 2.00 | | | | 4.25 | 6.00 | 4.50 | 16.75 |
| | 11/20 | 11/21 | 11/22 | 11/23 | 11/24 | 11/25 | 11/26 |
| | | | | | 8.00 | 5.00 | 7.50 | 20.50 |

top ▶  37.25

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|---|---|---|---|---|---|



http://cdav1appcrdn01/cta660/cta.asp

10/8/2007

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

Home | Help | Logout

**Timecard for Linda Beard** 🔒

| | REG | 34.25 | NonWk | 0.00 |
| Signed No | OT | 0.00 | DT | 0.00 |
| Approved 12/12/2005@7:53AM by Kimberly Curry | NIGHT | 0.00 | WKEND | 0.00 |
| Pay Freq BiWeekly (Locked) | TOTAL | 34.25 | | |
| Pay Period 11/27/2005-12/10/2005 View Other Periods | | | | |

Operations: Printable  Return to Approval Timecard

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Wed 11/30 | RG | 04:00P | | | 08:15P | 04:15 | | | | 80184 | 800 |
| | Thu 12/01 | RG | 01:00P | | | 06:30P | 05:30 | | | | 80184 | 800 |
| | Fri 12/02 | RG | 02:45P | | | 09:15P | 06:30 | | | | 80184 | 800 |
| | Sat 12/03 | RG | 01:15P | | | 06:30P | 05:15 | | | | 80184 | 800 |
| | Wed 12/07 | RG | 04:00P | | | 04:15P | 00:15 | | | | 80184 | 800 |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Wed 12/07 | RG | 04:15P | | | 06:30P | 02:15 | | | | 80184 | 800 |
| | Fri 12/09 | RG | 02:15P | | | 06:15P | 04:00 | | | | 80184 | 800 |
| | Sat 12/10 | RG | 04:00P | | | 10:15P | 06:15 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

**Daily Hours Summary**

| | 11/27 | 11/28 | 11/29 | 11/30 | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | 12/06 | 12/07 | 12/08 | 12/09 | 12/10 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 4.25 | 5.50 | 6.50 | 5.25 | 21.50 | | | 2.50 | | 4.00 | 6.25 | 12.75 |
| | | | | | | | | | | | | | | | 34.25 |

top ▶

Time Code Listing



208 2653199   COLDWATER CREEK                    10:35:13 a.m.   10-08-2007   42 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

Home | Help | Logout

## Timecard for Linda Beard

Signed No
Approved   12/26/2005@8:26AM by Kimberly Curry
Pay Freq   BiWeekly (Locked)
Pay Period   12/11/2005-12/24/2005 View Other Periods

| | REG | 20.25 | NonWk | 0.00 |
| | OT | 0.00 | OT | 0.00 |
| | NIGHT | 0.00 | WKEND | 0.00 |
| | TOTAL | 20.25 | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable   Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Thu 12/15 | RG | 02:00P | | | 08:00P | 06:00 | | | | 80184 | 800 |
| | Fri 12/16 | RG | 02:00P | | | 07:30P | 05:30 | | | | 80184 | 800 |
| | Sat 12/17 | RG | 04:00P | | | 08:45P | 04:45 | | | | 80184 | 800 |
| | Wed 12/21 | RG | 04:00P | | | 08:00P | 04:00 | | | | 80184 | 800 |

Operations: Printable   Return to Approval Timecard

### Daily Hours Summary

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 12/11 | 12/12 | 12/13 | 12/14 | 12/15 | 12/16 | 12/17 | |
| | | | | 6.00 | 5.50 | 4.75 | 16.25 |
| 12/18 | 12/19 | 12/20 | 12/21 | 12/22 | 12/23 | 12/24 | |
| | | | 4.00 | | | | 4.00 |

top ►

20.25

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|---|---|---|---|---|---|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |
| VA | Vacation Pay | | | | |





http://cdwv1apprtdn01/ctn660/cta.asp

10/8/2007

208 2653199    COLDWATER CREEK    10:35:33 a.m.    10-08-2007    43 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

Home | Help | Logout

# Timecard for Linda Beard

| Signed | No |
|---|---|
| Approved | 01/09/2006@6:47AM by Kimberly Curry |
| Pay Freq | BiWeekly (Locked) |
| Pay Period | 12/25/2005-01/07/2006 View Other Periods |

| | | |
|---|---|---|
| REG | 18.75 | NonWk 0.00 |
| OT | 2.00 | OT 0.00 |
| NIGHT | 0.00 | WKEND 0.00 |
| TOTAL | 20.75 | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sun 12/25 | NP | 12:00A | | | 08:00A | 08:00 | | | | 8014 | 800 |
| | Fri 12/30 | RG | 02:15P | | | 06:30P | 04:15 | | | | 8014 | 800 |
| | Sat 12/31 | RG | 03:15P | | | 07:00P | 03:45 | | | | 8014 | 800 |
| | Sun 01/01 | NP | 12:00A | | | 08:00A | 08:00 | | | | 800 | 800 |
| | Sun 01/01 | RG | 02:00P | | | 04:00P | 02:00 | | | | 8014 | 800 |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fri 01/06 | RG | 02:00P | | | 06:30P | 04:30 | | | COMP | 8014 | 800 |
| | Sat 01/07 | RG | 01:15P | | | 07:30P | 06:15 | | | | 8014 | 800 |

Operations: Printable  Return to Approval Timecard

top

### Daily Hours Summary

| 12/25 | 12/26 | 12/27 | 12/28 | 12/29 | 12/30 | 12/31 | |
|---|---|---|---|---|---|---|---|
| 8.00 | | | | | 4.25 | 3.75 | 16.00 |
| 01/01 | 01/02 | 01/03 | 01/04 | 01/05 | 01/06 | 01/07 | |
| 10.00 | | | | | 4.50 | 6.25 | 20.75 |
| | | | | | | | 36.75 |

### Time Code Listing

| AB Absence | AD Admin Leave | DS Disability |
|---|---|---|

http://cdav1appcdn01/cta660/cta.asp

10/8/2007

208 2653199    COLDWATER CREEK    10:35:54 a.m.    10-08-2007    44 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2



Home | Help | Logout

## Timecard for Linda Beard

| Signed | No |
|---|---|
| Approved | 01/23/2008@10:35AM by Kimberly Curry |
| Pay Freq | BiWeekly (Locked) |
| Pay Period | 01/08/2008-01/21/2008 View Other Periods |

| | | |
|---|---|---|
| REG | 48.00 | NonWk 0.00 |
| OT | 0.00 | DT 0.00 |
| NIGHT | 0.00 | WKEND 0.00 |
| TOTAL | 48.00 | |

Operations: Printable  Return to Approval Timecard

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sun 01/08 | RG | 06:30P | | | 08:30P | 02:00 | | | | 80184 | 800 |
| | Thu 01/12 | RG | 01:00P | | | 06:30P | 05:30 | | | | 80184 | 800 |
| | Fri 01/13 | RG | 02:00P | | | 06:30P | 04:30 | | | | 80184 | 800 |
| | Sat 01/14 | RG | 01:00P | | | 06:15P | 05:15 | | | | 80184 | 800 |
| | Sun 01/15 | RG | 01:45P | | | 09:45P | 08:00 | | | | 80184 | 800 |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mon 01/16 | RG | 02:00P | | | 06:00P | 04:00 | | | | 80184 | 800 |
| | Tue 01/17 | RG | 01:30P | | | 06:15P | 04:45 | | | | 80184 | 800 |
| | Wed 01/18 | RG | 01:15P | | | 06:15P | 05:00 | | | | 80184 | 800 |
| | Thu 01/19 | RG | 02:00P | | | 06:15P | 04:15 | | | | 80184 | 800 |
| | Fri 01/20 | RG | 01:15P | | | 06:00P | 04:45 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| 01/08 | 01/09 | 01/10 | 01/11 | 01/12 | 01/13 | 01/14 | |
|---|---|---|---|---|---|---|---|
| 2.00 | | | | 5.50 | 4.50 | 5.25 | 17.25 |
| 01/15 | 01/16 | 01/17 | 01/18 | 01/19 | 01/20 | 01/21 | |
| 8.00 | 4.00 | 5.00 | 4.75 | 4.25 | 4.75 | | 30.75 |

48.00
top

208 2653199        COLDWATER CREEK

10:36:17 a.m.    10-08-2007    45 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2



Confidion Home & Attendance



Home | Help | Logout

Home

# Timecard for Linda Beard

Signed No
Approved 02/06/2006@6:58AM by Kimberly Curry
Pay Freq BiWeekly (Locked)
Pay Period 01/22/2006-02/04/2006 View Other Periods

| | REG | 26.75 | NonWk | 0.00 |
| | OT | 0.00 | OT | 0.00 |
| | NIGHT | 0.00 | WKEND | 0.00 |
| | TOTAL | 26.75 | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|-----|------|-----------|-----|----------|---------|-----|-------|-----|-------------|------|------|-----|
| | Thu 01/26 | RG | 01:00P | | | 06:15P | 05:15 | | | | 80184 | 800 |
| | Sat 01/28 | RG | 04:15P | | | 07:15P | 03:00 | | | | 80184 | 800 |
| | Sun 01/29 | RG | 03:15P | | | 06:30P | 03:15 | | | | 80184 | 800 |
| | Tue 01/31 | RG | 02:15P | | | 06:00P | 03:45 | | | | 80184 | 800 |
| | Fri 02/03 | RG | 02:30P | 06:15P | 07:00P | 09:45P | 06:30 | | | | 80184 | 800 |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|-----|------|-----------|-----|----------|---------|-----|-------|-----|-------------|------|------|-----|
| | Sat 02/04 | RG | 01:15P | | | 06:15P | 05:00 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| 01/22 | 01/23 | 01/24 | 01/25 | 01/26 | 01/27 | 01/28 |
|-------|-------|-------|-------|-------|-------|-------|
| | | | | 5.25 | | 3.00 |
| 01/29 | 01/30 | 01/31 | 02/01 | 02/02 | 02/03 | 02/04 |
| 3.25 | | 3.75 | | | 6.50 | 5.00 |

top ▶ 26.75

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|----|---------|----|-------------|----|-----------|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |

http://cdsv1apprdm01/cta060/cta.asp

10/8/2007

208 2653199     COLDWATER CREEK     10:36:41 a.m.     10-08-2007     46 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn



Coldwater Creek Time & Attendance

Home | Help | Logout

# Timecard for Linda Beard

| Signed | No |
|---|---|
| Approved | 02/20/2006@11:37AM by Kimberly Curry |
| Pay Freq | BiWeekly (Locked) |
| Pay Period | 02/05/2006-02/18/2006 View Other Periods |

| | | |
|---|---|---|
| REG | 39.75 | NonWk 0.00 |
| OT | 0.00 | DT 0.00 |
| NIGHT | 0.00 | WKEND 0.00 |
| TOTAL | 39.75 | |

Operations: **Printable  Return to Approval Timecard**

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sun 02/05 | RG | 02:15P | | | 09:15P | 07:00 | | | | 80\84 | 800 |
| | Mon 02/06 | RG | 02:00P | | | 06:15P | 04:15 | | | | 80\84 | 800 |
| | Thu 02/09 | RG | 02:15P | | | 06:15P | 04:00 | | | | 80\84 | 800 |
| | Sat 02/11 | RG | 02:15P | | | 06:00P | 03:45 | | | | 80\84 | 800 |
| | Tue 02/14 | RG | 01:30P | | | 06:15P | 04:45 | | | | 80\84 | 800 |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Thu 02/16 | RG | 03:15P | | | 07:00P | 03:45 | | | | 80\84 | 800 |
| | Fri 02/17 | RG | 02:00P | 06:00P | 07:00P | 09:30P | 06:30 | | | | 80\84 | 800 |
| | Sat 02/18 | RG | 01:15P | | | 07:00P | 05:45 | | | | 80\84 | 800 |

Operations: **Printable  Return to Approval Timecard**

## Daily Hours Summary

| 02/05 | 02/06 | 02/07 | 02/08 | 02/09 | 02/10 | 02/11 | |
|---|---|---|---|---|---|---|---|
| 7.00 | 4.25 | | | 4.00 | | 3.75 | 19.00 |
| 02/12 | 02/13 | 02/14 | 02/15 | 02/16 | 02/17 | 02/18 | |
| | | 4.75 | | 3.75 | 6.50 | 5.75 | 20.75 |

39.75

top ▶

Time Code Listing




208 2653199    COLDWATER CREEK    10:37:02 a.m.    10-08-2007    47 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2



Home | Help | Logout

Home ▼

## Timecard for Linda Beard

| Signed | No |
| Approved | 03/06/2006@10:33AM by Kimberly Curry |
| Pay Freq | Biweekly (Locked) |
| Pay Period | 02/19/2006-03/04/2006 View Other Periods |

| REG | 41.50 | NonWH | 0.00 |
| OT | 0.00 | DT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 41.50 | | |

Operations: Printable Return to Approval Timecard

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mon 02/20 | RG | 02:15P | | | 06:15P | 04:00 | | | | 80184 | 800 |
| | Thu 02/23 | RG | 01:15P | | | 08:15P | 07:00 | | | | 80184 | 800 |
| | Fri 02/24 | RG | 01:30P | | | 06:00P | 04:30 | | | | 80184 | 800 |
| | Sat 02/25 | RG | 03:15P | | | 08:30P | 05:15 | | | | 80184 | 800 |
| | Tue 02/28 | RG | 03:15P | 06:15P | 07:30P | 09:30P | 05:00 | | | | 80184 | 800 |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Thu 03/02 | RG | 03:00P | | | 08:15P | 05:15 | | | | 80184 | 800 |
| | Fri 03/03 | RG | 01:30P | | | 06:15P | 04:45 | | | | 80184 | 800 |
| | Sat 03/04 | RG | 02:15P | | | 08:00P | 05:45 | | | | 80184 | 800 |

Operations: Printable Return to Approval Timecard

### Daily Hours Summary

| 02/19 | 02/20 | 02/21 | 02/22 | 02/23 | 02/24 | 02/25 |
|---|---|---|---|---|---|---|
| | 4.00 | | | 7.00 | 4.50 | 5.25 | 20.75 |
| 02/26 | 02/27 | 02/28 | 03/01 | 03/02 | 03/03 | 03/04 |
| 5.00 | 5.25 | 4.75 | 5.75 | 20.75 |

top ▶ 41.50

Time Code Listing

208 2653199        COLDWATER CREEK                         10:37:24 a.m.    10-08-2007        48 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn



Home ▾

**(Copyright © Home & Attendance)**

## Timecard for Linda Beard ®

| Signed | No |
|---|---|
| Approved | 03/20/2006@11:10AM by Kimberly Curry |
| Pay Freq | BiWeekly (Locked) |
| Pay Period | 03/05/2006-03/18/2006 View Other Periods |

| | | | |
|---|---|---|---|
| REG | 31.75 | NonWk | 0.00 |
| OT | 0.00 | OT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 31.75 | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sun 03/05 | RG | 01:45P | | | 06:15P | 04:30 | | | | 80184 | 800 |
| | Tue 03/07 | RG | 02:15P | | | 06:15P | 04:00 | | | | 80184 | 800 |
| | Fri 03/10 | RG | 05:15P | | | 09:30P | 04:15 | | | | 80184 | 800 |
| | Sat 03/11 | RG | 02:15P | | | 08:15P | 06:00 | | | | 80184 | 800 |
| | Tue 03/14 | RG | 03:15P | | | 07:00P | 03:45 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fri 03/17 | RG | 01:00P | | | 06:00P | 05:00 | | | COMP | 80184 | 800 |
| | Sat 03/18 | RG | 05:00P | | | 09:15P | 04:15 | | | | 80184 | 800 |

### Daily Hours Summary

| 03/05 | 03/06 | 03/07 | 03/08 | 03/09 | 03/10 | 03/11 | |
|---|---|---|---|---|---|---|---|
| 4.50 | | 4.00 | | | 4.25 | 6.00 | 18.75 |
| 03/12 | 03/13 | 03/14 | 03/15 | 03/16 | 03/17 | 03/18 | |
| | | 3.75 | | | 5.00 | 4.25 | 13.00 |
| | | | | | | | 31.75 |

top ▶

| Time Code Listing | | | | | |
|---|---|---|---|---|---|
| AB | Absence | AD | Admin Leave | DS | Disability |

208 2653199        COLDWATER CREEK        10:37:48 a.m.        10-08-2007        49 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

Home | Help | Logout

## Timecard for Linda Beard

Signed : No
Approved : 04/03/2006@8:43AM by Kimberly Curry
Pay Freq : BiWeekly (Locked)
Pay Period : 03/19/2006-04/01/2006 View Other Periods

| | REG | 35.25 | NonWk | 0.00 |
|---|---|---|---|---|
| | OT | 0.00 | DT | 0.00 |
| | NIGHT | 0.00 | WKEND | 0.00 |
| | TOTAL | 35.25 | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sun 03/19 | RG | 01:00P | | | 05:30P | 04:30 | | | | 80184 | 800 |
| | Mon 03/20 | RG | 03:00P | | | 06:00P | 03:00 | | | | 80184 | 800 |
| | Thu 03/23 | RG | 01:00P | | | 07:15P | 06:15 | | | | 80184 | 800 |
| | Sat 03/25 | RG | 02:00P | | | 07:00P | 05:00 | | | | 80184 | 800 |
| | Mon 03/27 | RG | 01:30P | | | 05:00P | 03:30 | | | | 80184 | 800 |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tue 03/28 | RG | 01:15P | | | 06:15P | 05:00 | | | COMP | 80184 | 800 |
| | Wed 03/29 | RG | 03:00P | | | 06:15P | 03:15 | | | | 80184 | 800 |
| | Sat 04/01 | RG | 01:15P | | | 06:00P | 04:45 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

**Daily Hours Summary**

| 03/19 | 03/20 | 03/21 | 03/22 | 03/23 | 03/24 | 03/25 |
|---|---|---|---|---|---|---|
| 4.50 | 3.00 | | | 6.25 | | 5.00 |

| 03/26 | 03/27 | 03/28 | 03/29 | 03/30 | 03/31 | 04/01 |
|---|---|---|---|---|---|---|
| | 3.50 | 5.00 | 3.25 | | | 4.75 |

| | |
|---|---|
| 18.75 | |
| 16.50 | |
| 35.25 | |

top ▶

Time Code Listing

208 2653199    COLDWATER CREEK    10:38:10 a.m.    10-08-2007    50 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2



*Canadian Time & Attendance*

Home | Help | Logout



# Timecard for Linda Beard ®

| Signed | No |
| --- | --- |
| Approved | 04/17/2006@1:05PM by Santina Golson |
| Pay Freq | BiWeekly (Locked) |
| Pay Period | 04/02/2006-04/15/2006 |

View Other Periods

| | REG | 19.50 | NonWk | 0.00 |
| --- | --- | --- | --- | --- |
| | OT | 0.00 | OT | 0.00 |
| | NIGHT | 0.00 | WKEND | 0.00 |
| | TOTAL | 19.50 | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Wed 04/05 | RG | 03:00P | | | 06:00P | 03:00 | | | | 80184 | 800 |
| | Sat 04/08 | RG | 02:00P | | | 07:00P | 05:00 | | | | 80184 | 800 |
| | Sat 04/08 | RG | 09:00P | | | 10:45P | 01:45 | | | | 80184 | 800 |
| | Wed 04/12 | RG | 01:00P | | | 06:00P | 05:00 | | | | 80184 | 800 |
| | Sat 04/15 | RG | 01:15P | | | 06:00P | 04:45 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

| Daily Hours Summary | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 04/02 | 04/03 | 04/04 | 04/05 3.00 | 04/06 | 04/07 | 04/08 8.75 | |
| 04/09 | 04/10 | 04/11 5.00 | 04/12 | 04/13 | 04/14 4.75 | 04/15 8.75 | 19.50 |

top ►

| Time Code Listing | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| AB | Absence | AD | Admin Leave | DS | Disability | |
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty | |
| ML | Military Leave | MT | Meeting | NP | No Pay | |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium | |
| SK | Sick Pay | TN | Training | TV | Travel Time | |




http://cdav1.apprcrdn01/cta660/cta.asp

10/8/2007

208 2653199          COLDWATER CREEK                    10:38:33 a.m.    10-08-2007    51 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn



Home ▼

**Timecard for Linda Beard** ⊡

| | REG | 34.25 | NonWk | 0.00 |
| Signed : No | OT | 0.00 | DT | 0.00 |
| Approved | 05/01/2006@10:34AM by Kimberly Curry | NIGHT | 0.00 | WKEND | 0.00 |
| Pay Freq | BiWeekly (Locked) | TOTAL | 34.25 | | |
| Pay Period | 04/16/2008-04/29/2008 View Other Periods | | | | |

Operations: Printable  Return to Approval Timecard

Timecard  | Transactions  | Schedule  | Accruals  | Notes  | Audit | Profile

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|-----|------|-----------|-----|----------|---------|-----|-------|-----|-------------|------|------|-----|
| | Wed 04/19 | RG | 01:00P | | | 06:00P | 05:00 | | | | 80184 | 800 |
| | Thu 04/20 | RG | 01:15P | | | 06:15P | 05:00 | | | | 80184 | 800 |
| | Sat 04/22 | RG | 01:00P | | | 06:15P | 05:15 | | | | 80184 | 800 |
| | Sun 04/23 | RG | 01:00P | | | 05:15P | 04:15 | | | | 80184 | 800 |
| | Tue 04/25 | RG | 03:00P | | | 06:15P | 03:15 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|-----|------|-----------|-----|----------|---------|-----|-------|-----|-------------|------|------|-----|
| | Thu 04/27 | RG | 01:00P | | | 06:15P | 05:15 | | | | 80184 | 800 |
| | Sat 04/29 | RG | 01:00P | | | 07:15P | 06:15 | | | | 80184 | 800 |

**Daily Hours Summary**

| 04/16 | 04/17 | 04/18 | 04/19 | 04/20 | 04/21 | 04/22 |
|-------|-------|-------|-------|-------|-------|-------|
| | | | 5.00 | 5.00 | | 5.25 |
| 04/23 | 04/24 | 04/25 | 04/26 | 04/27 | 04/28 | 04/29 |
| 4.25 | | 3.25 | | 5.25 | | 6.25 |

| | 15.25 |
| | 19.00 |

top ▶

34.25

**Time Code Listing**

| AB | Absence | AD | Admin Leave | DS | Disability |

http://cdav1appcrdn01/cta660/cta.asp

208 2653199    COLDWATER CREEK      10:38:57 a.m.  10-08-2007    52 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

Home | Help | Logout

## Timecard for Linda Beard

| | Signed | No |
| --- | --- | --- |
| Approved | 05/15/2006@9:12AM by Kimberly Curry | |
| Pay Freq | BiWeekly (Locked) | |
| Pay Period | 04/30/2006-05/13/2006 View Other Periods | |

| REG | 19.75 | NonWk | 0.00 |
| --- | --- | --- | --- |
| OT | 0.00 | DT | 0.00 |
| NIGHT | 0.00 | WKND | 0.00 |
| TOTAL | 19.75 | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations:  Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Tue 05/02 | RG | 02:00P | | | 06:00P | 04:00 | | | | 80184 | 800 |
| | Sat 05/06 | RG | 02:15P | | | 07:00P | 04:45 | | | | 80184 | 800 |
| | Tue 05/09 | RG | 01:00P | | | 06:00P | 05:00 | | | | 80184 | 800 |
| | Sat 05/13 | RG | 03:15P | | | 09:15P | 06:00 | | | | 80184 | 800 |

Operations:  Printable  Return to Approval Timecard

### Daily Hours Summary

| 04/30 | 05/01 | 05/02 | 05/03 | 05/04 | 05/05 | 05/06 | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | 4.00 | | | | 4.75 | 8.75 |
| 05/07 | 05/08 | 05/09 | 05/10 | 05/11 | 05/12 | 05/13 | |
| | | 5.00 | | | | 6.00 | 11.00 |
| | | | | | | | 19.75 |

top ▲

### Time Code Listing

| AB | Absence | AD | Admin Leave | D5 | Disability |
| --- | --- | --- | --- | --- | --- |
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |
| VA | Vacation Pay | | | | |

http://cdav1appcardn01/cta660/cta.asp

10/8/2007



208 2653199          COLDWATER CREEK                    10:39:20 a.m.    10-08-2007        53/60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn



Home | Help | Logout

## Timecard for Linda Beard 🔒

Home ▾

**Chevidson Times & Attendance**

| | | REG | 24.25 | NonWK | 0.00 |
| Signed | No | OT | 0.00 | DT | 0.00 |
| Approved | 05/29/2006@3:24PM by Kimberly Curry | NIGHT | 0.00 | WKEND | 0.00 |
| Pay Freq | BiWeekly (Locked) | TOTAL | 24.25 | | |
| Pay Period | 05/14/2008-05/27/2006 | | | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable  Return to Approval Timecard   View Other Periods

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mon 05/15 | RG | 03:00P | | | 06:00P | 03:00 | | | | 80164 | 800 |
| | Thu 05/18 | RG | 03:00P | | | 06:15P | 03:15 | | | | 80164 | 800 |
| | Sat 05/20 | RG | 02:15P | | | 07:00P | 04:45 | | | | 80164 | 800 |
| | Tue 05/23 | RG | 01:00P | | | 06:15P | 05:15 | | | | 80164 | 800 |
| | Sat 05/27 | RG | 01:30P | | | 09:30P | 08:00 | | | | 80164 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| 05/14 | 05/15 | 05/16 | 05/17 | 05/18 | 05/19 | 06/20 |
|---|---|---|---|---|---|---|
| | 3.00 | | | 3.25 | | |
| 05/21 | 05/22 | 05/23 | 05/24 | 05/25 | 05/26 | 05/27 |
| | | 5.25 | | | 4.75 | 11.00 |

| | | 24.25 |
|---|---|---|
| | 8.00 | 13.25 |

top ▶

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|---|---|---|---|---|---|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |





208 2653199    COLDWATER CREEK    10:39:41 a.m.    10-08-2007    54 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

Home | Help | Logout

Home ▼

## Timecard for Linda Beard

Signed | No
Approved | 06/12/2006@12:43PM by Kimberly Curry
Pay Freq | BiWeekly (Locked)
Pay Period | 05/28/2006-06/10/2006 View Other Periods

| REG | 19.25 | NonWk | 0.00 |
| OT | 4.00 | DT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 23.25 | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mon 05/28 | NP | 12:00A | | | 08:00A | 08:00 | | | | 80184 | 800 |
| | Mon 05/29 | RG | 02:15P | | | 06:15P | 04:00 | | | | 80184 | 800 |
| | Sat 06/03 | RG | 05:00P | | | 09:15P | 04:15 | | | | 80184 | 800 |
| | Tue 06/06 | RG | 01:00P | | | 06:30P | 05:30 | | | | 80184 | 800 |
| | Wed 06/07 | RG | 01:15P | | | 06:00P | 04:45 | | | | 80184 | 800 |
| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
| | Fri 06/09 | RG | 01:15P | | | 06:00P | 04:45 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| 05/28 | 05/29 | 05/30 | 05/31 | 06/01 | 06/02 | 06/03 |
|---|---|---|---|---|---|---|
| 12.00 | | | | | | 4.25 | 16.25 |
| 06/04 | 06/05 | 06/06 | 06/07 | 06/08 | 06/09 | 06/10 |
| | 5.50 | 4.75 | | | 4.75 | 15.00 |

| 31.25 |

top ►

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|---|---|---|---|---|---|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |



http://cdav1appcrdm01/cta660/cta.asp

10/8/2007

208 2653199        COLDWATER CREEK

10:40:02 a.m.    10-08-2007        55 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2





Home | Help | Logout

**Timecard for Linda Beard** @

Signed | No
Approved 06/26/2006@2:50PM by Kimberly Curry
Pay Freq BiWeekly (Locked)
Pay Period : 06/11/2006-06/24/2006 View Other Periods

| | REG | 30.50 | NonWk. | 0.00 |
| | OT | 0.00 | DT | 0.00 |
| | NIGHT | 0.00 | WKEND | 0.00 |
| | TOTAL | 30.50 | | |

Operations: Printable  Return to Approval Timecard

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sun 06/11 | RG | 01:15P | | | 06:00P | 04:45 | | | | 80184 | 800 |
| | Tue 06/13 | RG | 01:15P | | | 06:00P | 04:45 | | | | 80184 | 800 |
| | Thu 06/15 | RG | 01:15P | | | 06:00P | 04:45 | | | | 80184 | 800 |
| | Sun 06/18 | RG | 01:30P | | | 06:15P | 04:45 | | | | 80184 | 800 |
| | Wed 06/21 | RG | 01:15P | | | 06:00P | 04:45 | | | | 80184 | 800 |
| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
| Sat 06/24 | | RG | 01:15P | | | 08:00P | 06:45 | LD | | COMP | DEPT | JOB |
| | | | | | | | | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| 06/11 | 06/12 | 06/13 | 06/14 | 06/15 | 06/16 | 06/17 |
|---|---|---|---|---|---|---|
| 4.75 | | 4.75 | | 4.75 | | 14.25 |
| 06/18 | 06/19 | 06/20 | 06/21 | 06/22 | 06/23 | 06/24 |
| 4.75 | | | 4.75 | | | 6.75 16.25 |
| | | | | | | 30.50 |

top ▶

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|---|---|---|---|---|---|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |

http://cdav1arpcrdn01/cta60/cta.asp

10/8/2007

208 2653199    COLDWATER CREEK    10:40:26 a.m.    10-08-2007    56/60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

Home | Help | Logout

# Timecard for Linda Beard

| Signed | No |
| Approved | 07/10/2006@7:33AM by Kimberly Curry |
| Pay Freq | BiWeekly (Locked) |
| Pay Period | 06/25/2006-07/08/2006 |

| REG | 22.00 | NonWk | 0.00 |
| OT | 5.25 | DT | 0.00 |
| NIGHT | 0.00 | WKND | 0.00 |
| TOTAL | 27.25 | | |

Operations: Printable  Return to Approval Timecard

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fri 06/30 | RG | 02:00P | | | 08:00P | 06:00 | | | | 80184 | 800 |
| | Sat 07/01 | RG | 02:00P | | | 08:15P | 06:15 | | | | 80184 | 800 |
| | Tue 07/04 | NP | 12:00A | | | 08:00A | 08:00 | | | | 80184 | 800 |
| | Tue 07/04 | RG | 01:15P | | | 06:30P | 05:15 | | | | 80184 | 800 |
| | Fri 07/07 | RG | 01:15P | | | 06:15P | 05:00 | | | | 80184 | 800 |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sat 07/08 | RG | 01:15P | | | 06:00P | 04:45 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

**Daily Hours Summary**

| 06/25 | 06/26 | 06/27 | 06/28 | 06/29 | 06/30 | 07/01 |
|---|---|---|---|---|---|---|
| | | | | | 6.00 | 6.25 | 12.25 |
| 07/02 | 07/03 | 07/04 | 07/05 | 07/06 | 07/07 | 07/08 |
| 13.25 | | | 5.00 | 4.75 | 23.00 |

top ▶    35.25

**Time Code Listing**

| AB Absence | AD Admin Leave | DS Disability |
| FN Funeral Pay | HP Holiday Pay | JD Jury Duty |

http://cdav1appcrdn01/cta660/cta.asp

10/8/2007

208 2653199     COLDWATER CREEK     10:40:50 a.m.   10-08-2007     57 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

Home | Help | Logout

## Timecard for Linda Beard

| | |
|---|---|
| Signed | No |
| Approved | 07/24/2006@10:34AM by Kimberly Curry |
| Pay Freq | BiWeekly (Locked) |
| Pay Period | 07/09/2006-07/22/2006 View Other Periods |

| | | | |
|---|---|---|---|
| REG | 37.75 | NonWk | 0.00 |
| OT | 0.00 | OT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 37.75 | | |

Operations: Printable Return to Approval Timecard

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mon 07/10 | RG | 01:00P | | | 07:00P | 08:00 | | | | 80184 | 800 |
| | Wed 07/12 | RG | 01:00P | | | 06:00P | 05:00 | | | | 80184 | 800 |
| | Fri 07/14 | RG | 01:15P | | | 06:30P | 05:15 | | | | 80184 | 800 |
| | Sat 07/15 | RG | 02:15P | | | 08:45P | 08:30 | | | | 80184 | 800 |
| | Tue 07/18 | RG | 01:15P | | | 06:00P | 04:45 | | | | 80184 | 800 |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Thu 07/20 | RG | 01:00P | | | 06:00P | 05:00 | | | | 80184 | 800 |
| | Sat 07/22 | RG | 01:00P | | | 06:15P | 05:15 | | | | 80184 | 800 |

Operations: Printable Return to Approval Timecard

### Daily Hours Summary

| 07/09 | 07/10 | 07/11 | 07/12 | 07/13 | 07/14 | 07/15 | |
|---|---|---|---|---|---|---|---|
| | 6.00 | | 5.00 | | 5.25 | 6.50 | 22.75 |
| 07/16 | 07/17 | 07/18 | 07/19 | 07/20 | 07/21 | 07/22 | |
| | | 4.75 | | 5.00 | | 5.25 | 15.00 |

top ► 37.75

### Time Code Listing

| ABI | Absence | AD | Admin Leave | DIS | Disability |
|---|---|---|---|---|---|

http://cdav1appcrdh01/cta660/cta.asp

10/8/2007

208 2653199    COLDWATER CREEK    10:41:11 a.m.    10-08-2007    58/60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2



Home | Help | Logout

Home [ ▼ ]

## Timecard for Linda Beard

Signed | No
Approved: 08/07/2006@10:49AM by Kimberly Curry
Pay Freq: BiWeekly (Locked)
Pay Period: 07/23/2008-08/05/2008 View Other Periods

| | | |
|---|---|---|
| REG | 22.50 | NonWk 0.00 |
| OT | 0.00 | DT 0.00 |
| NIGHT | 0.00 | WKEND 0.00 |
| TOTAL | 22.50 | |

Operations: Printable  Back to List

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fri 07/28 | RG | 02:00P | | | 06:00P | 04:00 | | | | 80184 | 800 |
| | Sat 07/29 | RG | 03:00P | | | 06:15P | 03:15 | | | | 80184 | 800 |
| | Sun 07/30 | RG | 01:00P | | | 04:00P | 03:00 | | | | 80184 | 800 |
| | Tue 08/01 | RG | 03:00P | | | 06:15P | 03:15 | | | | 80184 | 800 |
| | Wed 08/02 | RG | 01:00P | | | 06:00P | 05:00 | | | | 80184 | 800 |

Operations: Printable  Back to List

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Thu 08/03 | RG | 01:00P | | | 05:00P | 04:00 | | | | 80184 | 800 |

### Daily Hours Summary

| 07/23 | 07/24 | 07/25 | 07/26 | 07/27 | 07/28 | 07/29 | |
|---|---|---|---|---|---|---|---|
| | | | | | 4.00 | 3.25 | 7.25 |

| 07/30 | 07/31 | 08/01 | 08/02 | 08/03 | 08/04 | 08/05 | |
|---|---|---|---|---|---|---|---|
| 3.00 | | 3.25 | 5.00 | 4.00 | | | 15.25 |

22.50

top

### Time Code Listing

| AB Absence | AD Admin Leave | DS Disability |
|---|---|---|
| FN Funeral Pay | HP Holiday Pay | JD Jury Duty |

http://cdav1appcdn01/cta660/cta.asp

10/8/2007





208 2653199   COLDWATER CREEK

10:41:32 a.m.   10-08-2007   59 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2



Home | Help | Logout

## Timecard for Linda Beard

| Signed | No |
|---|---|
| Approved | 08/21/2006@2:53PM by Kimberly Curry |
| Pay Freq | BiWeekly (Locked) |
| Pay Period | 08/06/2006-08/19/2006 View Other Periods |

| REG | 32.25 | NonWk | 0.00 |
|---|---|---|---|
| OT | 0.00 | OT | 0.00 |
| NIGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 32.25 | | |

Operations: Printable Return to Approval Timecard

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sun 08/06 | RG | 03:30P | | | 08:45P | 05:15 | | | | 80184 | 800 |
| | Tue 08/08 | RG | 02:00P | | | 06:00P | 04:00 | | | | 80184 | 800 |
| | Sat 08/12 | RG | 02:15P | | | 07:00P | 04:45 | | | | 80184 | 800 |
| | Sun 08/13 | RG | 02:00P | 04:00P | 05:00P | 08:15P | 06:15 | | | | 80184 | 800 |
| | Tue 08/15 | RG | 02:00P | | | 06:00P | 04:00 | | | | 80184 | 800 |

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Thu 08/17 | RG | 03:00P | | | 06:00P | 03:00 | | | COMP | DEPT | JOB |
| | Sat 08/19 | RG | 01:15P | | | 06:15P | 05:00 | | | | 80184 | 800 |

Operations: Printable Return to Approval Timecard

### Daily Hours Summary

| 08/06 | 08/07 | 08/08 | 08/09 | 08/10 | 08/11 | 08/12 |
|---|---|---|---|---|---|---|
| 5.25 | | 4.00 | | | | 4.75 | 14.00 |
| 08/13 | 08/14 | 08/15 | 08/16 | 08/17 | 08/18 | 08/19 |
| 6.25 | | 4.00 | | 3.00 | | 5.00 | 18.25 |

32.25

top ▲

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|---|---|---|---|---|---|

http://cdav1/appcrth01/cta660/cta.asp

10/8/2007

208 2653199    COLDWATER CREEK    10:41:53 a.m.    10-08-2007    60 /60

Timecard - CWC Time History - NOT PRODUCTION for Jennifer Flynn

Page 1 of 2

Home | Help | Logout

## Timecard for Linda Beard ⊕

| | | |
|---|---|---|
| Signed | No |
| Approved | 09/04/2006@2:45PM by Janiece Norwood |
| Pay Freq | BiWeekly (Locked) |
| Pay Period | 08/20/2006-09/02/2006 View Other Periods |

| | | | |
|---|---|---|---|
| REG | 11.00 | NonWk | 0.00 |
| OT | 0.00 | DT | 0.00 |
| NGHT | 0.00 | WKEND | 0.00 |
| TOTAL | 11.00 | | |

Timecard | Transactions | Schedule | Accruals | Notes | Audit | Profile

Operations: Printable  Return to Approval Timecard

| Del | Date | Time Code | In | Meal Out | Meal In | Out | Hours | LD | Favorite Set | COMP | DEPT | JOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sat 08/26 | RG | 02:15P | | | 07:00P | 04:45 | | | | 80184 | 800 |
| | Sun 08/27 | RG | 01:15P | | | 05:00P | 03:45 | | | | 80184 | 800 |
| | Tue 08/29 | RG | 03:30P | | | 06:00P | 02:30 | | | | 80184 | 800 |

Operations: Printable  Return to Approval Timecard

### Daily Hours Summary

| 08/20 | 08/21 | 08/22 | 08/23 | 08/24 | 08/25 | 08/26 | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | 4.75 | | |
| 08/27 | 08/28 | 08/29 | 08/30 | 08/31 | 09/01 | 09/02 | | |
| 3.75 | 2.50 | | | | | | 11.00 | |

top ▶

### Time Code Listing

| AB | Absence | AD | Admin Leave | DS | Disability |
|---|---|---|---|---|---|
| FN | Funeral Pay | HP | Holiday Pay | JD | Jury Duty |
| ML | Military Leave | MT | Meeting | NP | No Pay |
| PT | PTO | RG | Regular Hours | S2 | Shift 2 Premium |
| SK | Sick Pay | TN | Training | TV | Travel Time |
| VA | Vacation Pay | | | | |

top ▶

http://cdsv1apperdm01/cta660/cta.asp

10/8/2007

# *Coldwater Creek*                    **Confidential**

**To:** Linda Beard

**From:** Kim Curry

**Location:** Store # 184, The Shoppes at EastChase

**Date:** December 4, 2005

**Subject:** Performance Warning

*Based on a previous discussion with you, the following area of your job performance remains a concern:*

1.   *Failure to comply with company attendance policy;*

*We must see immediate and sustained improvement in the above-mentioned aspect of your job performance or further corrective action up to and including termination may result.*

_____ 12-9-05          _____ 12-9-05
Linda Beard            Date                      Kim Curry            Date

_____
Valerie Lee            Date

# *Coldwater Creek*                                    **Confidential**

**To:** Linda Beard

**From:** Kim Curry

**Location:** Store # 184, The Shoppes at EastChase

**Date:** March 6, 2006

**Subject:** Performance Warning

*Based on a previous discussion with you, the following area of your job performance remains a concern and is unacceptable:*

I.  *Failure to comply with company attendance policy; specifically tardiness.*

*We must see immediate and sustained improvement in the above-mentioned aspect of your job performance or further corrective action up to and including termination may result.*

_____ 3-11-06          _____ 3-11-06
Linda Beard          Date                          Kim Curry          Date

_____
Valerie Lee          Date

*Due to recent severe physical/medical problems that I am seeking treatment for I have had a most difficult time being at work period and definetly struggled with getting here on time. I will make every effort to improve and correct this*

# Authorization to Use and/or Disclose Personal
# Health Plan Information

| | | Form Received By | Date |
|---|---|---|---|

| 1. Employee Name  *Linda L. Beard* | 1a. Employee Health Plan ID Number |
|---|---|
| **1b. Employee Date of Birth**  *12-31-1949* | |

| 2. Name of Person Whose Health Information is the Subject of this Authorization  *Linda L. Beard* | 2a. Relationship to Employee |
|---|---|

Self ☑    Spouse ☐    Child ☐    Other ☐

| 3. Your Name  *Linda L. Beard* | 3a. Authority |
|---|---|
| | If you are not the person in Box 2, please describe your authority to act on his or her behalf: |

| 4. Mailing Address for Records  *8305 Grand Oak Ct* | 4a. City, State, Zip Code  *Mtge, AL, 36117* |
|---|---|

I hereby authorize the Coldwater Creek Inc. Benefit Plan ("the Plan") or contracted Business Associate to use and/or disclose the health information described in Sections A — E below.

## Section A: Health Information to be Used and/or Disclosed.

Specify the health information to be released and/or used, including (if applicable) the time period(s) to which the information relates. Select only one (1) of the following boxes:

☐ All of my past, present or future health claims and/or medical records.

☐ All of my health information relating to Claim Number _____.

☐ Other (please specify)._____

## Section B: Person(s) Authorized to Use and/or Receive Information.

Specify the persons or class of persons authorized to use and/or receive the health information described in Section A:

_____

## Section C: Purposes for Which Information will be Used or Disclosed.

Specify each purpose for which the health information described in Section A may be used or disclosed. Select all of the applicable boxes below:

☐ To facilitate the resolution of a claim dispute.

☐ As part of my application for leave of under the Family and Medical Leave Act (FMLA) or state family leave laws.

☐ For a disability coverage determination.

☐ At my request.

☑ Other (please specify). *Physical limitations of regarding work*

**Section D: Expiration of Authorization**

Specify when this Authorization expires. (Provide a date or triggering event related to the use or disclosure of the information.)

☐ On the following date: _____.

☐ Upon the passage of the following amount of time: _____.

☐ Upon my disenrollment from Coldwater Creek's health plan.

☐ Upon my return from FMLA leave.

☐ Other (please specify) _____

**Your rights:**

- You can revoke this Authorization at any time by submitting a written revocation to **Michelle Horning, Human Resources Manager – Administration,** at the following address:  One Coldwater Creek Drive, Sandpoint, ID  83864.

- A revocation will not apply to information that has already been used or disclosed in reliance on the Authorization.

- Once the information is disclosed pursuant to this Authorization, it may be redisclosed by the recipient and the information will no longer be protected by HIPAA.

- [Option 1: The Plan may not condition Treatment, Payment, enrollment or eligibility for benefits on whether I sign the Authorization.]

- [Option 2: This clause applies to individuals not yet enrolled in the Plan. If this Authorization was requested so the Plan can make an eligibility or enrollment determination or an underwriting or risk rating determination, then the person in Box 2 may be ineligible for enrollment or benefits if you fail to sign this form.]

- You will be provided with a copy of this Authorization Form, after signing, if the Plan sought the Authorization.

_____

Signature of Participant & Date

All **original** HIPPA forms (both for salaried and hourly employees) should be **mailed** to:

HR/Benefits Administrator
Coldwater Creek
One Coldwater Creek Drive
Sandpoint, ID 83864

Do not keep a copy in the personnel file.

# MONTGOMERY RHEUMATOLOGY ASSOCIATES
## Practice Limited to Adult and Pediatric Rheumatology

1421 NARROW LANE PARKWAY
MONTGOMERY, ALABAMA 36111-2654

**334-284-3105 • Fax-334-284-3107 • 1-800-631-3105**

SCHRAB FALLAHI, M.D., F.A.C.P.
DIPLOMATE AMERICAN BOARD OF INTERNAL
MEDICINE AND RHEUMATOLOGY

JAMES T. JAKES, M.D.
DIPLOMATE AMERICAN BOARD OF INTERNAL
MEDICINE AND RHEUMATOLOGY

March 16, 2006

RE:    Linda Beard

To Whom It May Concern:

Linda Beard was determined to be disabled as of June 2003. She suffers from several health problems. The morning hours are the most difficult for her. These chronic difficulties interfere with her normal activities and her ability to perform work activities in the morning. As the day goes on, Ms. Beard tends to get better. Starting work no earlier than 1:00 p.m. is necessary. Working 5-6 hour shifts between 1:00 and 8:00 p.m. with two days off works best for her. Ms. Beard is usually able to sustain a work schedule in the range of 28 hours per week. She has worked 7-8 hour shifts for extra hours for inventory etc. and is able to do this at times. It is best that Ms. Beard avoid vacuuming or any awkward or heavy lifting. She has worked at her present job almost two years performing the routine job duties required of her position without difficulty. She has avoided vacuuming and heavy lifting on occasion, as her condition varies on a daily basis.

In addition over the past months, particularly over the last several weeks, Ms. Beard has experienced another health problem for which she is seeking diagnosis and treatment of this problem. It causes significant pain at times and exacerbates her existing health conditions. The pain can interfere with sleeping. Usual activities including getting to work on time, and performing some routine tasks as usual may be difficult on occasion while treatment is pursued. Ms. Beard has started on medication and upon delivery of this letter, she will start other treatments and should both start to provide some relief for this temporary condition.

It is most beneficial, both physically and mentally, for Ms. Beard to work. She also needs work as her position provides income necessary for basic needs.

Your consideration and accommodation would be appreciated, particularly during this somewhat difficult temporary period while Ms. Beard seeks treatment for the current problems.

If you have any further questions, please don't hesitate to contact me.

Sincerely,

James T. Jakes, M.D.

JTI/tr

# March Monthly Availability

Name: Linda Beard

Prefer the afternoon shifts particularly on Saturday but getting hours is most important.

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|--------|--------|---------|-----------|----------|--------|----------|
| 5 1:00 to close | 6 1:00 to close | 7 1:00 to close | 8 1:00 to close | 9 1:00 to close | 10 1:00 to close | 11 1:00 to close |
| 12 1:00 to close | 13 1:00 to close | 14 1:00 to close | 15 1:00 to close | 16 DV appt | 17 1:00 to close | 18 1:00 to close |
| 19 1:00 to close | 20 1:00 to close | 21 1:00 to close | 22 ✗ | 23 1:00 to close | 24 1:00 to close | 25 1:00 to close |
| 26 1:00 to close | 27 1:00 to close | 28 1:00 to close | 29 1:00 to close. | 30 1:00 to close | 31 1:00 to close | 1 1:00 to close |

**Any Request off, please put "RO" with the corresponding Date**
**Any Days you are not available to work, put an "X" with the corresponding Date**

Will have doctor appt - not yet scheduled - will let you know as soon as scheduled. Thank You

## April Monthly Availability

_I need more hours please_

I need 2 week days off
or 1 week day off + 1 other
week day off by 4:30 at 5:00
for physical therapy — a part
week of ending 22nd only need
18th off + RO
+ 2 days
(on account
I have a
physical
therapy
appt.)

Name: _____

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|--------|--------|---------|-----------|----------|--------|----------|
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 <br> 1–6:30 | 10 <br> 1–10 | 11 <br> RO | 12 <br> 1–10 | 13 <br> 1–10 | 14 <br> 1–10 | 15 <br> 1–10 |
| 16 <br> 1–6:30 | 17 <br> 1–10 | 18 Dr. RO <br> appt 11:30 | 19 <br> 1–10 | 20 <br> 1–10 | 21 <br> 1–10 | 22 <br> 1–10 |
| 23 <br> 1–6:30 | 24 <br> 1–10 | 25 <br> 1–10 | 26 | 27 <br> 1–10 | 28 RO <br> Dr. appt 2:30 | 29 <br> 1–10 |

**Any Request off, please put "RO" with the corresponding Date**
**Any Days you are not available to work, put an "X" with the corresponding Date**

## May Monthly Availability

**Any Request off, please put "RO" with the corresponding Date**
**Any Days you are not available to work, put an "X" with the corresponding Date**

Name: _(signature)_

_For health reasons - please do not schedule more than 2 days in a row._

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
|  | 1  1-8 | 2  1-8 | 3  X | 4  1-8 | 5  1-8 | 6  1-8 |
| 7  1-6 | 8  1-8 | 9  1-8 | 10  1-8 | 11  1-8 | 12  1-8 | 13  1-8 |
| 14  1-6 | 15  1-8 | 16  1-8 | 17  1-8 | 18  1-8 | 19  1-8 | 20  1-8 |
| 21  1-6 | 22  1-8 | 23  1-8 | 24  1-8 | 25  1-8 | 26  1-8 | 27  1-8 |
| 28  1-6 | 29  1-8 | 30  1-8 | 31  1-8 |  |  |  |

## June Monthly Availability

Any Request off, please put "RO" with the corresponding Date
Any Days you are not available to work, put an "X" with the corresponding Date

Name: _Linda Boul_

No more than 2 days straight please.

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|--------|--------|---------|-----------|----------|--------|----------|
| | | | | 1 1-10 | 2 1-10 | 3 1-10 |
| 4 1-10 | 5 | 6 1-10 | 7 1-10 | 8 1-10 | 9 1-10 | 10 1-10 |
| 11 1-10 | 12 | 13 1-10 | 14 1-10 | 15 1-10 | 16 1-10 | 17 1-10 |
| 18 1-10 | 19 | 20 1-10 | 21 1-10 | 22 1-10 | 23 1-10 | 24 1-10 |
| 25 1-10 | 26 | 27 1-10 | 28 1-10 | 29 1-10 | 30 1-10 | |

A letter will be coming from Dr. Jokes confirming that I can still work 1-10 as I have for the past 2 years.

# July Availability Sheet

*Any Request off, please put "RO" with the corresponding Date*
*Any Days you are not available to work, put an "X" with the corresponding Date*

Name: _Linda Beard_ (signature)

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| | | | | | | 1  1-10 |
| 2  X | 3  X | 4  1-6 | 5  1-10 | 6  1-10 | 7  1-10 | 8  1-10 |
| 9  X | 10  1-10 | 11  1-10 | 12  1-10 | 13  1-10 | 14  1-10 | 15  1-10 |
| 16  1-6:30 | 17  X | 18  1-10 | 19  1-10 | 20  1-10 | 21  1-10 | 22  1-10 |
| 23  1:30-6:30 | 24  1-10 | 25  1-10 | 26  1-10 | 27  1-10 | 28  1-10 | 29  1-10 |
| 30  1-6:30 | 31  X | | | | | |

Evansville Provisional Sheet turned in 8/6/06

Provisional Sheet Starting

# August Availability Sheet

**Any Request off, please put "RO" with the corresponding Date**
**Any Days you are not available to work, put an "X" with the corresponding Date**

Name: _Juretha Beard_

Please give hours on Sat & Sun 1st & fill in on Tues & Thurs –

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|--------|--------|---------|-----------|----------|--------|----------|
| 6 / 1–6:30 | 7 Called Evansville to Enrolla to 2pm. | 8 2/0 | 9 | 10 2-10 | 11 8/4/06 Aug | 12 2-10 |
| 13 1–6:30 | 14 | 15 2-10 | 16 | 17 2-10 | 18 | 19 2-10 |
| 20 1–6:30 | 21 | 22 2-10 | 23 | 24 2-10 | 25 | 26 2-10 |
| 27 1–6:30 | 28 | 29 2-10 | 30 | 31 2/0 | | |

On accomodation request letter from doctor will be provided – this is temporary due to medical treatment

On accomodation request letter from doctor will be provided – this is temporary due to medical treatment

Revised in on
& turned in on
8/6/06

# August Availability Sheet

**Any Request off, please put "RO" with the corresponding Date**
*Any Days you are not available to work, put an "X" with the corresponding Date*

Name: _____

| | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| | | | **1** 1-10 | **2** 1-10 | **3** 1-10 | **4** 1-10 | **5** 1-10 |
| **6** 1-6:30 | | **7** RO | **8** 2-10 | **9** RO | **10** 2-10 | **11** RO | **12** 1-10 |
| **13** 1-6:30 | | **14** RO | **15** 2-10 | **16** RO | **17** 2-10 | **18** RO | **19** 1-10 |
| **20** 1:630 | | **21** RO | **22** 2-10 | **23** RO | **24** 2-10 | **25** RO | **26** 1-10 |
| **27** 1:6:30 | | **28** RO | **29** 2-10 | **30** RO | **31** 2-10 | | |

All of the RO days a for
required medical treatments
I need to maintain
My welld # of weekly
hours.

Please give me the most hours
on dates when I am not in
treatment & complete RO's on
Tues & Thurs.

Thank



**ALABAMA SURGICAL CONSULTANTS, P.C.**
4749 Berry Boulevard
Montgomery, AL 36106
(334) 271-0280

RETURN TO WORK OR SCHOOL

NAME _Linda Beard_

HAS BEEN UNDER MY CARE FROM _6/26/06_

TO _____ AND IS ABLE TO RETURN TO

WORK ON _when pt (Ms. Beard) feels capable to Return to work_

NATURE OF ILLNESS OR INJURY _____

_____ RESTRICTIONS                _____ LIGHT DUTY

COMMENTS _____
_____
_____

DR. EADDY     _Howard C. Audley Jr._
DR. SNIDER _____ DATE _6/28/06_

# Coldwater Creek                    Confidential

To: Linda Beard

From: Kim Curry

Location: Store # 184, The Shoppes at EastChase

Date: August 29, 2006

Subject: Termination Notice

*Based on our previous discussions with you, we are terminating your employment for:*

*1. Failure to comply with company time and attendance policies.*

_Linda Beard_ 8-29-06                    _Kim Curry_ 8/29/06

Linda Beard          Date                    Kim Curry          Date

_DeCrosta_ 8/29/06

_____                          Dan DeCrosta          Date

Valerie Lee          Date

MAR-28-07  16:13  From:EEOC                    2052122142         T-648  P.04   Job-734

## CHARGE OF DISCRIMINATION

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| | ☐ FEPA | 420-2007-00288 |
| | ☑ EEOC | |

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

_____ and EEOC

State or local Agency, if any

OCT 1 3 2006

| NAME (Indicate Mr. Ms, Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Linda L. Beard | (334) 409-9436 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 8305 Grand Oak Ct. | Montgomery, Alabama 36117 | 12/31/1949 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Coldwater Creek | 300+ | (334)-277-8575 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 7256 Eastchase Parkway, | Montgomery, Alabama 36117 | Montgomery |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box (es))

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☐ RETALIATION ☐ AGE ☑ DISABILITY ☐ OTHER (Specify)

DATE OF DISCRIMINATION TOOK PLACE
EARLIEST          LATEST
                  080/29/06
CONTINUING ACTION

    My name is Linda L. Beard, white female, age 56. I was determined disabled as of June 2003. I have diagnosed fibromyalgia and degenerative disc disease. I was employed on or about June 5, 2004, as a sales clerk. At all times I performed my duties to the reasonable expectation of my employer. Until early 2006 there had been no complaints regarding my work performance as an employee.

    In March 2006, my employer requested a letter from my doctor explaining my disability. Once my employer received the letter my work hours and functions changed. I felt that I was being discriminated against due to my disability. In early May, I was diagnosed with breast cancer and the discrimination seemed to escalate. On or about August 29, 2006, when I reported for work, I was asked to sign a paper explaining that I was being terminated for my failure to abide by the company's attendance policy. I felt I had not violated the policy, however, I signed the paper but disputed the contents. Since working at Coldwater I feel that my employment has been prejudiced due to my physical disability and unexpected health problems. During my employment my manager had complained a number of times about my inability to perform certain job functions. I was denied days and work hours. When I requested more work, I was told that my employer needed employees who could perform certain functions that my disability allegedly would not allow me to do. However, I was able and capable of doing the work regardless of my employer's belief as I had done while employed almost two years.

    It is my belief that I am a victim of discrimination because of my disability in violation of the "Americans with Disabilities Act", including lack of cooperation regarding reasonable accommodation for unexpected health problems.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY (When necessary for State and Local Requirements) |
|---|---|
| | I swear of affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct | SIGNATURE OF COMPLAINANT |
| 10/11/06          Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Month, day and year) 10-11-2006 |
| Date | |

EEOC FORM 5 (Rev. 07/99)

Page 1

## Schedule — Linda Brand

I am available 7 days a week 9 hours per day from 1:00 pm to close, & I prefer the afternoons and 5 hour shifts, 6 hours on Saturday. I have been employed since the store opened and have worked mostly afternoon hours and I should get priority for these hours.

It's said those most available should get the most hours! If there are 26 hours available that I can work — I should get these hours. Other associates available 8 hours per day — 7 days a week should also get the most hours. Instead hours are being spread out among employees with limited availability.

Associates who work limited hours — such as nights and/or weekends or only a few days or morning per week should get the least hours. During

**movies, movies, new hit movies.**

**STARZ!.**
an encore network

Page 2

slow times they should be cut back 1st to only 1-4 hr shift or as in the past — no hours some weeks. It is _not fair at all_ for those with limited availability to get as many or more hours than those consistently available 8 hours most everyday. Plus new employees should not get more hours than long time employees who are available to work.

_This is retail_ and those _of us who make our-selves regularly available to work substantial part-time hours_ for this store, deserve the hours particularly during slow times. Those with _only limited availability_ should _fill in as needed._

I say this because I inquired about it and it is my understanding that consistent availability 8 hours a day - 7 days a week — _matters a lot be-cause its retail_ — and your hours should be

movies, movies, new hit movies.

STARZ!
an encore network

Page 3

effected by your availability. Less availability should equal less hours! Why are new associates being hired to work hours that I am consistently available to work – and want to work? It doesn't make sense other hours are limited.

I know hours are not guaranteed, but I was hired to work 26 hours per week, if there are hours available – that I am available to work – I should get to work them before associates with limited availability or who are new to the company do so. Other employees that are consistently available – 8 hours and 7 days deserve priority, for hours also.

P.S. Kim said at a meeting being available is important to getting hours because after all – this is retail. The schedule does not reflect this.

Thank you,
Linda

movies, movies, new hit movies.

STARZ!
an encore network

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LINDA BEARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: |
| v. | ) | |
| | ) | 2:07-CV-790-MNT |
| COLDWATER CREEK, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# PLAINTIFF LINDA BEARD'S
# APRIL 1, 2008 DEPOSITION

# PART 1 OF 2

American Court Reporting
toll-free (877) 320-1050

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CIVIL CASE NUMBER

2:07-CV-00790-MHT


LINDA BEARD,

    Plaintiff,

vs.

COLDWATER CREEK, INC.,

    Defendant.


VOLUME II OF THE

DEPOSITION TESTIMONY OF:

LINDA BEARD



April 1, 2008

1:24 p.m.


COURT REPORTER:

Gwendolyn P. Timbie, CCR

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

| | Page 2 |
|---|---|
| 1 | S T I P U L A T I O N S |
| 2 | IT IS STIPULATED AND AGREED by and |
| 3 | between the parties through their |
| 4 | respective counsel that the deposition of |
| 5 | LINDA BEARD, may be taken before Gwendolyn |
| 6 | P. Timbie, Certified Court Reporter and |
| 7 | Notary Public, State at Large, at the law |
| 8 | office of Jay Lewis, Montgomery, Alabama, |
| 9 | on April 1, 2008, commencing at |
| 10 | approximately 1:24 p.m. |
| 11 | IT IS FURTHER STIPULATED AND |
| 12 | AGREED that the signature to and the |
| 13 | reading of the deposition by the witness |
| 14 | is waived, the deposition to have the same |
| 15 | force and effect as if full compliance had |
| 16 | been had with all laws and rules of Court |
| 17 | relating to the taking of depositions. |
| 18 | IT IS FURTHER STIPULATED AND |
| 19 | AGREED that it shall not be necessary for |
| 20 | any objections to be made by counsel to |
| 21 | any questions, except as to form or |
| 22 | leading questions, and that counsel for |
| 23 | the parties may make objections and assign |

| | Page 3 |
|---|---|
| 1 | grounds at the time of trial or at the |
| 2 | time said deposition is offered in |
| 3 | evidence, or prior thereto. |
| 4 | Please be advised that this is the |
| 5 | same and not retained by the Court |
| 6 | Reporter, nor filed with the Court. |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

| | Page 4 | |
|---|---|---|
| 1 | I N D E X | |
| 2 | EXAMINATION BY: | PAGE NO: |
| 3 | Ms. Singer | 8 |
| 4 | Certificate | 123 |
| 5 | | |
| 6 | LIST OF EXHIBITS | |
| 7 | EXHIBITS: | PAGE NO: |
| 8 | Defendant's 23 | 33 |
| 9 | Defendant's 24 | 42 |
| 10 | Defendant's 25 | 43 |
| 11 | Defendant's 26 | 44 |
| 12 | Defendant's 27 | 48 |
| 13 | Defendant's 29 | 49 |
| 14 | Defendant's 31 | 50 |
| 15 | Defendant's 32 | 51 |
| 16 | Defendant's 33 | 52 |
| 17 | Defendant's 34 | 54 |
| 18 | Defendant's 36 | 56 |
| 19 | Defendant's 37 | 58 |
| 20 | Defendant's 38 | 60 |
| 21 | Defendant's 39 | 61 |
| 22 | Defendant's 41 | 63 |
| 23 | Defendant's 44 | 71 |

| | Page 5 | |
|---|---|---|
| 1 | LIST OF EXHIBITS (Continued) | |
| 2 | EXHIBITS: | PAGE NO: |
| 3 | Defendant's 48 | 76 |
| 4 | Defendant's 49 | 77 |
| 5 | Defendant's 50 | 86 |
| 6 | Defendant's 56 | 93 |
| 7 | Defendant's 60 | 102 |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |

2 (Pages 2 to 5)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 6

1       A P P E A R A N C E S
2
3   FOR THE PLAINTIFF:
4       KEITH A. NELMS, Esquire
5       HEATHER DIXON, Esquire
6       Attorney at Law
7       Post Office Box 5059
8       Montgomery, Alabama 36103-5059
9
10  FOR THE DEFENDANT:
11      FERN H. SINGER, Esquire
12      Baker, Donelson, Bearman, Caldwell
13          & Berkowitz, P.C.
14      420 20th Street North
15      Suite 1600
16      Birmingham, Alabama 35203
17
18
19
20
21
22
23

Page 7

1       I, Gwendolyn P. Timbie, Certified
2   Court Reporter and Notary Public for the
3   State of Alabama at Large, acting as
4   Commissioner, certify that on this date,
5   pursuant to the Federal Rules of Civil
6   Procedure, and the foregoing stipulation
7   of counsel, there came before me at the
8   law office of Jay Lewis, Montgomery,
9   Alabama, commencing at approximately
10  1:24 p.m. on April 1, 2008, Linda Beard,
11  plaintiff in the above cause, for oral
12  examination, whereupon the following
13  proceedings were had:
14
15      LINDA BEARD,
16  Having been first duly sworn, was examined
17  and testified as follows:
18
19      COURT REPORTER:  Usual
20  stipulations?
21      MR. NELMS:  Yes.
22
23

Page 8

1   EXAMINATION BY MS. SINGER:
2       Q.   Ms. Beard, we needed you to be
3   here at 1:00 today, correct?
4       A.   Right.  I called and left a
5   message with Andy that I was running
6   behind.
7       Q.   How far behind were you?
8       A.   I guess whatever time it is I
9   got here.
10      Q.   What time was that?
11      A.   When I walked in.
12      Q.   1:15?
13      A.   I guess.
14      Q.   Well, do you know?
15      A.   No.  I wasn't looking at my
16  watch.
17      Q.   What time is it now?
18      A.   I guess 1:20.
19      Q.   Do you have any changes to
20  your deposition from Part 1?  Any changes
21  to any answers?
22      MR. NELMS:  Not additions, but
23  changes.

Page 9

1       Q.   Changes.
2       A.   Yeah.  There was one thing you
3   said about -- you were saying that
4   Coldwater Creek didn't know anything about
5   my disability.
6       Q.   I didn't testify, Ms. Beard.
7       A.   Well, I mean, I don't know how
8   else to put it.  But you responded to
9   something I said about Coldwater Creek not
10  knowing anything about my disability prior
11  to something.  And I just wanted to
12  clarify that when I -- Mary Ralph Russell
13  that hired me -- the manager that hired
14  me, when I went -- she had us come to the
15  EastChase office to fill out some
16  paperwork, you know, because the store
17  wasn't ready yet.
18      Q.   Yes, ma'am.
19      A.   And when I went to fill out
20  the paperwork there, I did tell her that I
21  had applied for disability, you know.
22  That I was pretty sure I was going to get
23  it, but I hadn't started getting my

3  (Pages 6 to 9)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 10

1  payments yet. And stressed to her then
2  that it was real important that I get my
3  24 hours. And so she did know about it.
4  And --
5     Q.   Go ahead.
6     A.   Also, you know -- because my
7  hours were cut a lot, I applied for --
8  they have a program called the Helping
9  Hand that helps -- helps people pay bills
10 and stuff, you know, in an emergency-type
11 situation or whatever. And so my hours
12 were so drastically cut. And this was
13 before I was getting my payments. I
14 applied for the Helping Hand.
15    And I called the human resources
16 department instead of going through the
17 office, because I didn't really want
18 anybody at work to know about it because
19 they all gossip. And I figured -- I
20 couldn't trust the management not to talk
21 about it. So I called the human resources
22 department. And I'm pretty sure that I
23 told them my situation, about this was my

Page 11

1  only source of income and I was waiting to
2  get my disability payments.
3     Q.   Coldwater Creek was your only
4  source of income?
5     A.   (Witness nodded head in the
6  affirmative.)
7     Q.   Is that a yes?
8     A.   Uh-huh.
9     Q.   You have to answer out loud
10 for the court reporter.
11    A.   Yes.
12    Q.   But when you started working
13 for Coldwater Creek, you also had a
14 part-time job, correct? You had another
15 part-time job?
16    A.   No.
17    Q.   You had some job where you
18 were working as a telemarketer, did you
19 not?
20    A.   I quit that job when I started
21 to work at Coldwater Creek.
22    Q.   Well, what was that job?
23    A.   With a telemarketer.

Page 12

1     Q.   For whom?
2     A.   ASK.
3     Q.   I'm sorry. For --
4     A.   ASK Telemarketing.
5     Q.   And how long did you work for
6  ASK?
7     A.   It was like two months or so.
8  Two and a half months, I think.
9     Q.   And what's the reason you left
10 that job?
11    A.   To take the job at Coldwater
12 Creek.
13    Q.   So you're saying you told the
14 hiring person for Coldwater Creek in or
15 around June of '04 that you needed to work
16 24 hours, correct?
17    A.   Right.
18    Q.   Did you tell her anything else?
19    A.   I told her that I had applied
20 for disability.
21    Q.   All right.
22    A.   You know. And that that was
23 why -- that that was why I needed to -- I

Page 13

1  couldn't work in the mornings. That's why
2  I needed to come in at 1:00. And, you
3  know, that that was my -- this was my
4  income, and that's why I needed to work at
5  least 24 hours a week.
6     Q.   Now, just one thing. Tell
7  me -- you mentioned that at some point
8  your hours were drastically cut. Tell me
9  when that happened, Ms. Beard.
10    A.   Well, it was gradually during
11 the next few months.
12    Q.   No. I need you to be very
13 specific. When were your hours first
14 drastically cut? What month?
15    A.   August and -- August.
16    Q.   Of what year, ma'am?
17    A.   '04.
18    Q.   So you're saying your hours
19 were cut --
20    A.   That's the month that I first
21 got help from the Helping Hand.
22    Q.   And your testimony today is
23 that your hours began to be cut in August

4  (Pages 10 to 13)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 14

1    of '04.  Is that your testimony?
2        A.   Right.  I mean, everybody's
3    were cut.  In other words, you know -- I
4    told you they hired all these people.
5    Everybody's were cut.
6        But, I mean, I never really got 24
7    hours.  I think I might have -- I don't
8    even know if I ever worked 24 hours.
9    Maybe one time in the first month we were
10   open.
11       But in other words, the store didn't
12   have -- undoubtedly didn't have the kind
13   of traffic and everything that they
14   expected it to have, I guess, because they
15   hired so many people.  And, you know, we
16   weren't that busy.  So everybody's hours
17   were cut.
18       And she promised -- like I told you
19   before, there were a lot of people that
20   were unhappy because they weren't getting
21   the hours that they had been told they
22   would get.  And a lot of people -- some
23   people quit after, you know, a few

Page 15

1    months.  Three or four months there were a
2    few people who quit.
3        Q.   Who quit after a few months?
4        A.   There was one girl named Robin
5    that quit after three or four months.  And
6    a lot of people were just real unhappy
7    with the situation.  And, you know -- and,
8    of course, a lot of people had full-time
9    jobs, and then there were some people that
10   were married and they were just working,
11   you know, for something to do and to get a
12   discount.  And it was -- you know, the
13   money was not that much of a priority for
14   them.
15       Q.   But you're testifying here
16   today that everybody's hours started to be
17   cut in August of '04?
18       A.   Uh-huh.  Pretty much.  I mean,
19   you know, a lot of people's hours were
20   cut.  I mean, there was just a cutback.
21       Q.   In hours?
22       A.   In hours.  From what most
23   people had been told that they would be

Page 16

1    working when they were hired.
2        Q.   Is there any time that your
3    hours were then drastically cut again,
4    Ms. Beard?
5        A.   When I was going through
6    physical therapy.
7        Q.   And when was that, please?
8        A.   March of '06.
9        Q.   All right.  So you're saying
10   in March of '06.  Tell me what you're
11   complaining about in terms of your hours.
12       A.   The hours were cut down to
13   only ten a week, and one time they were
14   cut to five.
15       Q.   So are there two weeks in
16   March of '06 that you're complaining
17   about?
18       A.   No.  There were several weeks
19   when they were cut to ten and one week
20   that they were cut to five.  But, you
21   know, by -- when I contacted Valerie Lee,
22   she had the five changed to ten.
23       Q.   Does that have -- your hours

Page 17

1    being cut in March of '06, does that have
2    anything to do with your claim in this
3    lawsuit?
4        A.   Right.
5        Q.   Tell me what it is.
6        A.   Because they were -- she cut
7    my hours.  It was retaliation and --
8    because she -- you know, it was like she
9    perceived that I wasn't physically able to
10   do the work, to work regular hours.  I
11   mean, I just think it was a deliberate
12   retaliation.  And it was very deliberate
13   the week that she cut them to five.
14   Because I had already talked to Valerie
15   Lee about the ten hours; that I wasn't
16   happy with the ten.  And she --
17       Q.   Who is "she"?
18       A.   Kim had said that Valerie Lee
19   told her -- which she didn't really say
20   Valerie Lee.  She said "they" -- referring
21   to corporate -- had told her that -- she
22   said that they told her to schedule me for
23   only ten hours.  And I told Valerie

5 (Pages 14 to 17)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 18

1  what she said, and Valerie Lee said that
2  no, that's not true. I didn't tell her
3  that and that she would discuss it with
4  Kim.
5      And then -- it was after that that
6  Kim scheduled me to work five hours, and
7  it was on a week that she was going to be
8  out of town for a meeting in Idaho. And
9  that week the schedule came out later than
10  normal. Which it came out after she had
11  left to go out of town, which to me was
12  purposely done so that I couldn't get the
13  hours changed, she thought. Because when
14  I went to one of the other managers that
15  was there in charge and said, you know,
16  that I was unhappy about the hours --
17  which they knew I would be before I even
18  saw the schedule, after I had already
19  complained, you know. And, of course,
20  that's what they said. I'm sorry. Kim is
21  out of town. There's nothing we can do.
22  Like ha, ha, ha. You're stuck with five
23  hours.

Page 19

1      And what I did was call Valerie
2  Lee's voice mail and left a message, you
3  know, saying that I felt this was
4  deliberate. I was very upset about it,
5  you know, and that I didn't intend to put
6  up with this.
7      Q.  How long were your hours
8  drastically cut?
9      A.  And immediately my hours were
10  changed.
11      Q.  To what?
12      A.  To ten.
13      Q.  Any --
14      A.  Because the schedule was
15  already out. So, you know, getting me
16  five more hours was like the best they
17  could do on a schedule that had already
18  been made.
19      Q.  So you're saying that the
20  cutback of hours in March of '06 was in
21  retaliation for you complaining to whom?
22      A.  I think the retaliation
23  started after Kim made that smart

Page 20

1  remark -- slanderous remark to me in
2  February.
3      Q.  Of '06? Of '06?
4      A.  Right.
5      Q.  Did you file a charge of
6  discrimination in February of '06?
7      A.  No.
8      Q.  When did you file your charge
9  of discrimination? Do you remember?
10      A.  After I was terminated.
11      Q.  So it was after August of '06;
12  is that correct?
13      A.  Right.
14      Q.  And are you saying that you
15  knew you were being discriminated against
16  as early as February of '06?
17      A.  No. It went on -- it came on
18  gradually.
19      Q.  Well, when was the first time
20  you think you were being discriminated
21  against based on your alleged disability?
22          MR. NELMS:  Are you saying on
23  hindsight now or at the present time?

Page 21

1  Contemporaneous thought?
2          MS. SINGER:  Well, let's just
3  start with the contemporaneous thought.
4      A.  I didn't realize all of it
5  until after -- till looking back on it.
6  As it was happening -- you know, the day
7  it happened, I wasn't thinking, you know,
8  oh, today I was discriminated against.
9  No.
10      Q.  So it was only after --
11      A.  So it was after -- on looking
12  back on it.
13      Q.  Do you know at what point,
14  looking back on it, you determined that
15  you were being discriminated against?
16      A.  Well, I was starting to think
17  it when -- I was starting to think that
18  after -- when she started saying things --
19  throwing up in my face things about my
20  disability letter.
21      Q.  When was that?
22      A.  That was -- well, that was
23  when I --

6 (Pages 18 to 21)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 22

1    Q.   What year?
2    A.   It was in '06.
3    Q.   What month?
4    A.   May.
5    Q.   And when you say "she," you're
6    talking about Kim?
7    A.   Kim.
8    Q.   Any other time that your hours
9    were drastically cut?
10   A.   They were cut in March and
11   April.  And then in May I was denied hours
12   to work on the visual team.  In other
13   words, they were cut -- they were cut some
14   in March.  And then in April, after I had
15   finished my physical therapy treatment,
16   they were cut even more.
17        Actually, in March -- at the first
18   of March, I had more hours.  In other
19   words, when I went to her -- I'm getting
20   confused.  When I went to her, you know,
21   and told her that -- you know, that
22   something was wrong with me and that I was
23   going to the doctor and getting tests and

Page 23

1    trying to find out what was wrong with
2    me.  And I was having a lot of pain, and
3    we hadn't figured out what was wrong with
4    me.  So, you know, I was just having to
5    deal with the pain and, you know, wasn't
6    being -- hadn't been properly treated
7    yet.  That's when I got more hours.
8        Then, after I started physical
9    therapy and, you know, even -- I had some
10   relief after just one treatment of
11   physical therapy.  And, you know, then I
12   started to get less hours.
13       Then in April -- my treatment ended
14   on April -- I believe it was April 17th.
15   Then my hours were cut even more in April,
16   when I had finished physical therapy and
17   was feeling better.  Which it didn't make
18   sense to me, you know, that I had more
19   hours when I was feeling the worst.  Then,
20   when I felt better, my hours were cut
21   more.
22       Then, you know, when I volunteered
23   to work on the visual team, instead of

Page 24

1    telling me if you would like to work on
2    the visual team, we need a letter from
3    your doctor releasing you, saying that you
4    can work on the visual team, she
5    purposely waited till after they had
6    that -- after that work was done and
7    after -- the day after I had been to my --
8    to see the doctor -- the cancer doctor,
9    who had, you know, given me all this
10   overwhelming information about cancer.  So
11   I was, you know, not in a very good state
12   of mind.  She calls me in there to tell me
13   you didn't get to work on the visual team
14   because of your letter.
15       And then, when I said, well, I could
16   have provided a letter had I been told two
17   weeks prior when I volunteered, which is
18   what she should have done -- and this was
19   very upsetting to me, you know, to find
20   this out after the fact, because I needed
21   those hours.  And it would have been very
22   good for me to have come in and worked
23   with my fellow friendly --

Page 25

1    friends/associates to get my mind off of
2    that information that I had just learned
3    about, you know.  And it was just so
4    deliberate.
5        And then, when I said that I could
6    provide another letter and that I would
7    provide it in case I needed it for any
8    other situation, she was like no, no.  We
9    have a letter.  We don't want another
10   letter.  We don't need another letter.
11   Don't you dare provide another letter.
12   They have a letter up there, and don't you
13   get another letter.  And I said, well, I
14   am.
15       And I went that Friday.  This was on
16   Thursday.  I went the very next day --
17   Q.   What month?
18   A.   -- to Dr. Jakes and got a
19   letter.
20   Q.   What month?  What month?
21       MR. NELMS:  Just your
22   responses to her questions.
23   A.   I'm sorry.  It aggravates me.

7 (Pages 22 to 25)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 26

1  So I get -- that's when I talk loud.
2     It was -- this was on May the 18th,
3  I believe. May the 19th or something like
4  that.
5     Q.  Do you know whether you were
6  working in March and April more or less
7  hours than your co-associates at the
8  store?
9     A.  I don't know. I just was
10  going by the hours that I normally worked.
11     Q.  But you're saying that you
12  were being treated differently by virtue
13  of your disability when your hours were
14  cut and then you were given hours back,
15  correct?
16     A.  Right.
17     Q.  But you don't know what your
18  co-associates were working? You don't
19  know if they were working --
20     A.  To some degree.
21     Q.  Well, tell me what --
22     A.  I know -- I know, you know,
23  that she gave certain hours to certain

Page 27

1  people.
2     Q.  But were --
3     A.  And like they told me when I
4  was having -- when I was going to physical
5  therapy, one of the things they told me
6  was that -- like I had never worked the
7  3 to 6 shift before. It wasn't even a
8  shift until they created it for this one
9  person. Which, you know, they always gave
10  me such a hassle, about it was such an
11  ordeal to try to accommodate me by giving
12  me certain shifts to accommodate my
13  schedule for physical therapy or radiation
14  treatment, but yet they could make up a
15  new shift for this person to work 3 to 6
16  when we didn't even have such a shift
17  before. And 3 to 6 is not a busy time in
18  the store.
19     Q.  Who is the "she"?
20     A.  The person they created that
21  shift for? Ruth. And I can't remember
22  her last name.
23     Q.  How do you know they created

Page 28

1  it for her, Ms. Beard?
2     A.  Because we didn't have that
3  shift before, and she's the only person
4  that worked that shift. And she started
5  to work there and worked 3 to 6.
6     Q.  How do you know that they
7  created it for her?
8     A.  Well, nobody else was working
9  it but her.
10     Q.  Did somebody tell you?
11     A.  Well, if nobody else worked
12  it -- she suddenly came to work and
13  started working 3 to 6.
14     Q.  Ms. Beard, it may very well be
15  that you're right. I don't know. I want
16  to know if somebody told you they created
17  that shift for her.
18     A.  I don't know. I can't
19  remember.
20     Q.  Since the last time we met,
21  have you looked for work?
22     A.  No.
23     But they kept telling me that --

Page 29

1     Q.  Who is "they"?
2     A.  Management kept saying that
3  like there were no shifts available. You
4  know, like 1 to 6 or 2 to 6 that I usually
5  worked. They weren't -- they
6  didn't have -- those shifts were not
7  available on certain days or something.
8  And I could look on the schedule and there
9  was such and such working that shift and
10  another person working that shift.
11     Q.  Well, are you saying that you
12  stopped getting a shift that began at
13  1:00?
14     A.  On some days.
15     Q.  And --
16     A.  Or 2 to 6, you know.
17     Q.  If 1 to 6 wasn't available, 2
18  to 6 was better for you. Is that what
19  you're saying?
20     A.  No. Like when I was going to
21  physical therapy, I was supposed to be
22  like off three days a week. Like off on
23  Monday, Wednesday, and Friday, preferably,

8 (Pages 26 to 29)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 30

1  so that I could have time between the
2  treatments, you know. Instead of having
3  the treatments on Monday, Tuesday, and
4  Wednesday, three days in a row, it's
5  better to have a space between them --
6  days between them.
7      And then, you know, they'd schedule
8  me like 3 to 6 on the days I could work,
9  which was cutting my hours. Giving me
10  less hours than I normally worked, because
11  I normally worked 1 to 6 and occasionally
12  2 to 6. And then they would tell me that
13  there was no hours to work 1 to 6 on the
14  days that I could work. You know, caused
15  me to have less hours. But say it was a
16  Tuesday and they gave me 3 to 6, and
17  they'd say there's no shifts available
18  when you can work. And I'd look on there
19  and there were shifts that I normally
20  worked that I could work. And they were
21  just making that up.
22      Q.   So do you think that you were
23  entitled to have priority over other

Page 31

1  people who were working those shifts?
2      A.   Well, there was just no excuse
3  for why they were suddenly taking them
4  away from me.
5      Q.   Well, I think I asked you this
6  the first time, and I promised your lawyer
7  that I won't rehash that. You went to
8  physical therapy in March and April of
9  '06; is that correct?
10      A.   Uh-huh.
11      Q.   Is that a yes?
12      A.   Yes.
13      Q.   Before March or April of '06,
14  do you know how many days you were late
15  coming to work?
16      A.   No. But I have reason to
17  believe, too, that Kim may have changed my
18  time and made me look late -- changed my
19  time in the computer and made me appear to
20  be late when I wasn't late. I wouldn't
21  put it past her.
22      Q.   Well, do you have any evidence
23  of that?

Page 32

1      A.   No. But because of everything
2  else she did, I -- wouldn't surprise me.
3      Q.   I understand you have these
4  strong feelings. I want to know whether
5  or not you have any evidence.
6      A.   How could I have evidence of
7  it unless I was standing there watching
8  her?
9      Q.   Ms. Beard, the answer is --
10      A.   No.
11      Q.   -- either yes or no. And your
12  answer is no, correct?
13      A.   Right.
14      Q.   Are you taking any other
15  medicine today that you were not taking
16  the first time we met?
17      A.   I started taking the Topamax.
18      Q.   And what is that to treat,
19  please?
20      A.   Migraines.
21      MR. NELMS: Can you spell that
22  for me, please?
23      THE WITNESS: Topamax?

Page 33

1      MR. NELMS: Yes, ma'am.
2      THE WITNESS: T-O-P-O-M-A-X
3  (sic), I think.
4      (WHEREUPON, a document was
5  marked as Defendant's Exhibit Number 23
6  and is attached to the original
7  transcript.)
8      Q.   Ms. Beard, I'm going to show
9  you what your lawyer, I think, has
10  produced to me, which are documents that
11  are marked as Exhibits 23 through 59.
12      Do I understand this is what you
13  found at home?
14      A.   Right.
15      Q.   Do you not have your glasses
16  today again?
17      A.   I can see.
18      Do you want me to flip through all
19  this?
20      Q.   Well, I want -- on the first
21  page -- let's try Exhibit 23 first. On
22  the left-hand side, on the very top, it
23  says still working 20 hours at the other

9 (Pages 30 to 33)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 34

1 job. Do you see that?
2    A.   Uh-huh.
3    Q.   Is that a yes?
4    A.   Yes.
5    Q.   So does that mean that in
6 August of '05 you were still working at
7 the other job?
8    A.   Right.
9    Q.   And then, below that, it says
10 no day off. What are you saying there? I
11 mean, I know what the words mean. But
12 what's the significance?
13    A.   Okay. After -- in other
14 words -- and when I say still working 20
15 hours at the other job, actually I was
16 scheduled to work 20 hours at the other
17 job. Although I didn't always work. I
18 mean, I missed time because I couldn't --
19 I was having trouble keeping up with the
20 schedules. But -- because after I quit
21 working 20 hours at my -- at that job, I
22 had my hours cut to -- I was supposed to
23 work 12 hours at the other job, and I

Page 35

1 was --
2    Q.   Hold on a second. All right.
3 In August of '05, you still were working
4 for the other company?
5    A.   Right.
6    Q.   So it's not that you quit
7 working for the other company when you got
8 your job at Coldwater Creek, correct?
9    A.   I didn't start working at the
10 other -- I got the job at Coldwater Creek
11 in '04.
12    Q.   In '04?
13    A.   I started for this other
14 company in April of '05.
15    Q.   All right. So in August of
16 '05, though, it reflects that you were
17 still working at the ASK company, correct?
18    A.   No.
19    Q.   There's another company?
20    A.   Right. I went to work for
21 another company --
22    Q.   All right.
23    A.   -- in April of '05 because I

Page 36

1 was not getting enough hours at Coldwater
2 Creek.
3    Q.   I'm with you now. And what
4 was the name of the other company? Remind
5 me.
6    A.   Or, actually, you could say
7 that I expected -- because my hours had
8 been so slack the summer before at
9 Coldwater Creek. And, you know, that
10 early spring we hadn't had -- the hours
11 hadn't been very good. I anticipated that
12 we might -- the hours might be slack. I
13 had an opportunity to get another job, so
14 I took it.
15    Q.   Were the hours slack for the
16 other associates in Coldwater Creek the
17 spring of '05?
18    A.   Summer of '05? Yes.
19    Q.   Summer of '05. All right.
20 Now, this is your handwriting,
21 correct, on Exhibit 23?
22    A.   Uh-huh.
23    Q.   Is that a yes?

Page 37

1    A.   Right.
2    Q.   And when did you write these
3 things?
4    A.   When I -- when I made that --
5 that first thing that I had -- all that
6 paperwork about my -- that I had turned in
7 to you before any --
8    Q.   What was marked at Exhibit
9 Number 1?
10    A.   Yeah. Just my -- no. My
11 notes that I gave you that -- the notes
12 that just were showing how things
13 happened. My documentation about how
14 things happened over the period of time
15 when I was working at Coldwater Creek.
16    Q.   I don't have that
17 documentation.
18    A.   Yes, you do.
19    Q.   Are you talking about Exhibit
20 Number 12?
21    A.   No. The --
22    Q.   Or Exhibit Number 13 or
23 Exhibit Number 14?

10 (Pages 34 to 37)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 38

1    A.   We gave it to you when we were
2  here last time.
3    Q.   What was it, Ms. Beard?
4  Because I don't remember.  All I have --
5  everything --
6    MR. NELMS:  Were these your
7  handwritten notes?
8    THE WITNESS:  Yeah.  The
9  details of how the events took place.
10   MS. SINGER:  Let's go off the
11 record.
12         1:50 p.m.
13 (Off-the-record discussion.)
14         2:01 p.m.
15   Q.   All right.  Look at Exhibit
16 Number 23, please.  When did you write
17 that?
18   A.   I don't know what the exact
19 date was.
20   Q.   What year?
21   A.   2006.
22   Q.   What prompted you to do that
23 in 2006?

Page 39

1    A.   I was just getting all my
2  information together.
3    Q.   Why?
4    A.   For my attorney.
5    Q.   In 2006?
6    A.   Yeah.  I had already -- after
7  I came to see the attorney.
8    Q.   All right.  What does it mean
9  "no day off" that's written on the side of
10 what's been marked as Exhibit 23?
11   A.   Okay.  After I quit working 20
12 hours a week for OSI --
13   Q.   Yes, ma'am.
14   A.   What I did was I had my hours
15 cut back at OSI to three days a week --
16 Sunday, Monday, and Tuesday.  Then I was
17 supposed to be off on Wednesday, and I was
18 supposed to work Thursday, Friday, and
19 Saturday at Coldwater Creek.
20     And I was filling out my
21 availability sheets to be available
22 Thursday, Friday, and Saturday at
23 Coldwater Creek, but they kept putting me

Page 40

1  to work and asking me to work on
2  Wednesday, which is why -- I was not
3  having a day off and kept telling me they
4  needed me to be available on Wednesday.
5  And so -- and I started putting myself
6  available on Wednesday, thinking that they
7  would give me a day off on one of the
8  other days, which sometimes they would.
9     As you can see, I would have a day
10 off on Thursday.  Where I had that slash,
11 I would have a day off on Thursday or I'd
12 have a day off on Friday.  But as you see,
13 where I put no day off is because they
14 scheduled me to work Wednesday, Thursday,
15 Friday, and Saturday.
16   Q.   Well, you wanted 24 hours,
17 correct?
18   A.   Not -- I didn't want 24 hours
19 when I was working the other job.  I was
20 working the other job because they
21 wouldn't give me 24 hours.
22   Q.   But you --
23   A.   And I kept saying to them --

Page 41

1  after I had cut my hours -- before I cut
2  my hours back -- back to just 12, like I
3  said, I kept telling them I would like to
4  quit the other job.  If they would give me
5  enough hours, I'd just completely quit the
6  other job.
7     Then -- then I kept saying, when
8  they would get, you know -- when they were
9  giving me more hours than I wanted for
10 these -- on these four days, I said, you
11 know, if I quit my other job, will you --
12 will I be able to get enough hours?  We
13 can't guarantee that.  I'd hate for you to
14 quit your other job because I just can't
15 guarantee that.
16   MR. NELMS:  And who is this --
17 you're altering your voice.
18   A.   Kim.  And then Janiece was the
19 one that was doing the schedule at that
20 time.
21   Q.   Did that have anything to do
22 with your disability?
23   A.   What?

11  (Pages 38 to 41)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 42

1    Q.   The fact that they couldn't
2  guarantee you more hours, and so they
3  didn't want you to quit your other job?
4    A.   Not that I know of.
5       (WHEREUPON, a document was
6  marked as Defendant's Exhibit Number 24
7  and is attached to the original
8  transcript.)
9    Q.   Let's go to Exhibit Number 24,
10  please. And I think that you wrote some
11  notes on the back of Exhibit Number 24,
12  Ms. Beard. Do you remember when you wrote
13  those notes?
14    A.   Do I remember exactly when I
15  wrote them?
16    Q.   Yes, ma'am.
17    A.   No. I mean, I wrote them at
18  that -- I wrote them the week that this
19  occurred.
20    Q.   So what was the reason that
21  you did that?
22    A.   Just for my own benefit.
23    Q.   Tell me -- I understand. But

Page 43

1  what -- how did it help you? What was the
2  benefit to you?
3    A.   Just -- I don't know. Just
4  what I -- I just did it. I have no
5  explanation other than that.
6       (WHEREUPON, a document was
7  marked as Defendant's Exhibit Number 25
8  and is attached to the original
9  transcript.)
10    Q.   All right. Well, let's look
11  at Exhibit Number 25, which is the next
12  page. And you have -- I know that's
13  Exhibit -- the first page of 25,
14  Ms. Beard. And then, off to the right,
15  you appear to have -- are you counting
16  everybody's hours? Off to the right on
17  Exhibit Number 25.
18    A.   Uh-huh.
19    Q.   Is that a yes?
20    A.   Yes.
21    Q.   And what's the reason you're
22  doing that?
23    A.   Just to see what they add up

Page 44

1  to.
2    Q.   Were you looking to see if
3  people were getting more hours than you?
4    A.   Uh-huh.
5    Q.   Is that a yes?
6    A.   Yes.
7    Q.   And there were some people who
8  were and some people who were not; is that
9  correct.
10    A.   Right.
11       (WHEREUPON, a document was
12  marked as Defendant's Exhibit Number 26
13  and is attached to the original
14  transcript.)
15    Q.   All right. Let's look at the
16  next exhibit, which is Exhibit Number 26.
17  And what are you saying on this exhibit?
18  Your handwritten notes. What's that all
19  about?
20    A.   This is the week that -- well,
21  from -- from Thursday of the week -- of
22  the -- Exhibit 25 through Friday of
23  Exhibit 26, they had me scheduled to work

Page 45

1  49 hours.
2    Q.   All right. Now, is this in
3  '06?
4    A.   Uh-huh.
5    Q.   Is that yes? Okay. And so
6  you didn't want that many hours; is that
7  correct?
8    A.   Well, that's too many hours
9  for me to work. Forty-nine hours over --
10  what is that? Eight? Nine straight days
11  or whatever it is. However many days they
12  had.
13    Q.   So that was too many hours; is
14  that correct?
15    A.   Right. Without a day off in
16  between. And one day is an
17  eight-and-a-half hour day of inventory.
18  And I had -- two or three of those days I
19  had the hours cut back.
20    Q.   You asked --
21    A.   And then I --
22    Q.   You asked that they be cut
23  back?

12  (Pages 42 to 45)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 46

1     A.   Right.
2     Q.   And did they cut it back?
3     A.   Right.  And I -- then I
4  wandered later, after all the trouble
5  started and stuff, whether they actually
6  changed it in the computer or whether they
7  made it look like I was late.
8     Q.   Well, you don't have any
9  evidence of that, correct?
10    A.   I said I wandered.
11    Q.   I only am interested in
12 evidence.  I know you wander about a lot
13 of things, Ms. Beard.  We all wander about
14 a lot of things.  This case is about
15 needing evidence.
16    MR. NELMS:  What was the
17 question again?
18    MS. SINGER:  I'm getting
19 there.
20    A.   And the reason I had that many
21 hours is because Santina was --
22    Q.   I didn't ask you any question
23 yet.

Page 47

1     Was there anything working -- why
2  are you -- I ask the questions; you answer
3  the questions.  All right.  If you don't
4  want to do that, that's fine, and then we
5  can just simply dismiss your lawsuit and
6  cut to the chase.
7     A.   I didn't say anything.
8     Q.   No.  You just -- you know,
9  your expression is enough.  Unfortunately,
10 your expression can't be picked up by the
11 court reporter.  However, your expression
12 will be extremely evident to a jury of
13 yours peers.
14    Now, was the scheduling of 49 hours
15 in any way discriminatory?
16    A.   I guess not.
17    Q.   And then, when you asked to
18 cut back the hours, that was done,
19 correct?
20    A.   Right.
21    Q.   You explained that that was
22 too many hours for you, correct?
23    A.   Right.

Page 48

1     (WHEREUPON, a document was
2  marked as Defendant's Exhibit Number 27
3  and is attached to the original
4  transcript.)
5     Q.   Now, on Exhibit Number 27,
6  once again, you're marking out, to the
7  right-hand side of that document, what
8  everyone's hours were -- what everyone was
9  working, correct?
10    A.   Right.
11    Q.   What was the reason you did
12 that?
13    A.   Because I wanted to see how
14 many hours everybody had.
15    Q.   What's the reason why you
16 wanted to do that?
17    A.   I went back and did this after
18 I started having problems.  I didn't do
19 this the week -- you know, at the time --
20    Q.   All right.  And --
21    A.   Before I was having problems.
22 I went back to check on it.
23    Q.   All right.  Now, your problems

Page 49

1  began in March of '06, correct?
2     A.   Right.
3     Q.   Is there anything
4  discriminatory about these hours that
5  you've listed off to the side on Exhibit
6  Number 27?
7     A.   (No response.)
8     Q.   Is that a complicated
9  question, Ms. Beard?
10    A.   Probably not.
11    (WHEREUPON, a document was
12 marked as Defendant's Exhibit Number 29
13 and is attached to the original
14 transcript.)
15    Q.   Now, on the next -- on
16 exhibit -- let's go to Exhibit 29,
17 please.  On Exhibit 29, you make a note
18 that says "me -- 2 to 9:30."  And then in
19 -- what's that next thing that you write?
20 Next to that.
21    A.   Margie sick.
22    Q.   All right.  So were you
23 filling in for Margie?

13  (Pages 46 to 49)

American Court Reporting
April 1, 2008

American Court Reporting
toll-free (877) 320-1050

Page 50

1    A.   Uh-huh.
2    Q.   Is that a yes?
3    A.   Yes.
4    Q.   Was there anything
5  discriminatory about you filling in for
6  Margie?
7    A.   No.
8    Q.   Off to the left, that seems to
9  have been cut off.  It says "priority for
10  afternoon hours;" is that correct?
11    A.   I guess.
12    Q.   Do you know what that means?
13    A.   No.  It doesn't look like
14  "for", though, because that's too short a
15  word.
16    Q.   Well, do you know --
17    A.   Too short for "for."
18    Q.   Well, priority, blank,
19  afternoon hours.  Do you know what you
20  were trying to signal there?
21    A.   I have no idea.
22       (WHEREUPON, a document was
23  marked as Defendant's Exhibit Number 31

Page 51

1  and is attached to the original
2  transcript.)
3    Q.   All right.  Now, on Exhibit
4  31 -- let's go to 31.  Now, what is that
5  written on the top?
6    A.   Oh, that's the -- this is
7  when -- this is the week that -- it says
8  that -- told to work visual at 8:00 in the
9  morning if didn't drink.  That's when she
10  told me that about --
11    Q.   I'm with you.
12    A.   -- drinking.
13    Q.   I'm with you.  And why is it
14  that you crossed out on the right-hand
15  side on Exhibit Number 31?
16    A.   It's probably where I had
17  written some hours.
18    Q.   Then why did you cross it out?
19    A.   I don't know.
20       (WHEREUPON, a document was
21  marked as Defendant's Exhibit Number 32
22  and is attached to the original
23  transcript.)

Page 52

1    Q.   Now, on the next exhibit -- on
2  Exhibit Number 32.  Do you remember if you
3  requested February 26th off and February
4  27th off and March 1st off?  Do you
5  remember if you made those requests?
6    A.   What is this?  February?
7    Q.   Yes, ma'am.  It's February of
8  '06.
9    A.   No, I don't remember.  I was
10  probably just off just like -- I just
11  probably wrote that in for myself.
12    Q.   Was there anything
13  discriminatory about that?
14    A.   No.
15       (WHEREUPON, a document was
16  marked as Defendant's Exhibit Number 33
17  and is attached to the original
18  transcript.)
19    Q.   All right.  Let's go to the
20  next exhibit, Number 33.  Now, on the
21  bottom, it says "Warning 3/11/06.  So not
22  fair."  Did you write that?
23    A.   Uh-huh.

Page 53

1    Q.   And then you say, at the very
2  end, "I hate that B."  Would "B" be bitch?
3    A.   Right.
4    Q.   And are we talking about Kim?
5    A.   Uh-huh.
6    Q.   Is that a yes?
7    A.   Yes.
8    Q.   And you and Kim didn't like
9  each other, correct?  Or you didn't like
10  Kim?
11    A.   I didn't like her after she --
12  I didn't like her after the -- after that
13  first time of the warning, when she told
14  me, you know, not to worry about it and
15  then six days later I got the warning.
16    Q.   So that was in March of '06;
17  is that correct?
18    A.   No.  That was in December.
19    Q.   December of '05.  So after
20  December of '05, you didn't like her?
21    A.   Yeah.  Because she, you know,
22  lied to my face.  And then, after the
23  thing she said to me that was so

14 (Pages 50 to 53)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 54

1   slanderous -- I mean, how can you like
2   somebody that acts like that?
3       Q.   I don't have to answer any
4   questions, Ms. Beard.
5       Now, in terms of this exhibit, which
6   is Exhibit Number 33, do you recall
7   working 20 hours that week?
8       A.   I guess.
9       Q.   There's nothing discriminatory
10  about your schedule noted on Exhibit 33,
11  is there?
12      A.   No.
13          (WHEREUPON, a document was
14  marked as Defendant's Exhibit Number 34
15  and is attached to the original
16  transcript.)
17      Q.   Now, on Exhibit Number 34, on
18  the very bottom --
19      A.   That's when I was sick.  This
20  is when I was really sick.
21      Q.   Well, there's nothing
22  discriminatory about this schedule, is
23  there?

Page 55

1       A.   Huh-uh.
2       Q.   No.  Okay.  No; is that
3   correct?
4       A.   Right.
5       Q.   On Exhibit Number 34, on the
6   bottom, you write, Kim, idiot and lies and
7   lies and lies and more lies, correct?
8       A.   Uh-huh.
9       Q.   Do you know what prompted you
10  to write that?  Do you recall?
11      A.   (No response.)
12      Q.   Do you recall what prompted
13  you to write that, Ms. Beard?
14      A.   I'm trying to see if anything
15  on here makes -- recalls my memory.
16      Q.   Okay.
17      A.   It probably had something to
18  do with what was going on with -- because
19  I see I had my MRI that week, and I called
20  Valerie Lee and I was scheduled for a lot
21  of hours.
22      Q.   Was there --
23      A.   I was having a lot of pain

Page 56

1   that week.  And so it's probably something
2   that she told me that -- you know, some
3   problems with the schedule or something,
4   or accommodating me for the physical
5   therapy or something.
6       Q.   Do you remember?
7       A.   Specifically what it was?  No.
8       Q.   Do you know if there's
9   anything discriminatory about this
10  schedule?  What we've marked as Exhibit
11  Number 34.
12      A.   I don't know.  It looks like
13  it was changed some.  So I don't know.
14      Q.   Was it a change because you
15  had a doctor's appointment?
16      A.   I'm not sure.
17          (WHEREUPON, a document was
18  marked as Defendant's Exhibit Number 36
19  and is attached to the original
20  transcript.)
21      Q.   Let's look at Exhibit Number
22  36.  Are you saying here, on Exhibit 36,
23  that you were called in but weren't given

Page 57

1   much notice?
2       A.   Right.
3       Q.   Do you remember how much
4   notice you were given?
5       A.   No.  But it was -- it
6   wasn't -- it was later than normal and,
7   you know, really unexpected.
8       Because out of all the times that
9   I've ever been scheduled to be on call,
10  you know, it was probably one or two times
11  they ever called you in.  You know, when
12  you see on call on there, it practically
13  means you're off.  Which to me -- and
14  she's the only one that started doing the
15  on call, was Kim, because you -- when --
16  there was supposed to be one or two people
17  that were hired to be on call -- people to
18  work on call.  None of the rest of us were
19  hired to work on call.  And I didn't like
20  being on call because that didn't work for
21  me.
22      Q.   Sure.  But other people were
23  on call as well, correct?

15  (Pages 54 to 57)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 58

1    A.   Right.
2    And, you know, another thing that
3  she did, the week that I was scheduled to
4  have my surgery --
5    Q.   When was that?
6    A.   June.
7    Q.   Why don't we wait till we get
8  to June.
9    A.   Okay.
10   (WHEREUPON, a document was
11  marked as Defendant's Exhibit Number 37
12  and is attached to the original
13  transcript.)
14   Q.   Go to what's been marked as
15  Exhibit Number 37.  And here you're
16  complaining -- at least your note reflects
17  that there were plenty of 1 to 6 and 2 to
18  6 shifts, but that you were given 3 to 6
19  shifts; is that correct?
20   A.   Right.
21   Q.   And Ruth was also due to work
22  3 to 6, correct?
23   A.   Right.

Page 59

1    Q.   When you were due to work at
2  3:00, Ms. Beard, were you able to get
3  there on time?
4    A.   I don't know.
5    Q.   Does that mean you were
6  sometimes late for the 3:00 shift?
7    A.   Maybe.
8    Q.   Do you have any documentation
9  regarding that?
10   A.   What do you mean
11  documentation?
12   Q.   Well, any notes that you
13  showed up late.
14   A.   I don't know.
15   Q.   You would know, wouldn't you?
16  You either do or you don't have any.
17   A.   I don't -- I'm not sure.  But
18  I didn't like working 3 to 6.  Made me
19  mad.
20   Q.   But there were other people
21  who were asked to work 3 to 6, correct,
22  Ms. Beard?
23   A.   I guess.  But, you know, I was

Page 60

1  working to make money.  And you don't make
2  much money if you go in three days a week
3  from 3 to 6 and use your gas to drive to
4  work 3 to 6, when you can go in, you know,
5  one day and work six hours or five hours.
6  That's ridiculous.
7    Q.   So you think it was poor
8  management; is that right?
9    A.   No.  I think it was -- I think
10  she did it to me on purpose.
11   Q.   Well, what about the other
12  workers?
13   A.   Well, some people would rather
14  work short shifts.
15   Q.   But there --
16   A.   Some people got there and were
17  ready to leave five minutes after they got
18  there, you know.  I don't know why they
19  came in.  They were like, can I go home
20  early?
21   (Recess taken.)
22   (WHEREUPON, a document was
23  marked as Defendant's Exhibit Number 38

Page 61

1  and is attached to the original
2  transcript.)
3    Q.   Now, here, on Exhibit Number
4  38, you write that I might be on time more
5  if I was not so upset and stressed by all
6  the harassment.  That's your handwriting,
7  correct?
8    A.   Right.
9    Q.   Do you remember when you wrote
10  that, Ms. Beard?
11   A.   Probably when -- that week.
12   Q.   And so are you conceiving here
13  that you were late?
14   A.   Well, I never said I was not
15  ever late.
16   Q.   And I think you told me in
17  Part I of your deposition an employer has
18  the right to expect employees to come to
19  work on time, correct?
20   A.   Right.
21   Q.   Thank you.
22   (WHEREUPON, a document was
23  marked as Defendant's Exhibit Number 39

16 (Pages 58 to 61)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 62

1 and is attached to the original
2 transcript.)
3     Q. Let's look at the next
4 exhibit, which is Exhibit Number 39. What
5 are you writing on the right-hand side of
6 this, on top of this exhibit? Can you
7 tell me what that says?
8     A. I just can't tell what it
9 says.
10     Q. Well, on the back of this
11 document, on Exhibit Number 39, you note
12 that on Wednesday and Thursday, which is
13 April 19th and April 20th -- you note that
14 you're on time. Do you see that? That is
15 your handwriting, correct?
16     A. Uh-huh.
17     Q. Is that a yes?
18     A. Yes.
19     Q. Why did you note "on time" on
20 the back of this exhibit? Defendant's
21 Exhibit Number 39.
22     A. Maybe -- somewhere in there --
23 I don't know if it was -- it might have

Page 63

1 been after I had -- because Jan, the
2 district manager, come. You know, she had
3 started as the district manager. And she
4 came in and met me and told me, you know,
5 that I had to be on time every day. So I
6 was trying to get -- I was watching my
7 time more closely. I don't know if that
8 was it or not.
9     Q. Well, because you knew being
10 on time was important to the employer, to
11 Coldwater Creek, correct?
12     A. Right.
13     (WHEREUPON, a document was
14 marked as Defendant's Exhibit Number 41
15 and is attached to the original
16 transcript.)
17     Q. Let's go to Exhibit Number
18 41.
19     A. But -- can I say something?
20     Q. No. Let's actually go to
21 Exhibit Number 40 -- yeah, 41. Now, over
22 to the right-hand side on Exhibit 41, you
23 note "me," I think 17, and then maybe --

Page 64

1 is that Janice? And then it says 13; is
2 that correct?
3     A. Uh-huh.
4     Q. Is that a yes?
5     A. Yes.
6     Q. What are you trying to signify
7 there, Ms. Beard?
8     A. I think I was figuring out how
9 many hours it is with your -- if you count
10 your -- well, I don't see any on-call
11 hours. So I don't know what I was doing.
12     Q. Why were you looking at what
13 other people were working?
14     A. I just told you. Because I
15 had had a problem with my hours. I mean,
16 I have been saying that all along.
17     Q. But you also said that
18 everybody was working part time for
19 Coldwater Creek also had problems with
20 their hours, correct?
21     A. In '04.
22     Q. What about in '05?
23     A. Well, this is '06.

Page 65

1     Q. Well, I'm asking you about
2 '05.
3     A. I don't know what -- you know,
4 I don't know about '05. I just -- all I
5 know is that, you know, the hours weren't
6 that many -- there weren't enough hours in
7 '05 that, you know, I was willing to quit
8 my job that I started at OSI, because I
9 didn't love that job that much -- that I
10 was willing to quit it, because I knew I
11 was going to get enough hours at Coldwater
12 Creek. Because I would have done that,
13 because I preferred to work at Coldwater
14 Creek.
15     Q. But there weren't any --
16     A. But that's the only thing I
17 can say about it.
18     Q. But there weren't enough hours
19 in '05, correct?
20     A. To the best of my memory.
21 Because if there was so many hours, I
22 would have quit.
23     Q. You would have quit OSI?

17 (Pages 62 to 65)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 66

1      A.  Right.
2      Q.  Do you have any -- either from
3  looking at -- either from your memory or
4  just looking at documents either -- from
5  '06, do you have any recollection what
6  other people worked in '05?
7      A.  I mean, what do you mean what
8  they worked?
9      Q.  Other hours.  Were they
10  working more or fewer hours than you?
11      A.  Well, obviously they were
12  working more than I was, because I was
13  working -- I was working my other job.  So
14  I wasn't -- I wasn't as worried about it.
15  You know, I didn't -- well, first of all,
16  we didn't make -- we didn't have
17  availability sheets then, because Mary
18  Ralph was still there.  Kim wasn't there.
19  And she didn't do availability sheets.
20      And for one thing, Mary Ralph never
21  gave me very many hours.  When Mary Ralph
22  was there, the one thing I can say that
23  she did that I felt was discriminating was

Page 67

1  -- I was slower to learn how to cashier.
2  And she never let me cashier.  She told me
3  I was too slow.  She never let me
4  cashier.  In fact, I think she did -- she
5  discriminated to several other people the
6  same way.
7      And once she left -- right before
8  she left, she hired Diane, who was an
9  assistant manager, and Karen, who was an
10  assistant manager.  And both of them were
11  very good about training -- there was me
12  and a couple of other people that wanted
13  to learn how to cashier better.  I mean, I
14  had done it a little bit.  Most -- most of
15  the time -- I mean, I could do the very
16  basics, but most of the time, you know,
17  you needed help.  Because if it's not
18  something you do on a -- I'm the type, if
19  I don't do it on a regular basis, I don't
20  -- it doesn't stick with me.
21      And, anyway, I learned how to do
22  everything really well.  And like -- I've
23  mentioned this before.  I cashiered during

Page 68

1  the busiest times.  During Christmas and
2  during the busiest times of day.  Became
3  very good at it.  So her judgment of my
4  ability to cashier was totally wrong.  But
5  for the whole first -- until after Kim
6  came -- Karen and them came there, I
7  didn't get to cashier.
8      Q.  But you said other people
9  couldn't cashier as well, correct?
10      A.  Right.  She discriminated
11  against several people.
12      Q.  Let's look at --
13      A.  I don't know why she
14  discriminated against them.
15      Q.  But look.  In '06, in the
16  documents that we've been looking at --
17      A.  But she also cut my hours a
18  lot.
19      Q.  In '06, are you working
20  greater or fewer hours than most of your
21  colleagues?
22      A.  It varies.  What she tends to
23  do -- one of the things that Kim tended to

Page 69

1  do was, she would hire new people.  When
2  she hired new people, she'd hire them and
3  give them -- after -- the first week or
4  so, she might give them just average hours
5  and then, all of a sudden, she'd give them
6  like 20 hours.  For two or three weeks,
7  she'd just give all the hours to them.
8      Q.  So that affected you, correct?
9      A.  Yeah.  She'd take hours away
10  from other people to give to them.
11      Q.  So it not only affected you,
12  but it affected other people who were
13  working there, correct?
14      A.  I don't really know that much
15  about the other people, you know, because
16  it was not my business to tend to theirs.
17      Q.  Well, this is the question:
18  You said that Kim took hours away from the
19  people who were there to give it to the
20  new people, correct?  Isn't that what you
21  just testified?
22      A.  She might have taken some from
23  them.  I don't know.  I know she took some

18  (Pages 66 to 69)

American Court Reporting
April 1, 2008

American Court Reporting
toll-free (877) 320-1050

Page 70

1  from me.
2      Q.   Are you sure about that?
3      A.   Uh-huh.
4      Q.   And so if we studied the
5  number of hours that are on Exhibits 23
6  through 59, we'll be able to determine
7  whether or not you worked fewer or greater
8  hours than your colleagues?
9      A.   I know that my hours were
10 different.
11     Q.   Different than what?
12     A.   Than what they had been.
13     Q.   From '05?
14     A.   No.
15     Q.   When were your hours
16 different?
17     A.   My hours were more in January
18 and February and the first of March.
19     Q.   Of '06?
20     A.   The first of March I was
21 working -- like I said, I had 20, 23, 24
22 hours.
23     Q.   And then they got cut back in

Page 71

1  March and April.  That's your testimony?
2      A.   Yeah.  I got ten, five, ten.
3      Q.   And this was in 2006, correct?
4      A.   Uh-huh.  And other people had
5  15.  There were several weeks in there --
6  you know, I'll have to go back and go over
7  it.  There were some weeks in there when
8  other people had repeatedly had 15, 18,
9  18, 18, and I repeatedly had 10, 10, 10.
10     Q.   And looking at what you've
11 produced and what we've marked as 29
12 through 59 -- or 29 through -- we'll go
13 through them -- will support that.  Is
14 that your testimony?
15     A.   I think.
16     Q.   Well, do you have anything
17 else that would support that?  Any new
18 documents that you haven't already given
19 to your lawyer?
20     A.   No.
21          (WHEREUPON, a document was
22 marked as Defendant's Exhibit Number 44
23 and is attached to the original

Page 72

1  transcript.)
2      Q.   I'm going to show you what
3  we've marked as Exhibit 44.  And off next
4  to your name -- I guess on Wednesday, May
5  24, '06, and Thursday, May 25, '06 -- you
6  say "upset - upset."  Were you scheduled
7  to be off on those days?
8      A.   No.  I swapped with Tanya
9  because I had a doctor's appointment.
10     Q.   All right.
11     A.   And Kim didn't like it.
12     Q.   But you did swap, correct?
13     A.   Right.  We were supposed to be
14 able to do that, but she had to make a big
15 deal about it.
16     Q.   Is it your testimony that she
17 made a big deal about it every time
18 someone swapped?
19     A.   No.
20     Q.   Only when you swapped?
21     A.   Only on this particular
22 occasion.
23     Q.   Only on this one occasion; is

Page 73

1  that correct?
2      A.   And this is when I -- you
3  know, this is for my -- related to my
4  cancer.
5      Q.   On the right-hand side of this
6  exhibit, it shows that you worked 11 hours
7  that week, correct?
8      A.   Right.
9      Q.   And that falls pretty much
10 within the range of what everybody who was
11 a part-time associate of Coldwater Creek
12 in Montgomery worked that week.  Isn't
13 that so?
14     A.   Sort of.  I could have worked
15 more.
16     Q.   Well, Joely worked 11 and Lois
17 worked 11 and Tanya worked 11, then it
18 shows that you worked 11 and that Jeanette
19 worked 11 and Tanico worked 11.  You see
20 that, correct?
21     A.   Uh-huh.
22     Q.   Is that a yes?
23     A.   (Witness nodded head in the

19 (Pages 70 to 73)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 74

1  affirmative.)
2      Q.   You have to speak aloud,
3  Ms. Beard.
4      A.   Yes.
5      Q.   But your testimony is that you
6  wanted to work more hours, correct?
7      A.   Right. I had -- I requested
8  to work as many hours as possible because
9  I was going to have to take a leave of
10  absence at some point in time. And so I
11  needed to work as much as possible while I
12  was able. Not have my hours cut to five
13  and ten.
14      Q.   Well, the only time your hours
15  were cut to five and ten was in March of
16  '06, correct?
17      A.   Actually, I think that was
18  April.
19      Q.   Well, it only happened on one
20  occasion. Isn't that true, Ms. Beard?
21  The documents will speak for themselves
22  when that happened. Although your
23  testimony may be -- on the subject. I'm

Page 75

1  not sure. But it only happened on one
2  occasion. Isn't that true?
3      A.   The five?
4      Q.   Yes, ma'am.
5      A.   Right. It shows her intent.
6      Q.   It shows Kim's intent?
7      A.   Uh-huh.
8      Q.   To do what, Ms. Beard?
9      A.   To retaliate.
10      Q.   By taking away hours from you?
11      A.   Uh-huh.
12      Q.   On that one occasion?
13      A.   Well, I'm sure she would have
14  done it more than once if she could have
15  gotten by with it.
16      Q.   Did she do it --
17      A.   She would have given me no
18  hours if she could have gotten by with it.
19      Q.   Did she do it more than once?
20      A.   No. Because she couldn't get
21  by with it.
22      Q.   The company stepped in and did
23  something about it?

Page 76

1      A.   Right.
2  Just tell me what number.
3      Q.   Well, I don't have the numbers
4  on my page. I apologize for that.
5      (WHEREUPON, a document was
6  marked as Defendant's Exhibit Number 48
7  and is attached to the original
8  transcript.)
9      Q.   I'm going to show you what
10  we've marked -- I think that's Exhibit
11  Number 48. And it says worked till 8:00
12  on Saturday. What was the reason, if you
13  remember, you wrote that?
14      A.   Because I did work till 8.
15      Q.   Is that a complaint that
16  you're writing, that you worked until 8?
17      A.   No. I'm just notating it.
18      Q.   I want to understand,
19  Ms. Beard, the reason you noted it.
20      A.   Because it wasn't scheduled.
21  I wasn't scheduled to work till 8.
22      Q.   But this gave you --
23      A.   I was scheduled to work till

Page 77

1  5.
2      Q.   Sure. But then you got
3  additional hours, correct?
4      A.   Right.
5      Q.   That was a good thing,
6  correct?
7      A.   Right.
8      (WHEREUPON, a document was
9  marked as Defendant's Exhibit Number 49
10  and is attached to the original
11  transcript.)
12      Q.   All right. On the next
13  exhibit, I guess on the left-hand side of
14  this, it says, I'm so blessed in spite of
15  you, Kim.
16      A.   Uh-huh.
17      MR. NELMS: Linda, you're
18  going to have to say --
19      A.   Yes.
20      MR. NELMS: Sorry. I know
21  it's -- I could never get it right myself,
22  to be honest with you, if I were being
23  deposed.

20  (Pages 74 to 77)

American Court Reporting
April 1, 2008

American Court Reporting
toll-free (877) 320-1050

Page 78

1    A.   Well, we passed the week I
2  told you I wanted to tell you something
3  about the week I had surgery, which was
4  June the 26th.
5    Q.   Well, sure.  Tell me what you
6  want to tell me about surgery in June of
7  '06.
8    A.   Well, the week that I was -- I
9  had surgery on June the 26th, which is a
10 Monday.
11   Q.   Yes, ma'am.
12   A.   And when I turned in my
13 availability sheet, I put that I would be
14 available to work Friday and Saturday of
15 that week, because my doctor had told me
16 that I probably only --
17   Q.   Hold on a second.  Let's talk
18 about actual dates so that you don't go
19 off on a tangent here.
20   Are you talking about you'd be able
21 to work on June 30th and July 1st of '06?
22   A.   This is so faded.  I can't see
23 the dates.  Right.

Page 79

1    Q.   So you had your surgery on
2  June 26th, and then you asked to work on
3  Friday, June 30th of '06 and Saturday,
4  July 1st of '06; is that correct?
5    A.   Right.
6    Q.   Tell me what you want to tell
7  me.
8    A.   And she gave me no hours that
9  week.  And I had suggested that she, you
10 know, put a person on call at the same
11 time that I was scheduled to work.  Just
12 in case something happened.  Because when
13 you have surgery, you know, you never know
14 what might occur.  You know -- but that my
15 doctor had told me, you know, that I
16 should be able to work by then.
17   And so, you know -- then when I got
18 the schedule and saw that I had no hours,
19 you know, I asked her why I didn't have
20 any hours.  And she told me that they were
21 not going to do any on-call shifts
22 anymore; that on-call shifts were over
23 with from -- no more on-call shifts

Page 80

1  forever again.  And you'll note that we
2  have more on-call shifts, what, the very
3  next week.
4    Q.   And what's your point?
5    A.   My point is that she lies.
6    Q.   Well, what does that have to
7  do -- that's discriminatory?
8    A.   Well, it was very stressful to
9  me.  I didn't need to be told -- you know,
10 to go through this stress.  I needed --
11 like I said, I needed to work as much as I
12 possibly could.  I didn't need to go
13 through that right before I had surgery.
14 I didn't need this stress and harassment
15 that she had been putting me through since
16 February, you know.  She did it all the
17 time, about every little thing, you know.
18 And here, right before my surgery, she did
19 it again.
20   Q.   By not scheduling you for
21 hours?
22   A.   Right.  And you think that's
23 funny?

Page 81

1    Q.   I don't think that --
2    A.   Well, you're smiling about it.
3    Q.   I'm smiling because I don't
4  get it, Ms. Beard.
5    A.   Why?
6    Q.   Well, I don't have to answer
7  any questions.
8    Did she change anybody else's
9  schedule?  Do you know?
10   A.   What do you mean change it?  I
11 don't understand what you're saying.
12   Q.   Is there a word in that
13 sentence that you don't understand?
14   A.   Change anybody else's schedule
15 in reference to what?
16   Q.   To that week.  If you know.
17   A.   I don't understand what you
18 mean.  She made the schedule out and gave
19 me no hours.
20   Q.   And then you told her you
21 could work, correct?
22   A.   I told her -- I turned in my
23 availability sheet showing I could work.

21 (Pages 78 to 81)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 82

1    Q.   Do you know whether other
2    people had also turned in their
3    availability sheet?
4    A.   Right.
5    Q.   And you're saying because she
6    did not give you hours that you requested
7    that that was stressful to you, correct?
8    A.   Absolutely.  Because there was
9    no reason for her to give me no hours.  It
10   was not her place to tell me I have to be
11   off for a whole week because I'm having
12   surgery if my doctor tells me that I'll be
13   able to work.
14   Q.   But she had the right to
15   schedule people, correct?
16   A.   But she's not supposed to put
17   somebody off for an entire week.
18   Q.   Ms. Beard, who had the
19   responsibility for scheduling the
20   part-time associates?
21   A.   Kim.
22   Q.   Now, are you saying as part of
23   your lawsuit that her failure to schedule

Page 83

1    you for June 30th of '06 and July 1st of
2    '06 was discrimination based on your
3    alleged disability?
4    A.   No.  I'm saying that it was
5    part of her harassment.
6    Q.   But the harassment for what
7    purpose?
8    A.   Because she enjoyed it.
9    Because she liked to cause -- she liked to
10   be harassing.  Because she has the
11   fibromyalgia.  She knows how much -- how
12   much of an effect stress can have on you.
13   She talked about it herself.
14   And she wanted me -- and I think she
15   was hoping that -- when I said that I
16   could work, she said -- she said, oh,
17   well, the surgery is going to be so bad.
18   You're going to want to take the whole
19   week off, you know.  I think she was
20   hoping that because she didn't give me any
21   hours that week that I'd just go ahead and
22   take the whole week off, you know.  Like
23   I'd be like, oh, well, I'm not scheduled.

Page 84

1    I think I'll just lay out for the whole
2    week.  Like I didn't really need to work
3    and make the money.
4    Q.   Well --
5    A.   So I wouldn't make an effort
6    to try to work.
7    Q.   Sure.  But it shows here on
8    this exhibit 2 to 8 for both June 30th and
9    July 1st of '06.  Does that mean you
10   worked both of those days?
11   A.   Yes.
12   Q.   And did Kim put you in the
13   schedule?
14   A.   Yes.  I called her and told
15   her I wanted to work.
16   Q.   And so she --
17   A.   But my point is I didn't need
18   her -- she didn't need to put me through
19   that right before I had surgery.  She
20   could have just easily have done what I
21   asked without going through all that.  But
22   that's the way she made every little
23   thing.

Page 85

1    Q.   Well, I think on this exhibit
2    as well, which is Exhibit Number 49 -- it
3    says I'm so blessed in spite of you, Kim.
4    When did you write that?
5    A.   That week.
6    Q.   And what prompted you to do
7    that?
8    A.   Because of everything I just
9    said.
10   Q.   Look on the reverse -- on page
11   two of Exhibit Number 49.  You show
12   Friday, 2 to 8.  That's six hours.  And
13   then Saturday, 2 to 8.  That's six hours.
14   I guess that was in the June -- June 30th
15   of '06, July 1st of '06.  And then you
16   write above it, Kim was actually nice for
17   once.  Do you see that?
18   A.   Right.
19   Q.   Do you think she was being
20   nice by allowing you to work these two
21   days?
22   A.   Right.
23   Q.   Now, off to the right, you

22  (Pages 82 to 85)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 86

1  say, would never give these hours in
2  March, April, May, or June as I requested
3  or preferred.
4      A.   Right.
5      Q.   What do you mean by that?
6      A.   Well, the letter from my
7  doctor had said that we would prefer those
8  hours. Those were preferred hours, from 2
9  to 8. But those were, you know, never
10 workable hours, you know, with -- you
11 know, could never work me in on those 2 to
12 8 hours then, you know. Even though they
13 could create a schedule from 3 to 6 for
14 somebody, they couldn't possibly let me
15 work 2 to 8 back then. And I had worked 2
16 to 8, you know, some other times before
17 that too.
18      And then the schedule that -- the
19 on-call shifts that were totally never to
20 be worked again suddenly appeared again on
21 Schedule 50.
22      (WHEREUPON, a document was
23 marked as Defendant's Exhibit Number 50

Page 87

1  and is attached to the original
2  transcript.)
3      Q.   On Exhibit 50? And there were
4  on-call hours for other people. Isn't
5  that true, Ms. Beard?
6      A.   But she told me the week of
7  June -- they were completely done away
8  with.
9      Q.   I appreciate that. But I'm
10 saying, other people were scheduled for
11 on-call hours as well, correct?
12      A.   Right. But it's funny, when I
13 wanted to make use of them, they were
14 nonexistent.
15      Q.   And you wanted to make use of
16 them for June 30th and July 1st of '06,
17 correct?
18      A.   I wanted somebody else to be
19 on call in case I had an emergency
20 surgery, which is very reasonable.
21      Q.   Sure. But you also wanted to
22 work those three days, correct?
23      A.   Yes. If I could. But if I

Page 88

1  had an emergency, which you never know
2  with surgery, I wanted -- I was doing it
3  for her benefit; that somebody would be
4  available to come in in my place.
5      Q.   So your --
6      A.   And since we used on-call
7  people every day of the year, it's funny
8  to me that we couldn't use them on those
9  two days.
10      Q.   But you don't really have any
11 quarrel because you could work on those
12 two days and you were given those two
13 days.
14      A.   I do have a quarrel that
15 suddenly the two days that I asked that we
16 use them that we couldn't. It doesn't
17 make any sense.
18      MR. NELMS: Just answer the
19 questions.
20      A.   It doesn't make sense.
21      Q.   It doesn't make sense to you?
22      A.   Pardon me?
23      Q.   It doesn't make sense to you?

Page 89

1      A.   It doesn't make sense period.
2      Q.   Well, have you had any
3  conversation with anybody else about
4  whether it makes sense? Any of your
5  former colleagues at Coldwater Creek?
6      A.   Yeah.
7      Q.   Tell me with whom.
8      A.   Tanya and several other
9  people. I can't think who.
10      Q.   Well, tell me what you and
11 Tanya talked about.
12      A.   That that didn't make sense;
13 that we were never going to have on call
14 and now we're having them -- now we had
15 them again.
16      Q.   Anybody else?
17      A.   Stephanie.
18      Q.   What did you and Stephanie
19 talk about?
20      A.   We talked about? Talked about
21 different things.
22      Q.   We're only talking now about
23 on-call hours.

23 (Pages 86 to 89)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 90

1      A.   Just that.  That it was
2   strange that nobody could be on call then,
3   and that she said we weren't going to have
4   on calls anymore and then suddenly there
5   they were right back.  Exactly what I just
6   said.
7        But she says what she -- she says
8   whatever -- whatever fits her situation,
9   she'll just say it.  She'll just say what
10  fits the situation.  Just make up
11  something to fit the situation, whether
12  it's true or not.
13       Q.   And the example of that has to
14  do with on-call hours?
15       A.   That's one example.
16       Q.   Give me another example,
17  Ms. Beard.
18       A.   Well, like she told me that
19  issuing -- that I didn't -- hadn't gotten
20  my stock because issuing the stock had
21  been put on hold.  And I have my doubts
22  about whether that's true or not.
23       Q.   When did you have that

Page 91

1   discussion with Kim?
2        A.   It wasn't no discussion.  I
3   just asked her about, you know, why I
4   hadn't gotten my stock yet, and she said
5   that it had been put on hold.
6        Q.   But tell me when that
7   happened.
8        A.   It was in April, I believe.
9        Q.   Of '06?
10       A.   Uh-huh.  April or May.
11  Somewhere around there.
12       Q.   April or May of '06?
13       A.   Uh-huh.
14       Q.   Is that yes?
15       A.   Yes.
16       Q.   Does that have anything to do
17  with your case?
18       A.   I never got it.
19       Q.   I know.  But is that any part
20  of your case?  Like, for instance, we're
21  here today for the second time.
22       A.   Well, I mean, it has to do
23  with the fact that I never got it.  It's

Page 92

1   part of my case that I never got it.
2        Q.   Well, tell me how it's part of
3   your case, Ms. Beard.
4        A.   Well, that I earned it while I
5   was working there, and I never got it.
6        Q.   Well, do you know if anybody
7   else got it?
8        A.   Yeah.  Some people got
9   theirs.  Yes.  Absolutely.
10       Q.   How do you know that?
11       A.   Because they said so.
12       Q.   Tell me who got it.
13       A.   I don't know exactly.  I can't
14  remember their names.  We had a chart on
15  the board of who had earned theirs.  And
16  my name was up there because I had earned
17  mine, but I hadn't gotten it.  And Ruth,
18  she had earned hers, and she hadn't gotten
19  hers.  And, in fact, she asked me about
20  it, because she was wandering why she
21  hadn't gotten hers yet.  And I said -- I
22  told her what Kim had told me.  And I
23  don't know if she pursued it further or

Page 93

1   not.
2        Q.   So your testimony today is
3   that, like you, Ruth also did not get the
4   stock?
5        A.   I don't know if she got it
6   later or not.
7        Q.   By the time you had this
8   discussion, Ruth had not gotten her stock;
9   is that correct?
10       A.   Right.  Because she had just
11  earned her last legendary customer service
12  that entitled her to it.
13       Q.   Ms. Beard, did you take that
14  up with anybody at corporate HR?
15       A.   No.  Because, you know, I
16  didn't know I was going to get fired, and
17  I didn't -- you know, obviously I had a
18  lot going on.  So I hadn't pursued it.
19          (WHEREUPON, a document was
20  marked as Defendant's Exhibit Number 56
21  and is attached to the original
22  transcript.)
23       Q.   All right.  Let's look at what

24  (Pages 90 to 93)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 94

1  I've marked as Defendant's Exhibit Number
2  56. And you make a note here. You say,
3  changed to OC hours. You're talking about
4  yourself; is that correct?
5      A.  Yes.
6      Q.  If you would -- you say Kim --
7  you're saying that Kim is not
8  accommodating you on the schedule; is that
9  correct?
10     A.  Right.
11     Q.  And how did she not
12  accommodate you? Could you just explain
13  that to me, please, Ms. Beard? Do you
14  remember?
15     A.  First, the schedule came out
16  having me work 1 to 6.
17     Q.  Yes, ma'am.
18     A.  And I was supposed to work 2
19  to 6. So then they changed the schedule
20  and put me on call, which meant,
21  basically, that I wouldn't get any hours.
22  Because, like I said, normally when you're
23  on call, you don't work. Then they

Page 95

1  changed it to allow me to work. Except
2  Thursday I didn't get to work. I got to
3  work Tuesday, but I didn't get to work
4  Thursday.
5      Q.  So how was it that they did
6  not accommodate you?
7      A.  Because I was supposed to get
8  to work 2 to 6 on Thursday -- Tuesday and
9  2 to 6 on Thursday.
10     Q.  Oh, they changed it to on
11  call; is that correct?
12     A.  Right.
13     Q.  So then you only got called in
14  on one of the two days?
15     A.  Right.
16     Q.  Did you talk to Kim about
17  that?
18     A.  Yes.
19     Q.  Tell me what was said and who
20  said it.
21     A.  I asked her if she would
22  accommodate me, you know, for me to go to
23  radiation, and she had said that she

Page 96

1  would.
2      Q.  And what was the accommodation
3  that you were asking?
4      A.  I told her that, you know, I'd
5  like to be off three days and work two
6  days, from 2 to 6, and work on the
7  weekend, on Saturday and Sunday, when I
8  was, you know, not getting radiation.
9      Q.  Well, she scheduled you for
10 Saturday from 2 to 7. You see that,
11 correct?
12     A.  Right.
13     Q.  And that's okay, correct?
14     A.  Right.
15     Q.  And she let you off -- to be
16 off on Friday, correct?
17     A.  Right.
18     Q.  To accommodate the radiation?
19     A.  Right.
20     Q.  And she gave you off on
21 Wednesday to accommodate the radiation,
22 correct?
23     A.  Right.

Page 97

1      Q.  And she gave you off on
2  Monday, August 7th, to accommodate the
3  radiation, correct?
4      A.  Right. But it was important
5  for me to work and get hours because I was
6  going to have to take a leave of absence,
7  and I needed to make money. I was having
8  extra medical expenses.
9      Q.  So you wanted her to
10 accommodate you, to allow you to be off
11 when you needed to be off, but also
12 schedule you for the hours when you wanted
13 to work, correct?
14     A.  Right. Since I was, you
15 know -- I was still available four days a
16 week. That shouldn't be that hard.
17     Q.  Well, I asked you this the
18 first time, and I think you said you
19 didn't know, about how it is the labor
20 budget is made up in the store, how they
21 determine how many hours they have to give
22 to people. You don't know how they do
23 that, correct?

25 (Pages 94 to 97)

American Court Reporting
April 1, 2008

American Court Reporting
toll-free (877) 320-1050

Page 98

1    A.   I do know that based on the
2 hours I normally get that I should be able
3 to get that many hours per week.  I also
4 know that, you know, they should never
5 have hired me and promised me 24 hours a
6 week if they were never going to give them
7 to me.
8    Q.   But they promised other people
9 that as well based on your testimony,
10 correct?
11    A.   Well, you know, what they
12 promised other people is not my problem.
13    Q.   On this document as well, you
14 say Kim Curry is doing everything she
15 can -- I guess keep me -- is that
16 stressful?
17    A.   Stressed.
18    Q.   Stressed.  Especially when I'm
19 on time.  What does that mean?
20    A.   She gets worse.  It's like --
21 then she tries to find some other thing --
22 something else to create trouble over.
23    Q.   Well, was it --

Page 99

1    A.   It's like --
2    Q.   Was it --
3    A.   Like she's going to create
4 another problem.  Because she was out to
5 get rid of me.  That was her goal.  It was
6 as clear as day -- as the day -- clear as
7 the sky is blue.
8         In other words, when they issued my
9 -- those warnings, if their intent was for
10 me to improve with getting to work on
11 time, why -- the only time they ever
12 issued the warnings was when I was ill
13 with unexpected health problems.  Why was
14 I never issued a warning when I was well?
15    Q.   A warning for what?
16    A.   Pardon me?
17    Q.   A warning for what?
18    A.   For being late.  They issued
19 them when I was -- when I was sick.
20 That's a strange time to try to improve on
21 being on time, when I have a disability.
22 And the only time they issue a warning is
23 when I'm sick, going through an unexpected

Page 100

1 health problem.  That's when they want me
2 to improve, when they know I'm under
3 stress due to a health problem.  And I'm
4 seeking medical treatment to find out
5 what's wrong with me and trying to get
6 treatment and, you know, having a lot of
7 pain and everything.  That's when they
8 issue a warning and ask me to improve on
9 getting to work on time.  Why not issue it
10 when I'm well?
11    Q.   What about in December of '05?
12    A.   I was sick.
13    Q.   What was the --
14    A.   I offered to get a letter from
15 my doctor.  Oh, that's not necessary.
16 Don't worry about it.  You're fine.  Six
17 days later, I get a warning.
18    Q.   What was the nature of the
19 illness in December of '05?
20    A.   It was a stomach problem,
21 which, you know, I'd rather not go into
22 complete detail.  But I could have gotten
23 a letter from my doctor about it.  It's

Page 101

1 associated with fibromyalgia.
2    Q.   Let me show you --
3    A.   And she assured me that
4 everything was fine.  No.  You don't need
5 a letter.  Just like she did about not
6 getting a release letter.  And that was
7 the -- you know, she had only been at
8 Coldwater Creek a couple of months then.
9 I didn't know that she could not be
10 trusted at all.
11    Q.   In your judgment, who could be
12 trusted?
13    A.   What do you mean?  Who could
14 be trusted at Coldwater Creek?
15    Q.   Yes, ma'am.
16    A.   Well, I think they should have
17 made Karen, who was an assistant
18 manager -- she really wanted to be the
19 manager after Mary Ralph left.  And Ron
20 would not make her the manager for some
21 reason, and that was a terrible mistake.
22 I think he's the one that hired Mary
23 Ralph, and she was a disaster.  And then

26  (Pages 98 to 101)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 102

1  he hired Kim, and she was a disaster. And
2  I don't know why he wouldn't have hired
3  Kim. She would have been wonderful. I
4  mean Karen.
5      Q.   So you just think there was
6  bad management, correct?
7      A.   Well, there was. Everybody
8  that worked there said so.
9          (WHEREUPON, a document was
10  marked as Defendant's Exhibit Number 60
11  and is attached to the original
12  transcript.)
13     Q.   Let me show you what I've
14  marked as Defendant's Exhibit Number 60.
15     A.   Yes.
16     Q.   Do you remember the Social
17  Security --
18     A.   Right.
19     Q.   -- application?
20     A.   Number 60? Is that what
21  you --
22     Q.   Yeah. Just -- let's go to the
23  top of Section 2 of this document. I

Page 103

1  don't know how many pages it is. Keep
2  going.
3          Now, that's your handwriting,
4  correct?
5      A.   Right.
6      Q.   Now, this asks you how do your
7  illnesses, injuries, or conditions limit
8  your ability to work. Now, you say that
9  the pain and symptoms, and then you say,
10  see remark, Section 2C, often requiring
11  strong medications impair normal
12  day-to-day functioning. Do you see that?
13     A.   (Witness nodded head in the
14  affirmative.)
15     Q.   That was correct when you
16  wrote that, correct?
17     A.   Uh-huh.
18     Q.   Is that a yes?
19     A.   Yes.
20     Q.   And you wrote this document.
21  Do you remember when you wrote it?
22     A.   February or March of '03.
23     Q.   And how does the strong

Page 104

1  medicine impair your normal day-to-day
2  functioning?
3      A.   Sometimes it makes me dizzy or
4  affects my coordination, makes me feel
5  weak.
6      Q.   And what kind of accommodation
7  can there be for being dizzy or weak? Or
8  what kind of accommodation can there be
9  for having an impact on your coordination?
10     A.   Well, that's why I don't work
11  in the mornings, because that's when I
12  have the worst kind of effect from that,
13  is because -- the first thing I do when I
14  wake up in the morning is take my pain
15  medication. And my sleeping medicine has
16  not completely gotten out of my system.
17  And it's probably the combination of those
18  two that has some effect on that, I
19  guess. I don't know.
20         And actually, you know, I don't have
21  as much trouble with that all the time now
22  as I did then, because I had just started
23  taking the Tramadol, which is the same as

Page 105

1  the Ultram. I had just started taking it
2  in -- I had taken it some prior to that
3  for a while for the fibromyalgia. But I
4  hadn't been taking it for a while, and I
5  started back taking it that summer when I
6  started having so much trouble with my
7  back. And I got a much stronger effect on
8  it back then than I do now. I guess
9  because over time from taking it I've
10  gotten more used to it.
11     Q.   Sure. But when you were
12  working at Coldwater Creek, you came to
13  work -- you asked to be scheduled at 1:00
14  because you knew the effect on you,
15  correct?
16     A.   Right.
17     Q.   I think you told me from day
18  one of your deposition that other than the
19  first week or so that you worked at
20  Coldwater Creek, you were always scheduled
21  at 1:00 or later, correct?
22     A.   Right.
23     Q.   Now --

27 (Pages 102 to 105)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 106

1      A.   But that is one of the reasons
2   that sometimes I run late, is because
3   sometimes the problems that I have in the
4   mornings do -- don't automatically end in
5   time for me to be like punctual at 1:00.
6      That's what happened to me today.  I
7   was feeling real shaky today.  Probably
8   today, though, what the problem is, I
9   think it might be my thyroid, you know.  I
10  just started having thyroid problems this
11  past October.  And I'm taking thyroid
12  medication.  And I haven't been back --
13  I'm supposed to go back to the doctor.
14  Well, I haven't made the appointment yet.
15  But, you know, I'm supposed to go back at
16  some point to have my blood checked again
17  to see, you know, whether my medicine is
18  going to need to be adjusted or anything.
19      And I was feeling real shaky.  And
20  then I did have -- I do have a swollen
21  tonsil that's bothering me and, you know,
22  sinus and stuff.  And I don't know -- you
23  know, I'm not sure why I was real shaky

Page 107

1   today, you know.  But I'm just feeling
2   kind of shaky, and I didn't feel real
3   well.  You know, it's just one of those
4   days where --
5      Q.   You think we could all just
6   stay around and wait for you to show up;
7   is that right?  I'm just asking.
8      A.   Things didn't go well, and I
9   called and said I was running late.
10     Q.   And so do you think that
11  calling and saying you're going to be late
12  fixes the problem?
13     A.   No.  But I have a health
14  problem that I cannot fix every day.
15     Q.   Well, what time did you get up
16  this morning?
17     A.   I got up at 8:30.
18     Q.   Might it have helped if you
19  had gotten up at 7:30?
20     A.   I didn't wake up at 7:30.
21     Q.   Even though you knew you
22  needed to be here at 1:00 today?
23     A.   I didn't think it would take

Page 108

1   me that long.
2      Q.   Let's continue to look at
3   Exhibit Number 60.  Also, on the same
4   page, I guess, under H, it talks about
5   your illness, injuries, or conditions.
6      A.   Number 16, under H?
7      Q.   It's Exhibit 60, and it's
8   under H.  And it's asking you if your
9   illnesses, injuries, or conditions cause
10  you to either work fewer hours or change
11  your job duties.  Do you see that?
12     A.   Yes.
13     Q.   And you said that you started
14  coming in late or only worked half days as
15  your condition deteriorated, correct?
16     A.   Right.
17     Q.   And then you were demoted from
18  assistant credit manager to a collection
19  clerk.  I think we talked about that on
20  day one, did we not?
21     A.   I don't know.
22     Q.   Had more and more frequent and
23  extended absences.  And when did those

Page 109

1   more and more frequent and extended
2   absences begin to occur?  Do you remember?
3      A.   In June, I think.
4      Q.   May or June?
5      A.   Either May or June.
6      Q.   Of '03?
7      A.   Right.
8      Q.   Now, also, under J, on this
9   same page, you say your employment was
10  terminated.  Which job was that?
11     A.   Where, now?
12     Q.   I'm down at J.  Why did you
13  stop working, the question on Exhibit
14  Number 60.
15     A.   That was because I was
16  terminated.
17     Q.   What job?
18     A.   The one at Sabel.
19     Q.   At Sabel.  Okay.  And it says
20  that you were terminated due to frequent
21  full- and half-day absences; is that
22  correct?
23     A.   Right.

28  (Pages 106 to 109)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 110

1  Q.  And tardiness?
2  A.  Right.
3  Q.  Now, you're saying it was
4  caused by your illness and the chronic
5  disease, correct?
6  A.  Right.
7  Q.  And your employer said that
8  this disqualified you from your job
9  because it had an impact on the company's
10  day-to-day business, right?
11  A.  Correct.
12  Q.  And you don't disagree with
13  that, do you?
14  A.  No.  It was -- but it was a --
15  could have been a temporary situation,
16  possibly, if I could have gotten the
17  treatment I needed.  I don't know.  It was
18  the last full-time job I had.
19  Q.  Let me just ask you
20  something.  On the next page, under F,
21  where it says lifting and carrying -- do
22  you see that?
23  A.  Right.

Page 111

1  Q.  Off and on during the day
2  handled -- is that lamps and pictures?
3  A.  Right.
4  Q.  What was that about?  Was that
5  when you worked at Sabel?
6  A.  No.  That was -- they asked
7  about the job -- a job that you worked the
8  longest.  And that was when I worked in
9  furniture --
10  Q.  Could you do that --
11  A.  -- and design.
12  Q.  Excuse me.  Could you do that
13  job now?
14  A.  No.
15  Q.  What's the reason that you
16  can't do that job now?
17  A.  Too much lifting and carrying,
18  and it's a full-time job.
19  Q.  So you can't work full time?
20  A.  No.
21  I notice it asked on here if you
22  ever climbed, and I put no.  But I did
23  climb up stairs.  So I don't know why I

Page 112

1  put no.
2  Q.  It's an overwhelming form.
3  A.  I mean, not climb upstairs,
4  but ladders.  I climbed up ladders, doing
5  bookcases and hanging pictures and all
6  that stuff.
7  Q.  And when did you do that?
8  A.  Working in furniture.
9  Q.  But what year was that?
10  A.  There was different years
11  because I worked at different times.  I
12  worked at different furniture stores.
13  Q.  There's some place on this
14  application for Social Security where it
15  says, I believe, that sometimes you lose
16  feeling in your feet; is that correct?
17  A.  I have pain or tingling in my
18  feet or something every once in a while.
19  Q.  And does that affect your
20  coordination?
21  A.  I don't know.  One thing I
22  know about the coordination was that I
23  was -- they were doing a test one time at

Page 113

1  work where you -- they threw -- threw a
2  ball.  They didn't tell us it was a test.
3  But they had us in a small circle, and
4  they threw a small, little ball from
5  person to person.  And I was the only one
6  that -- I couldn't catch it once.
7  Q.  Is that a neurological test?
8  A.  They just said it was a test
9  for coordination.
10  Q.  A doctor did that?
11  A.  No.  It was at work.
12  Q.  It was at what work?
13  A.  Actually, it was a job that I
14  was trying to be trained for.  But this is
15  when I first was diagnosed -- well, it was
16  after I had been to my doctor.  This was
17  when I first applied for fibromyalgia -- I
18  mean, for Social Security, in '98, when
19  you were mentioning that.
20  I had -- had to take a test for this
21  job.  It was for BellSouth.  And I took
22  the test, you know, and then they hired me
23  for this job.  It was several months later

29 (Pages 110 to 113)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 114

1  when I actually started to work for the
2  training. It was a real good job, paying
3  real well. And -- and they had, you know,
4  like eight weeks of training or
5  something. And part of the training --
6  that's what they did one day. And, you
7  know, I failed. I was the only person
8  that couldn't catch the ball.
9      At that time, my doctor had
10  scheduled me an appointment to see
11  Dr. Jakes, but it was like two months
12  before I could get in to see Dr. Jakes.
13  So I was waiting for that appointment.
14  And I -- it was a devastating -- that was
15  just devastating to me, is that I could
16  not -- I couldn't make it through the
17  training. I couldn't catch on. This
18  is -- my memory wouldn't work, was
19  failing. I just -- it was awful. I was
20  just devastated.
21      Q.  Well, how can you
22  accommodate -- because I think in Exhibit
23  60 you talk sometimes -- that sometimes

Page 115

1  your memory is affected. How can you
2  accommodate an affected memory?
3      A.  Pardon me?
4      Q.  How do you accommodate an
5  affected memory? Is there a way to do
6  that?
7      A.  What do you mean?
8      Q.  Well, you say here that --
9  someplace in this application you say that
10  sometimes your illness has an impact on
11  your memory.
12      A.  Right.
13      Q.  Is that true?
14      A.  (Witness nodded head in the
15  affirmative.)
16      Q.  Is that a yes?
17      A.  Yes.
18      Q.  And so if you're working
19  someplace, how does an employer
20  accommodate that?
21      A.  Well, they may not need to.
22      Q.  Well, how will you know when
23  your memory is being impaired?

Page 116

1      A.  I guess if I can't do the work
2  or, you know, if it shows up in -- a
3  problem with the work.
4      Q.  So it's unplanned; is that
5  right? I mean, you can't -- you don't
6  know if your memory is going to be
7  impaired or not?
8      A.  Right.
9      Q.  All right. Look on page --
10      A.  Usually if it's a problem --
11  it becomes a problem if I go for a period
12  of time without sleeping well. It's
13  related to not sleeping.
14      Q.  But here is that you say, I
15  think, one, two -- Section 9 remarks of
16  Exhibit Number 60. Also the
17  impaired physical abilities, including
18  walking, climbing stairs, constant up and
19  down from chair, and any of the lifting
20  with impaired mental alertness, memory,
21  and cognitive skills negatively affected
22  job performance.
23      A.  That's the job that -- I'm

Page 117

1  describing the problems I was having on
2  that job -- full-time job I had, because I
3  was working in the morning. And I was
4  having severe back trouble, and I had to
5  go -- I had to walk up and down stairs to
6  get to my -- my office was on the second
7  floor. But we went up and down stairs to
8  go to files downstairs. I was describing
9  my problems on that job.
10      Q.  And so you're saying you could
11  do all these things on a part-time basis?
12      A.  Maybe not. Not necessarily.
13      Q.  Well, when do you know if
14  you'll be able to perform any of these
15  functions on a part-time basis,
16  Ms. Beard? Is there any way you can
17  predict that?
18      A.  No. That's why they have
19  trial work periods or -- that's why --
20  like under Social Security, you can go to
21  work part time and see how you do. You
22  can go -- they encourage you to go to work
23  part time and see -- and do the best you

30 (Pages 114 to 117)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 118

1    can.
2      Q.   But you had --
3      A.   And they encourage you to work
4    part time because it's good for you.
5      Q.   Sure.  But you haven't looked
6    for any work, correct?
7      A.   No.  Because I've been having
8    a lot of trouble with fatigue, which is
9    probably -- like all this time I kept
10   complaining and complaining to them about
11   the fatigue, which, you know, part of
12   it -- it's normal to have some fatigue
13   problems after the radiation.  And I kept
14   telling them that it was a problem.  And,
15   you know, it's like nobody was listening
16   to me.
17       And then, finally, when it got so
18   severe -- when I went to the doctor in
19   October, I told Dr. Jakes, I said, well, I
20   think -- I want my blood checked because I
21   think it might be my thyroid.  I mean, if
22   I hadn't said check my blood for the
23   thyroid, it probably wouldn't have been

Page 119

1    checked.  And I was right.  They called me
2    back and go, it's way -- your levels are
3    way up or whatever it is.  Because it's
4    low thyroid.  I get it confused.  Which is
5    -- because the nurse actually told me
6    wrong.  She told me that I had overactive
7    thyroid to begin with.  And I didn't find
8    out till I went to see him.  I said, which
9    is it?  Because this medicine says not to
10   take it if you have overactive.  And --
11      Q.   Well, before you --
12      A.   -- that could have been the
13   problem all long.  Maybe it was the
14   thyroid.  Because I read that radiation
15   can affect the thyroid.  And that's not
16   regulated yet.  And, you know, it's worse
17   because I already had a fatigue problem to
18   begin with.
19      Q.   That's my point I was trying
20   to get back to, which is could you predict
21   when you were going to be feeling
22   fatigued.
23      A.   You mean before I had --

Page 120

1      Q.   Before they diagnosed the
2    thyroid.  Yes, ma'am.
3      A.   You mean before that day?
4    No.  I mean, no.  I'd just get up and
5    either be, you know -- it's almost like --
6      Q.   Either you're going to be okay
7    or you're not going to be okay, correct?
8      A.   Right.  It's usually like a
9    heavy weight.  Or, I mean, it could come
10   on suddenly.  But most of the time you're
11   going to know that day.
12       Now, I have been -- there have
13   been -- but these occasions are far and
14   few between.  I have been like out grocery
15   shopping, like -- well, this particular
16   time I was at WalMart, and I was, you know
17   -- all of a sudden I just could not make
18   it through the store.  I had to just stop
19   and leave right then or I wasn't going to
20   make it.
21      Q.   When did that happen?
22      A.   Oh, I can't remember exactly,
23   you know.

Page 121

1      Q.   What year?
2      A.   Not recently.
3      Q.   Well, last year?
4      A.   Maybe last year or the year
5    before or something.  I mean, something
6    like that has happened once or twice,
7    where I've been somewhere and I just, you
8    know -- I had to -- you know, my legs --
9    it was like my legs were like lead.
10      Q.   And you couldn't predict that,
11   correct?
12      A.   Right.  Yeah.  And I just had
13   to -- I mean, I was able to make it home,
14   but it was like, you know -- you're not
15   going to finish grocery shopping and get
16   your groceries and get out of here.
17   You've got to go now.
18       But that's rare, you know, and it's
19   far and few between, in other words.
20      Q.   I don't have any other
21   questions, Ms. Beard.  Your counsel may
22   have some questions.
23       MR. NELMS: I do not.

31 (Pages 118 to 121)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

American Court Reporting
toll-free (877) 320-1050

Page 122

1    Q.   Thank you.
2         3:22 p.m.
3
4         FURTHER DEPONENT SAITH NOT
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 123

1         C E R T I F I C A T E
2
3    STATE OF ALABAMA  )
4    MONTGOMERY COUNTY )
5       I hereby certify that the above and
6    foregoing deposition was taken down by me
7    in stenotype, and the questions and
8    answers thereto were transcribed by means
9    of computer-aided transcription, and that
10   the foregoing represents a true and
11   correct transcript of the deposition given
12   by said witness upon said hearing.
13      I further certify that I am neither of
14   counsel nor of kin to the parties to the
15   action, nor am I in anywise interested in
16   the result of said cause.
17
18          GWENDOLYN P. TIMBIE, CCR
19          Certificate No:  AL-CCR-172
20
21   My Commission Expires
22   March 4, 2009
23

32 (Pages 122 to 123)

American Court Reporting
April 1, 2008

617bdc60-b8a7-4751-9446-1d40604bb504

DEFENDANT'S EXHIBIT

23
Beard

# Schedules 8-6-05 to 12-3-05

| Week Ending | Sun | Mon | Tues | Wed | Thurs | Fri | Sat | Total Hours |
|---|---|---|---|---|---|---|---|---|
| 8-6-05 | | 1/5 ④ | 1/5 ④ | — | 1/5 ④ | 1/6 ④ | 1/6 ⑤ | 21 |
| 8-13-05 | 3/5 (5.5) 8:30 meeting | 12-5.30 (3.5) | — | | 1/7 ⑥ | | | 14 |
| 8-27-05 | 1/5 ④ | | 8 | | 1/5 ④ | 3/6:30 (3.5) | 3/6 ⑦ | 19.5 |
| 9-3-05 | | | | 1/6 ⑤ 9/12 ⑤ | — | 1/6 ⑤ | 1/6 ⑥ | 18 |
| 9-10-05 | — | 5/ (4.5) 9/30 | | 1/6 ⑤ | — | | 3/9:30 1/6 (5.5) | 16 |
| 9-17-05 | — | | | 4/ (5) 9:30 | 1/6 ⑤ | 1/6 ⑥ | 3/9:30 | 20.5 |
| 9-24-05 | — | | | 1/6 ⑤ | 1/6 ⑤ | | 2/8 ⑥ | 16 |
| 10-1-05 | — | | | 5/ (4.5) 9:30 | | 1/6 ⑥ | 3/9:30 (6.5) | 16 |
| 10-8-05 | — | | | 1/9 (7.5) | 1/6 ⑤ | 3/8 ⑥ | 2/30 (5.5) | 24 |
| 10-15-05 | — | | | 4/9:30 (5.5) | 1/6 ⑤ | 1/6 ⑤ | 1/6:30 (5.5) | 21 |
| 10-22-05 | 6:30 meeting 9:00 (2.5) | — | | 1/4 ③ | 1/6 ⑤ | 1/6 ⑥ | 1/6 ⑤ | 20.5 |
| 10-29-05 | | | | 1/6 (3.5) | 3/7 ④ | 3/8 ⑤ | 13.5 scheduled 15.5 |
| 11-5-05 | Brother died out of town funeral | — | | 1/6 ④ 9/30 | 1/ ④ ? | 1/ worked 3/7 | worked 4 |
| 11-12-05 | — | | | 2/6 ④ | 1/6 ③ | 2/6:30 8:30 | 15.5 |
| 11-19-05 | 7:30 meeting 9:30 (2) | — | | 4/8 ? | 2/6 ④ | 1/6 ⑤ | 5/10 ⑤ | 17 |
| 11-26-05 | — | | | HOLIDAY | 1/6 ⑤ | 1/ (7.5) 8:30 | 12.5 |
| 12-3-05 | — | | | 4/ (4.25) 8.15 | 1/6:30 (5.5) | 3/9:30 (6.5) | 1/6:30 | 21.5 |
| 12-10-05 | — | | | 4/8 ④ | 2/6 ④ | 1/6 ④ | 4/10 ⑥ | 18 |
| 12-17-05 | — | | | | 2/8 ⑥ | 2/8 ⑥ | 1/8 ④ | 19 |
| 12-24-05 | — | | 4/8 ④ | | | 2/6 ④ | | 8 |
| 12-31-05 | — | | | | 2/6 ④ | 2/6 ④ | 3/7 ④ | 12 |

Also scheduled 1-12-06 to 1-21-06
for 49 hours – no days off
Last schedule changed to 46 hours
but still too many hours over 7 days

| | Sunday | HRS | Monday | HRS | Tuesday | HRS | Wednesday | HRS | Thursday | HRS | Friday | HRS | Saturday | HRS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | | | | | | | | | | | | | | | $ 23,602 |
| Sales Plan | | | | | | | | | | | | | | | |
| KIM | off | | 7-5 | | RO | | 5a-2 | | 5a-2/task | | 5a-2/task | | 8-5 | | |
| JANIECE | 10-630/task | | RO | | 1-10/task | | 7-4 | | 8-5 | | off | | 1-10/task | | |
| SANTINA | off | | 1-10 | | 8-5 | | 1-10 | | off | | 8-5 | | 8-5 | | 0 |
| JESSICA | off | | off | 8.0 | 1-10 | 8.0 | 5a-2 | 8.0 | 5a-2/task | 3.0 | 5a-2/task | 3.0 | 1-10 | 3.0 | 33 |
| JOELY | | | | | | | | | 5-10.5 | | 5-10 | 5 | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| CONNIE | RO | | 6-9 | 3.0 | 12-6 | 6.0 | 6-9 | 3.0 | RO | | 6-9 | OC | 11-5 | 6.0 | 18 |
| BARBARA | | | | | | | 2-6 | 4.0 | 9-230 | 4.5 | | | 2-8 | 6.0 | 14.5 |
| HELEN | RO | | X | | 10-2 | 4.0 | RO | | RO | | 2-6 | 4.0 | 830-1 | 4.5 | 12.5 |
| JANIS | RO | | 6-10 | 4.0 | 6-10 | 4.0 | X | | 6-10 | 4.0 | 6-10 | OC | 12-6 | 6.0 | 18 |
| JEAN ANN | RO | | | | | | | | | | | | RO | | 0 |
| JEANETTE | RO | | RO | | 6-9 | 3.0 | 6-10 | 4.0 | 6-9 | 3.0 | RO | | RO | | 10 |
| JUDY C. | 2-6 | 4.0 | X | | X | | X | | 10-2 | 4.0 | 11-6 | 7.0 | 5-10 | 5.0 | 20 |
| | | | | | | | | | 1-6 | 5.0 | 1-6 | 5.0 | 1-7 | 6.0 | 16 |
| LINDA | X | | X | | X | | X | | RO | | 830-230 | 6.0 | X | | 19.5 |
| LOIS | X | | 7a-230 | 7.5 | 830-230 | 6.0 | X | | 6-10 | 4.0 | 6-10 | 4.0 | 9-1 | 6.0 | 18 |
| MARGIE | | | 7a-12 | 5.0 | 6-10 | OC | X | 4.0 | | | 6-10 | | X | | 16 |
| STEPHANIE | X | | 6-10 | 4.0 | 6-10 | 4.0 | 6-10 | 4.0 | 6-10 | OC | 6-10 | | 12-6 | 6.0 | 16 |
| SUSAN | 1230-630 | 6.0 | | | 6-10 | OC | X | | 6-10 | OC | | | 5-10 | 5.0 | 22 |
| TANICO | | | 2-6 | 4.0 | | | 11-6 | 7.0 | 12-6 | 6.0 | | | RO | | 13 |
| TANYA | 1230-630 | 6.0 | 11-6 | 7.0 | RO | | RO | | RO | | RO | | | | 17.5 |
| RUTH | | | 230-6 | 3.5 | 230-6 | 3.5 | 230-6 | 3.5 | 230-6 | 3.5 | 230-6 | 3.5 | | | 16 |
| SHIRLEY | RO | | RO | | RO | | RO | | 5-10 | 5.0 | 5-10 | 5.0 | 4-10 | 6.0 | 16 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | HOLIDAY TRIM | | | | SPRING FLOOR SET/ thurs-sat | | | | | | | | 0 |
| | | | Take down/Transfer | | | | | | | | | | | | 0 |
| | | | Mon-Tues | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | PLEASE CALL 2HRS AHEAD FOR ALL "OC" SHIFTS | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | "ON CALL" | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 280 |
| Total Hrs | | 16 | | 46 | | 39 | | 34 | | 42 | | 46 | | 59 | 233 |
| Selling Hours Allowed | | 12 | | 32 | | 19 | | 29 | | 35 | | 46 | | 61 | |
| | | | | | | | | | 5a-10 | | 5a-10 | | 5a-10 | | 0 |
| KIM | | | | | | | | | 5a-10 | | 5a-10 | 5.0 | 5a-10 | 5.0 | 15 |
| JESSICA | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | 4-8 | | 0 |
| JANIECE | | | 10-1230 | | 8-11 | | | | | | | | | | 19 |
| | | | | | 2-6 | 4.0 | 1-6 | 5.0 | 12-6 | 6.0 | 2-6 | 4.0 | | | 19 |
| DAN | | | | | 2-6 | 4.0 | 1-6 | 5.0 | 12-6 | 6.0 | 2-6 | 4.0 | | | 0 |
| TODD | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| SPLF ACTUAL | | 101 | | 101 | | 71 | | 75 | | 68 | | 76 | | 94 | 0 |
| SPLF PLAN | | 101 | | 101 | | 101 | | 101 | | 104 | | 101 | | 101 | 0 |

DESK Copy

| | |
|---|---|
| Tasking Hours scheduled | 53 |
| Tasking Hours allowed | 29 |
| Total Hours (Selling + Tasking) scheduled | 333 |

DEFENDANT'S EXHIBIT

24 Board



### Schedule Form 6.2

| | Sunday | HRS | Monday | HRS | Tuesday | HRS | Wednesday | HRS | Thursday | HRS | Friday | HRS | Saturday | HRS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | 08-Jan | | 09-Jan | | 10-Jan | | 11-Jan | | 12-Jan | | 13-Jan | | 14-Jan | | |
| Sales Plan | | | | | | | | | | | | | | | $ 22,981 |
| KIM | 1230-830 | | 7-5 | | off | | off. | | 7-5 | | 1-10 | | 7-5 | | |
| JANIECE | 630-830 | | 5a-10/5-10 | | off | | 7-4/task | | 1-10/task | | 8-5 | | 6-3 | | |
| SANTINA | 630-830 | | 8-5 | | 8-5 | | 1-10 | | 9-6 | | off | | 1-10 | | |
| | | | | | | | | | | | | | | | 0 |
| JESSICA | 630-830 | 2.0 | 8-5 | 8.0 | 1-10 | 8.0 | 9-6 | 8.0 | 11-6 | 6.0 | 1-10 | 8.0 | off | | 40 |
| JOELY | 1-830 | 7.5 | x | | x | | x | | 530-10 | 4.5 | | | | | 12 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| CONNIE | 2-830 | 6.5 | RO | | RO | | 6-9 | OC | 6-9 | OC | RO | | 9-1 | 4.0 | 10.5 |
| BARBARA | 630-830 | 2.0 | 12-5 | 5.0 | 11-3 | 4.0 | 1-6 | OC | | | | | 6-10 | 4.0 | 15 |
| HELEN | 630-830 | 2.0 | RO | | RO | | 10-3 | 5.0 | 12-4 | OC | 10-2 | 4.0 | 12-4 | 4.0 | 15 |
| JANIS | 630-830 | 2.0 | 6-10 | OC | | | X | | 6-10 | 4.0 | 6-10 | OC | 1-6 | 6.0 | 12 |
| JEAN ANN | 630-830 | 2.0 | | | | | | | | | | | | | 2 |
| JEANETTE | RO | | RO | | RO | | 6-10 | 4.0 | | | 6-9 | 3.0 | 12-6 | 6.0 | 13 |
| JUDY C. | 630-830 | 2.0 | X | | X | | X | | 10-2 | 4.0 | | | 4-9 | 5.0 | 11 |
| | | | | | | | | | | | | | | | 0 |
| LINDA | 630-830 | 2.0 | X | | X | | 4-8 | OC | 1-6 | OC | 1-6 | 5.0 | 1-6 | 5.0 | 12 |
| LOIS | 630-830 | 2.0 | 10-2 | OC | 830-3 | 6.5 | X | | 10-3 | OC | 830-3 | 6.5 | X | | 15 |
| MARGIE | 1-830 | 7.5 | X | | 6-10 | OC | X | | 6-10 | 4.0 | | | 10-2 | 4.0 | 15.5 |
| STEPHANIE | 630-830 | 2.0 | | | 6-10 | 4.0 | 6-10 | 4.0 | 6-10 | OC | RO | | X | | 10 |
| SUSAN | 630-830 | 2.0 | 6-10 | OC | 6-10 | 4.0 | X | | | | 6-10 | 4.0 | RO | | 10 |
| TANICO | 630-830 | 2.0 | 5-10 | 5.0 | X | | 2-8 | OC | X | | 2-6 | 4.0 | 10-2 | 4.0 | 15 |
| TANYA | RO | | 2-8 | OC | 12-6 | 6.0 | | | 2-6 | 4.0 | 12-4 | OC | 5-10 | 5.0 | 15 |
| RUTH | 630-830 | 2.0 | 3-6 | 3.0 | 3-6 | OC | 3-6 | 3.0 | | | 3-6 | OC | 5-10 | 5.0 | 13 |
| SHIRLEY | 630-830 | 2.0 | 5-10 | 5.0 | 6-10 | OC | X | | | | 6-10 | 4.0 | 3-7 | 4.0 | 15 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | REVISED 1/05 | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | Store Meeting | | | | | | | | | | | | | | 0 |
| | 630-830p | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | PLEASE CALL 2HRS AHEAD FOR ALL "OC" SHIFTS | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | "ON CALL" | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |

Handwritten margin notes (right side): 16,5; 20; 19; 20; 2; 21 x; 23; 19,5; 14; 14; 21; 25; 19; 19

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Hrs | 48 | | 26 | | 33 | | 24 | | 27 | | 39 | | 56 | | 251 |
| Selling Hours Allowed | 19 | | 15 | | 27 | | 24 | | 21 | | 29 | | 52 | | 187 |
| KIM | | | | | | | | | | | | | | | 0 |
| JESSICA | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| JANIECE | | | 5a-10 | | | | 7a-10 | | 5-8 | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| DAN | 630-830 | 2.0 | 2-6 | 4.0 | 2-6 | OC | 1-5 | 4.0 | 2-6 | 4.0 | | | | | 14 |
| TODD | 630-830 | 2.0 | | | 2-6 | 4.0 | 1-5 | 4.0 | 2-6 | OC | 2-6 | 4.0 | | | 14 |
| | | | | | | | | | | | | | | | 0 |
| SPLH ACTUAL | 102 | | 97 | | 107 | | 92 | | 103 | | 108 | | 123 | | 0 |
| SPLH PLAN | 123 | | 123 | | 123 | | 123 | | 123 | | 123 | | 123 | | 0 |

DEFENDANT'S EXHIBIT

25 Beard

Tasking Hours scheduled    28
Tasking Hours allowed    23



Schedule Form 6.2

| | Sunday | HRS | Monday | HRS | Tuesday | HRS | Wednesday | HRS | Thursday | HRS | Friday | HRS | Saturday | HRS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | 15 Jan | | 16 Jan | | 17 Jan | | 18 Jan | | 19 Jan | | 20 Jan | | 21 Jan | | |
| Sales Plan | 2929 | | 3197 | | 3383 | | 2621 | | 2985 | | 3187 | | 6977 | | $ 26,289 |
| KIM | 7a-10 | | 8-5 | | 7a-12 | | 7a-5 | | off | | 1-10 | | 8-5 | | |
| JANIECE | 12-10 | | off | | 1-10 | | 1-10 | | 7-4/task | | 8-5 | | off | | |
| SANTINA | 1-10(INV) | | T | | R | | A | | I | | N | | | | |
| | | | | | | | | | | | | | | | 0 |
| JESSICA | 2-10 | 8.0 | 1-10 | 8.0 | 8-5 | 8.0 | off | | 830-530 | 8.0 | off | | 1-10 | 8.0 | 40 |
| JOELY | 530-10(INV) | 4.0 | x | | x | | x | | 530-10 | 4.5 | 530-10 | 4.5 | X | | 13 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| CONNIE | | | 10-5 | 6.0 | | | 2-6 | OC | 2-6 | 5.0 | 12-4 | 4.0 | 10-2 | 4.0 | 19 |
| BARBARA | 1230-430 | 4.0 | X | | X | | X | | 10-1 | 3.0 | 1-6 | 5.0 | 9-1 | 4.0 | 16 |
| HELEN | | | X | | 11-4 | OC | RO | | RO | | RO | | 12-4 | 4.0 | 4 |
| JANIS | 1-4 | 3.0 | 6-10 | OC | 6-10 | 4.0 | X | | 6-10 | OC | | | 4-10 | 6.0 | 13 |
| JEAN ANN | 130-10(INV) | 8.0 | RO | | | | 6-10 | OC | | | 6-10 | 4.0 | RO | | 12 |
| JEANETTE | 330-630 | 3.0 | RO | | | | 6-10 | 4.0 | | | | | 6-10 | 4.0 | 11 |
| JUDY C. | | | X | | X | | X | | X | | 10-230 | 4.5 | 3-8 | 5.0 | 9.5 |
| SHIRLEY | 330-630 | 3.0 | 5-10 | 5.0 | | | X | | | | 5-10 | OC | 12-6 | 6.0 | 14 |
| LINDA | 130-10(INV) | 8.5 | 2-6 | 5.0 | 1-6 | 5.0 | 1-6 | 5.0 | 2-6 | | 1-6 | 5.0 | | | 20 |
| LOIS | X | | 9-2 | 5.0 | 830-2 | 6.5 | X | | 10-230 | 4.5 | 9-2 | 5.0 | X | | 21 |
| MARGIE | 130-10(INV) | 8.0 | X | | 6-10 | OC | X | | 6-10 | 4.0 | 6-10 | 4.0 | 2-6 | 4.0 | 20 |
| STEPHANIE | X | | 6-10 | 4.0 | 6-10 | OC | X | | 6-10 | 4.0 | 6-10 | 4.0 | X | | 12 |
| SUSAN | 130-10(INV) | 8.0 | | | 6-10 | 4.0 | 6-10 | 4.0 | | | RO | | RO | | 16 |
| TANICO | RO | | RO | | X | | 9-6 | 8.0 | X | | 10-3 | 5.0 | 10-6 | 8.0 | 21 |
| TANYA | 530-10(INV) | 4.0 | 12-6 | 6.0 | 11-6 | 7.0 | RO | | RO | | RO | | RO | | 23 |
| RUTH | | | RO | | | | 230-6 | 3.5 | 230-6 | 3.5 | 3-6 | 3.0 | 6-10 | 4.0 | 14 |
| SHANNON | 130-8(INV) | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | INVENTORY | | | | | | | | | | | | | | 0 |
| | 130-6(Back) | | | | | | | | | | | | | | 0 |
| | 6-10(Front) | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | PLEASE CALL 2hrs AHEAD FOR ALL OC SHIFTS | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| Total Hrs | 53 | | 39 | | 34 | | 32 | | 37 | | 48 | | 57 | | 299 |
| Selling Hours Allowed | 24 | | 35 | | 28 | | 22 | | 25 | | 26 | | 58 | | 218 |
| KIM | | | | | | | | | | | | | | | 0 |
| JESSICA | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| JANIECE | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| DAN | | | 1-5 | OC | 1-5 | | 1-5 | 4.0 | 1-5 | 4.0 | 1-4 | 3.0 | | | 15 |
| TODD | | | 1-5 | OC | 1-5 | 4.0 | 1-5 | 4.0 | 1-5 | 4.0 | 1-4 | 3.0 | | | 15 |
| | | | | | | | | | | | | | | | 0 |
| SPLH ACTUAL | 121 | | 121 | | 94 | | 88 | | 91 | | 98 | | 121 | | 0 |
| SPLH PLAN | 121 | | 121 | | 121 | | 121 | | 121 | | 121 | | 121 | | 0 |

Tasking Hours scheduled 30
Tasking Hours allowed 27

DEFENDANT'S EXHIBIT
ZY Brand



| Date | Sunday | hrs | Monday | hrs | Tuesday | hrs | Wednesday | hrs | Thursday | hrs | Friday | hrs | Saturday | hrs | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 22-Jan | | 23-Jan | | 24-Jan | | 25-Jan | | 26-Jan | | 27-Jan | | 28-Jan | | |
| Sales Plan | 2,933 | | 2,723 | | 2,984 | | 2,986 | | 3,501 | | 3,161 | | 4,606 | | $ 21,383 |
| KIM | off | | 7a-5(office) | | 7a-5 | | 7a-5 | | 8-5(V) | | off | | off | | |
| JANIECE | off | | 5-10/5-10 | | 7-4 | | 7-4 | | RO | | 1-10 | | 9-6 | | |
| SANTINA | off | | 8-5 | | 1-10 | | 1-10 | | 9-6 | | 8-5 | | off | | |
| | | | | | | | | | | | | | | | 0 |
| JESSICA | 1230-630 | 6.0 | 8-10/meet | 2.0 | off | | 1-10 | 8.0 | 8-5(V) | 8.0 | 9-6 | 8.0 | 1-10 | 8.0 | 40 |
| JOELY | | | x | | x | | x | | 530-10 | 4.5 | | | 9-2 | 6.0 | 11 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| CONNIE | | | 930-2 | 4.5 | 2-6 | 4.0 | | | 1-6 | OC | | | RO | | 8.5 |
| HELEN | | | X | | 10-230 | 4.5 | 12-4 | OC | 11-3 | 4.0 | 1-5 | OC | RO | | 8.5 |
| JANIS | | | | | 6-10 | OC | X | | 6-10 | 4.0 | | | 9-4 | 7.0 | 11 |
| JEAN ANN | | | | | 6-10 | 4.0 | 6-10 | OC | | | | | 2-6 | 4.0 | 8 |
| JEANETTE | RO | | | | RO | | 6-10 | 4.0 | 6-10 | OC | 6-9 | OC | 1-8 | 7.0 | 11 |
| JUDY C. | 2-630 | 4.5 | X | | X | | X | | X | | 2-6 | 4.0 | | | 8.5 |
| LINDA | | | 2-6 | 4.0 | 2-6 | OC | RO | | 1-6 | 5.0 | | | 4-7 | 3.0 | 12 |
| LOIS | X | | X | | 10-3 | OC | X | | 830-230 | 6.0 | 10-2 | 4.0 | X | | 10 |
| MARGIE | 1-5 | 4.0 | X | | 6-10 | 4.0 | X | | | | 6-10 | 4.0 | 10-2 | 4.0 | 12 |
| RUTH | RO | | RO | | 230-6 | 3.5 | 230-6 | 3.5 | 230-6 | OC | 230-6 | OC | 5-8 | OC | 7 |
| STEPHANIE | X | | 6-10 | OC | RO | | 6-10 | 4.0 | 6-10 | 4.0 | RO | | X | | 8 |
| SHIRLEY | RO | | 5-10 | 5.0 | 5-10 | OC | X | | | | 5-10 | | 5-10 | 5.0 | 10 |
| SUSAN | RO | | 6-10 | 4.0 | | | 6-10 | OC | 6-10 | OC | 6-10 | OC | RO | | 8 |
| TANICO | 1230-630 | 6.0 | 12-5 | OC | X | | 11-3 | 4.0 | X | | | | 6-10 | 4.0 | 14 |
| TANYA | | | 11-4 | 5.0 | 1-6 | 5.0 | 1-6 | OC | 3-8 | OC | 4-8 | 4.0 | | | 14 |
| | | | | | | | | | | | | | | | 0 |

Handwritten notes at right margin: W/OC's — 13.5, 16.5, 25, 12, 19, 16 X, 15, 16, 14, 12, 20, 18, 19, 24

PLEASE CALL 2hrs AHEAD FOR ALL OC SHIFTS

| Selling Hours | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Coverage AM/MID/PM | 3/5/4 | 1/4/3 | 3/4/1 | 3/4/1 | 4/5/1 | 4/5/6 | 5/5/4 | |
| Total Hrs | 21 | 25 | 25 | 24 | 36 | 28 | 44 | 201 |
| Selling Hours Allowed | 17 | 24 | 26 | 24 | 31 | 28 | 40 | 187 |

| Visual Team | | | | | | | | |
|---|---|---|---|---|---|---|---|
| KIM | | | | | 8-5 | | | 0 |
| JESSICA | | | | | 8-5 | | | 0 |
| | | | | | DANA | | | 0 |
| | | | | | VISITS | | | 0 |
| | | | | | | | | 0 |

| Stock Team | | | | | | | | |
|---|---|---|---|---|---|---|---|
| JANIECE | | | | | | | | 0 |
| | | | | | | | | 0 |
| DAN | | 1-5 | OC | 1-5 | 4.0 | 1-5 | 4.0 | 1-5 | 4.0 | 1-4 | OC | | 12 |
| TODD | | 1-5 | 4.0 | 1-5 | OC | 1-5 | 4.0 | 1-5 | 4.0 | 1-4 | OC | | 12 |
| | | | | | | | | 0 |

| | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | |
|---|---|---|---|---|---|---|---|---|
| SPLH ACTUAL | 114 | 98 | 99 | 83 | 91 | 114 | 114 | 0 |
| SPLH PLAN | 114 | 114 | 114 | 114 | 114 | 114 | 114 | 0 |

| | |
|---|---|
| Tasking Hours scheduled | 24 |
| Tasking Hours allowed | 23 |
| Total Hours (Selling + Tasking) scheduled | 225 |

DEFENDANT'S EXHIBIT 27



Week Ending - 1-28-06

Sunday off -

Monday - 2-6 = 4 about - Blake in practice

Oc Tuesday - 2-6 = 4? not needed just

Wednesday - off -

Thursday - 2-6 = 5

Friday - off -

Saturday - 1-3 = 8 worked

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **LINDA BEARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | |
| | ) | **2:07-CV-790-MNT** |
| **COLDWATER CREEK, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# PLAINTIFF LINDA BEARD'S
# APRIL 1, 2008 DEPOSITION

# PART 2 OF 2

| Date | 05-Feb | | 06-Feb | | 07-Feb | | 08-Feb | | 09-Feb | | 10-Feb | | 11-Feb | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales Plan | $ 23,928 | | $ 35,240 | | $ 33,234 | | $ 30,073 | | $ 33,070 | | $ 35,920 | | $ 17,524 | | $ 23,637 |
| KIM | 10-630 | | 7-4(office) | | off | | 8-5 | | off | | 1-10 | | 8-5(task) | | |
| JANIECE | 3-11(T) | | 6a-10/5-10 | | 8-5 | | off | | 7-4 | | off | | 1-10 | | |
| SANTINA | 3-11 (T) | | 8-5 | | off | | 1-10 | | off | | 8-5 | | 8-5(task) | | |
| | | | | | | | | | | | | | | | 0 |
| JESSICA | off | | 6a-10(task) | | 1-10 | 8.0 | 12-4 | 4.0 | 830-530 | 8.0 | 8-5 | 8.0 | 1-10 | 8.0 | 36 |
| JOELY | x | | x | | x | | x | | 530-10 | 4.5 | | | 9-5 | 8.0 | 13 |
| | | | | | | | | | | | | | | | 0 |
| BEVERLY | | | | | | | 2-6 | 4.0 | 6-10 | 4.0 | | | | | 8 |
| CONNIE | RO | | 830-2 | 5.5 | 10-230 | 4.5 | 2-6 | OC | RO | | 10-2 | OC | RO | | 10 |
| HELEN | 1230-430 | 4.0 | X | | 12-4 | OC | 9-2 | 5.0 | RO | | 12-4 | 4.0 | RO | | 13 |
| JANIS | 1-4 | 3.0 | 6-10 | OC | 6-10 | 4.0 | X | | RO | | | | 1-6 | 5.0 | 12 |
| JEAN ANN | RO | | | | 6-10 | OC | 6-10 | 4.0 | RO | | | | 10-2 | 4.0 | 8 |
| JEANETTE | | | 6-10 | | 6-10 | | 6-10 | OC | RO | | RO | | 4-8 | 4.0 | 12 |
| JUDY C. | 2-630 | 4.5 | X | | X | | X | | X | | | | 5-10 | 5.0 | 9.5 |
| LINDA | 2-6 9130 | 8.0 | 2-6 | 4.0 | 2-6 | OC | | | 2-6 | 4.0 | | | 2-6 | 4.0 | 16 |
| LOIS | X | | X | | 830-2 | 5.5 | X | | 10-2 | 4.0 | 10-2 | 4.0 | | | 13.5 |
| MARGIE | 6p-10(T) | 4.0 | X | | 6-10 | 4.0 | X | | 6-10 | OC | 6p-10 | 4.0 | 10-2 | 4.0 | 16 |
| STEPHANIE | X | | 6-10 | OC | | | 6-10 | 4.0 | 6-10 | 4.0 | 6-10 | 4.0 | | | 12 |
| SUSAN | 4p-10(T) | 6.0 | 6-10 | 4.0 | | | 6-10 | OC | | | | | 6-10 | 4.0 | 14 |
| TANICO | 6p-11(T) | 4.0 | 11-230 | 3.5 | X | | 1-6 | 5.0 | X | | 1-6 | 5.0 | 2-8 | OC | 17.5 |
| TANYA | 1-630 | 5.5 | 1-6 | OC | 2-6 | 4.0 | | | 2-6 | 4.0 | 2-6 | OC | | | 13.5 |
| TENISHA | | | | | | | 10-2 | 4.0 | 10-2 | 4.0 | | | | | 8 |
| RUTH | 6p-10(T) | 4.0 | 230-6 | 3.5 | 230-6 | 3.5 | | | RO | | 230-6 | OC | RO | | 11 |
| SHIRLEY | 6p-10(T) | 4.0 | | | 6-10 | OC | RO | | | | 5-10 | 5.0 | 12-4 | 4.0 | 13 |
| | | | | | | | | | | | | | | | 0 |
| Me - 2-9130 - Marge Stah | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| Transfers | (T) | | | | | | | | | | | | | | 0 |
| | SUN | | | | | | | | | | | | | | 0 |
| | 3p-11 | | | | | | | | | | | | | | 0 |
| | | | Carpet | | | | | | | | | | | | 0 |
| | | | Cleaning | | | | | | | | | | | | 0 |
| | | | Mon 9p-10 | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | PLEASE CALL 2hrs AHEAD FOR ALL OC SHIFTS | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |

| Coverage | | | | | | Selling Hours | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AM/MID/PM | 3/4/3 | | 3/3/3 | | 3/3/3 | | 3/3/3 | | 4/4/3 | | 1/5/0 | | 6/6/5 | | |
| Total Hrs | 43 | | 25 | | 34 | | 30 | | 37 | | 34 | | 50 | | 252 |
| Selling Hours Allowed | 20 | | 16 | | 16 | | 22 | | 22 | | 21 | | 53 | | 171 |

| | | | | | | Visual Team | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JESSICA | | | 6a-10 | 4.0 | | | | | | | | | | | 4 |
| KIM | | | | | | | | | | | | | | | 0 |
| SANTINA | | | | | | | | | | | | | | | 0 |
| JANIECE | | | | | | | | | | | | | | | 0 |

| | | | | | | Stock Team | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JANIECE | | | | | | | | | | | | | | | 0 |
| TODD | | | 2-6 | 4.0 | 2-6 | OC | 2-6 | 4.0 | 2-6 | OC | 2-6 | 4.0 | | | 12 |
| DANNY | | | 2-6 | OC | 2-6 | 4.0 | 2-6 | 4.0 | 2-6 | 4.0 | 2-6 | OC | | | 12 |
| | | | | | | | | | | | | | | | 0 |
| SPLH ACTUAL | 138 | | 93 | | 111 | | 101 | | 117 | | 116 | | 138 | | 0 |
| SPLH PLAN | 138 | | 138 | | 138 | | 138 | | 138 | | 138 | | 138 | | 0 |

| | | |
|---|---|---|
| Tasking Hours scheduled | | 28 |
| Tasking Hours allowed | | 22 |
| Total Hours (Selling + Tasking) scheduled | | 280 |

DEFENDANT'S EXHIBIT



Week ending 2/11/06
Transfers 6:30 half hour

Sunday - 2-8 = 8  x = 1.5
Monday - 2-6 = 4
Tuesday - 2-6 = 4
Wednesday - 2-6 = 4
Thursday - 2-6 = 4
Friday - off
Saturday -

DEFENDANT'S EXHIBIT

*[handwritten: Tele work issue 8:00 - morning of didn't did]*

*[handwritten: 31 Beard]*

| Schedule Form 6.2 | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sunday | HRS | Monday | HRS | Tuesday | HRS | Wed | HRS | Thursday | HRS | Friday | HRS | Saturday | HRS | |
| Date | 19 Feb | | 20 Feb | | 21 Feb | | 22 Feb | | 23 Feb | | 24 Feb | | 25 Feb | | |
| Sales Plan | 2,199 | | 2,026 | | 479 | | 3,648 | | 3,034 | | 5,169 | | 7,730 | | $ 29,695 |
| KIM | 7-1 | | 7-4 | | Visual | | 7-5 (FS) | | 1-10 | | 7-1 | | R/O | | |
| JANIECE | 7-1 | | Task/10-4 | | R/O | | -1-10 | | 8-5 | | | | 1-10 | | |
| SANTINA | | | 8-5 | | 2-10 | | 7-5 (FS) | | | | 1-10 | | 8-4 ✓ | | |
| | | | | | | | | | | | | | | | 0 |
| JESSICA | | | 8-10/4-10 | 8.0 | V/10-2 | 4.0 | 8-5 | 8.0 | RO | | 7-4 | 8.0 | 1-10 | 8.0 | 36 |
| JOELY | 1230-630 | 6.0 | | | | | | | 6-10 | 4.0 | 6-10 | 4.0 | 9-3 ✓ | 6.0 | 20 |
| | | | | | | | | | | | | | | | 0 |
| LOIS | R/O | | R/O | | 10-230 | 4.5 | R/O | | R/O | | 11-3 | 4.0 | R/O | | 8.5 |
| CONNIE | 1-5.5 | | 10-2 | 4.0 | 11-4 | 5.0 | 9-11/11-5(FS) | 8.0 | | | | | 2-6 | 4.0 | 21 |
| TANYA | 1230-630 | OC | 2-6 | OC | 4-10 ✓ | 6.0 | 12-6 | 6.0 | 11-3 | 4.0 | | | 5 | | 16 |
| LINDA | 1-6 | OC | 2-6 | 4.0 | | | R/O | | 1-6 | 5.0 | 1-6 | 5.0 | 3-8 | OC | 14 |
| RUTH | 3 | | R/O | | 230-6 | 3.5 | | | 230-6 | OC | 3-6 | 3.0 | 3-6 | OC | 6.5 |
| STEPHANIE | | | 6-10 | 4.0 | | | 6-10 | 4.0 | | | | | | | 8 |
| JEANETTE | R/O | | 6-10 | 4.0 | 6-10 | 4.0 | 6-10 | OC | | | | | 3-8 | 5.0 | 13 |
| JUDY | 1-630 | 5.5 | | | | | | | | | 11-3 | OC | 1-5 | 4.0 | 9.5 |
| JANIS | | | | | R/O | | R/O | | 6-10 | OC | 6-10 | 4.0 | 3-6 | 3.0 | 7 |
| MARGIE | R/O | | R/O | | 6-10 | OC | 6-10 | 4.0 | 6-10 | 4.0 | | | 10-2 ✓ | 4.0 | 12 |
| JEAN ANN | | | | | | | | | | | | | | | 0 |
| TANICO | 1230-630 | 6.0 | | | | | 11-3 | 4.0 | | | | | 6-10 | OC | 10 |
| YOLANDA | | | | | | | | | | | | | | | 0 |
| HELEN | | | R/O | | | | 3-6 | 3.0 | 8-1 | 5.0 | R/O | | 11-3 ✓ | 4.0 | 12 |
| SHIRLEY | R/O | | R/O | | | | R/O | | 6-10 | OC | 6-10 | 4.0 | 6-10 | 4.0 | 8 |
| SUSAN | R/O | | R/O | | R/O | | R/O | | | | 6-10 | OC | 6-10 | 4.0 | 4 |
| | | | | | | | | | | | | | | | 0 |
| Coverages Selling Hours | | | | | | | | | | | | | | | |
| AWH/DPH | 2.30 | | 3.5 | | 3/.3 | | 3./48 | | 19/.44 | | 4./.94 | | | | 206 |
| Total Hrs | 18 | | 24 | | 27 | | 37 | | 22 | | 32 | | 46 | | 206 |
| Selling Hours Allowed | 16 | | 24 | | 21 | | 22 | | 18 | | 31 | | 46 | | 178 |
| Visual Hours | | | | | | | | | | | | | | | |
| KIM | | | | | 5-9 | | | | | | | | | | 0 |
| JESSICA | | | | | 5-10 | 8.0 | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| Stock/Learning | | | | | | | | | | | | | | | |
| JANIECE | 7-1 | | 6a-10a | | | | | | | | | | | | 0 |
| KIM | 7-1 | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| DANIEL | | | 1-5 | OC | 1-6 | 5.0 | 1-5 | OC | 1-6 | 5.0 | 1-5 | OC | | | 10 |
| TODD | | | 1-5 | 4.0 | 1-6 | OC | 1-5 | 4.0 | 1-6 | OC | 1-5 | 4.0 | | | 12 |
| | | | | | | | | | | | | | | | 0 |
| DAILY SPLH GOAL | 155 | | 140 | | 94 | | 89 | | 112 | | 143 | | 168 | | 0 |
| WEEK SPLH GOAL | 167 | | 167 | | 167 | | 167 | | 167 | | 167 | | 167 | | 0 |

*[handwritten: Work late Thursday till 8]*

| | |
|---|---|
| Tasking Hours scheduled | 27 |
| Tasking Hours allowed | 22 |
| Total Hours (Selling + Tasking) scheduled | 233 |
| Total Hours Allowed | 200 |



DEFENDANT'S EXHIBIT

*32 Beard*

| | Sunday | HRS | Monday | HRS | Tuesday | HRS | Wed | HRS | Thursday | HRS | Friday | HRS | Saturday | HRS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | Schedule Form 6.2 | | |
| Date | 26-Feb | | 27-Feb | | 28-Feb | | 01-Mar | | 02-Mar | | 03-Mar | | 04-Mar | | |
| Sales Plan | 3,403 | | 4,521 | | 4,208 | | 3,450 | | 4,608 | | 7,986 | | | | $ 32,983 |
| KIM | | | 7-4 | | 8-5 | | | | 1-10 | | Vacation | | 8-5 | | |
| JANIECE | | | 7-10/4-10 | | 8-5 | | 8-5 | | | | 1-10 | | 11-7 | | |
| SANTINA | 1230-630 | | - 8-5 | | 1-10 | | 1-10 | | 8-5 | | | | | | |
| | | | | | | | | | | | | | | | |
| JESSICA | | | 8-10/4-10 | 8.0 | R/O | | 8-5 | 8.0 | 8-5 | 8.0 | 8-5 | 8.0 | 1-10 | 8.0 | 40 |
| JOELY | 1230-630 | 6.0 | | | | | | | 6-10 | 4.0 | 6-10 | 4.0 | | | 14 |
| | | | | | PLEASE CALL 2 HRS AHEAD FOR ALL *OC* SHIFTS | | | | | | | | | | |
| LOIS | R/O | | R/O | | 11-3 | 4.0 | R/O | | 11-2 | 3.0 | 11-3 | 4.0 | R/O | | 11 |
| CONNIE | 1230-630 | 6.0 | | | 6-10 | OC | 6-10 | | 2-6 | OC | 8-1 | 5.0 | 10-2 | 4.0 | 15 |
| TANYA | | | 11-4 | 5.0 | 6-10 | OC | | | | | 3-6 | 3.0 | 1-6 | 5.0 | 13 |
| LINDA | *off* | | *off* | | *4:30* 3-8 | 3.0 | *off* | | *3-2?* | 4.0 | 1-6 | 5.0 | 2-8 | 4.0 | 16 |
| RUTH | | | | | 3-6 | OC | 3-6 | 3.0 | | | R/O | | R/O | | 3 |
| STEPHANIE | | | 6-10 | OC | *(1.5 break)* | | 6-10 | 4.0 | | | 6-10 | OC | | | 4 |
| JEANETTE | 1230-630 | OC | | | | | | | | | 6-10 | 4.0 | 5-10 | 5.0 | 9 |
| JUDY | | | | | | | | | | | | | 3-8 | 5.0 | 5 |
| JANIS | | | | | 6-10 | 4.0 | R/O | | 6-10 | 4.0 | | | 1-6 | OC | 8 |
| MARGIE | 1-5 | 4.0 | R/O | | 6-10 | 4.0 | R/O | | | | | | 9-1 | 4.0 | 12 |
| JEAN ANN | R/O | | R/O | | R/O | | R/O | | R/O | | R/O | | R/O | | 0 |
| TANICO | | | 11-3 | OC | | | 6-10 | 4.0 | | | | | 11-5 | 6.0 | 10 |
| YOLANDA | | | | | | | | | | | | | | | 0 |
| HELEN | | | R/O | | 11-3 | OC | 11-3 | 4.0 | R/O | | R/O | | | | 4 |
| SHIRLEY | R/O | | | | | | R/O | | 6-10 | OC | | | 4-10 | 6.0 | 6 |
| SUSAN | R/O | | 6-10 | 4.0 | | | 6-10 | OC | | | | | 6-10 | 4.0 | 8 |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | *Worked till 9:300 Tuesday* | | | | | | *hrs changed 3?* | | *late Sat till 8* | | | | 0 |

| Coverage AM/MID/PM | 3/4/5 | | 3/3/6 | | 3/4/3 | | 3/4/3 | | 3/4/3 | | 3/4/3 | | 5/6/5 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Hrs | 16 | | 17 | | 15 | | 23 | | 23 | | 33 | | 51 | | 178 |
| Selling Hours Allowed | 18 | | 13 | | 16 | | 18 | | 21 | | 33 | | 51 | | 169 |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | 0 |
| | | | | *don't want 3 people* | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0.0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| DANIEL | | | 1-4 | OC | 1-5 | 4.0 | 1-4 | OC | 1-5 | 4.0 | 1-4 | OC | | | 8 |
| TODD | | | 1-4 | OC | 1-5 | OC | 1-4 | | 3.0 | 1-5 | OC | 1-4 | 3.0 | | | 8 |
| | | | | | | | | | | | | | | | 0 |
| DAILY SPLH GOAL | 218 | | 149 | | 162 | | 133 | | 148 | | 179 | | 196 | | 0 |
| WEEK SPLH GOAL | 195 | | 195 | | 195 | | 195 | | 195 | | 195 | | 195 | | 0 |

| | |
|---|---|
| Tasking Hours scheduled | 14 |
| Tasking Hours allowed | 21 |
| Total Hours (Selling + Tasking) scheduled | 192 |
| Total Hours Allowed | 190 |

Week ending 3-4-06

Week ending 3-4-06

Sunday - off
Monday - off
1st Tuesday - 3:30 = (work at this place)
1st Wednesday - off
2 Thursday - 3:30 = 5 - less 1.5-break
3 Friday - 1-6 = 5
4th Saturday - 2:30 = 8 = 6  Rain, Closed

Pay ahead last week - this week -

$\frac{21.25}{+21.25} = 348.56$

Week ending 3/11
5- 1:30 - 6:30 - 5
M- off
4- 2-6 - 4
Wed- off
4- off
7- 5
7- 5-10 - 5
7-5


DEFENDANT'S EXHIBIT

33 Beard

Schedule Form 6.2

| | Sunday | HRS | Monday | HRS | Tuesday | HRS | Wed | HRS | Thursday | HRS | Friday | HRS | Saturday | HRS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | 05-Mar | | 06-Mar | | 07-Mar | | 08-Mar | | 09-Mar | | 10-Mar | | 11-Mar | | |
| Sales Plan | $ 5,004 | | $ 3,718 | | $ 3,485 | | $ 4,485 | | $ 4,464 | | $ 5,102 | | $ 8,972 | | $ 35,230 |
| KIM | 1030-630 | | 7-5 | | R/O | | Sick | | Sick | | 1-10 | | 8-5 | | |
| JANIECE | | | 6-10/4-10 | | 8-5 | | 1-10 | | | | 11-7 | | 8-5 | | |
| SANTINA | | | | | Vacation | | Vacation | | 8-5 | | 8-5 | | 1-10 | | |
| | | | | | | | | | | | | | | | |
| JESSICA | 1230-630 | 6.0 | 8-5 | 8.0 | 1-10 | 8.0 | 8-5 | 8.0 | 1-10 | 8.0 | | | | | 38 |
| JOELY | | | | | | | | | | | | | | | 0 |
| | | | PLEASE CALL 2 HRS AHEAD FOR ALL "OC" SHIFTS | | | | | | | | | | | | |
| LOIS | R/O | | R/O | | R/O | | R/O | | R/O | | 830-230 | 6.0 | R/O | | 6 |
| CONNIE | | | 11-5 | OC | 8-2 | 6.0 | 2-6 | OC | 8-2 | 6.0 | | | 12-6 | 6.0 | 18 |
| TANYA | | | 5-10 | 5.0 | 11-5 | 6.0 | 8-2 | OC | 11-5 | 6.0 | | | 3-6 | 3.0 | 20 |
| LINDA | 130-630 | 5.0 | | | 2-6 | 4.0 | | | | | 5-10 | 5.0 | 2-8 | 6.0 | 20 |
| RUTH | 230-630 | OC | | | 3-6 | OC | | | 2-6 | OC | 230-6 | 3.5 | 12-5 | 5.0 | 8.5 |
| STEPHANIE | | | | | | | 6-10 | 4.0 | R/O | | R/O | | | | 4 |
| JEANETTE | 230-630 | 4.0 | | | | | | | R/O | | | | 4-10 | 6.0 | 10 |
| JUDY | | | | | | | | | | | | | 4-10 | 6.0 | 6 |
| JANIS | 1-4 | 3.0 | 6-10 | 4.0 | 6-10 | OC | R/O | | R/O | | R/O | | R/O | | 7 |
| MARGIE | 130-630 | OC | | | 6-10 | 4.0 | R/O | | 6-10 | OC | 6-10 | 4.0 | 10-2 | 4.0 | 12 |
| JEAN ANN | R/O | | | | 6-10 | 4.0 | 5-10 | OC | 6-10 | 4.0 | | | 11-3 | 4.0 | 12 |
| TANICO | | | 11-5 | 6.0 | | | 11-5 | 6.0 | | | | | 3-10 | 7.0 | 19 |
| YOLANDA | | | | | | | | | | | | | | | 0 |
| HELEN | | | | | 8-2 | OC | 8-2 | 5.0 | 8-2 | OC | | | R/O | | 5 |
| SHIRLEY | | | | | | | | | 6-10 | OC | 6-10 | OC | 12-6 | OC | 0 |
| SUSAN | R/O | | 6-10 | OC | R/O | | 6-10 | 4.0 | 6-10 | 4.0 | | | R/O | | 8 |
| Selling Hours | | | | | | | | | | | | | | | |
| Coverage AM/MID/PM | 2/5/4 | | 3/3/3 | | 3/4/3 | | 1/3/3 | | 3/3/3 | | 3/4/4 | | 4/8/5 | | |
| Total Hrs | 18 | | 23 | | 32 | | 27 | | 28 | | 19 | | 47 | | 194 |
| Selling Hours Allowed | 26 | | 19 | | 18 | | 23 | | 23 | | 27 | | 47 | | 183 |
| Visual Team | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0.0 |
| | | | | | | | | | | | | | | | 0 |
| Stock Team | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| DANIEL | | | 1-4 | OC | | OC | 1-4 | 3.0 | 1-4 | | 1-4 | 3.0 | | | 6 |
| TODD | | | 1-4 | OC | 1-4 | 3.0 | 1-4 | OC | 1-4 | | | | | | 6 |
| | | | | | | | | | | | | | | | 0 |
| DAILY SPLH GOAL | 278 | | 162 | | 100 | | 150 | | 144 | | 237 | | 191 | | 0 |
| WEEK SPLH GOAL | 192 | | 192 | | 192 | | 192 | | 192 | | 192 | | 192 | | 0 |

| | |
|---|---|
| Taskiny Hours scheduled | 12 |
| Tasking Hours allowed | 23 |
| Total Hours (Selling + Tasking) scheduled | 206 |
| Total Hours Allowed | 206 |

Dr appt for medications on the [illegible] & to request this all important letter [illegible] did not my call and I got very upset [illegible] she called [illegible] when leaving for Dr appt was late to Dr [illegible] late to work

Kim also not liked was late even though it was sick w/ pain & I had to get letter she demand [illegible]

Warning 3-11-06 So not [illegible] pain lasts like [illegible] be fired [illegible] schedule [illegible] get letter in 1 week [illegible] that B



DEFENDANT'S EXHIBIT

34 Beald

| | Sunday | HRS | Monday | HRS | Tuesday | HRS | Wed | HRS | Thursday | HRS | Friday | HRS | Saturday | HRS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Date** | 12-Mar | | 13-Mar | | 14-Mar | | 15-Mar | | 16-Mar | | 17-Mar | | 18-Mar | | |
| **Sales Plan** | 3,258 | | 3,308 | | 3,619 | | 3,265 | | 4,225 | | 5,447 | | 7,959 | | $ 32,279 |
| **KIM** | | | 7-4 | | Visual | | Visual | | 11-10 | | Meeting | | 8-1 | | |
| **JANIECE** | 1030-630 | | 8-5 | | 1-10 | | 1-10 | | Vacation | | R/O | | R/O | | |
| **SANTINA** | | | 8-10/1-10 | | 7-4 | | 8-5 | | | | 1-10 | | 8-5 | | |
| | | | | | | | | | | | | | | | |
| **JESSICA** | | | | | Visual | | Visual | | V/9-1 | 4.0 | 7-4 | 8.0 | 1-10 | 8.0 | 20 |
| **JOELY** | 130-630 | 5.0 | | | | | | | 6-10 | 4.0 | 6-10 | 4.0 | 9-4 | 7.0 | 20 |
| | | | | PLEASE CALL 2 HRS AHEAD FOR ALL "OC" SHIFTS | | | | | | | | | | | |
| **LOIS** | | | 11-3 | 4.0 | 10-2 | 4.0 | RO | | 9-1 | 4.0 | | | | | 12 |
| **CONNIE** | RO | | 1-6 | 5.0 | | | 2-6 | 4.0 | 1-6 | 5.0 | 8-1 | 5.0 | RO | | 19 |
| **TANYA** | 1230-630 | OC | | | 11-3 | 4.0 | 10-2 | 4.0 | 11-3 | OC | | | 6-10 | 4.0 | 12 | Tanya |
| **LINDA** | | | | | 2-6 | 4.0 | | | RO | | 1-6 | 5.0 | 1-5-10 | 5.0 | 14 |
| **RUTH** | | | 3-6 | 3.0 | 3-6 | 3.0 | | | 3-6 | 3.0 | | | RO | | 9 |
| **STEPHANIE** | | | 6-10 | 4.0 | | | | | | | 6-10 | OC | | | 4 |
| **JEANETTE** | | | 6-10 | OC | 6-10 | 4.0 | RO | | 6-10 | 4.0 | RO | | 5-10 | OC | 8 | Jeanet |
| **JUDY** | | | | | | | | | | | | | | | 0 |
| **JANIS** | | | | | | | | | | | | | | | 0 |
| **MARGIE** | | | RO | | 6-10 | 4.0 | 6-10 | 4.0 | | | | | | | 8 |
| **JEAN ANN** | 1-5 | 4.0 | | | | | 6-10 | 4.0 | | | | | 2-6 | 4.0 | 12 |
| **TANICO** | 130-630 | OC | | | | | 11-6 | 7.0 | | | 11-6 | 7.0 | 6-10 | 4.0 | 18 | Tanico |
| **YOLANDA** | | | | | | | | | | | | | | | 0 |
| **HELEN** | | | RO | | RO | | RO | | | | | | 12-5 | 5.0 | 5 |
| **SHIRLEY** | | | 6-10 | 4.0 | | | 6-10 | | OC | | 6-10 | | 1-6 | 5.0 | 13 |
| **SUSAN** | 1230-630 | 6.0 | | | 6-10 | OC | | | 6-10 | OC | RO | | 1-6 | 5.0 | 11 |
| | | | | | | | | | | | | | | | |
| | | Yves Atongol 3-1 | | | | | | | | | | Charged 90 | | | | |
| | | | | | | | | | | | | | | | 0 |

| Coverage | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AM/PM/PM | | | 3/4/3 | | 1/3 | | 3/4/3 | | 3/4/3 | | 3/1 | | 5/7/5 | | |
| Total Hrs | 15 | | 20 | | 23 | | 23 | | 24 | | 33 | | 47 | | 185 |
| Selling Hours Allowed | 22 | | 17 | | 20 | | 17 | | 22 | | 29 | | 42 | | 169 |

| Visual Team | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **KIM** | | | 5-11 | | 5-2 | | | | | | | | | | 0 |
| **JESSICA** | | | 5-2 | 8.0 | 5-2 | 8.0 | 5-9 | 4.0 | | | | | | | 20 |
| **LIAMA** | | | 5-11 | 6.0 | 5-11 | 6.0 | | | | | | | | | 12 |
| | | | | | | | | | | | | | | | 0.0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |

| Stock Team | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| **DANIEL** | | | 1-5 | 4.0 | | | 1-5 | 4.0 | 1-5 | OC | | | | | 12 |
| **TODD** | | | 1-5 | | 1-5 | OC | | | 1-5 | OC | 1-5 | 4.0 | | | 12 |
| | | | | | | | | | | | | | | | 0 |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **DAILY SPLH GOAL** | 284 | | 118 | | 93 | | 80 | | 132 | | 147 | | 169 | | 0 |
| **WEEK SPLH GOAL** | 191 | | 191 | | 191 | | 191 | | 191 | | 191 | | 191 | | 0 |

| | | |
|---|---|---|
| Tasking Hours scheduled | | 56 |
| Tasking Hours allowed | | 21 |
| Total Hours (Selling + Tasking) scheduled | | 241 |
| Total Hours Allowed | | 190 |



**DEFENDANT'S EXHIBIT**

*3L Beard*

| | Sunday | HRS | Monday | HRS | Tuesday | HRS | Wed | HRS | Thursday | HRS | Friday | HRS | Saturday | HRS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Schedule Form 6.2 | | | | | | |
| Date | 26-Mar | | 27-Mar | | 28-Mar | | 29-Mar | | 30-Mar | | 31-Mar | | 1-Apr | | |
| Sales Plan | $ 892 | | | | | | | | | | | | | | $ 38,388 |
| KIM | | | 8-5 | | 8-5 | | 1-10 | | | | 8-8 | | 8-5 | | |
| JANIECE | | | 8-5 | | 1-10 | | | | 1-10 | | 8-5 | | 8-5 | | |
| SANTINA | | | 8-9/2-10 | | 8-5 | | 8-5 | | 8-5 | | | | 1-10 | | |
| | | | | | | | | | | | | | | | |
| JESSICA | | | Vacation | | Vacation | | Vacation | | Vacation | | Vacation | | | | 0 |
| JOELY | 1230-630 | 6.0 | | | | | | | 5-10 | 5.0 | 5-10 | 5.0 | | | 16 |
| | | | PLEASE CALL 2 HOURS IN ADVANCE FOR ALL ON CALL (OC) SHIFTS | | | | | | | | | | | | |
| LOIS | | | R/O | | 11-2 | 3.0 | R/O | | 11-3 | | 11-3 | 4.0 | | | 11 |
| CONNIE | R/O | | R/O | | 2-6 | 4.0 | 8-1 | 5.0 | 8-1 | 5.0 | | | | | 14 |
| TANYA | 1230-630 | OC | 11-3 | 4.0 | | | 1-6 | 5.0 | | | | | 6-10 | 4.0 | 13 |
| LINDA | | | 1-6 | OC | 1-6 | 5.0 | 3-6 | 3.0 | 3-6 | OC | | | 1-6 | 5.0 | 13 |
| RUTH | | | 3-6 | 3.0 | R/O | | R/O | | R/O | | 3-6 | 3.0 | R/O | | 6 |
| STEPHANIE | | | 6-10 | 4.0 | 6-10 | 4.0 | | | 6-10 | OC | 6-10 | 4.0 | | | 12 |
| JEANETTE | 130-630 | 5.0 | R/O | | 6-10 | OC | 6-10 | 4.0 | | | | | 5-10 | 5.0 | 14 |
| JUDY | | | | | | | | | | | | | | | 0 |
| JANIS | | | | | | | | | | | | | | | 0 |
| MARGIE | 1-6 | OC | R/O | | 6-10 | 4.0 | R/O | | 6-10 | 4.0 | 6-10 | OC | 9-1 | 4.0 | 12 |
| JEAN ANN | | | 6-10 | OC | R/O | | 6-10 | 4.0 | | | 6-10 | 4.0 | 10-2 | 4.0 | 12 |
| TANICO | | | 1-6 | 5.0 | | | 11-3 | 4.0 | | | 12-5 | OC | 11-5 | 4.0 | 15 |
| YOLANDA | | | | | | | | | | | | | | | 0 |
| HELEN | | | R/O | | 11-2 | OC | R/O | | 11-3 | OC | 11-3 | | | | 0 |
| SHIRLEY | | | | | | | | | | | | | | | 0 |
| SUSAN | 1230-630 | 6.0 | 6-10 | 4.0 | | | 6-10 | OC | 6-10 | OC | R/O | | 2-6 | 4.0 | 14 |
| AMBER | 1-6 | 5.0 | | | | | 1-6 | OC | 1-5 | 4.0 | | | 6-10 | 4.0 | 13 |
| LAIMA | | | | | | | | | 3-6 | 3.0 | 12-5 | | 12-5 | 5.0 | 13 |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | 0 |
| Coverage | | | | | | Selling Hours | | | | | | | | | |
| AM/MID/PM | 3/4/4 | | 3/5/3 | | 3/5/3 | | 3/4/3 | | 3/4/3 | | 3/4/4 | | 5/7/4 | | |
| Total Hrs | 22 | | 20 | | 20 | | 25 | | 25 | | 25 | | 41 | | 178 |
| Selling Hours Allowed | 22 | | 19 | | 20 | | 25 | | 24 | | 25 | | 41 | | 177 |

*Called to come in not much notice. did not tell til 1:30 + tod rescheduled physically not OC person*

*These swap schedules w/Susan 2-6 30 lates*

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Stock Team | | | | | | | | |
| TODD | | | 1-5 | 4.0 | 1-5 | 4.0 | 1-5 | 4.0 | 1-5 | 4.0 | 1-5 | | | | 20 |
| | | | | | | | | | | | | | | | 0 |
| DAILY SPLH GOAL | 222 | | 172 | | 184 | | 189 | | 177 | | 186 | | 218 | | 0 |
| WEEK SPLH GOAL | 217 | | 217 | | 217 | | 217 | | 217 | | 217 | | 217 | | 0 |

| | |
|---|---|
| Tasking Hours scheduled | 20 |
| Tasking Hours allowed | 22 |
| Total Hours (Selling + Tasking) scheduled | 198 |
| Total Hours Allowed | 199 |



DEFENDANT'S EXHIBIT

3-6 Mon    Wed 3-6    37 Braid

| | Sunday | HRS | Monday | HRS | Tuesday | HRS | Wed | HRS | Thursday | HRS | Friday | HRS | Saturday | HRS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Schedule Form 6.2 | | | | | | | | |
| Date | | | | | | | | | | | | | | | |
| Sales Plan | | | | | | | | | | | | | | | $ 36,579 |
| KIM | 1030-630 | | 7-5 | | V/10-3 | | | | Visual | | 7-7 | | 7-4/9p-11p | | |
| JANIECE | | | 8-10/2-10 | | 8-5 | | 1-10 | | | | 8-5 | | 8-5/9p-11p | | |
| SANTINA | | | 8-5 | | 1-10 | | 8-5 | | 8-5 | | | | 3-11 | | |
| | | | | | | | | | | | | | | | |
| JESSICA | | | 8-4 | 7.0 | V/10-2 | 3.0 | V/10-2 | 3.0 | V/10-2 | 3.0 | 7-3 | 7.0 | Meeting | 2.0 | 25 |
| JOELY | R/O | | | | | | | | 5-10 | 5.0 | 5-10 | 5.0 | Meeting | 2.0 | 12 |
| | | | PLEASE CALL 2 HOURS IN ADVANCE FOR ALL ON CALL (OC) SHIFTS | | | | | | | | | | | | |
| LOIS | | | | | 11-2 | 3.0 | | | 11-3 | 4.0 | 11-3 | 4.0 | Meeting | 2.0 | 13 |
| CONNIE | | | ABSENT | | | | | | | | | | | | 0 |
| TANYA | 130-630 | 5.0 | 6-10 | 4.0 | 2-6 | 4.0 | 1-6 | OC | | | | | 1-60/9-11 | 7.0 | 20 |
| LINDA | 130-630 | OC | 3-6 | 3.0 | off | | 3-6 | 3.0 | 1-6 | OC | off | | 2-7/9-11 | 7.0 | 13 |
| RUTH | 1-5 | 4.0 | R/O | | | | 3-6 | 3.0 | | | 3-6 | 3.0 | Meeting | 2.0 | 12 |
| STEPHANIE | | | R/O | | 6-10 | 4.0 | | | 6-10 | 4.0 | 6-10 | 4.0 | Meeting | 2.0 | 14 |
| JEANETTE | R/O | | R/O | | 6-10 | OC | 6-10 | 4.0 | R/O | | 6-10 | OC | 4-11 | 7.0 | 11 |
| JUDY | 1230-630 | 6.0 | | | | | | | | | 12-6 | 6.0 | Meeting | 2.0 | 14 |
| MARGIE | | | R/O | | 6-10 | 4.0 | R/O | | 6-10 | 4.0 | | | 5-11 | | 13 |
| JEAN ANN | 2-6 | 4.0 | R/O | | | | 6-10 | 4.0 | 6-10 | OC | | | 10-2/9-11 | 6.0 | 14 |
| TANICO | | | 11-3 | 4.0 | | | 11-3 | 4.0 | | | | | 12-5/9-11 | 7.0 | 15 |
| SUSAN | | | 6-10 | 4.0 | | | 6-10 | OC | | | 6-10 | 4.0 | Meeting | 2.0 | 10 |
| AMBER | 1230-630 | OC | 1-6 | OC | 1-6 | 5.0 | | | 1-6 | 5.0 | | | 11-4/9-11 | 7.0 | 17 |
| LAIMA | | | 6-10 | OC | Visual | | Visual | | Visual | | | | 2-6/9-11 | 6.0 | 6 |
| TARRESSA | | | 1-6 | 5.0 | 2-6 | OC | | | | | 1-6 | 5.0 | 6-11 | 5.0 | 15 |
| | | | | | | | | | | | | | | | |
| | | | | | Valerie Lee here | | | | | | | | Mandatory Store Meeting 9p-11p | | |
| | | | | | | | | | | | | | | | 0 |
| Coverage AM/O/PM | | | | | | | Selling Hours | | | | | | | | |
| Total Hrs | 19 | | 27 | | 23 | | 21 | | 30 | | 33 | | 71 | | 224 |
| Selling Hours Allowed | 21 | | 20 | | 23 | | 18 | | 23 | | 32 | | 44 | | 181 |
| | | | | | | | Visual Team | | | | | | | | |
| KIM | | | | | 5a-10a | | | | 4a-9a | | | | | | 0 |
| JESSICA | | | | | 5a-10a | 5.0 | 5a-10a | 5.0 | 5a-10a | 5.0 | | | | | 15 |
| LAIMA | | | | | 5a-10a | 5.0 | 5a-10a | 5.0 | 5a-10a | 5.0 | | | | | 15 |
| | | | | | | | | | | | | | | | 0.0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | Stock Team | | | | | | | | |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| TODD | | | 1-5 | 4.0 | 1-5 | 4.0 | 1-5 | 4.0 | 1-5 | | 1-5 | 4.0 | | | 20 |
| DAILY SPLH GOAL | 223 | | 129 | | 126 | | 104 | | 105 | | 177 | | 125 | | 0 |
| WEEK SPLH GOAL | 202 | | 202 | | 202 | | 202 | | 202 | | 202 | | 202 | | 0 |

| | |
|---|---|
| Tasking Hours scheduled | 50 |
| Tasking Hours allowed | 22 |
| Total Hours (Selling + Tasking) scheduled | 274 |
| Total Hours Allowed | 203 |



This week ending   4/8/06 (adjusted)

OT  Sun — 7:30-6:30 sleeping 3/8/06

MON — 3-6 = 3 #Blanton

Tues — off — therapy 2:30  all valg.

Wed — 3-6 = 3 — ill. Bottles!!

OT  Thur — 3-6 — needed sounds

Fri — off — therapy 2:30

Sat — 2-7+9-11 = 7   annina 1:56

10 choursel

Val Lee 800-280-7413

*(handwritten across top)* Only Skirs   Kim   didor   Purpose   Out of   town   Call Val

| | Sunday | HRS | Monday | HRS | Tuesday | HRS | Wed | HRS | Thursday | HRS | Friday | HRS | Saturday | HRS | Schedule Form 6.2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | 09-Apr | | 10-Apr | | 11-Apr | | 12-Apr | | 13-Apr | | 14-Apr | | 15-Apr | | |
| Sales Plan | | | | | 5,060 | | | | 6,841 | | 7,494 | | 6,479 | | $ 39,295 |
| KIM | CWCU | | CWCU | | CWCU | | CWCU | | CWCU | | CWCU | | CWCU | | |
| JANIECE | | | 8-5 | | 1-10 | | R/O | | 8-5 | | 8-5 | | 1-10 | | |
| SANTINA | | | 8-5 | | 8-5 | | 1-10 | | | | 1-10 | | 8-5 | | |
| JESSICA | 1230-630 | 6.0 | 1-10 | 8.0 | | | 8-5 | 8.0 | 1-10 | 8.0 | | | 11-7 | 7.0 | 37 |
| JOELY | | | | | | | | | 5-10 | 5.0 | 5-10 | 5.0 | 8-2 | 6.0 | 16 |
| | | | | | Please call 2 hrs ahead for on call shifts | | | | | | | | | | |
| LOIS | | | | | 11-2 | 3.0 | | | 11-3 | 4.0 | 11-3 | 4.0 | | | 11 |
| CONNIE | | | | | | | | | | | | | | | 0 |
| TANYA | | | 1-6 | 5.0 | 6-10 | OC | 3-6 | 3.0 | R/O | | R/O | | | | 8 |
| LINDA | 1-5 | OC | | | R/O | | 1-6 | 5.0 | | | | | | | 5 |
| RUTH | | | 3-6 | 3.0 | | | R/O | | 3-6 | 3.0 | 3-6 | 3.0 | 6-10 | 4.0 | 13 |
| STEPHANIE | | | 6-10 | 4.0 | 6-10 | 4.0 | | | 6-10 | OC | R/O | | | | 8 |
| JEANETTE | 1230-630 | OC | 6-10 | 4.0 | R/O | | 6-10 | 4.0 | | | R/O | | 2-6 | 4.0 | 12 |
| JUDY | 1-5 | 4.0 | | | | | | | | | 1-6 | 5.0 | | | 9 |
| MARGIE | 230-630 | 4.0 | R/O | | 6-10 | 4.0 | R/O | | | | 6-10 | 4.0 | 10-2 | 4.0 | 16 |
| JEAN ANN | | | R/O | | R/O | | R/O | | 6-10 | 4.0 | R/O | | 11-3 | 4.0 | 12 |
| TANICO | 1230-630 | 6.0 | 11-3 | 4.0 | | | 11-3 | 4.0 | | | R/O | | R/O | | 14 |
| SUSAN | 2-6 | 4.0 | 6-10 | OC | R/O | | 6-10 | 4.0 | | | R/O | | 5-10 | 5.0 | 13 |
| AMBER | | | | | 1-6 | 5.0 | | | 1-5 | 4.0 | 1-6 | OC | 5-10 | 5.0 | 14 |
| LAIMA | | | | | 2-6 | 4.0 | 6-10 | OC | R/O | | 8-1 | 5.0 | 1-5 | 4.0 | 13 |
| TARRESSA | | | | | 8-1 | 5.0 | 8-1 | 5.0 | 8-1 | 5.0 | 12-5 | 5.0 | 12-5 | OC | 20 |
| PAM | | | 8-2 | 6.0 | | | 8-3 | 7.0 | | | | | | | 13 |
| | | | | | Hours may be cut based on business needs | | | | | | | | | | |
| | | | | | | | | | | | | | | | 0 |
| Coverage | | | | | Sub Total | | | | | | | | | | |
| AM/MID | 35.0 | | 35.5 | | 34.5 | | 34.5 | | 34.5 | | 34.5 | | 35.0 | | |
| Total Hrs | 24 | | 34 | | 25 | | 40 | | 33 | | 35 | | 43 | | 234 |
| Selling Hours Allowed | 20 | | 16 | | 25 | | 27 | | 34 | | 37 | | 35 | | 194 |

*(handwritten note)* Sat 1-5 changed to Kile

*(handwritten paragraph)* I might be on time more if I was not so upset + stressed by all the managment this is...

| | | | | | | | | | | | | | | | 0 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| OD | | | 1-5 | 4.0 | 1-5 | 4.0 | 1-5 | 4.0 | 1-5 | 4.0 | 1-5 | 4.0 | | | 20 |
| LY SPLH GOAL | 172 | | 84 | | 174 | | 123 | | 185 | | 192 | | 167 | | 0 |
| EK SPLH GOAL | 202 | | 202 | | 202 | | 202 | | 202 | | 202 | | 202 | | 0 |

| | |
|---|---|
| Tasking Hours scheduled | 20 |
| Tasking Hours allowed | 24 |
| Total Hours (Selling + Tasking) scheduled | 254 |
| Total Hours Allowed | 218 |

DEFENDANT'S EXHIBIT



| | Sunday | HRS | Monday | HRS | Tuesday | HRS | Wed | HRS | Thursday | HRS | Friday | HRS | Saturday | HRS | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Schedule Form 6.2 | | | | | | | |
| Date | 16 April | | 17 April | | 18 April | | 19 April | | 20 April | | 21 April | | 22 April | | | |
| Sales Plan | | | 3450 | | 4005 | | 3908 | | 3708 | | 5599 | | 7065 | | $ 29,803 | |
| KIM | | | Vacation | | 8-5 | | 8-3 | | Transfers | | Transfers | | | | | |
| JANIECE | | | 8-5 | | 1-10 | | 8-3 | | Transfers | | Transfers | | R/O | | | |
| SANTINA | | | 1-10 | | 8-5 | | R/O | | 8-5 | | 1-10 | | 8-5 | | | |
| | | | | | | | | | | | | | | | | |
| JESSICA | | | 8-5 | 8.0 | | | 3-10 | 7.0 | Visual | | 7-4 | 8.0 | 1-10 | 8.0 | 31 | |
| JOELY | | | | | | | | | 5-10 | 5.0 | 5-10 | 5.0 | | | 10 | |
| | | | PLEASE CALL 2 HOURS AHEAD FOR "ON CALL" SHIFTS | | | | | | | | | | | | | |
| LOIS | | | | | 11-3 | OC | | | 11-3 | 4.0 | 9-1 | 4.0 | | | 8 | |
| CONNIE | | | | | | | | | | | | | | | 0 | |
| TANYA | | | Stock | | 1-6 | 5.0 | | | Transfers | | 1-5 | 4.0 | 6-10 | 4.0 | 13 | |
| LINDA | | | 1-6 | OC | R/O | | 1-6 | 5.0 | 1-6 | 5.0 | | | 1-6 | 5.0 | 15 | |
| RUTH | | | R/O | | 3-6 | 3.0 | | | 3-6 | 3.0 | 3-6 | 3.0 | R/O | | 9 | |
| STEPHANIE | | | 6-10 | 4.0 | | | 6-10 | 4.0 | 6-10 | 4.0 | | | | | 12 | |
| JEANETTE | | | | | | | | | | | | | | | 0 | |
| JUDY | | | | | | | | | | | | | | | 0 | |
| MARGIE | | | R/O | | 6-10 | 4.0 | R/O | | 6-10 | 4.0 | | | 9-1 | 4.0 | 12 | |
| JEAN ANN | | | 6-10 | OC | 6-10 | 4.0 | 6-10 | 4.0 | R/O | | 6-10 | OC | 2-6 | 4.0 | 12 | |
| TANICO | | | 1-6 | 5.0 | | | | | | | Transfers | | 8-2 | 6.0 | 11 | |
| SUSAN | | | 6-10 | 4.0 | | | 6-10 | 4.0 | 6-10 | OC | 6-10 | 4.0 | R/O | | 12 | |
| AMBER | | | 2-6 | 4.0 | Stock | | 3-6 | 3.0 | Stock | | R/O | | R/O | | 7 | |
| LAIMA | | | | | 6-10 | OC | | | Transfers | | 1-5 | OC | 1-7 | 6.0 | 6 | |
| TARRESSA | | | | | 11-3 | 4.0 | 1-6 | OC | 8-1 | 5.0 | 11-3 | 4.0 | 6-10 | 4.0 | 17 | |
| PAM | | | 8-2 | 6.0 | | | 8-3 | 7.0 | | | | | | | 13 | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | Transfer | | Transfers | | | | | |
| | | | | | | | | | 1a-10a | | 5a-2p | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | Hours may be cut based on business needs | | | | | | | | | |
| | | | Selling Hours | | | | | | | | | | | | | |
| Coverage AM/MID/PM | | | 3/5/3 | | 3/5/3 | | 3/5/3 | | 3/4/3 | | 3/4/3 | | 3/5/3 | | | |
| Total Hrs | 0 | | 31 | | 20 | | 34 | | 30 | | 32 | | 41 | | 188 | |
| Selling Hours Allowed | 0 | | 24 | | 27 | | 21 | | 20 | | 30 | | 38 | | 160 | |
| | | | | | | | Visual Team | | | | | | | | | |
| JESSICA | | | | | | | | | 5-2 | 8.0 | | | | | 8 | |
| TANICO | | | | | | | | | 5a-8a | 3.0 | | | | | 3 | |
| TODD | | | | | | | | | 5a-11a | 6.0 | | | | | 6 | |
| | | | | | | | | | | | | | | | 0.0 | |
| | | | | | | | | | | | | | | | 0 | |
| | | | | | | | | | | | | | | | 0 | |
| | | | | | | | Stock Team | | | | | | | | | |
| | | | | | | | | | 1a-10a | | 5a-3p | | | | 0 | |
| JANIECE | | | | | | | | | 1a-10a | | 5a-2p | | | | 0 | |
| TANYA | | | 1-5 | 4.0 | | | | | 3a-10a | 7.0 | | | | | 11 | |
| TANICO | | | | | | | 1-5 | 4.0 | | | 5a-8a | 3.0 | | | 7 | |
| LAIMA | | | | | | | | | 3a-10a | 7.0 | | | | | 7 | |
| TODD | | | 1-5 | 4.0 | 1-5 | 4.0 | 1-5 | 4.0 | | | 1-5 | 4.0 | | | 16 | |
| AMBER | | | | | 1-5 | 4.0 | | | 1-6 | 5.0 | | | | | 9 | |
| DAILY SPLH GOAL | #DIV/0! | | 114 | | 178 | | 93 | | 58 | | 144 | | 172 | | 0 | |
| WEEK SPLH GOAL | #DIV/0! | | 186 | | 186 | | 186 | | 186 | | 186 | | 186 | | 0 | |

| | |
|---|---|
| Tasking Hours scheduled | 67 |
| Tasking Hours allowed | 20 |
| Total Hours (Selling + Tasking) scheduled | 255 |
| Total Hours Allowed | 180 |

DEFENDANT'S EXHIBIT

39 Bond

Week ending 4/22/06

Schedule 15

Sun – off – Easter – θ

Mon – θ/6/06 – off

Tues – off (St. Patterson 1:30) Cancelled reschedule

1:02 Wed – 1-6 – 5
1:08 Thurs – 1-6 – 5 → on time

Fri – off

Sat – 1-6 — 5
                    15

Physical
therapy
finished

| | Sunday | HRS | Monday | HRS | Tuesday | HRS | Wed | HRS | Thursday | HRS | Friday | HRS | Saturday | HRS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | 30-Apr | | 01-May | | 02-May | | 03-May | | 04-May | | 05-May | | 06-May | | |
| Sales Plan | 355 | | 1,068 | | 574 | | 738 | | 1,302 | | 1,302 | | 1,519 | | $ 33,849 |
| KIM | | | 7-4 | | | | 1-10 | | 8-5 | | 1-10 | | 8-5 | | |
| JANIECE | 1230-630 | | 8-5 | | 1-10 | | R/O | | 11-7 | | | | 1-10 | | |
| SANTINA | | | 8a-10a | | Vacation | | Vacation | | Vacation | | 8-5 | | 1-10 | | |
| | | | | | | | | | | | | | | | |
| HEATHER | | | 7-4 | 8.0 | | | 1-10 | 8.0 | 8-5 | 8.0 | 1-10 | 8.0 | 8-5 | 8.0 | 40 |
| JESSICA | | | 8-10/2-10 | 8.0 | 8-5 | 8.0 | 8-5 | 8.0 | 1-10 | 8.0 | | | 10-7 | 8.0 | 40 |
| JOELY | | | | | | | | | | | | | | | 0 |
| | | | | | CALL 2 HOURS AHEAD ON ALL "OC" SHIFTS | | | | | | | | | | |
| LOIS | | | 10-2 | 4.0 | | | | | 10-2 | 4.0 | 10-3 | 5.0 | | | 13 |
| CONNIE | | | | | | | | | | | | | | | 0 |
| TANYA | 130-630 | 5.0 | | | | | 3-6 | 3.0 | | | 12-6 | 6.0 | R/O | | 14 |
| LINDA | | | 2-6 | 4.0 | 2-6 | 4.0 | R/O | | | | | | 2-7 | 5.0 | 13 |
| RUTH | 230-630 | 4.0 | 3-6 | 3.0 | | | 3-6 | 3.0 | | | 3-6 | 3.0 | R/O | | 13 |
| STEPHANIE | | | 6-10 | 4.0 | 6-10 | OC | 6-10 | 4.0 | 6-10 | 4.0 | R/O | | | | 12 |
| JEANETTE | R/O | | | | 6-10 | 4.0 | | | | | 6-10 | 4.0 | 5-10 | 5.0 | 13 |
| JUDY | | | | | | | | | | | | | | | 0 |
| MARGIE | 2-6 | 4.0 | | | | | 6-10 | OC | 6-10 | 4.0 | R/O | | 9-1 | 4.0 | 12 |
| JEAN ANN | 1-5 | 4.0 | 6-10 | 4.0 | | | | | 6-10 | OC | R/O | | 1-5 | 4.0 | 12 |
| TANICO | 1230-330 | 3.0 | | | 8-2 | 6.0 | 11-3 | 4.0 | 2-6 | 4.0 | R/O | | R/O | | 17 |
| SUSAN | 330-630 | 3.0 | 6-10 | OC | 6-10 | 4.0 | | | | | 6-10 | 4.0 | 12-5 | OC | 11 |
| AMBER | | | | | | | | | | | | | | | 0 |
| TARRESSA | | | 10-3 | 5.0 | | | | | | | 8-12 | 4.0 | 5-10 | 5.0 | 14 |
| PAM | | | 8-2 | 6.0 | | | 8-3 | 7.0 | | | | | | | 13 |
| JANIS | | | | | | | | | | | | | | | 0 |
| HELEN | | | | | | | | | | | | | | | 0 |
| MELISSA | | | 8-12 | 4.0 | 2-6 | 4.0 | | | | | | | 11-4 | 5.0 | 13 |
| LAIMA | | | | | Stock | | | | Stock | | | | 12-5 | 5.0 | 5 |
| | | | | | | | | Selling Hours | | | | | | | |
| Coverage | | | | | | | | | | | | | | | |
| AM/MID/PM | 3/3/1 | | 5/6/1 | | 3/4/3 | | 3/5/3 | | 3/5/4 | | 5/5/6 | | 5/9/6 | | |
| Total Hrs | 23 | | 46 | | 34 | | 37 | | 32 | | 34 | | 49 | | 255 |
| Selling Hours Allowed | 26 | | 24 | | 21 | | 22 | | 25 | | 31 | | 50 | | 200 |
| | | | | | | | | Visual Team | | | | | | | |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0.0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | Stock Team | | | | | | | |
| LAIMA | | | | | 1-4 | 3.0 | | | 1-4 | 3.0 | | | | | 6 |
| BILL | | | 1-4 | 3.0 | | | 1-4 | 3.0 | | | 1-4 | 3.0 | | | 9 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| GOAL | 189 | | 83 | | 97 | | 93 | | 123 | | 143 | | 174 | | 0 |
| GOAL | 169 | | 169 | | 169 | | 169 | | 169 | | 169 | | 169 | | 0 |

| | |
|---|---|
| Tasking Hours scheduled | 15 |
| Tasking Hours allowed | 25 |
| Total Hours (Selling + Tasking) scheduled | 270 |
| Total Hours Allowed | 225 |

DEFENDANT'S EXHIBIT



Week ending May 6/06

Sun - off
Mon - 2-6 = 4 absent - Sgt - available
Tues 2:00 — Chris Manager
Tues - 2-6 = 4
Wed - off - Management
Thurs - off - Came
Fri - off - Need get close - Jill
Sat - 2-7 = 5

(Number 13)

Schedule 13



Management
for Mon 2:00 rescheduled
to Wed

(Number 1-13)

5 - Tonya
Ruth
Marci
Jean Ann
Tania
Susan

**Schedule Form 6.2**

| | Sunday | HRS | Monday | HRS | Tuesday | HRS | Wed | | HRS | Thursday | HRS | Friday | HRS | Saturday | HRS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | 21 May | | 21 May | | 21 May | | 21 May | | | 21 May | | 21 May | | 21 May | | |
| Sales Plan | 3.21 | | 3.639 | | 3.701 | | 3.741 | | | 3.478 | | 3.131 | | 3.323 | | $ 31,758 |
| KIM | 10-8 | | 7-2 | | R/O | | 8-5 | | | | | 11-10 | | 11-10 | | |
| JANIECE | | | Vacation | | Vacation | | Vacation | | | Vacation | | Vacation | | | | |
| SANTINA | 6-8 | | 8-5 | | 3-10 | | 1-10 | | | 8-5 | | R/O | | 8-5 | | |
| | | | | | | | | | | | | | | | | |
| HEATHER | 6-8 | 2.0 | 8-5 | 8.0 | 8-4 | 7.0 | 1-10 | | 8.0 | 1-10 | 8.0 | 11-7 | 7.0 | R/O | | 40 |
| JESSICA | 6-8 | 2.0 | 8-10/2-10 | 9.0 | 8-4 | 7.0 | | | | 11-7 | 7.0 | 8-4 | 7.0 | 8-5 | 8.0 | 40 |
| | | | | | CALL 2 HOURS AHEAD ON ALL *OC* SHIFTS | | | | | | | | | | | |
| JOELY | 1-8 | 7.0 | | | | | 10-2 | | 4.0 | | | | | | | 11 |
| LOIS | 6-8 | 2.0 | R/O | | R/O | | | | | 1-5 | 4.0 | 8-1 | 5.0 | | | 11 |
| TANYA | 6-8 | 2.0 | 2-6 4. | | 1-6 OC | 5.0 | | | | | | | | 6-10 | 4.0 | 11 |
| LINDA | 6-8 | 2.0 | | 4.0 | 1-6 5oc | | Upset-Upset | | | | | | | 1-6 | 5.0 | (11) |
| RUTH | 6-8 | 2.0 | R/O | | R/O | | 3-6 | | 3.0 | | | | | 12-5 | 5.0 | 10 |
| STEPHANIE | 6-8 | 2.0 | 6-10 | 4.0 | | | 6-10 | | 4.0 | 6-10 | 4.0 | R/O | | | | 14 |
| JEANETTE | 6-8 | 2.0 | 1-5 | 4.0 | | | | | | 8-1 | 5.0 | | | | | 11 |
| JUDY | 6-8 | 2.0 | | | | | | | | | | 1-6 | 5.0 | 6-10 | 4.0 | 11 |
| MARGIE | 12-8 | 8.0 | R/O | | 6-10 | 4.0 | R/O | | | R/O | | R/O | | R/O | | 12 |
| JEAN ANN | 6-8 | 2.0 | | | 6-10 | OC | | | | | | 6-10 | 4.0 | 2-6 | 4.0 | 10 |
| TANICO | 6-8 | 2.0 | | | 10-2 | 4.0 | 6-10 | OC | | | | 8-1 | OC | 5-10 | 5.0 | 11 |
| SUSAN | 6-8 | 2.0 | 6-10 | OC | 6-10 | 4.0 | | | | 6-10 | 4.0 | 6-10 | 4.0 | | | 14 |
| TARRESSA | 2-8 | 6.0 | | | 2-6 | 4.0 | R/O | | | | | | | R/O | | 10 |
| PAM | 6-8 | 2.0 | 10-2 | 4.0 | | | 8-3 | | 7.0 | | | | | | | 13 |
| LAIMA | 6-8 | 2.0 | R/O | | R/O | | 2-6 | | 4.0 | | | | | 10-2 | 4.0 | 12 |
| JAMILA | 2-8 | 6.0 | 5-10 | 5.0 | | | | | | | | | | 3-6 | 3.0 | 14 |
| | | | | | | | | | | | | | | | | |
| | | | Mandatory | | | | | | | | | | | | | |
| | | | Store Meeting | | | | | | | | | | | | | |
| | | | 6p-8p | | | | | | | | | | | | | |

Selling Hours

| Coverage AMMIDIPM | 3/4/3 | 3/6/3 | 3/4/3 | 3/6/3 | 3/6/3 | 3/6/3 | 3/5/3 | |
|---|---|---|---|---|---|---|---|---|
| Total Hrs | 55 | 38 | 35 | 30 | 32 | 32 | 42 | 264 |
| Selling Hours Allowed | 23 | 23 | 25 | 30 | 32 | 34 | 42 | 209 |

*swap w/ Tanya* *for Dr appt* *scheduled by Dr Ender* *for new store* (handwritten notes)

| | | | | | | | | 0 |
| | | | | | | | | 0 |
| | | | | | | | | 0.0 |
| | | | | | | | | 0.0 |
| | | | | | | | | 0 |
| | | | | | | | | 0 |

Stock Team

| | | | | | | | | 0 |
| SUSAN | 6-8 | 2.0 | 1-5 | 4.0 | 1-5 | 4.0 | 1-5 | 4.0 | 14 |
| BILL | 6-8 | 2.0 | R/O | | R/O | | | | 1-5 | 4.0 | 1-5 | 4.0 | 10 |
| | | | | | | | | 0 |
| Beach | | | | | | | | 0 |
| SPLH GOAL | 60 | 83 | 97 | 135 | 133 | 143 | 153 | |
| SPLH GOAL | 152 | 152 | 152 | 152 | 152 | 152 | 152 | |

| | |
|---|---|
| Tasking Hours scheduled | 24 |
| Tasking Hours allowed | 26 |
| Total Hours (Selling + Tasking) scheduled | 288 |
| Total Hours Allowed | 235 |

DEFENDANT'S EXHIBIT 44

Sunday – 6-8 – meeting = 2

Monday – Dr. Smith 4:00

Tuesday – 1-6

Wed – off

Thurs – off – upset cancer

Fri – off

Sat – 1-6

$$\frac{21}{23} = 189\frac{75}{} = \$170.00$$

off – 6/1/06

$61.79^{00}$

$198.00$

S – Marge
foreman

Dr. Sister local not lumpectomy
mastectomy

*Register before surgery get set + sew hours end of June due ... Val ... ...* (handwritten)

| | | Sunday | HRS | Monday | HRS | Tuesday | HRS | Wed | HRS | Thursday | HRS | Friday | HRS | Saturday | HRS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Schedule Form 6.2 | | | | | | | | |
| Date | | | | | | | | | | | | | | | | |
| Sales Plan | | | | | | | | 1,550 | | 110 | | 1,800 | | 2,510 | | $ 25,397 |
| KIM | | R/O | | 7-4 | | 8-5 | | 8-5 | | | | 1-10 | | 8-5 | | |
| JANIECE | | 1130-630 | | 8-5 | | 1-10 | | 1-10 | | 8-5 | | R/O | | R/O | | |
| SANTINA | | | | 8-5 | | | | 8-5 | | 1-10 | | 8-5 | | 10-7 | | |
| | | | | | | | | | | | | | | | | |
| HEATHER | | R/O | | 8-10/3-10 | 9.0 | 10-6 | 7.0 | | | 8-5 | 8.0 | 8-5 | 8.0 | 1-10 | 8.0 | 40 |
| JESSICA | | | | 8-5 | 8.0 | 8-5 | 8.0 | 1-10 | 8.0 | 1-10 | 8.0 | 10-7 | 8.0 | | | 40 |
| | | | | | | CALL 2 HOURS AHEAD ON ALL *OC* SHIFTS | | | | | | | | | | |
| JOELY | | 1230-630 | OC | | | | | | | | | 5-10 | 5.0 | 6-10 | 4.0 | 9  15 |
| LOIS | | | | | | R/O | | 8-1  5 | OC | 2-5 | 3.0 | 10-2 | 4.0 | | | 7  12 |
| TANYA | | | | | | 1-6  5 | OC | | | 5-10 | 5.0 | | | 4-8 | 4.0 | 9  14 |
| LINDA | | 1-6 | 5.0 | | | | | 1-5 | | | | | | 1-5 | 4.0 | 9  13 |
| RUTH | | 330-630 | 3.0 | 3-6 | OC | | | | | 3-6 | OC | | | 12-4 | 4.0 | 7  13 |
| STEPHANIE | | | | 6-10 | 4.0 | 6-10 | OC | | | | | 6-10 | 4.0 | | | 8  12 |
| JEANETTE | | | | 10-3 | OC | | | 1-5 | 4.0 | | | 2-5 | 3.0 | | | 7  12 |
| JUDY | | | | | | | | | | | | | | | | 0 |
| MARGIE | | 1230-330 | 3.0 | 6-10 | OC | 6-10 | 4.0 | | | | | R/O | | R/O | | 7  11 |
| TANICO | | R/O | | | | 8-1  5 | OC | 5-10 | 5.0 | | | 6-10  4 | OC | 8-12 | 4.0 | 9  18 |
| SUSAN NESSELRODE | | | | 6-10 | 4.0 | | | 6-10 | OC | | | R/O | | 5-10 | 5.0 | 9  13 |
| TARRESSA | | 230-630 | 4.0 | | | | | | | 10-2 | OC | | | 2-6 | 4.0 | 8  12 |
| PAM | | | | R/O | | | | 10-1 | 3.0 | 10-2 | 4.0 | | | | | 7 |
| JAMILA | | 330-630 | OC | | | 5-10 | 5.0 | | | | | 3-6 | 3.0 | 6-10 | OC | 8  15 |
| | | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| Coverage | | | | | | | | Selling Team | | | | | | | | |
| AM/MID/PM | | 3/4/4 | | 4/5/4 | | 3/4/5 | | 3/5/5 | | 3/6/4 | | 3/6/3 | | 3/6/4 | | |
| Total Hrs | | 15 | | 25 | | 24 | | 20 | | 28 | | 35 | | 37 | | 184 |
| Selling Hours Allowed | | 15 | | 17 | | 21 | | 23 | | 26 | | 27 | | 33 | | 162 |
| | | | | | | | | Visual Team | | | | | | | | |
| | | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | | 0.0 |
| | | | | | | | | | | | | | | | | 0.0 |
| | | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | Stock Team | | | | | | | |
| SUSAN CLARK | | | | 1-4 | 3.0 | | | 1-4 | 3.0 | | | 1-4 | 3.0 | | | 9 |
| BRIDGET | | | | | | 1-4 | OC | | | 1-4 | OC | | | | | 0 |
| | | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | | 0 |
| DAILY SPLH GOAL | | 157 | | 94 | | 136 | | 156 | | 148 | | 113 | | 138 | | 0 |
| WEEK SPLH GOAL | | 157 | | 157 | | 157 | | 157 | | 157 | | 157 | | 157 | | 0 |

*worked till 8:00 Saturday* (handwritten)

| | |
|---|---|
| Tasking Hours scheduled | 9 |
| Tasking Hours allowed | 20 |
| Total Hours (Selling + Tasking) scheduled | 193 |
| Total Hours Allowed | 181 |

**DEFENDANT'S EXHIBIT**

*48 Boyd* (handwritten)

*Did not try* *on Fri + Sat* *also told* *no more* *for anyone*

| Schedule Form 6.2 | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sunday | HRS | Monday | HRS | Tuesday | HRS | Wed | HRS | Thursday | HRS | Friday | HRS | Saturday | HRS | |
| Date | 25 Jun | | 26 Jun | | 27 Jun | | 28 Jun | | 29 Jun | | 30 Jun | | 01 Jul | | |
| Sales Plan | 2,634 | | 2,621 | | 3,192 | | 2,200 | | 3,466 | | 4,227 | | 5,854 | | $ 28,325 |
| KIM | | | 7-4 | | 1-12 | | | | 8-5 | | 8-5 | | 8-5 | | |
| JANIECE | 6a-1p | | 8-5 | | R/O | | R/O | | 1-10 | | 11-7 | | 1-10 | | |
| SANTINA | | | 8-5 | | 8-5 | | 8-5 | | | | 1-10 | | 8-5 | | |
| | | | | | | | | | | | | | | | |
| HEATHER | | | | | 3-12 | 8.0 | 1-10 | 8.0 | 8-5 | 8.0 | 8-5 | 8.0 | 1-10 | 8.0 | 40 |
| JESSICA | 930-630 | 8.0 | 8-10/2-10 | 9.0 | Visual | | Visual | | | | 8-5 | 8.0 | R/O | | 25 |
| | | | | | CALL 2 HOURS AHEAD ON ALL "OC" SHIFTS | | | | | | | | | | |
| JOELY | 230-630 | OC | | | | | | | 5-10 | 5.0 | 5-10 | 5.0 | 10-5 | 7.0 | 17 |
| LOIS | | | R/O | | 10-3 | 5.0 | 8-2 | 6.0 | 10-2 | 4.0 | 1-5 | 4.0 | | | 19 |
| TANYA | 330-630 | 3.0 | 1-6 | 5.0 | R/O | | R/O | | R/O | | R/O | | R/O | | 8 |
| LINDA | X | | R/O | *Surgery* | R/O | | R/O | | R/O | | R/O | | R/O | | 0 |
| RU... | | | | | 3-6 | 3.0 | 3-6 | 3.0 | R/O | | | | 12-6 | 6.0 | 12 |
| S... | | | 6-10 | 4.0 | | | 6-10 | 4.0 | | | 6-10 | 4.0 | | | 12 |
| J... | | | | | 8-3 | 7.0 | | | | | | | | | 7 |
| | | | R/O | | R/O | | R/O | | R/O | | R/O | | R/O | | 0 |
| | | | | | 6-12 | 6.0 | R/O | | Stock | | | | 9-2 | 5.0 | 17 |
| | | | | | Stock | | Stock | | 2-6 | 4.0 | | | 4-10 | 6.0 | 16 |
| | | | | | 6-12 | 6.0 | 6-10 | 4.0 | 6-10 | 4.0 | R/O | | R/O | | 14 |
| | | | | | | | | | | | | | 11-6 | 7.0 | 11 |
| | | | 10-1 | 3.0 | | | 10-3 | 5.0 | | | | | | | 11 |
| | | | 5-10 | 5.0 | | | 2-6 | 4.0 | | | | | 4-10 | 6.0 | 20 |
| | | | | | | | | | | | | | | | 0 |
| | | | Transfers | | | | Second MDs | | | | | | | | |
| | | | 6a-12p | | | | 9p-12a | | | | | | | | |

*DEFENDANT'S EXHIBIT* *49 Beard*

*I'm so blessed in spite of you Kim*

*Requested hours for tues + sat hours for sale. Kim said she doesn't care — won't let Joan try the new hours*

| Coverage | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AM/MID/PM | | 8-4-8 | | 8-4-5 | | 8-4-4 | | 8-4-4 | | 8-4-3 | | 8-6-3 | | 5-7-4 | |
| Total Hrs | | 31 | | 26 | | 35 | | 34 | | 25 | | 29 | | 45 | | 225 |
| Selling Hours Allowed | | 17 | | 22 | | 23 | | 23 | | 23 | | 29 | | 45 | | 187 |

| Visual Team | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JESSICA | | | | | 9p-4a | 7.0 | 9p-5a | 8.0 | | | | | | | 15 |
| BRIDGET | | | | | 9p-3a | 6.0 | | | | | | | | | 6 |
| SUSAN CLARK | | | | | 9p-4a | 7.0 | 9p-4a | 7.0 | | | | | | | 14.0 |
| | | | | | | | | | | | | | | | 0.0 |

*I AM SO HAPPY SURGERY OVER*

| Stock Team | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SUSAN CLARK | | | 1-5 | 4.0 | Visual | | Visual | | | | | | | | 8 |
| BRIDGET | | | 1-5 | 4.0 | Visual | | R/O | | R/O | | R/O | | R/O | | 4 |
| TANICO | | | | | 1-5 | 4.0 | | | | | | | | | 8 |
| MARGIE | | | | | | | | | 6-10 | 4.0 | | | | | 4 |

*and was good. Report — would have been so much worse — Thank you Lord*

| | Sunday | | Monday | | Tuesday | | Wed | | Thursday | | Friday | | Saturday | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DAILY SPLH GOAL | 83 | | 96 | | 59 | | 79 | | 120 | | 134 | | 153 | | |
| WEEK SPLH GOAL | 152 | | 152 | | 152 | | 152 | | 152 | | 152 | | 152 | | |

| | | |
|---|---|---|
| Tasking Hours scheduled | | 59 |
| Tasking Hours allowed | | 23 |
| Total Hours (Selling + Tasking) scheduled | | 284 |
| Total Hours Allowed | | 210 |

*a lot good report - no lymph node involved + this they got it all - only small incision - have Radiation but maybe no chemo*

Sun – off
Mon – Surgery – 1:00 ☆
Tues – off
Wed – off – Dr. Shiloh – after surgery appt get portals resub
Thurs – off – detted to get hours
(Kim was totally nice you once) would resub
Fri – 2-8 = 6  give these hours in June
Sat – 2-8 = 6  give May & June and requested did formal

(12,25)

Sun – off
Mon – off
Tues – 1-6
Wed – off   On – 4:30
Tues – 1-6
Thurs – off
Fri – off
Sat – 1-6

week ending July – off

| | Sunday | HRS | Monday | HRS | Tuesday | HRS | Wed | HRS | Thursday | HRS | Friday | HRS | Saturday | HRS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | **Schedule Form 6.2** | | | | | | |
| Date | | | | | | | | | | | | | | | |
| Sales Plan | | | | | | | | | | | | | | | $ 25,970 |
| KIM | | | 8-5 | | | | 8-5 | | 1-10 | | 8-5 | | 8-5 | | |
| JANIECE | 1130-630 | | 8-5 | | | | R/O | | 8-5 | | 1-10 | | 8-5 | | |
| SANTINA | | | 8-10/2-10 | | | | 8-5 | | 8-5 | | 8-5 | | 1-10 | | |
| | | | | | | | | | | | | | | | |
| HEATHER | | | 8-5 | 8.0 | 830-630 | 9.0 | | | 2-10 | 7.0 | 1-10 | 8.0 | 10-7 | 8.0 | 40 |
| JESSICA | R/O | | R/O | | 830-630 | 9.0 | 1-10 | 8.0 | 10-7 | 8.0 | 8-5 | 8.0 | 2-10 | 7.0 | 40 |
| | | | | | CALL 2 HOURS AHEAD ON ALL "OC" SHIFTS | | | | | | | | | | |
| JOELY | 1230-330 | 3.0 | | | | | | | | | 5-10 | 5.0 | | | 8 |
| LOIS | | | | | 1030-230 | 4.0 | | | R/O | | | | | | 4 |
| TANYA | R/O | | R/O | | R/O | | R/O | | R/O | | R/O | | R/O | | 0 |
| LINDA | R/O | | | | 1-6 | 5.0 | | | | | 1-6 | | 1-6 | 5.0 | 10 |
| RUTH | 2-6 | OC | 3-6 | 3.0 | | | 3-6 | 3.0 | | | | | R/O | | 6 |
| STEPHANIE | | | 6-10 | 4.0 | R/O | | 6-10 | 4.0 | 6-10 | OC | R/O | | | | 8 |
| JEANETTE | | | | | | | | | | | | | | | 0 |
| JUDY | | | | | 230-630 | 4.0 | | | | | 6-10 | OC | 6-10 | 4.0 | 8 |
| MARGIE | 130-630 | 5.0 | R/O | | R/O | | 6-10 | OC | | | | | 10-2 | 4.0 | 9 |
| TANICO | 330-630 | 3.0 | 6-10 | 4.0 | | | | | | | | | 6-10 | 4.0 | 11 |
| SUSAN NESSELRODE | R/O | | R/O | | R/O | | R/O | | R/O | | R/O | | R/O | | 0 |
| TARRESSA | R/O | | | | R/O | | | | | | | | | | 0 |
| PAM | | | R/O | | | | 10-3 | 5.0 | | | | | | | 5 |
| JAMILA | R/O | | R/O | | | | 5-10 | 5.0 | 6-10 | 4.0 | R/O | | R/O | | 9 |
| LINDSEY | R/O | | 1-6 | 5.0 | | | | | | | | | 2-6 | 4.0 | 9 |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| **Covering** | | | | | | | _Sellion Hours_ | | | | | | | | |
| **AM/MID/PM** | | | | | | | | | | | | | | | 167 |
| Total Hrs | 11 | | 24 | | 31 | | 25 | | 19 | | 21 | | 36 | | 167 |
| Selling Hours Allowed | 18 | | 18 | | 17 | | 20 | | 23 | | 24 | | 35 | | 154 |
| | | | | | | | _Main Team_ | | | | | | | | |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0.0 |
| | | | | | | | | | | | | | | | 0.0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | _Spc Team_ | | | | | | | | |
| SUSAN CLARK | | | 1-5 | 4.0 | | | 1-5 | 4.0 | 1-5 | OC | | | | | 8 |
| BRIDGET | R/O | | R/O | | R/O | | R/O | | R/O | | 1-5 | 4.0 | | | 4 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | | | | 0 |
| DAILY SPLH GOAL | 269 | | 108 | | 92 | | 114 | | 202 | | 162 | | 165 | | 0 |
| WEEK SPLH GOAL | 169 | | 169 | | 169 | | 169 | | 169 | | 169 | | 169 | | 0 |

| | |
|---|---|
| Tasking Hours scheduled | 12 |
| Tasking Hours allowed | 19 |
| Total Hours (Selling + Tasking) scheduled | 179 |
| Total Hours Allowed | 173 |

**DEFENDANT'S EXHIBIT**

50  Beard



Sales

Weekends - 7/8/0

Sun - off - forgive

Mon - off

Tues - 11:30-6:30 = 5.25 = 6500

Wed - off

Thurs - off date

Fri - 1-6 = 5

Sat - 1:05-6:10 = 5

Tried to be on-time Tuesday

see re-time Tuesday

not-so good Tuesday

(D) 4:30) forgive

Don't know

why I'm so

tired

8.25
4.13
12.38
5.25

6500
18.38
24.8.5 = 795.0

8.25
12.38

1.0
12
22.25

| | Sunday | HRS | Monday | HRS | Tuesday | HRS | Wed | HRS | Thursday | HRS | Friday | HRS | Saturday | HRS | Schedule Form 6.2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | 06-Aug | | 07-Aug | | 08-Aug | | 09-Aug | | 10-Aug | | 11-Aug | | 12-Aug | | |
| Sales Plan | 3091 | | 4695 | | 5744 | | 4068 | | 4055 | | 5254 | | 5844 | | $ 32,663 |
| KIM | 1130-830 | | 8-12 | | | | 8-5 | | | | 1-10 | | 8-5 | | |
| JANIECE | 730-830 | | 8-5 | | 1-10 | | R/O | | 8-5 | | 8-5 | | | | |
| SANTINA | 730-830 | | 8-5 | | 8-5 | | 8-5 | | 1-10 | | | | 1-10 | | |
| | | | | | | | | | | | | | | | |
| HEATHER | 730-830 | 1.0 | 8-10/4-10 | 8.0 | 8-5 | 8.0 | 10-6 | 7.0 | | | 8-5 | 8.0 | 1-10 | 8.0 | 40 |
| JESSICA | 1130-830 | 8.0 | 8-5 | 8.0 | | | 1-10 | 8.0 | 8-5 | 8.0 | 1-10 | 8.0 | | | 40 |
| | | | | | CALL 2 HOURS AHEAD ON ALL OC SHIFTS | | | | | | | | | | |
| JOELY | 730-830 | 1.0 | R/O | | | | | | 5-10 | 5.0 | 6-10 | 4.0 | R/O | | 10 |
| LOIS | 730-830 | 1.0 | 1-5 | OC | 10-3 | 5.0 | R/O | | 10-3 | 5.0 | 10-3 | 5.0 | | | 16 |
| TANYA | 730-830 | 1.0 | 5-10 | 5.0 | 6-10 | OC | | | 1-5 | 4.0 | | | 11-3 | 4.0 | 14 |
| LINDA | 330-830 | 5.0 | | | 2-6 | | | | 2-6 | OC | | | 2-7 | 5.0 | 10 |
| RUTH | 730-830 | 1.0 | R/O | | 3-6 | 3.0 | | | 3-6 | 3.0 | 3-6 | 3.0 | R/O | | 10 |
| STEPHANIE | 730-830 | 1.0 | 6-10 | 4.0 | R/O | | 6-10 | 4.0 | 6-10 | 4.0 | R/O | | | | 13 |
| JEANETTE | 730-830 | 1.0 | 12-5 | 5.0 | 1-6 | 5.0 | 1-5 | 4.0 | R/O | | R/O | | R/O | | 15 |
| JUDY | 730-830 | 1.0 | | | | | | | | | 2-7 | 5.0 | 3-8 | 5.0 | 11 |
| MARGIE | 230-830 | 6.0 | R/O | | 6-10 | 4.0 | R/O | | | | 6-10 | OC | 10-2 | 4.0 | 14 |
| TANICO | 730-830 | 1.0 | | | | | | | | | | | | | 1 |
| SUSAN NESSELRODE | 130-830 | 7.0 | 6-10 | OC | 6-10 | 4.0 | 6-10 | OC | | | | | 6-10 | 4.0 | 15 |
| TARRESSA | 730-830 | 1.0 | | | | | | | | | | | | | 1 |
| PAM | 730-830 | 1.0 | 10-3 | OC | | | 10-3 | OC | | | | | | | 1 |
| JAMILA | 730-830 | 1.0 | | | 6-10 | OC | 5-10 | 5.0 | | | | | 12-6 | 6.0 | 12 |
| JANIS | 730-830 | 1.0 | | | | | | | 6-10 | OC | | | 1-6 | 5.0 | 6 |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | Mandatory Store Meeting 730p-830p | | *Changed to OC Hours* | | | | | | | | | | | | |
| | | | | | | | Selling Hours | | | | | | | | |
| Coverage AM 10-2 PM | 2516 | | 4413 | | 3156 | | 1853 | | 3353 | | 3158 | | 4816 | | |
| Total Hrs | 39 | | 30 | | 29 | | 28 | | 29 | | 33 | | 41 | | 229 |
| Selling Hours Allowed | 16 | | 14 | | 21 | | 25 | | 21 | | 33 | | 41 | | 171 |

EXHIBIT<br>5 to Board

| | | | | | | | | | | | | | | | Visual Team | 0 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

*She - Kim - did not accommodate me w/schedule*
*for Rael - Tatina + Kim jerked me around*
*both ugly about it!!*

| | | | | | | | | | | | | | | | Receiving Team | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SUSAN CLARK | 730-830 | 1.0 | 1-5 | 4.0 | | | 1-5 | 4.0 | | | 1-5 | 4.0 | 3-8 | 5.0 | 18 |
| BRIDGET | 730-830 | 1.0 | | | 1-5 | 4.0 | | | 1-5 | 4.0 | | | | | 9 |

*Kim Curry is doing everything she can keep me*
*stressed especially when I'm on time + she gets worse*
*I know that she is doing*

| DAILY SPLH GOAL | 74 | | 79 | | 123 | | 147 | | 123 | | 170 | | 171 | | 0 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WEEK SPLH GOAL | 191 | | 191 | | 191 | | 191 | | 191 | | 191 | | 191 | | 0 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tasking Hours scheduled | 27 |
| Tasking Hours allowed | 21 |
| Total Hours (Selling + Tasking) scheduled | 256 |
| Total Hours Allowed | 192 |

*if I was not ill w/ treatments etc — I'd beat*
*her at her game*



# Social Security Administration
Disability Information

SEPSC (PC3)
P. O. BOX 830589
BIRMINGHAM AL 35282-8950

Date:  May 24, 2007
Claim Number:  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 A

LINDA BEARD
8305 GRAND OAK CT
MONTGOMERY AL 36117-4750



DEFENDANT'S EXHIBIT

We recently reviewed the evidence in your Social Security disability claim and found that your disability is continuing.  Here is some important information about your claim.  We have also enclosed information about working that explains some of the terms we use.

You have completed your trial work period.  Although you are now working (or have worked and stopped), we find that the work you have been doing does not show that you can do substantial work.

We counted the following as trial work month(s):
April 2005
May 2005
June 2005
July 2005
August 2005
September 2005
October 2005
November 2005
December 2005

Your claim will be reviewed from time to time to see if you are still eligible for benefits based on disability.  When your claim is reviewed, you will be contacted if there is any question as to whether your eligibility continues.

If you are receiving Supplemental Security Income payments, any decision about that claim will be sent in a separate notice.

See Next Page

Refer To: 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

Office of Hearings and Appeals
OHA Hearing Ofc, SSA
3381 Atlanta Highway
Montgomery, AL 36109-2746

Date: SEP 0 1 2004

Linda L Beard
8305 Grand Oak Ct
Montgomery, AL 36117

### NOTICE OF DECISION – FULLY FAVORABLE

I have made the enclosed decision in your case. Please read this notice and the decision carefully.

### This Decision is Fully Favorable To You

Another office will process the decision and send you a letter about your benefits. Your local Social Security office or another may first ask you for more information. If you do not hear anything for 60 days, contact your local office.

### The Appeals Council May Review The Decision On Its Own

The Appeals Council may decide to review my decision even though you do not ask it to do so. To do that, the Council must mail you a notice about its review within 60 days from the date shown above. Review at the Council's own motion could make the decision less favorable or unfavorable to you.

### If You Disagree With The Decision

If you believe my decision is not fully favorable to you, or if you disagree with it for any reason, you may file an appeal with the Appeals Council.

### How To File An Appeal

To file an appeal you or your representative must request the Appeals Council to review the decision. You must make the request in writing. You may use our Request for Review form, HA-520, or write a letter.

You may file your request at any local Social Security office or a hearing office. You may also mail your request right to the **Appeals Council, Office of Hearings and Appeals, 5107 Leesburg Pike, Falls Church, VA 22041-3255.** Please put the Social Security number shown above on any appeal you file.

See Next Page

Linda L Beard (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)                                        Page 2 of 3

## Time To File An Appeal

To file an appeal, you must file your request for review **within 60 days** from the date you get this notice.

The Appeals Council assumes you got the notice 5 days after the date shown above unless you show you did not get it within the 5-day period. The Council will dismiss a late request unless you show you had a good reason for not filing it on time.

## Time To Submit New Evidence

You should submit any new evidence you wish to the Appeals Council to consider **with** your request for review.

## How An Appeal Works

Our regulations state the rules the Appeals Council applies to decide when and how to review a case. These rules appear in the Code of Federal Regulations, Title 20, Chapter III, Part 404 (Subpart J) and Part 416 (Subpart N).

If you file an appeal, the Council will consider all of my decision, even the parts with which you agree. The Council may review your case for any reason. It **will** review your case if one of the reasons for review listed in our regulations exists. Section 404.970 and 416.1470 of the regulation list these reasons.

Requesting review places the entire record of your case before the Council. Review can make any part of my decision more or less favorable or unfavorable to you.

On review, the Council may itself consider the issues and decide your case. The Council may also send it back to an Administrative Law Judge for a new decision.

## If No Appeal And No Appeals Council Review

If you do not appeal and the Council does not review my decision on its own motion, you will not have a right to court review. My decision will be a final decision that can be changed only under special rules.

See Next Page

Linda L Beard (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)

**If You Have Any Questions**

If you have any questions, you may call, write or visit any Social Security office. If you visit an office, please bring this notice and decision with you. The telephone number of the local office that serves your area is (334)223-7183. Its address is Social Security, 2450 President'S Drive, Montgomery, AL 36116-1616.

Michael D. Anderson
Administrative Law Judge

cc: S. Kay Dansby
    1723 Forest Avenue
    Po Box 11352
    Montgomery, AL 36111

# SOCIAL SECURITY ADMINISTRATION
## Office of Hearings and Appeals

## ORDER

**IN THE CASE OF**                                    **CLAIM FOR**

                                                     Period of Disability,
                                                     Disability Insurance Benefits, and
Linda L Beard                                        Supplemental Security Income
_____
(Claimant)

                                                     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
_____                     _____
(Wage Earner)                                        (Social Security Number)

I approve the fee agreement between the claimant and her representative subject to the condition that the claim results in past-due benefits.

My determination is limited to whether the fee agreement meets the statutory conditions for approval and is not otherwise excepted. I neither approve nor disapprove any other aspect of the agreement.

## HOW TO ASK US TO REVIEW THE FEE AGREEMENT DETERMINATION

You or your representative may ask us to review the determination on the fee agreement. If you decide to ask us for a review, write us within 15 days from the day you get this order. Tell us that you disagree and give your reasons.
Send your request to this address:

- **Ollie L. Garmon, III**
  **Regional Chief Administrative Law Judge**
  **Atlanta Federal Center**
  **61 Forsyth Street, SW, Ste. 20T10**
  **Atlanta, GA 30303**

Your representative also has 15 days to write us if he or she does not agree with the determination on the fee agreement.

You should include the social security number(s) shown on this order on any papers that you send us.

_M. D. Anderson_
_____
Michael D. Anderson
Administrative Law Judge
SEP 0 1 2004
_____
Date

**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings and Appeals**

### DECISION

<u>**IN THE CASE OF**</u>                                    <u>**CLAIM FOR**</u>

Period of Disability,
Disability Insurance Benefits, and
Linda L Beard _____          Supplemental Security Income _____
(Claimant)

_____          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 _____
(Wage Earner)                                    (Social Security Number)

### <u>INTRODUCTION</u>

The claimant protectively filed applications for disability benefits and supplemental security income on March 19, 2004 and February 26, 2004, respectively, alleging disability since June 13, 2003. After a denial of the applications, she filed a timely request for hearing before an administrative law judge. A hearing was deemed unnecessary as a wholly fully favorable decision could be made based on the evidence of record. The claimant is represented by S. Kay Dansby, attorney-at-law.

### <u>ISSUES</u>

The general issues are whether the claimant is entitled to a period of disability and disability insurance benefits under sections 216(i) and 223 of the Social Security Act and/or eligible for supplemental security income (SSI) under sections 1602 and 1614(a)(3)(A) of the Social Security Act. "Disability" is defined as the inability to engage in substantial gainful activity by reason of a medically determinable impairment(s) that can be expected to result in death or last for a continuous period of not less than 12 months.

The specific issues are whether the claimant has been "disabled" since the alleged onset date, and, if so, when the disability commenced and its duration, as well as whether the disability insured status requirements of the Social Security Act are met for purposes of entitlement.

### <u>CONCLUSION</u>

I conclude that the claimant is disabled within the meaning of the Social Security Act as alleged.

See Next Page

## ANALYSIS

The record reflects that the claimant has not engaged in substantial gainful activity since the alleged onset date. The record contains ample evidence regarding the claimant's impairments, symptoms and limitations. On June 12, 2003, Dr. Larry W. Epperson, neurologist, stated that the claimant was initially seen by him on May 8, 2003. During his current examination, she presented with complaints of right leg pain and history of fibromyalgia. Dr. Epperson noted that a lumbosacral spine revealed L4-L5 spinal stenosis with facet hypertrophy and mild spinal stenosis at L3-L5. He stated that nerve conduction studies revealed findings compatible with lumbar radiculopathy. He stated that the claimant has two areas of spinal stenosis secondary to disc protrusion and arthritis of her lumbar spine and L4-L5 disc protrusion and facet arthritis compressing the right L5 nerve root, which innervates her right leg. Dr. Epperson stated that her spinal stenosis combined with fibromyalgia has been quite disabling. He stated that she gets very little sleep because of the pain from the lumbar spine and fibromyalgia. He stated that she already has atrophy of the muscle in the right lower leg, due to lumbar disc disease. He further stated that work place stress will only exacerbate her medical problems.

Dr. James T. Jakes, rheumatologist, has treated the claimant since 1998. He has treated her primarily for fibromyalgia and depression. On March 26, 2004, she presented with complaints of right elbow pain, pain with gripping, and chronic neck, shoulder and upper and lower back pain. An EMG suggested radiculitis. She was diagnosed with fibromyalgia, right lateral epicondylitis, carpal tunnel syndrome and lumbar radiculitis. In writing a letter on July 23, 2004, Dr. Jakes stated that the claimant has fibromyalgia and degenerative disc disease of the lumbar spine with radiculitis. He stated that she suffers from significant pain in her neck, shoulder and upper back. In addition, she appears to suffer from flu-like symptoms of extreme fatigue, recurrent migraine/tension type headaches, tremendous face and jaw pain and irritable bowel syndrome, which are all common in patients with fibromyalgia. The claimant suffers from an impairment in motor skills and cognitive memory and coordination. He stated that her sleep disorder and associated fibromyalgia will exacerbate her underlying disc disease. Dr. Jakes opined that her chronic difficulties interfere with her ability to perform work activities on a sustained basis such as 8 hours a day and/or 40 hours per week. He stated that she has some problems with cognitive functioning secondary to mediation she takes to correct her sleep disturbance and pain. He further described her pain as present to such an extent as to be distracting to the adequate performance of daily activities of work.

Dr. Daniel C. Clark, psychologist, performed a consultative examination of the claimant on June 7, 2004. She was diagnosed with depressive disorder and found to be mildly impaired in her ability to understand, remember and carry out instructions and to respond appropriately to supervision, co-workers and work pressures in a work setting.

In accordance with Social Security Ruling 96-2p, I give controlling weight to the assessments of Drs. Epperson and Jakes that reflect the claimant is unable to sustain work activity at any exertional level on a regular and continuing basis due to chronic pain. These are specialists and treating physicians whose opinion are well supported by his clinical examinations and testing and are not inconsistent with other substantial evidence of record.

See Next Page

The claimant has credibly described having chronic pain that interferes with her ability to perform work activity on a regular and sustained basis. Her description of her limitations is consistent with the evidence of record in its entirety.

Pursuant to Social Security Ruling 96-6p, I have considered and given little evidentiary weight to the opinions of the state medical consultants regarding the claimant's residual functional capacity. These were non-examining consultants whose opinions are contrary to the above-discussed evidence. Moreover, well-supported opinions provided by treating and/or examining sources are accorded greater weight under Eleventh Circuit case law and federal regulations.

Upon consideration of the record, I find that the claimant has severe impairments, including lumbosacral spine revealed L4-L5 spinal stenosis with facet hypertrophy, mild spinal stenosis at L3-L5, fibromyalgia, right lateral epicondylitis, carpal tunnel syndrome, lumbar radiculitis and depressive disorder. Although she does not have an impairment or combination of impairments that meets or equals in severity one set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1, the evidence demonstrates that the claimant has been unable to perform basic work activities on a regular and continuing basis at a sedentary exertional level in a competitive environment since the alleged onset date.[1] Pursuant to Social Security Rulings 96-8p and 96-9p, I find that the claimant is unable to return to any past relevant work, and the occupational base is so severely eroded that there are no other jobs existing in significant numbers in the national economy that she can perform.[2] Thus, the claimant has been disabled within the meaning of the Social Security Act since the alleged onset date.

### FINDINGS

On consideration of the record, I find:

1.  The claimant met the insured status requirements of the Social Security Act as of the alleged onset date.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset date.

3.  The claimant has "severe" impairments, including lumbosacral spine revealed L4-L5 spinal stenosis with facet hypertrophy, mild spinal stenosis at L3-L5, fibromyalgia, right lateral epicondylitis, carpal tunnel syndrome, lumbar radiculitis and depressive disorder.

---

[1] A "regular and continuing basis" means eight hours a day for five days a week or an equivalent work schedule (Social Security Ruling 96-8p).

[2] The ability to work eight hours a day for five days a week is not always required when evaluating an individual's ability to do past relevant work, but this claimant has no past relevant work that was substantial gainful activity performed as part-time, sedentary work. Thus, she is unable to return to any past relevant work as she cannot work at a sedentary exertional level on a regular and continuing basis (Social Security Ruling 96-8p).

See Next Page

4.  The claimant's impairments, considered individually and in combination, do not meet or equal in severity any impairment set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  The claimant's allegations of pain and functional limitations are credible.

6.  The claimant is unable to perform basic work activities on a regular and continuing basis at a sedentary exertional level in a competitive environment.

7.  The claimant cannot perform past relevant work.

8.  Pursuant to Social Security Rulings 96-8p and 96-9p, the claimant does not have the residual functional capacity to perform jobs that exist in significant numbers in the national economy.

9.  The claimant is disabled within the meaning of the Social Security Act.


## DECISION

Based on the disability application filed on March 19, 2004, the claimant is entitled to a period of disability commencing June 13, 2003, and to disability insurance benefits under sections 216(i) and 223 of the Social Security Act, and the disability has continued at least through the date of this decision.

Based on the SSI application protectively filed on February 26, 2004, the claimant has been disabled since June 13, 2003, under sections 1602 and 1614(a)(3)(A) of the Social Security Act, and the disability has continued through the date of this decision.

The Social Security Administration must still determine whether the claimant meets the income, resources and other eligibility requirements for SSI, and if she is eligible, the amount and the month(s) for which she will receive payment. The claimant will receive a notice from another office of the Social Security Administration when that office makes those determinations.


Michael D. Anderson
Administrative Law Judge


SEP 0 1 2004
Date

SOCIAL SECURITY ADMINISTRATION   *FJØDT1/2-26-04*

Form Approved
OMB No. 0960-0579

## DISABILITY REPORT ADULT

**For SSA Use Only**
Do not write in this box.

Related SSN _____

Number Holder _____

| SECTION 1- INFORMATION ABOUT THE DISABLED PERSON |
|---|

**A. NAME** *(First, Middle Initial, Last)*

Linda L Beard

**B. SOCIAL SECURITY NUMBER**

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

**C. DAYTIME TELEPHONE NUMBER** *(If you have no number where you can be reached, give us a daytime number where we can leave a message for you.)*

334 - 409-9436

Area Code    Number    ☑ Your Number    ☐ Message Number    ☐ None

**D.** Give the name of a **friend or relative** that we can contact (other than your doctors) **who knows about your illnesses, injuries or conditions** and can help you with your claim.

NAME _____  RELATIONSHIP _____

ADDRESS _____

*(Number, Street, Apt. No.(If any), P.O. Box, or Rural Route)*

| City | State | ZIP | DAYTIME PHONE | Area Code | Number |
|---|---|---|---|---|---|

**E.** What is your **height** without shoes?   5 feet  4 inches

**F.** What is your **weight** without shoes?   128 pounds

**G.** Do you have a **medical assistance card**? (For Example, Medicaid or Medi-Cal) If "YES," show the **number** here: _____   ☐ YES  ☑ NO

**H.** Can you **speak English**?  ☑ YES  ☐ NO   If "NO," what languages can you speak? _____

If you **cannot speak English**, is there someone we may contact who speaks English and will give you messages? ☐ YES  ☐ NO *(If "YES," is this the same person as in "D" above? If it is, show "SAME" below, if not complete below)*

NAME _____  RELATIONSHIP _____

ADDRESS _____

*(Number, Street, Apt. No.(If any), P.O. Box, or Rural Route)*

| City | State | ZIP | DAYTIME PHONE | Area Code | Number |
|---|---|---|---|---|---|

**I.** Can you **read English**? ☑ YES  ☐ NO   **J.** Can you **write more than your name in English**?  ☑ YES  ☐ NO

FORM SSA-3368-BK (6-2003) EF (6-2003)  Destroy Prior Editions

PAGE 1

## SECTION 2
## YOUR ILLNESSES, INJURIES OR CONDITIONS AND HOW THEY AFFECT YOU

A. What are the **illnesses, injuries or conditions** that limit your ability to work? _____

*Lumbar disc disease and arthritis, Fibromyalgia and associated sleep disorder and scoliosis*

B. How do your illnesses, injuries or conditions limit your ability to work? *The pain and symptoms - (see Remarks - Section 2-C) often requiring strong medications impaired normal day to day functioning. (See Remarks - Section 2-B - cont)*

C. Do your illnesses, injuries or conditions cause you **pain** or **other symptoms?** *(See Remarks Section 2-C)* ☑ YES ☐ NO

D. When did your illnesses, injuries or conditions **first bother you?** *See Remarks Section 2-D*

| Month | Day | Year |
|-------|-----|------|
| 3 | 5 | 03 |

E. When did you become **unable to work** because of your illnesses, injuries or conditions?

| Month | Day | Year |
|-------|-----|------|
| 6 | 13 | 03 |

F. Have you **ever worked?**   ☑ YES ☐ NO   *(If "NO," go to Section 4.)*

G. Did you **work at any time** after the date your illnesses, injuries or conditions first bothered you?   ☑ YES ☐ NO

H. If "YES," did your illnesses, injuries or conditions cause you to: *(check all that apply)*

☑ work fewer hours? *(Explain below)*

☑ change your job duties? *(Explain below)*

☑ make any job-related changes such as your attendance, help needed, or employers? *(Explain below)*

*Yes - come in late, or only worked half-day. As condition deteriorated - demoted from Assistant credit manager to collection clerk; Had more and more frequent and extended absences; I was demoted 1st of May.*

I. Are you **working now?**   ☐ YES ☑ NO

If "NO," when did **you stop working?**

| Month | Day | Year |
|-------|-----|------|
| 6 | 13 | 03 |

J. Why did you **stop working?** *Employment was terminated due to frequent full and half day absences and tardiness, caused by illnesses and chronic diseases and impaired work performance*

PAG

*My employer said this disqualified me and I ... with day to day company business.*

## SECTION 3 - INFORMATION ABOUT YOUR WORK

**A. List the kinds of jobs that you have had in the last 15 years that you worked.**

| JOB TITLE (Example: Cook) | TYPE OF BUSINESS (Example: Restaurant) | DATES WORKED (month & year) From | To | HOURS PER DAY | DAYS PER WEEK | RATE OF PAY (Per hour, day, week, month or year) |
|---|---|---|---|---|---|---|
| Asst Credit Mgr | Steel Ind. | 8-02 | 6-03 | 8 | 5 | $27,000 yr |
| Credit/Cust Serv Rep | Electronics & appliance sales | 10-01 | 12-01 | 8 | 5 | $22,000 yr |
| Marketing/Design Consultant | Pillow Mfg | 3-01 | 5-01 | 8 | 5 | $31,000 yr |
| Design Consultant | Furniture | 5-00 | 12-00 | 8 | 5 | $ draw/comm |
| Customer Serv/Sales Rep | Coffee & Internet | 11-98 | 1-00 | 8 | 15 | $ 21,000 y |
| Financial Serv Rep | Mobile Phone Corp | 4-97 | 2-98 | 8 | 5 | $ 20,000 yr |
| Telephone Collector | Attorney | 4-96 | 12-96 | 4 | 5 | $ 18,000 yr |

(SEE REMARKS Section 8-A)

**B. Which job did you do the longest?** Financial Serv Rep - Financial Corp
Furniture Sales - Design Consultant

**C. Describe this job. What did you do all day?** (If you need more space, write in the "Remarks" section.) Performed in store and or on-site selection and sales of furniture and accessories. Coordinated design choices and placement per floor plans etc. Phone calls to better assist customer, wrote up price quote, sales. Handled any problems until complete, maintained customer files, and handled orders from manufactures etc.

**D. In this job, did you:**

| | | |
|---|---|---|
| Use machines, tools or equipment? | ☑ YES | ☐ NO |
| Use technical knowledge or skills? | ☐ YES | ☑ NO |
| Do any writing, complete reports, or perform duties like this? | ☑ YES | ☐ NO |

**E. In this job, how many total hours each day did you:** — This was before became ill

| | | |
|---|---|---|
| Walk? 6-7 | Stoop? (Bend down & forward at waist.) 1-3 | Handle, grab or grasp big objects? 1-3 |
| Stand? 6-7 | Kneel? (Bend legs to rest on knees.) 1-3 | Reach? 1-3 |
| Sit? 1-2 | Crouch? (Bend legs & back down & forward.) 1-2 | Write, type or handle small objects? 1-2 |
| Climb? 0 | Crawl? (Move on hands & knees.) 0 | |

**F. Lifting and Carrying** (Explain what you lifted, how far you carried it, and how often you did this.)
Off, and or during the day - handled lamps, pictures - rarely home accessories - wall paper, books - sometimes chairs - fabrics etc.

**G. Check heaviest weight lifted:**
☐ Less than 10 lbs  ☐ 10 lbs  ☑ 20 lbs  ☐ 50 lbs  ☐ 100 lbs. or more  ☑ Other 8-10 lbs

**H. Check weight frequently lifted:** (By frequently, we mean from 1/3 to 2/3 of the workday.)
☑ Less than 10 lbs  ☐ 10 lbs  ☐ 25 lbs  ☐ 50 lbs. or more  ☑ Other 10-20 lbs

**I. Did you supervise other people in this job?** ☐ YES (Complete items below.)  ☑ NO (If NO, go to J.)
How many people did you supervise? N/A
What part of your time was spent supervising people? N/A
Did you hire and fire employees?  ☐ YES  ☑ NO

**J. Were you a lead worker?**  ☐ YES  ☑ NO

| SECTION 4 - INFORMATION ABOUT YOUR MEDICAL RECORDS |
|---|

A. Have you been seen by a **doctor/hospital/clinic** or anyone else for the illnesses, injuries or conditions that limit your ability to work?  ☑ YES   ☐ NO

B. Have you been seen by a **doctor/hospital/clinic** or anyone else for emotional or mental problems that limit your ability to work?  ☐ YES   ☑ NO

**If you answered "NO" to both of these questions, go to Section 5.**

C. List **other names** you have used on your medical records. _None_

**Tell us who may have medical records or other information about your illnesses, injuries or conditions.**

D. List each **DOCTOR/HMO/THERAPIST/OTHER.** Include your **next appointment.**

**1. NAME** Dr. Larry W. Epperson
Neurology Consultants of Montgomery

| | DATES |
|---|---|
| **STREET ADDRESS** 1722 Pine Street | **FIRST VISIT** 5-8-03 |
| **CITY** Montgomery **STATE** Al **ZIP** 36106 | **LAST SEEN** 6-12-03 |
| **PHONE** 334 834-1300  **PATIENT ID #** (If known) | **NEXT APPOINTMENT** |

**REASONS FOR VISITS** Referred by Dr James Oakes after he mis-diagnosed neuropathy, To determine problem causing severe back pain and pain from severe acute to middle and nerve contractions in legs - particularly night leg.

**WHAT TREATMENT WAS RECEIVED?** Referred to physical therapy and possible surgery. I was unable to complete the physical therapy as cost you and insurance. Have not been back to doctor due to lack of income.

**2. NAME** Dr James F. Oakes
Montgomery Rheumatology Assoc.

| | DATES |
|---|---|
| **STREET ADDRESS** 1429 Narrow Lane Rd | **FIRST VISIT** 6-98 |
| **CITY** Montgomery **STATE** Al **ZIP** 36111-2654 | **LAST SEEN** 4-29-03 |
| **PHONE** 334 284-3105  **PATIENT ID #** (If known) | **NEXT APPOINTMENT** |

**REASONS FOR VISITS** 1st visit - severe pain, fatigue, flu like symptoms, memory loss, impaired concentration - was diagnosed with fibromyalgia. All other appointments between 98 and 2003 were follow ups and problems associated with fibromyalgia / arthritis - medications etc.

**WHAT TREATMENT WAS RECEIVED?** Medications, instructions and description of fibromyalgia - how to handle and manage pain and symptoms etc. I was unable unable to work for 6 months.

## SECTION 4-INFORMATION ABOUT YOUR MEDICAL RECORDS

### DOCTOR/HMO/THERAPIST/OTHER

3. **NAME** *Montgomery East Family Practice*
   *Dr Louie Tolentino*

**STREET ADDRESS** *309 St Lukas Drive*

**CITY** *Montgomery*   **STATE** *AL*   **ZIP** *36117*

**PHONE** *334  272-0066*
Area Code    Phone Number

**PATIENT ID #** (If known) *29979 - 310712-5*

**DATES**

**FIRST VISIT** *12-97*

**LAST SEEN** *12-10-02*

**NEXT APPOINTMENT** *as needed*

*also
saw him
for
strep
throat
on
9/27/02*

**REASONS** FOR VISITS *Primary Care Physician - She referred me
to Dr Jakes for the fibromyalgia. Visits for throat
infections - sinus - various other infections - After etc
Eye pain - swelling + irritation w/face pain on 12-10-0.*

**WHAT TREATMENT WAS RECEIVED?** *Antibiotics, injections - bed rest
etc - depending on particular illness, Had more with
constant throat infections from 5-2000 - 9-2000 - Referred*

*(see remarks)*  If you need more space, use **Remarks, Section 9.** *to Ear, Nose &
THROAT
SPECIALIST*

E. List each **HOSPITAL/CLINIC.** Include your **next appointment.**

| 1. | HOSPITAL/CLINIC | | TYPE OF VISIT | DATES | |
|---|---|---|---|---|---|
| **NAME** | | | ☐ **INPATIENT STAYS** (Stayed at least overnight) | DATE IN | DATE OUT |
| **STREET ADDRESS** | | | ☐ **OUTPATIENT VISITS** (Sent home same day) | DATE FIRST VISIT | DATE LAST VISIT |
| **CITY** | **STATE** | **ZIP** | ☐ **EMERGENCY ROOM VISITS** | DATE OF VISITS | |
| **PHONE** Area Code    Phone Number | | | | | |

Next **appointment** _____  Your hospital/clinic **number** _____

**Reasons** for visits _____

_____

What **treatment** did you receive? _____

_____

What **doctors** do you see at this hospital/clinic on a regular basis? _____

_____

## SECTION 4-INFORMATION ABOUT YOUR MEDICAL RECORDS

### HOSPITAL/CLINIC

2.

| HOSPITAL/CLINIC | TYPE OF VISIT | DATES | |
|---|---|---|---|
| NAME | ☐ **INPATIENT STAYS** (Stayed at least overnight) | DATE IN | DATE OUT |
| STREET ADDRESS | ☐ **OUTPATIENT VISITS** (Sent home same day) | DATE FIRST VISIT | DATE LAST VISIT |
| CITY    STATE    ZIP | ☐ **EMERGENCY ROOM VISITS** | DATE OF VISITS | |
| PHONE _____ Area Code   Phone Number | | | |

Next **appointment** _____ Your hospital/clinic **number** _____

**Reasons** for visits _____

_____

What **treatment** did you receive? _____

_____

What **doctors** do you see at this hospital/clinic on a regular basis? _____

_____

### If you need more space, use Remarks, Section 9.

F. Does **anyone else have medical records or information** about your illnesses, injuries or conditions (Workers' Compensation, insurance companies, prisons, attorneys, welfare), or are you scheduled to see anyone else?

☐ YES  *(If "YES," complete information below.)*          ☐ NO

| NAME | *Blue Cross Blue Shield of Alabama* | DATES | |
|---|---|---|---|
| STREET ADDRESS | *450 Riverchase Parkway East* | FIRST VISIT | *11-5-02* |
| CITY *Birmingham,* | STATE *Al.* ZIP *35244-2858* | LAST SEEN | *6-12-02* |
| PHONE *1-800 292-8868* Area Code   Phone Number | | NEXT APPOINTMENT | |
| CLAIM NUMBER (If any) | *Contract # PPA4167454444* | | |
| REASONS FOR VISITS | *See attached insurance claim forms for medical treatments 11-5-02 thru 6-12-02* | | |

### If you need more space, use Remarks, Section 9.

FORM **SSA-3368-BK** (6-2003) EF (6-2003)  Destroy Prior Editions

## SECTION 5 - MEDICATIONS

Do you currently take any **medications** for your illnesses, injuries or conditions? ☑ YES

If "YES," please tell us the following: *(Look at your medicine bottles, if necessary.)* ☐ NO

| NAME OF MEDICINE | IF PRESCRIBED, GIVE NAME OF DOCTOR | REASON FOR MEDICINE | SIDE EFFECTS YOU HAVE |
|---|---|---|---|
| Ultram | Drs Jakes & Epperson | Pain | dizziness, weakness |
| Skelaxin | Dr. Jakes | muscle & nerve contractions | occasional stomach upset |
| Flexeril/Tizanidine | Dr Jakes | sleep/muscle relief | drowsiness dizziness |
| Protonix | Dr Jakes | stomach upset + pain | headache, irritability |
| Cortremoxilien? naqne | Dr Epperson | Pain + swelling | none |
| Excedrin Tension Headaches | over-counter | headaches/fatigue | none |

If you need more space, use Remarks, Section 9.

## SECTION 6 - TESTS

Have you had, or will you have, any **medical tests** for illnesses, injuries or conditions?

☑ YES ☐ NO  If "YES," please tell us the following: *(Give approximate dates, if necessary.)*

| KIND OF TEST | WHEN DONE, OR WHEN WILL IT BE DONE? (Month, day, year) | WHERE DONE? (Name of Facility) | WHO SENT YOU FOR THIS TEST? |
|---|---|---|---|
| EKG (HEART TEST) | | | |
| TREADMILL (EXERCISE TEST) | | | |
| CARDIAC CATHETERIZATION | | | |
| BIOPSY--Name of body part | | | |
| HEARING TEST | | | |
| SPEECH/LANGUAGE TEST | | | |
| VISION TEST | | | |
| IQ TESTING | | | |
| EEG (BRAIN WAVE TEST) | | | |
| HIV TEST | | | |
| BLOOD TEST (NOT HIV) yes | 4-18-03 | Dr Jakes office per Lab South | Dr Jakes |
| BREATHING TEST | | | |
| X-RAY--Name of body part | | | |
| MRI/CT SCAN Name of body part BACK | 4-16-03 | East Montgomery Imaging Center | Dr Jakes |

If you have had other tests, list them in Remarks, Section 9.

See other test remarks - Section 9 - Tests)

## SECTION 7-EDUCATION/TRAINING INFORMATION

A. Check the highest grade of **school** completed.

Grade school:                                                          College:

| 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | GED | 1 | 2 | 3 | 4 or mor |
|---|---|---|---|---|---|---|---|---|---|----|----|----|-----|---|---|---|----------|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☒ | ☐ | ☐ |

Approximate **date** completed: _High School 1968 — college 1984_

B. Did you attend **special education** classes?  ☐ YES  ☒ NO  *(If "NO," go to part C)*

> NAME OF SCHOOL _____
>
> ADDRESS _____
>
> *(Number, Street, Apt. No.(if any), P.O. Box or Rural Route)*
>
> _____
> City                State        Zip
>
> DATES ATTENDED _____ TO _____
>
> TYPE OF PROGRAM _____

C. Have you completed any type of **special job training, trade or vocational school?**

☒ YES  ☐ NO  If "YES," what type? _Certified Collector & Interior Design_

Approximate date completed: _1985_ _1986 & 200_

## SECTION 8 - VOCATIONAL REHABILITATION, EMPLOYMENT, or OTHER SUPPORT SERVICES INFORMATION

Are you participating in the Ticket Program or another program of vocational rehabilitation services, employment services or other support services to help you go to work?

☐ YES (Complete the information below)  ☒ NO

> NAME OF ORGANIZATION _____
>
> NAME OF COUNSELOR _____
>
> ADDRESS _____
>
> *(Number, Street, Apt. No.(if any), P.O. Box or Rural Route)*
>
> _____
> City                State        Zip
>
> DAYTIME PHONE NUMBER _____ _____
> Area Code        Number
>
> DATES SEEN _____ TO _____
>
> TYPE OF SERVICES OR
> TESTS PERFORMED _____
> *(IQ, vision, physicals, hearing, workshops, etc.)*

Remarks - Section 9 (additional information)

Section 6 - Tests - (Medical Test cost)

Nerve Test - 4-15-03 - Dr. Reuter Richardson - per Dr. Jo[

Nerve Test - 5-8-03- Dr. Larry Epperson - per Dr. Eppers

Other Test? - 5-8-03 Dr. Epperson - per Dr. Epperso

<u>Section 2-D</u> - (When illnesses (bothered me)

Problems with Fibromyalgia started in 4/1998 diagnosed 6/1998.

Problems with lumbar disc disease started severely with painful contractions on 3-5-03 diagnosed 5-8-03 after a mis-diagnoses in April of 2003. In addition I have had neck back problems since 1982 or 83 when started seeing my chiropractor Dr. Dallas Capistran - 20 years ag[

<u>Section 3-A</u> - (Kinds of jobs continued)

| | | | | | |
|---|---|---|---|---|---|
| Financial Serv. Rep. | financial serv. | 10-95 | 4-96 | 8-5 | $19,000 yr |
| Design Consultant | furniture store | 5-95 | 8-95 | 8-5 | draw/comm |
| Automobile Salesperson | automobile dealership | 12-94 | 4-95 | 8-5 | draw/comm |
| Telephone Collector | credit collection | 9-93 | 5-94 | 8-5 | $18,000 yr |
| Design Consultant | furniture store | 8-91 | 11-93 | 8-5 | draw/comm |
| Asst Manager | shoe store | 1-90 | 8-91 | 8-5 | $18,000 yr |
| Design Consultant | furniture store | 2-89 | 12-90 | 8-5 | draw/comm |

Section 2-C - continued - I have suffered with fatigue and recurrent infections such as (strep, tonsilitis) with flu like symptoms and joint pain - all of adult life. This explains the frequent job change and lapses in employment. Doctors were Dr. Ed Young and Dr. Vaughn Manaka. Said I had chronic fatigue syndrome.

## SECTION 9 - REMARKS

Use this section for any added information you did not show in earlier parts of the form. When you are done with this section (or if you don't have anything to add), be sure to go to the next page and complete the signature block.

continued from (Section 2-B) as required for work. Such as preparing for and getting to work on time. Also the impaired physical abilities including walking, climbing stairs, wrista up & down from chair and any lifting with impaired mental alertness, memory and cognitive skills negatively effected job performance. The susceptibility to infection and other illnesses in addition to the pain and symptoms of the fibromyalgia, arthritis and disc disease caused frequent full and half day absences and tardies for my employer this interfered with day to day management of company business, employers don't understand

continued from (Section 2-C) I suffer with severe acute pain from constant muscle and nerve contractions particularly (often have flu-like symptoms) in the right leg. All over body — burning, sore, aching pain with muscle, joint and chest pain. Also severe fatigue and lack of energy. Inability to get deep level sleep, and wake up several times during the night. Nighttime pain often more severe — wake up feeling tired. Numbness and tingling sensations in arms and hands particularly in the morning. Sensitive to weather changes and cold or damp temperatures. Impaired coordination, and dizziness at times. Stress, anxiety and over-exertion intensifies pain and symptoms. Difficulties functioning normaly or day to day basis particularly in the morning due to lack of sleep, impaired mental alertness and pain. Low immune system causes frequent infections requiring repeated antibiotic prescriptions and often 5 to 7 days of constant bed rest to recover. The lumbar disc disease and arthritis has exacerbated the fibromyalgia pain and symptoms. Often suffer irritable bowel (often feel like have been fatigue or mental fog) (over

I also become upset, anxious and stressed when absent from work — which increases my problems — because employers do not ...

Also for 2-C continued. I have severe pain in upper back, neck and shoulders. Often pain is most severe on right side of body - head to feet. Often have cramping pain and spasms in my feet.

## SECTION 9 - REMARKS

(Section 2-C - continued) The lumbar disc disease has caused permanent muscle spasm, herniated syndrome and chronic migrane/tension type headaches with severe jaw pain. Have severe leg jerking/muscle spasms at night. Also suffer with severe face pain and swelling and the irritated mouth/eyes; The pain is most intense during morning hours of the day, but it is constant and often severe - day & night.

## Section 4 - DOCTORS/HMO

(See Remarks - Section 2-C additional she...)

| | First Visit |
|---|---|
| 1- Central Alabama Ear, Nose & Throat Assoc. | 9 - 2000 |
| 6980 Winton Blount Blvd | Last Visit |
| Mtgy, Al. 36117    334 - 277 - 0484 | 2-24-03 |

Saw Dr. William J. Knox for severe face pain and swelling with flu like symptoms - referred by Pri-Med Originally on 11-27-03 and he diagnosed facial abscess. Saw him again, 2-24-03 - diagnosed flu like symptoms & severe jaw & face pain/fibromyalgia - prescribed 1 week constant bed rest. Saw him in 9-2000 - diagnosed - mono & recurrent throat infections. Treatment is weeks of antibiotics and bed rest for 2-3 weeks - also suffered with very severe fatigue & ach...

| 2- Pri-Med & Taylor Crossing | 334- | Visit - 1-5-03 |
|---|---|---|
| 94 Taylor Rd, Mtgy, Al. 36117 | (272-7639) | Dr Allan Muller |

Visit for infection - received shot & medications, head fatigue & all over pain

| 3- Pri-Med Vaughn Plaza | 334- | Visit 2-23-03 |
|---|---|---|
| 2815 East Blvd | 271-4545 | Dr Patricia Campbell |
| Mtgy, Al 36116 | | |

Visit for severe face pain & swelling - referred to Dr Knox at...

| 4- Dr Rueben Richardson III | 334- | Visit 4-15-03 |
|---|---|---|
| 2025 Normandie Dr | (284-9500) | - Referred by Dr Jakes |
| Mtgy Al. 36111 | Visit for nerve stimulation study | |

| 5- Rehab Associates | 334- | Visits - 5-9-03 thru 5-22-03 |
|---|---|---|
| 1801 Pine St Suite 102 | (262-6161) | Dr Robert Kohn Jr. |
| Mtgy, Al. 36106 | For physical therapy treatments for disc disease per Dr. Epperson | |

| 6- Dr. Dallas Capistron | 334-277-8699 | 1st Visit 1982 or 1983 |
|---|---|---|
| Doctor of Chiropractic | Spinal & Nervous Disorders | |
| 4208 Carmichael Court North, Mtgy, Al. | | |

Visits for adjustments back & neck on 11-5-02, 1-16-03, 3-28-..., 3-31-03 & 5-22-03

| | |
|---|---|
| **Name of person completing this form** (*Please Print*) | **Date Form Completed** (*Month, day, year*) |
| **Address** (*Number and street*) | e-mail address (*optional*) |
| **City** | **State**     **Zip Code** |

FORM SSA-3368-BK (6-2003) EF (6-2003)   Destroy Prior Editions

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LINDA BEARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: |
| v. | ) | |
| | ) | 2:07-CV-790-MNT |
| COLDWATER CREEK, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# DECLARATION OF TARA KESSLAR

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **LINDA BEARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | |
| | ) | **2:07-CV-790-MNT** |
| **COLDWATER CREEK, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### DECLARATION OF TARA KESSLAR

1.    I have been employed by Coldwater Creek, Inc. ("Coldwater Creek" or "Company") since December, 2004 as the Human Resources Director.  In that position, I am involved with all aspects of the human resources department, including but not limited to applicant processing, development of hiring policies and procedures, and the development of employment policies, practices and procedures.  I am involved in maintaining policies and procedures relating to employee job performance, attendance, and job duties.  As a member of Coldwater Creek management, I am also involved and/or informed about the general workings of the Company, including its day to day operations.  As such, I have personal knowledge of the facts set forth in this Declaration.

2.    In general terms, Coldwater Creek has policies regarding employee work schedules, absences and tardiness issues.

3.    Coldwater Creek maintains personnel files for every employee.  As Human Resources Director, I have access to those personnel files and am able to review them as needed.  I have reviewed Linda Beard's personnel file.

4.    Ms. Beard worked with Coldwater Creek in the capacity of a part-time Sales Clerk from June, 2004 to August, 2006.

5.    As a Sales Clerk, Ms. Beard's job duties would have involved, among other things, making sales to customers, displaying merchandise, running the cash register, participating in inventory checks, customer service, and general duties aiding efficient functioning of the store.

6.    Per Coldwater Creek's policy, employees' hours are scheduled during days, evenings and/or weekends based upon business demand, and Coldwater Creek adjusts employee schedules as necessary.

7.    It is an essential element of a Sales Clerk's job to be at work prepared to begin their shift at the time he/she is assigned to be present according to the posted schedule. This is because employee schedules are overlapping, and tardiness and/or absenteeism would cause other employees to work past their schedule, or leave the store functioning with less than needed amount of coverage.

8.    Coldwater Creek's policy on Absences and Tardiness make it clear that excessive amounts of either can lead to an employee's termination.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this the 12 day of May , 2008.

Tara Kesslar