IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LINDA BEARD, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| v. | ) | |
| | ) | **2:07-CV-790-MNT** |
| COLDWATER CREEK, INC., | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

This brief is submitted on behalf of Coldwater Creek, Inc. ("Coldwater Creek") in support of its motion for summary judgment as to the claim of disability discrimination against Coldwater Creek contained in the above-referenced matter. For all of the reasons discussed below, Coldwater Creek is entitled to judgment as a matter of law on the claim in Plaintiff, Linda Beard's ("Beard") Complaint.

## I.  STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

### A.  *Beard's Employment History*

1.  Coldwater Creek hired Beard in June, 2004, as a sales clerk at its Montgomery, Alabama location.  (Beard, Ex. 3).[2]

---

[1] Coldwater Creek presents the facts in the light most favorable to Plaintiff as required for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Coldwater Creek adopts this version of the facts only for purposes of summary judgment.

[2] All references to depositions or declarations will be cited by the deponent's or declarant's name, and will include a page reference and line number, or paragraph number.  Beard gave deposition testimony on two separate occasions, February 1, 2008 and April 1, 2008.  All citations referring to the April 1 deposition will be noted as Beard II.

2.     At the time she was hired, Beard completed a Coldwater Creek New Hire Checklist.  Pursuant to the New Hire Checklist, Beard acknowledged that she not only received a copy of the Coldwater Creek Handbook but she had read and fully understood the policies contained within the handbook.  (Beard p. 72 l. 12- p. 73 l. 8; Exs. 4-5).

3.     At the time Beard was hired, the then Manager, Mary Ralph, allegedly told Beard it would not be a problem for her to get 20-24 hours/week.  Beard claims she rarely got this many hours, and was disappointed with the hours she received.  Most of the part-time employees were disappointed with their hours, because, according to Beard, none of the part-time employees who were hired with Beard received the hours they were told they would get.  However, the store was small and there were a lot of employees. (Beard p. 77 l. 1, p. 79 l. 3 - p. 81 l. 11).

4.     Per Coldwater Creek's policy, employees' hours are scheduled during days, evenings and/or weekends based upon business demand, and Coldwater Creek adjusts employee schedules as necessary.  (Ex. 4, p. 18; Kesslar Dec. ¶ 6).

5.     On Beard's Application for Employment at Coldwater Creek, she indicated that she could not work before 1:00 p.m.  (Beard p. 63 ll. 3-13; Ex. 3).

6.     With the exception of the first week working with Coldwater Creek, Beard was scheduled to work after 1 p.m. as she requested.  Beard testified that she could not work mornings because the medication she was taking at night impacted her coordination and takes time to get out of her system.  Coldwater Creek

accommodated Beard's needs.  (Beard p. 87 l. 18 – p. 88 l. 8; Beard II at p. 104 l. 6 – p. 105 l. 22).

7.    While working at Coldwater Creek, Beard also worked for Outsourcing Services. She began working for them in April 2005.  Beard claims she worked at Outsourcing because she was not getting enough hours or making enough money at Coldwater Creek.  (Beard p. 64 l. 11 – p. 66 l. 2).

8.    Beard worked at Outsourcing from 6:00-10:00 p.m. during the week and sometimes on weekends.   She never had more than 20 hours/week with them. Outsourcing Services paid Beard an hourly wage. There was opportunity for commission but she never made it.  (Beard p. 66 l. 17 – p. 68 l. 2).

9.    Coldwater Creek has a Harassment policy which provides for zero tolerance for all forms of discrimination and/or harassment, including discrimination or harassment based on disability.   This policy is contained in the Employee Handbook reviewed with Beard.  (Ex. 4; Ex. 5 p. 9).

10.    Pursuant to Coldwater Creek's Open Door Policy, Beard understood that the policy was in was place for employees to report problems.  (Beard p. 100 l. 10-15; Ex. 5 p. 25).

11.    Beard's last day working was August 29, 2006.  She was terminated for continuous violation of Coldwater Creek's attendance policy. She has not attempted to get a job since her termination from Coldwater Creek. (Beard p. 35 l. 19-36 l. 2).

### B.     Beard's Health Issues

12.     Beard first applied for disability in 1998. Beard told Dr. Jakes in 1999 that she had been missing work because she was too tired to go to work.   Moreover, Beard told Dr. Jakes that she had left two jobs because she could not go to work because of sore throats.   Beard indicated that she knew she was about to be terminated for being absent from work.  (Beard p. 89 l. 12 – p. 91 l. 23).

13.     Beard sees Dr. Jakes about her fibromyalgia.  Dr. Jakes further did some blood work on Beard for thyroid problems, and suggested that Beard get physical therapy treatment when she had back problems.  (Beard p. 93 l. 13 – p. 94 l. 1).

14.     Although Beard's doctors have suggested that she quit smoking, she has never taken medicine to help her quit smoking.  (Beard p. 92 l. 1-14).

15.     Beard was diagnosed with degenerative disc disease in March or April of 2003.  (Beard p. 32 l. 15-21).

16.     Beard applied for social security disability in March 2004. She was determined to be disabled as of June 2003.   Beard has been on Social Security disability benefits since 2003 and currently collects $875.00 per month.  (Beard p. 36 l. 8 – p. 37 l. 1; Beard p. 60 l. 14-22).

17.     Beard was placed on Social Security benefits because she suffered from degenerative disc disease and fibromyalgia.  (Beard p. 37 l. 23-38 l. 10).

18.     Beard asserts that she receives disability benefits because she cannot work full time or 40 hours per week.  Moreover, Beard testified that she has problems

4

in the morning that make it difficult for her to hold a full time job for the type of work she has experience in. (Beard p. 39 l. 1-15).

19.    Prior to working with Coldwater Creek, Beard had experience working as an Assistant Credit Manager, experience in finance, marketing, interior design, retail and furniture sales. If she wanted to do so, Beard could currently perform the tasks of these jobs. (Beard p. 39 l. 17 – p. 42 l. 13, p. 45 l. 7-18).

20.    Beard has problems with back pain and carpal tunnel. (Beard p. 50 l. 9-15). Beard asserts the reason she has not attempted to return to work is because she has suffered a lot of fatigue, stress and anxiety and she needs to have surgery on her wrists. (Beard p. 50 l. 11 – p. 52 l. 15).

21.    Beard testified that she could work at Outsourcing Services or perform similar work today. (Beard p. 68 l. 3-8). On the other hand, she stated she does not know what job she could do now because of her carpel tunnel and arthritis. (Beard p. 70 l. 18 – p. 71 l. 6).

22.    Beard was diagnosed with breast cancer in May, 2006. She had a lumpectomy performed in June of 2006. (Beard p. 55 l. 5-20, p. 190 l. 20 – p. 191 l. 2). Her radiation treatment for the cancer began on August 7, 2006. (Beard p. 56 l. 10-13).

### C.    Beard's Hours

23.    Beard testified that upon hire, she explained to the hiring individual that she needed to work 24 hours per week because Coldwater Creek would be her only

source of income.  However, she alleges her hours began to get drastically cut around August, 2004. (Beard II p. 9 l. 19 – p. 10 l. 3, p. 10 l. 22 – p. 11 l. 11, p. 13 l. 6-17).

24.    Per Beard's own recollection, however, every other employee's hours were cut right along with hers.  Beard was not singled out for reduced hours.  (Beard II p. 14 l. 2-5, 11-22).

25.    In April, 2005, Beard began working part-time at another job because her hours had not been what she expected at Coldwater Creek. The hours were low for other associates as well.  (Beard II p. 35 l. 20 – p. 36 l. 18, p. 39 l. 11-12).

26.    According to Beard, March, 2006 is when she believes her problems at Coldwater Creek began.  (Beard II p. 48 l. 21– p. 49 l. 2).

27.    Specifically, at the beginning of March, 2006, Beard explained to Kimberly Curry, her Manager, that she was feeling bad and having a lot of pain, and that she needed to schedule some doctor's appointments and get some tests to determine what was wrong with her.  Beard says that this is when she received more hours, instead of getting fewer hours due to her pain.  Then, after her physical therapy began, and she started to feel better, her hours were reduced.  (Beard II p. 22 l. 17- p. 23 l. 12).

28.    Beard claims there were several weeks her hours were cut back to 10 hours per week, and one occasion when she had 5 hours.  However, after she complained to Regional Manager Valerie Lee using Coldwater Creek's Open Door

policy, Ms. Lee arranged so that the 5-hour week was increased to 10 hours.  (Beard II p. 16 l. 2-22).

29.    Around April 17, 2006, Beard's physical therapy ended and she was feeling better.  Beard testified that it did not make sense to her that when she was not feeling well, she had more hours but when she felt better, her hours were cut.  (Beard II p. 23 l. 13-21).  Beard believes that the reduction in her hours was retaliatory because Coldwater Creek did not think she was physically capable of working regular hours.  (Beard II p. 17 l. 6-p. 19 l. 6).

30.    According to the work schedules produced by Beard during her deposition, after completing physical therapy, Beard was scheduled for 15 hours during the week of April 17-22, 2006.  Out of 16 part-time employees only 3 had more hours than Beard did during this week.  (Ex. 39).

31.    The schedules produced by Beard reflect that in the weeks following April 17-22, 2006, Beard and other part-time employees' hours were comparable just as they were for the week immediately following her completion of physical therapy, with the exception of course for any weeks Beard requested to be off work.  (Exs. 41, 44, 48, 49, 50 and 56).

32.    Beard further complains because she was not allowed to work overnight hours on the visual team.  She claims she was told that she would not be allowed to work on the visual team until she produced a release from her doctor indicating that she could perform such work.  Beard believes that Coldwater Creek should have

informed her earlier of the need for a doctor's release so she would have had the opportunity to get a letter before the visual team was assigned.  (Beard II p. 23 l. 22 – p. 24 l. 21).

33.     Beard testified that she does not know whether her co-employees were working more or less hours than her, but she believes that Coldwater Creek made exceptions for certain people.  As an example, she alleges that they created a 3 p.m. – 6 p.m. shift for an employee named Ruth LNU.  However, Beard has no evidence that such a shift was in fact created.  (Beard II p. 26 l. 22 – p. 28 l. 19).

34.     Rather, the schedules reflect that several other employees, including Beard, sometimes worked the 3-6 p.m. shift.  (Exs. 31, 33, 36, 37 and 38).

35.     Beard claims that during physical therapy, she asked to be off three days a week, Monday, Wednesday, and Friday.  On the days she could work, Beard wanted the 1-6 p.m. or 2-6 p.m. shifts, but she alleges management told her that those shifts were not available.  Instead, Beard was working some 3-6 p.m. shifts which did not allow her to get as many hours.  (Beard II p. 29 l. 2 – p. 30 l. 21).

36.     On one of the schedules Beard produced, Beard calculated how many hours other employees were getting compared to her.  Admittedly, per the schedules, there were 2 employees getting more than Beard's 21 hours, but 10 employees getting the same amount or less than Beard.  (Beard II p. 43 l. 10 – p. 44 l. 10; Ex. 25).

37.     On another schedule in 2006, Beard had 49 hours and she complained that this was too many hours for her to work.  After requesting that her hours be cut,

they were cut.  Beard did not believe having this many hours was discriminatory. (Beard II p. 44 l. 16 – p. 46 l. 3, p. 47 l. 14-16; Ex. 26).

38.     Beard notes on one of the schedules that she was on-call and was not given much notice when she was asked to come in to work on one occasion.  Beard did not like working on-call, but conceded that other employees were required to work on-call hours as well.  (Beard II p. 56 l. 21 – p. 58 l. 1; Ex. 36).

39.     On one schedule, Beard noted that while she was working the 3-6 p.m. shift, there were some 1-6 p.m. and 2-6 p.m. shifts available.  Beard believed she should have been given the longer shifts, although acknowledging that other employees were working the 3-6 p.m. shift.  Moreover, although her shift began at 3 p.m., Beard believes it was possible that she still was not getting to work on time. (Beard II p. 58 l. 14 – p. 60 l. 6; Ex. 37).

40.     Beard testified that being on time was an important aspect of the job, and that it was important to Coldwater Creek.  (Beard II p. 63 l. 9-12).

41.     Beard admits that she did not file her Charge of Discrimination until August, 2006, more than five (5) months after the alleged discrimination began. (Beard II p. 20 l. 5-13).

42.     Although Beard's biggest complaint was about her hours, there were times when other employees had fewer hours than her.  Because there were not enough hours for everyone to get the hours they wanted, adjustments to the schedule

affected other employees as well. (Beard II p. 64 l. 17 – p. 65 l. 22, p. 68 l. 19 – p. 69 l. 10).

43.     Beard had surgery on June 26, 2006, but told Curry that she would like to work on June 30th and July 1st.  Beard was upset because she was not automatically scheduled for any hours that week.  Although Beard said she wanted to work these two days, she also told Curry to put someone on-call just in case she would not make it in.  (Beard II p. 78 l. 5 – p. 79 l. 16).  Curry gave her 2-8 p.m. shifts on both days. (Beard II p. 84 l. 7 – p. 85 l. 17; Ex. 49).

44.     Beard noted on one of her schedules, the week beginning August 6, 2006, that Curry was not accommodating her radiation treatments.  Beard had requested three days off for the actual treatments, but asked to work two days that week on the 2-6 p.m. shift.  Curry allowed Beard off, as requested.  Moreover, Curry scheduled her to work a 2-7 p.m. shift on *one* of the days Beard asked to work.  Beard's allegation that Curry failed to accommodate her radiation treatments then is solely based on the fact that she did not schedule Beard to work *both* of the two days she requested.  Beard believed that Curry should have scheduled her off on the days she needed off, and allowed her to work on the days she *wanted* to work, regardless of scheduling concerns for other employees.  (Beard II p. 94 l. 1– p. 96 l. 23; Ex. 56) (Emphasis added).

### D.    *Beard's Stated Availability Compared to Allowed Time Off*

45.    Beard filled out availability sheets while working at Coldwater Creek.  If she said she was not available on a particular day, she was usually not scheduled on that day. (Beard p. 121 l. 10-14).

46.    Beard's March, 2006 Work Availability Sheet indicated the days Beard needed off for doctor's appointments. Beard was given the days off when she said she had a doctor's appointment.  (Beard p. 139 l. 4 – p. 140 l. 14; Ex. 12).

47.    Based on Beard's April Work Availability Sheet, Beard was given off April 11, 18 and 28, 2006 for doctor's appointments.  (Beard p. 140 l. 19 – p. 141 l. 11; Ex. 13).

48.    According to her own testimony, when Beard asked for time off due to doctor's appointment, she always received it.   (Beard p. 141 l. 18 – p. 142 l. 1).

49.    On her May Availability Sheet, Beard requested that she not be scheduled to work more than 2 days in a row.  Beard was never scheduled to work more than 2 days in a row.  (Beard p. 143 l. 6 – p. 144 l. 12; Ex. 14).

50.    Even though Beard was accommodated after making her requests, she still felt she was being discriminated against in May 2006.  (Beard p. 145 l. 7-12).

51.    Again in June, Beard asked not to work more than 2 days in a row and was not given more than 2 days in a row.  (Beard p. 155 l. 16 – p. 156 l. 1; Ex. 15).

52.    When Beard started chemotherapy, she requested that she not be scheduled until 2:00 p.m. or later, instead of the 1 p.m. she had originally requested.

Beard's August, 2006 Availability Sheets reflect that this request was accommodated. (Beard p. 157 l. 8-10, p. 159 l. 23 – p. 160 l. 3, p. 195 l. 5-6; Exs. 17, 18 and 56).

### E.     Beard's History of Tardiness and Attendance Issues

53.     Prior to March or April, 2006, and prior to Beard having to request accommodations for physical therapy and/or radiation treatments, she had a history of being late for work.  (Beard II p. 31 l. 13-21).

54.     Specifically, there were days between December 2005 and March 2006 that Beard was late to work.   Beard testified that she is just a person that tends to run late.  She testified that running 5 minutes late has nothing to do with her disability. However, if she runs significantly late, it is usually because of something physical. (Beard p. 122 l. 12 – p. 123 l. 21).

55.     On December 4, 2005, Beard received a Performance Warning for being late to work.  (Beard p. 94 l. 8-13; Ex. 8).

56.     Beard admitted that she was late to work but blamed it on health issues. (Beard p. 94 l. 19-20, p. 98 l. 2-10).

57.     Five or six days before receiving the December 2005 warning, Beard talked to Curry and told her she knew that recently she had been running significantly late a lot, not the usual 5 or 10 minutes late. Beard asked whether she needed to provide a note from her doctor and Kim said "no."  (Beard p. 98 l. 17 – p. 99 l. 21).

58.     Beard knew that being late was a violation of company policy. However, Beard never called the hot line or took advantage of Coldwater Creek's Open Door policy with regard to this performance warning.  (Beard p. 100 l. 4-9).

59.     Beard received a second Performance Warning in March, 2006.  (Beard p. 101 l. 8-16).

60.     Beard testified that in March, 2006, she was working more hours, and when she could not meet the hours, she received performance warnings.   Beard admitted the warnings were warranted.  (Beard p. 115 l. 1 – p. 116 l. 1).

61.     Beard produced one document where she noted "Warning March 11, 2006. So not fair." The document also reflected a note at the end "I hate that B." Beard testified that she meant she hated that Bitch and was referring to Curry. Beard was upset because she had been given a warning in 2005 for her tardiness issues, and received a second one on March 11, 2006. (Beard II p. 52 l. 19 – p. 54 l. 2; Ex. 33).

62.     Beard, however, testified that she was having trouble getting to work on time.  (Beard p. 116 l. 8-14; Ex. 9).  Even when scheduled to begin work at 3:00 p.m. Beard sometimes did not get to work on time.  (Beard p. 189 l. 22 – p. 190 l. 4).

63.     Beard alleges that when she was well and wanted to work more hours, the hours were not scheduled. When she became sick, she started being assigned more hours. Although Beard believed this to be deliberate, she has no evidence that this was deliberate. (Beard p. 117 l. 11 – p. 118 l. 14).

64.     While Beard does not know what the labor budget or the sales goals were for this store, she understood that the number of hours assigned to part-time employees was based on the projected sales and previous year sales.  (Beard p. 119 l. 10 – p. 120 l. 12).

65.     Beard had surgery in June, 2006, and missed some work due to the surgery.  Beard presented a Return to Work Form from Alabama Surgical Consultants dated June 26, 2006.  This form indicates Beard could return to work when she felt able to return.  Beard returned to work 2-3 days later.   (Beard p. 165 l. 22 – p. 166 l. 17; Ex. 19).

66.     In August, 2006, Beard was out 4 days. She does not know how many times in August she was late.  Curry told Beard she needed to bring doctor excuses for the days she was out sick.  (Beard p. 166 l. 6 – p. 167 l. 6 – p. 169 l. 16).

67.     Beard does not know how many times she was late to work in 2006, but she knows it was more than 3 times per month.  (Beard p. 171 l. 1 – p. 172 l. 10).

### F.     *Beard's Termination*

68.     Kim Curry and Jan DeCosta were present at Beard's termination. DeCosta told Beard she was being terminated because she did not obey the attendance policy.  (Beard p. 170 l. 5-16; Ex. 20).

69.     On correspondence from Montgomery Cancer Center regarding a leave of absence for Beard, Beard wrote "terminated before able to turn in" on this form. No one at Coldwater Creek saw this form.  (Beard p. 57 l. 14 – p. 58 l. 16; Ex. 2).

70.    Beard asserted that Curry was out to get her fired because the two warnings she received for being late to work were during the times she was sick. However, Beard testified that if it was Coldwater Creek's mission to get her to improve on coming to work on time, they should have been writing her up during the times she was late and she was not sick. Beard's testimony implies that she should have been written up more than she actually was. (Beard II p. 99 l. 3 – p. 100 l. 10).

71.    Arriving on time and obeying the attendance policy is an essential element of a sales clerk's responsibilities while working at Coldwater Creek. (Kesslar Dec. ¶ 7).

72.    The Handbook makes clear that employees are expected to be present for work when they are assigned and excessive absenteeism or tardiness can result in termination. (Ex. 5 p. 18; Kesslar Dec. ¶ 8).

73.    Timeliness is an essential element of a sales clerk's job function because employee schedules are overlapping, and tardiness and/or absenteeism would cause other employees to work past their schedule, or leave the store functioning with less than needed amount of coverage. (Kesslar Dec. ¶ 7).

74.    Moreover, Beard conceded that arriving to work on time was essential to her job function. (Beard II p. 63 l. 9-12). She also conceded that she did not perform her duties to the reasonable expectation of her employer. (Beard p. 173 l. 15 – p. 174 l. 11).

75.     Beard testified that her tardiness results, in part, from the problems she has in the morning with her thyroid and the medications she is required to take. Moreover, Beard indicated that her illnesses sometimes affect her memory, but effects on her memory are unplanned and she will not know whether her memory is being affected until it happens.  (Beard II p. 114 l. 9 – p. 116 l. 8).

76.     Beard cannot predict when she will have to be late to work because of these issues, although she was not scheduled earlier than 1 p.m.  Beard never knows in advance if on a particular day she is going to be okay or not okay.  (Beard II p. 118 l. 7 – p. 120 l. 20).

77.     Beard agrees that such uncertainty could have an impact on a company's day-to-day business.  (Beard II p. 110 l. 1-14).

## II.  **ARGUMENT**

### A.    **Plaintiff Cannot Establish a *Prima Facie* Case Under the ADA.**

The ADA was enacted to provide "a clear and comprehensive national mandate for the elimination of discrimination against individual with disabilities. " 42 U.S. sec. 12101(b)(1)  To achieve its purpose, the ADA provides that no private employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application, procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment."  *Id*. at sec. 12112(a).

To state a claim under the ADA, Beard must demonstrate that: (1) she has a disability within the meaning of the ADA; (2) she is otherwise a qualified individual; and (3) she suffered an adverse employment action. *See, e.g. Carruthers v. BSA Advertising, Inc*., 357 F.3d 1213, 1215 (11th Cir. 2004). While Coldwater will concede for summary judgment purposes that Ms. Beard can meet her burden with respect to elements one (1) and three (3) – she cannot show that she is otherwise a "qualified individual" under the ADA. To determine "whether a disabled individual is otherwise qualified, the court must take a two-step approach. It must first determine whether the individual is capable of performing the essential functions of her job. If so, then she is otherwise qualified. If not, then the court must determining [sic] whether any reasonable accommodation by the employer would have enabled the employee to perform those functions. *Salmon v. Dade Co. School Board*, 4 F.Supp.2d 1157, 1160 (S.D. Fla. 1998) (citing *Milton v. Scrivner, Inc*., 53 F.3d 1118, 1124 (10th Cir. 1995); *Jackson v. Veterans Admin*., 22 F.3d 277, 281 (11th Cir. 1994); *See also*, *D'Angelo v. ConAgra Foods, Inc*., 422 F.3d 1220, 1229 (11th Cir. 2005); Beard cannot satisfy these inquiries.

### 1.    Beard Could Not Perform the Essential Functions of Her Job.

It is undisputed that Beard has a history of attendance and/or tardiness problems. According to Beard, she is just the kind of person that tends to run late. (Beard p. 123 l. 9-11). This has not changed since Beard's termination from Coldwater Creek. Although counsel scheduled Beard's depositions to begin after

1:00 p.m. to accommodate Beard, she was late for the continuation of her own deposition on April 1, 2008. (Beard II p. 8 l. 2-20). Not only does Beard admit that timeliness was essential to her job, but Coldwater Creek's Human Resources Director indicated that it is an essential element of a Sales Clerk's job to be at work prepared to begin their shift at the time he/she is assigned to be present according to the posted schedule. This is because employee schedules are overlapping, and tardiness and/or absenteeism would cause other employees to work past their schedule, or leave the store functioning with less than needed amount of coverage. (Kesslar Dec. ¶ 7; Beard II p. 63 l. 9-12). The ADA explicitly provides "consideration shall be given to the employer's judgment as to what functions of the job are essential." 42 U.S.C. § 12111(8). Moreover, it is well established that punctuality and regular attendance are essential functions of most jobs. *See Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000) (finding that punctuality was an essential function of plaintiff's job); *Hypes v. First Commerce Corp.*, 134 F.3d 721, 727 (5th Cir. 1998) ("[R]egular attendance is an essential function of most jobs.").

In light of Beard's inability to attend work regularly or on time, she is not a qualified individual with a disability. *See, e.g. Waggoner v. Olin Corp.*, 169 F.3d 481, 484 (7th Cir. 1999) ("[I]n most cases the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability."); *Nesser v. Trans World Airlines. Inc.*, 160 F.3d 442, 445 (8th Cir. 1998) (employee's inability to attend work on regular basis defeated his disability claim);

*Holly v. Clairson Industries LLC*, 18 A.D. Cases 286, 293 (M.D. Fla. 2006) (Plaintiff was not a qualified individual with a disability where his punctuality was sporadic and unpredictable). Beard admits as much in her deposition when testified that she did not perform her duties to the reasonable expectation of her employer. (Beard p. 173 l. 15 – p. 174 l. 11).

Prior to March or April, 2006 and prior to Beard having to request accommodations for physical therapy and/or radiation treatments, Beard had a history of being late for work. (Beard II p. 31 l. 13-21). Beard testified that when she showed up five or 10 minutes late, this tardiness had nothing to do with her alleged disability. However, the more substantial late arrivals were linked to some physical problem Beard might be having at the time. (Beard p. 122 l. 12 – p. 123 l. 21).

Because Beard could not perform the essential functions of her job, her ADA claim fails as a matter of law.

> **2.    Beard Failed to Identify Any Reasonable Accommodation That Would Allow Her to Perform the Essential Functions of Her Job.**

If the individual cannot perform the essential functions of her job, the next determination is whether there is any reasonable accommodation by the employer that would enable that person to perform in the position. *Gary v. Georgia Dept. of Human Resources*, 206 Fed. Appx. 849, 851-52 (11th Cir. 2006); *Lucas v. W.W. Grainger, Inc.,* 257 F. 3d 1249, 1255 (11th Cir. 2001). It is incumbent on the employee to identify a reasonable accommodation. *Boone v. Rumsfeld*, 172 Fed.

Appx. 268, 272 (11th Cir. 2006). Reasonable accommodations can include, *inter alia*, allowing the employee a modified working schedule. *Id*. Beard failed to specifically identify any accommodation that would have allowed her to show up for work on time. Again, she was just a person who tends to be late. (Beard p. 123 l. 9-11).

Beard testified that she could not work mornings because the medication she was taking at night impacted her coordination and takes time to get out of her system. Coldwater Creek accommodated Beard's needs by not scheduling her to work until after 1 p.m. (Beard p. 87 l. 18 – p. 88 l. 8; Beard II at p. 104 l. 6- p. 105 l. 22). Even still, Beard could not show up on time. As a matter of fact, even on the days her shift started at 3 p.m., Beard could not get to work on time. (Beard p. 189 l. 22 – p. 190 l. 3). The Eleventh Circuit, analyzing a fact pattern quite similar to the present, held that failure by the employee to identify any accommodation is fatal to an ADA claim. *See Earl, supra*. In reaching its decision, the Court noted:

> Appellant's psychiatrist testified that there was nothing Appellee could have done to help Appellant arrive at work on time. In addition, Appellant admitted she was unable to arrive at work on time even when scheduled for an afternoon or evening shift. The only "accommodation" Appellant identified was to allow her to clock in at whatever time she arrived, without reprimand, and to permit her to make up the missed time at the end of her shift…A request to arrive at work at any time, without reprimand, would in essence require the Appellee to change the essential functions of Appellant's job, and is thus not a request for a reasonable accommodation.

207 F. 3d at 1367. Beard's own testimony is fatal to her ADA claim. Beard testified that her tardiness results, in part, from the problems she has in the morning with her

thyroid and the medications she is required to take.  Moreover, Beard indicated that her illnesses sometimes affect her memory, but effects on her memory are unplanned and she will not know whether her memory is being affected until it happens.  (Beard II p. 114 l. 9 – p. 116 l. 8).  Beard cannot predict when she will have to be late to work because of these issues, although she was not scheduled earlier than 1 p.m. Beard never knows in advance if on a particular day she is going to be okay or not okay.  (Beard II p. 118 l. 7 – p. 120 l. 20).  Beard agrees that such uncertainty could have an impact on a company's day-to-day business.  (Beard II p. 110 l. 1-14). Therefore, there is nothing Coldwater Creek could have done, nor anything Beard herself identified that would have allowed her to arrive to work on time.

Moreover, with respect to all of the accommodations Beard did request, Coldwater Creek made the accommodations.  Beard indicated that she could not work before 1:00 p.m. (Beard p. 63 l. 10-13; Ex. 3). With the exception of the first week working with Coldwater Creek, Beard was scheduled to work on after 1 p.m. as she requested.  (Beard p. 87 l. 18 – p. 88 l. 8; Beard II at p. 104 l. 6 – p. 105 l. 22).  Beard claims that during physical therapy, she asked to be off three days a week, Monday, Wednesday, and Friday.  She was allowed to take those days off. (Beard II p. 29 l. 2 – p. 30 l. 21). Beard alleges that Coldwater Creek did not accommodate her radiation treatment schedule.  However, the evidence shows that Curry allowed her to be off work as requested to attend her all of her radiation treatments. (Beard II p. 94 l. 1– p. 16; Ex. 56).

In June, Beard asked not to work more than 2 days in a row and was not given more than 2 days in a row. (Beard p. 155 l. 16 – p. 156 l. 1; Ex. 15). Further, when Beard started chemotherapy, she requested that she not be scheduled until 2:00 p.m. or later, instead of the 1 p.m. she had originally requested. This request was accommodated. (Beard p. 157 l. 8-10, p. 159 l. 23 – p. 160 l. 1, p. 195 l. 2-6; Exs. 17, 18 and 56). Lastly, according to the availability sheets she submitted while working at Coldwater Creek, if Beard indicated that she would not be available for whatever reason, she was usually not scheduled on that day. (Beard p. 121 l. 8-14).

Accordingly, although Beard never specifically identified an accommodation that would help her show up to work in a timely manner, all of the evidence in this case demonstrates that Coldwater Creek did everything it could to accommodate the requests Beard *did* make.  Beard simply cannot establish that she is an otherwise qualified individual under the ADA.

**B.**     **Beard Has Failed to Present Any Evidence That Coldwater Creek Discriminated Against Her Based on Her Alleged Disability.**

Even if Beard could establish a *prima facie* case of disability discrimination, which she cannot, Coldwater Creek legitimately terminated Beard's employment for failure to obey the attendance policy.  Beard has not offered a scintilla of evidence that any other variables, disability related or not, impacted this termination decision. (Beard p. 170 l. 5-23; Ex. 20).  Beard makes some claims of discrimination against her while she was employed with Coldwater Creek, but a perusal of the evidence in

this case does not support her assertions.  For instance, Beard claims she rarely got as many hours as she requested, and was disappointed with the hours she received. Most of the part-time employees were disappointed with their hours, because, according to Beard, none of the part-time employees who were hired with Beard received the hours they were told they would get.  (Beard p. 77 l. 1, p. 79 l. 3 – p. 81 l. 11).

Beard claims there were several weeks her hours were cut back to 10 hours per week, and one occasion when she had 5 hours.  However, after she complained to Regional Manager Valerie Lee using Coldwater Creek's Open Door policy, Ms. Lee arranged where the 5-hour week was increased to 10 hours. (Beard II p. 16 l. 2-22). Beard complains after she completed physical therapy in April, 2006, her hours were cut even more.  (Beard II p. 23 l. 13-21).  Yet, according to the work schedules produced by Beard during her deposition, after completing physical therapy, Beard was scheduled for 15 hours during the week of April 17-April 22.  Out of 16 part-time employees only 3 had more hours than Beard did during this week.  (Ex. 39). Beard alleges that Coldwater Creek created a 3 p.m. – 6 p.m. shift for an employee named Ruth LNU.  However, Beard has no evidence that such a shift was in fact created.  (Beard II p. 26 l. 22 – p. 28 l. 19).  Rather, the schedules reflect that several other employees, including Beard, sometimes worked the 3-6 p.m. shift.  (Exs. 31, 33, 36, 37 and 38).  Beard also testified that she was required to work on-call hours. Admittedly, the other employees with whom she worked also had to work on-call

hours.  (Beard p. 199 l. 15-19).  Beard falls far short in establishing that she was treated any differently from her co-employees at all, let alone because of her alleged disability.

## III.    <u>CONCLUSION</u>

In light of the foregoing, Defendant Coldwater Creek, Inc., respectfully requests that summary judgment be granted in its favor and against Plaintiff, Linda Beard, on the claim asserted in her Complaint.

Respectfully submitted,

/s/ Fern H. Singer_____
FERN H. SINGER
Attorney for Defendant

<u>OF COUNSEL</u>:
**BAKER, DONELSON, BEARMAN,**
  **CALDWELL & BERKOWITZ, P.C.**
420 North 20th Street, Suite 1600
Birmingham, Alabama 35203
(205) 244-3801 - Phone
(205) 488-3801 - Fax

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing has been served upon the following counsel of record by electronic filing, this 13th day of May, 2008.

Andy Nelms, Esquire
Anderson Nelms and Associates, L.L.C.
847 South McDonough Street, Ste 104
Montgomery, Alabama 36104

/s/ Fern H. Singer_____
Of Counsel